No. 23-2195

---

IN THE UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

---

HARRY A. BOLDEN,

*Plaintiff - Appellant,*

v.

CAEI, INC., BALTIMORE GAS AND ELECTRIC COMPANY,

*Defendants - Appellees.*

---

On appeal from the United States District Court
for the District of Maryland
No. 1:21-cv-02295

---

**JOINT APPENDIX**

---

Eric Nwaubani, Esq.
Law Group International Chartered
1629 K Street NW Suite 300
Washington DC 20006
Tel: 202-446-8050
Email: enwaubani@yahoo.com

Lindsey A. White
Shawe Rosenthal LLP
One South Street, Suite 1800
Baltimore, MD 21202
Tel: 410-752-8861
Email: white@shawe.com

Veronica Yu Welsh
Shawe Rosenthal LLP
One South Street, Suite 1800
Baltimore, MD 21202
Tel: 410-752-8861
Email: vyw@shawe.com

# Table of Contents

| Exhibit | Description | Date | Vol. | Page |
|---------|-------------|------|------|------|
| 01 | DISTRICT COURT DOCKET REPORT | Through 11/27/2023 | 1 | 1 |
| 02 | [Dkts 11 & 11-1] Exelon Business Services Company, LLC Motion to Dismiss, Memorandum and Supporting Documents | 02/25/2022 | | 7 |
| | Attachments: | | | |
| | [Exhibit A]: Plaintiff's MCCR Charge Sheet [ECF 11-2] | | | 23 |
| | [Exhibit B]: MCCR Information Sheet [ECF 11-3] | | | 26 |
| | [Exhibit C]: CAEI Response re: MCCR Complaint [ECF 11-4] | | | 29 |
| | [Exhibit D]: MCCR Fact Finding Conference Notice [ECF 11-5] | | | 33 |
| | [Exhibit E]: Proposed Settlement of the Admin Complaint tice [ECF 11-6] | | | 38 |
| | [Exhibit F]: MCCR Writing Finding re: Admin Complaint tice [ECF 11-7] | | | 43 |
| 03 | [Dkt 14] Plaintiff's Opposition to Exelon's Motion to Dismiss | 03/14/2022 | | 58 |
| 04 | [Dkt 17 & 18] Court Opinion and Order re: Exelon's Motion to Dismiss | 05/09/2022 | | 68 |
| 05 | [Dkt 37] Amended Complaint | 11/30/2022 | 1 | 72 |

| 06 | [Dkt 39] Defendant BGE's Motion for Summary Judgment and Supporting Documents | 01/30/2023 | 1 | 79 |
|----|----|----|----|----|
| | Attachments: | | | |
| | [Exhibit 2]: Hubbard Declaration [ECF 39-4] | | | 130 |
| | [Exhibit 3] Andrews Declaration [ECF 39-5] | | | 130 |
| | [Exhibit 4] Temporary Worker Agreement [ECF 39-6] | | | 133 |
| | [Exhibit 5] Discrimination Policy [ECF 39-7] | | | 139 |
| | [Exhibit 6] Workplace Violence Policy[ECF 39-8] | | | 142 |
| | [Exhibit 7] Text Message from Plaintiff to Watts [ECF 39-9] | | | 144 |
| | (Exhibit 8] Charge of Discrimination [ECF 39-10] | | | 146 |
| | [Exhibit 9] Plaintiff's Responses to Defendant's Request for Admissions [ECF 39-11] | | | 149 |
| | [Exhibit 10] Notice of Charge of Discrimination [ECF 39-12] | | | 155 |
| | [Exhibit 11] MCCR.0165-.0168, Pre-Determination Settlement Agreement [ECF 39-13] | | | 158 |
| | [Exhibit 12] Duncan Declaration [ECF 39-14] | | | 163 |

| | | | | |
|---|---|---|---|---|
| | [Exhibit 13] MCCR's Written Finding [ECF 39-15] | | | 166 |
| | [Exhibit 14] Notice of Right to Sue [ECF 39-16] | | | 181 |
| | [Exhibit 15] MCCR.0028, Plaintiff Charge Intake Notes [ECF 39-17] | | | 184 |
| | [Exhibit 16] Exhibit 18 to Plaintiff's Deposition, Fact Finding Report [ECF 39-18] | | | 186 |
| 07 | [Dkt 45] Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment; Memorandum of Points and Authorities In Support and Attachments | 03/21/2023 | 1 | 191 |
| | Attachment: | | | |
| | [Exhibit 3]: Plaintiff's Deposition Transcript [ECF 45-3] | | | 214 |
| 08 | [Dkt 48] Defendant's Reply re: Motion for Summary Judgment | 04/24/2023 | 1 | 271 |
| | Attachments: | | | |
| | [Exhibit 1]: Plaintiff's Deposition Transcript [ECF 48-1] | | | 293 |
| | Exhibit 2: Plaintiff's Email to JoAnn Simmons-Holmes [ECF 48-2] | | | 362 |

| | | | | |
|---|---|---|---|---|
| | [Exhibit 3 ]: Hotline Phone Transcript [ECF 48-3] | | | 364 |
| 09 | [Dkt 49 & 50] Court Opinion and Order of Summary Judgment | 09/12/2023 | 1 | 368 |
| 10 | [Dkt 52] Plaintiffs' Motion & Memorandum of Points and Authorities and Supporting Evidence for Reconsideration | 09/26/2023 | 1 | 391 |
| | Attachment: | | | |
| | [Exhibit 3 ]: CAEI's letter to MCCR re : Administrative Complaint [ECF 52-1] | | | 397 |
| 11 | [Dkt 54] Defendant's Opposition to Plaintiff's Motion for Reconsideration | 10/10/2023 | 1 | 400 |
| | Attachments: | | | |
| | [Exhibit A]: Email Exchange Between Counsel re: Discovery [ECF 54-1] | | | 413 |
| | [Exhibit B]: CAEI's Email to MCCR re: Administrative Complaint [ECF 54-2] | | | 416 |
| | [Exhibit C]: Administrative Hearing Fact Finding Conference Notice [ECF 54-3] | | | 419 |
| | [Exhibit D]: CAEI's Employee log [ECF 54-4] | | | 422 |
| | [Exhibit E]: Defendant's Discovery log [ECF 54-5] | | | 425 |

| | | | | |
|---|---|---|---|---|
| | [Exhibit F]: Defendant's Response to Interrogatories [ECF 54-6] | | | 428 |
| **12** | [Dkt 55] Notice of Appeal | | 1 | 436 |
| 13 | [Dkt 60] Court Opinion and Order re: Motion for Reconsideration of Summary Judgment | 11/12/2023 | | 437 |

APPEAL,CLOSED

# U.S. District Court
## District of Maryland (Baltimore)
## CIVIL DOCKET FOR CASE #: 1:21-cv-02295-JRR

Bolden v. CAEI, Inc. et al
Assigned to: Judge Julie Rebecca Rubin
Case in other court: Fourth Circuit Court of Appeals, 23-02195
Cause: 42:2000 Job Discrimination (Race)

Date Filed: 09/07/2021
Date Terminated: 09/12/2023
Jury Demand: Plaintiff
Nature of Suit: 442 Civil Rights: Jobs
Jurisdiction: Federal Question

**Plaintiff**

**Harry A Bolden**
                                        represented by   **George A Rose**
                                        Rose Law Firm LLC
                                        9134 Liberty Rd
                                        Randallstown, MD 21133
                                        14107277555
                                        Fax: 14433200962
                                        Email: grose@roselawfirm.net
                                        *ATTORNEY TO BE NOTICED*

                                        **Joseph David Allen**
                                        Simms Showers LLP
                                        201 International Circle
                                        Suite 230
                                        Hunt Valley, MD 21030
                                        4432908710
                                        Email: jallen@baltimorecountymd.gov
                                        *TERMINATED: 02/03/2023*

V.

**Defendant**

**CAEI, Inc.**

**Defendant**

**Exelon Business Services Company, LLC**
*TERMINATED: 11/23/2022*
                                        represented by   **Lindsey Anne White**
                                        Shawe Rosenthal
                                        One South Street
                                        Suite 1800
                                        Baltimore, MD 21202
                                        14108433472
                                        Fax: 4107528861
                                        Email: law@shawe.com
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

                                        **Veronica Yu Welsh**

**JA1**

Shawe Rosenthal LLP
One South Street
Suite 1800
Batlimore, MD 21202
410-752-1040
Fax: 410-752-8861
Email: vyw@shawe.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Baltimore Gas and Electric Company**          represented by  **Lindsey Anne White**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Veronica Yu Welsh**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/07/2021 | 1 | COMPLAINT against All Defendants ( Filing fee $ 402 receipt number 0416-9479573.), filed by Harry A Bolden.(Allen, Joseph) (Entered: 09/07/2021) |
| 09/07/2021 | 2 | QC NOTICE: 1 Complaint filed by Harry A Bolden was filed incorrectly. ***The following attachments are missing - Civil Cover Sheet and summonses. To correct this problem, file Civil Cover Sheet and summonses using the event Notice (Other) and link Civil Cover Sheet and summonses to 1 .* (ko, Deputy Clerk) (Entered: 09/08/2021) |
| 09/09/2021 | 3 | NOTICE by Harry A Bolden re 1 Complaint *Civil Cover Sheet* (Attachments: # 1 Summons Defendant CAEI, # 2 Summons Defendant Exelon)(Allen, Joseph) (Entered: 09/09/2021) |
| 09/13/2021 | 4 | Summons Issued 21 days as to CAEI, Inc., Exelon Business Services Company, LLC. (dass, Deputy Clerk) (Entered: 09/13/2021) |
| 10/08/2021 |  | Case Reassigned to Judge Catherine C. Blake. Judge Deborah L. Boardman no longer assigned to the case. (kns, Deputy Clerk) (Entered: 10/08/2021) |
| 12/14/2021 | 5 | WAIVER OF SERVICE Returned Executed by Harry A Bolden. Exelon Business Services Company, LLC waiver sent on 12/13/2021, answer due 2/11/2022.(Allen, Joseph) (Entered: 12/14/2021) |
| 12/16/2021 | 6 | SUMMONS Returned Executed by Harry A Bolden. CAEI, Inc. served on 12/14/2021, answer due 1/4/2022.(Allen, Joseph) (Entered: 12/16/2021) |
| 01/24/2022 | 7 | NOTICE of Appearance by Lindsey Anne White on behalf of Exelon Business Services Company, LLC (White, Lindsey) (Entered: 01/24/2022) |
| 01/24/2022 | 8 | NOTICE of Appearance by Veronica Yu Welsh on behalf of Exelon Business Services Company, LLC (Yu Welsh, Veronica) (Entered: 01/24/2022) |
| 02/09/2022 | 9 | Consent MOTION for Extension of Time to File Answer re 1 Complaint by Exelon Business Services Company, LLC (Attachments: # 1 Text of Proposed Order)(White, |

**JA2**

| | | Lindsey) (Entered: 02/09/2022) |
|---|---|---|
| 02/10/2022 | 10 | ORDER granting 9 Consent Motion for Extension of Time to Answer; Exelon Business Services Company, LLC answer due 2/25/2022. Signed by Judge Catherine C. Blake on 2/10/2022. (dass, Deputy Clerk) (Entered: 02/10/2022) |
| 02/25/2022 | 11 | MOTION to Dismiss by Exelon Business Services Company, LLC (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Text of Proposed Order)(White, Lindsey) (Entered: 02/25/2022) |
| 03/14/2022 | 12 | Consent REQUEST for Extension of Time to File *Opposition to Def. MTD* (Allen, Joseph) (Entered: 03/14/2022) |
| 03/14/2022 | 13 | MARGINAL ORDER approving 12 Request for Extension of Time to File Opposition to Def. MTD filed by Harry A Bolden. Signed by Judge Catherine C. Blake on 3/14/2022. (dass, Deputy Clerk) (Entered: 03/14/2022) |
| 03/14/2022 | 14 | RESPONSE in Opposition re 11 MOTION to Dismiss filed by Harry A Bolden.(Allen, Joseph) (Entered: 03/14/2022) |
| 03/28/2022 | 15 | Local Rule 103.3 Disclosure Statement by CAEI, Inc., Exelon Business Services Company, LLC identifying Corporate Parent Exelon Corporation for Exelon Business Services Company, LLC.(White, Lindsey) (Entered: 03/28/2022) |
| 03/28/2022 | 16 | REPLY to Response to Motion re 11 MOTION to Dismiss filed by Exelon Business Services Company, LLC.(White, Lindsey) (Entered: 03/28/2022) |
| 04/29/2022 | | Case Reassigned to Judge Julie Rebecca Rubin. Judge Catherine C. Blake no longer assigned to the case. (kns, Deputy Clerk) (Entered: 04/29/2022) |
| 05/09/2022 | 17 | MEMORANDUM OPINION. Signed by Judge Julie Rebecca Rubin on 5/9/2022. (dass, Deputy Clerk) (Entered: 05/09/2022) |
| 05/09/2022 | 18 | ORDER denying Defendant Exelon Business Services Company, LLC's 11 Motion to Dismiss. Signed by Judge Julie Rebecca Rubin on 5/9/2022. (dass, Deputy Clerk) (Entered: 05/09/2022) |
| 05/23/2022 | 19 | Consent MOTION for Extension of Time to File Answer re 1 Complaint by Exelon Business Services Company, LLC (Attachments: # 1 Text of Proposed Order)(White, Lindsey) (Entered: 05/23/2022) |
| 05/23/2022 | 20 | PAPERLESS ORDER granting 19 Motion for Extension of Time to Answer 1 Complaint; Exelon Business Services Company, LLC answer due 6/6/2022. Signed by Judge Julie Rebecca Rubin on 5/23/2022. (dass, Deputy Clerk) (Entered: 05/23/2022) |
| 06/06/2022 | 21 | Consent MOTION for Extension of Time to File Answer re 1 Complaint by Exelon Business Services Company, LLC (Attachments: # 1 Text of Proposed Order)(White, Lindsey) (Entered: 06/06/2022) |
| 06/07/2022 | 22 | PAPERLESS ORDER granting 21 Consent MOTION for Extension of Time to File Answer 1 Complaint; Exelon Business Services Company, LLC answer due 6/17/2022. Signed by Judge Julie Rebecca Rubin on 6/7/2022. (dass, Deputy Clerk) (Entered: 06/07/2022) |
| 06/17/2022 | 23 | ANSWER to 1 Complaint *and Affirmative Defenses* by Exelon Business Services Company, LLC.(White, Lindsey) (Entered: 06/17/2022) |
| 07/15/2022 | 24 | SCHEDULING ORDER: Status Report due by 11/28/2022. Signed by Judge Julie Rebecca Rubin on 7/15/2022. (dass, Deputy Clerk) (Entered: 07/15/2022) |

**JA3**

| 07/15/2022 | 25 | LETTER ORDER REGARDING THE FILING OF MOTIONS. Signed by Judge Julie Rebecca Rubin on 7/15/2022. (dass, Deputy Clerk) (Entered: 07/15/2022) |
|---|---|---|
| 07/15/2022 | 26 | DISCOVERY ORDER. Signed by Judge Julie Rebecca Rubin on 7/15/2022. (dass, Deputy Clerk) (Entered: 07/15/2022) |
| 07/22/2022 | 27 | PAPERLESS ORDER directing parties to disregard the telephone number in the Scheduling Order for the July 29, 2022 Rule 16 Conference. Parties should instead dial 1.888.278.0296 and enter the access code 7492675. Signed by Judge Julie Rebecca Rubin on 7/22/2022. (dass, Deputy Clerk) (Entered: 07/22/2022) |
| 07/28/2022 | 28 | STATUS REPORT *Initial Joint Status Report* by CAEI, Inc., Exelon Business Services Company, LLC(White, Lindsey) (Entered: 07/28/2022) |
| 07/29/2022 | 29 | PAPERLESS ORDER directing the parties' requested modifications to the Scheduling Order (ECF No. 24) as outlined in the Initial Joint Status Report (ECF No. 28) are approved. Signed by Judge Julie Rebecca Rubin on 7/29/2022. (dass, Deputy Clerk) (Entered: 07/29/2022) |
| 09/02/2022 | 30 | Correspondence re: Consent Motion to Amend Complaint (Allen, Joseph) (Entered: 09/02/2022) |
| 09/27/2022 | 31 | PAPERLESS ORDER: Upon Consideration of Plaintiffs Letter re Consent Motion to Amend Complaint (ECF No. 30 ), it is this 27th day of September 2022, ORDERED that the request contained therein is APPROVED; and it is further ORDERED that Plaintiff shall file the Consent Motion to Amend Original Complaint as described in the letter. Signed by Judge Julie Rebecca Rubin on 9/27/2022. (dass, Deputy Clerk) (Entered: 09/27/2022) |
| 10/14/2022 | 32 | STIPULATION *Protective Order* by Exelon Business Services Company, LLC(White, Lindsey) (Entered: 10/14/2022) |
| 11/02/2022 | 33 | STIPULATED PROTECTIVE ORDER. Signed by Judge Julie Rebecca Rubin on 11/2/2022. (dass, Deputy Clerk) (Entered: 11/03/2022) |
| 11/23/2022 | 34 | CONSENT MOTION to Amend Complaint filed by Harry A Bolden. (Attachments: # 1 Attachment Proposed Amended Complaint, # 2 Attachment Redline Proposed Amended Complaint)(Allen, Joseph) Modified on 11/30/2022 (dass, Deputy Clerk). (Entered: 11/23/2022) |
| 11/28/2022 | 35 | STATUS REPORT *Joint Status Report* by Exelon Business Services Company, LLC(White, Lindsey) (Entered: 11/28/2022) |
| 11/30/2022 | 36 | PAPERLESS ORDER: Upon consideration of the Consent Motion to Amend Complaint (ECF No. 34 ; "the Motion"), it is this 30th day of November 2022, hereby ORDERED that the Motion shall be, and is hereby GRANTED; and further it is ORDERED that the Amended Complaint at Attachment 1 to the Motion to Amend Complaint (ECF No. 34-1) shall be docketed and shall be the operative pleading. Signed by Judge Julie Rebecca Rubin on 11/30/2022. (dass, Deputy Clerk) (Entered: 11/30/2022) |
| 11/30/2022 | 37 | AMENDED COMPLAINT against Baltimore Gas and Electric Company, CAEI, Inc., filed by Harry A Bolden.(dass, Deputy Clerk) (Entered: 11/30/2022) |
| 11/30/2022 | 38 | PAPERLESS ORDER: Upon consideration of the Joint Status Report filed at ECF No. 35 , it is this 30th day of November 2022, hereby, ORDERED that the Dispositive Motion Deadline shall be extended as follows: Defendant's deadline for filing Motion for Summary Judgment January 30, 2023; Plaintiff's Opposition and possible Cross-Motion for Summary Judgment February 21, 2023; Defendant's Reply March 7, 2023; if Plaintiff |

**JA4**

| | | |
|---|---|---|
| | | files a Cross-Motion for Summary Judgment, Plaintiff's Reply March 21, 2023. Signed by Judge Julie Rebecca Rubin on 11/30/2022. (dass, Deputy Clerk) (Entered: 11/30/2022) |
| 01/30/2023 | 39 | MOTION for Summary Judgment by Baltimore Gas and Electric Company (Attachments: # 1 Memorandum in Support, # 2 Attachment Table of Exhibits, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11, # 14 Exhibit 12, # 15 Exhibit 13, # 16 Exhibit 14, # 17 Exhibit 15, # 18 Exhibit 16, # 19 Text of Proposed Order)(White, Lindsey) (Entered: 01/30/2023) |
| 01/30/2023 | 40 | Consent MOTION to Withdraw as Attorney *Joseph D. Allen, Esq.* by Harry A Bolden(Allen, Joseph) (Entered: 01/30/2023) |
| 02/03/2023 | 41 | NOTICE of Appearance by George A Rose on behalf of Harry A Bolden (Rose, George) (Entered: 02/03/2023) |
| 02/03/2023 | 42 | ORDER granting 40 Consent Motion to Withdraw as Attorney. Attorney Joseph David Allen terminated. Signed by Judge Julie Rebecca Rubin on 2/3/2023. (dass, Deputy Clerk) (Entered: 02/03/2023) |
| 02/03/2023 | 43 | ORDER Regarding Correspondence by Plaintiff. Signed by Judge Julie Rebecca Rubin on 2/3/2023. (dass, Deputy Clerk) (Entered: 02/03/2023) |
| 02/03/2023 | 44 | PAPERLESS ORDER: The consent motion at ECF 40 requests that dispositive motions deadlines be adjusted to accommodate Plaintiff in view of Mr. Allens withdrawal as counsel. All requested deadline modifications are approved and the operative scheduling order is therefore modified to this extent. Signed by Judge Julie Rebecca Rubin on 2/3/2023. (dass, Deputy Clerk) (Entered: 02/03/2023) |
| 03/21/2023 | 45 | RESPONSE in Opposition re 39 MOTION for Summary Judgment filed by Harry A Bolden. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Exhibit Bolden's Deposition)(Rose, George) (Entered: 03/21/2023) |
| 03/24/2023 | 46 | Consent MOTION for Extension of Time to File Response/Reply as to 45 Response in Opposition to Motion *for Summary Judgment* by Baltimore Gas and Electric Company (Attachments: # 1 Text of Proposed Order)(Yu Welsh, Veronica) (Entered: 03/24/2023) |
| 03/27/2023 | 47 | PAPERLESS ORDER: Upon consideration of Defendants Consent Motion to Extend Time to Respond Plaintiff's Opposition to Defendant's Motion for Summary Judgment (ECF No. 46 ; "the Motion") it is this 27th day of March 2023, ORDERED that the Motion shall be, and is hereby, GRANTED; and further it is ORDERED that Defendant shall have through and including April 24, 2023 to respond to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment. Signed by Judge Julie Rebecca Rubin on 3/27/2023. (dass, Deputy Clerk) (Entered: 03/27/2023) |
| 04/24/2023 | 48 | REPLY to Response to Motion re 39 MOTION for Summary Judgment filed by Baltimore Gas and Electric Company. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3)(Yu Welsh, Veronica) (Entered: 04/24/2023) |
| 09/12/2023 | 49 | MEMORANDUM OPINION. Signed by Judge Julie Rebecca Rubin on 9/12/2023. (dass, Deputy Clerk) (Entered: 09/12/2023) |
| 09/12/2023 | 50 | ORDER granting 39 Motion for Summary Judgment; entering judgment in favor of Defendant Baltimore Gas and Electric Company; closing case. Signed by Judge Julie Rebecca Rubin on 9/12/2023. (dass, Deputy Clerk) (Entered: 09/12/2023) |
| 09/20/2023 | 51 | BILL OF COSTS by Baltimore Gas and Electric Company (Attachments: # 1 Memorandum in Support, # 2 Exhibit)(White, Lindsey) (Entered: 09/20/2023) |

**JA5**

| 09/26/2023 | 52 | MOTION for Reconsideration re 50 Order on Motion for Summary Judgment by Harry A Bolden (Attachments: # 1 Exhibit, # 2 Text of Proposed Order)(Rose, George) (Entered: 09/26/2023) |
| 10/03/2023 | 53 | RESPONSE in Opposition re 51 Bill of Costs filed by Harry A Bolden. (Attachments: # 1 Affidavit Plaintiff Affidavit, # 2 Text of Proposed Order)(Rose, George) (Entered: 10/03/2023) |
| 10/10/2023 | 54 | RESPONSE in Opposition re 52 MOTION for Reconsideration re 50 Order on Motion for Summary Judgment filed by Baltimore Gas and Electric Company. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C, # 4 Exhibit Exhibit D, # 5 Exhibit Exhibit E, # 6 Exhibit Exhibit F)(Yu Welsh, Veronica) (Entered: 10/10/2023) |
| 10/11/2023 | 55 | NOTICE OF APPEAL as to 50 Order on Motion for Summary Judgment by Harry A Bolden. Filing fee $ 505, receipt number AMDDC-10861768.(Rose, George) (Entered: 10/11/2023) |
| 10/13/2023 | 56 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 55 Notice of Appeal. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices.(slss, Deputy Clerk) (Additional attachment(s) added on 10/20/2023: # 1 Amended Transmittal) (slss, Deputy Clerk). (Entered: 10/13/2023) |
| 10/13/2023 | 57 | USCA Correspondence Re: Pending Motion in USDC re 55 Notice of Appeal. (slss, Deputy Clerk) (Entered: 10/15/2023) |
| 10/18/2023 | 58 | REPLY to Response in Opposition to Bill of Costs re 51 Bill of Costs, 53 Response in Opposition to Bill of Costs filed by Baltimore Gas and Electric Company. (Attachments: # 1 Exhibit Exhibit A)(Yu Welsh, Veronica) (Entered: 10/18/2023) |
| 11/07/2023 | 59 | USCA Correspondence Re: Pending Motion in USDC re 55 Notice of Appeal. (slss, Deputy Clerk) (Entered: 11/08/2023) |
| 11/12/2023 | 60 | ORDER denying 52 Motion for Reconsideration filed by Harry A Bolden. Signed by Judge Julie Rebecca Rubin on 11/12/2023. (dass, Deputy Clerk) (Entered: 11/13/2023) |
| 11/15/2023 | 61 | USCA Case Number 23-2195 for 55 Notice of Appeal filed by Harry A Bolden. Case Manager - Emily Borneisen. (slss, Deputy Clerk) (Entered: 11/16/2023) |
| 11/27/2023 | 62 | PAPERLESS ORDER re: 51 Bill of Costs. Costs are denied without prejudice to filing a new bill of costs within fourteen days of the U.S. Court of Appeals issuing any mandate affirming judgment. See Guidelines for Bills I.F. Signed by Clerk on 11/27/2023 (sj4s, Deputy Clerk) (Entered: 11/27/2023) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/09/2024 19:46:27 | | |
| **PACER Login:** | enwaubani | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cv-02295-JRR |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

**JA6**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| HARRY A. BOLDEN, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Case No.:  1:21-cv-02295-CCB |
| | * | |
| CAEI INC. and | * | |
| EXELON BUSINESS SERVICES | * | |
| COMPANY, LLC, | * | |
| | * | |
| Defendants. | * | |

_____/

### DEFENDANT EXELON BUSINESS SERVICES COMPANY, LLC'S
### <u>MOTION TO DISMISS</u>

Defendant, Exelon Business Services Company, LLC ("Exelon"), hereby moves to dismiss all claims set forth in the Complaint against Exelon, with prejudice, for Plaintiff's failure to exhaust administrative remedies as to Exelon.  In support thereof, Exelon incorporates the attached Memorandum in support of its Motion to Dismiss.

Respectfully submitted,

_____/s/_____
Lindsey A. White (Bar No. 29183)
Veronica Yu Welsh (Bar No. 10024)
SHAWE ROSENTHAL LLP
One South Street, Suite 1800
Baltimore, Maryland 21202
Telephone: (410) 752-1040
Facsimile: (410) 752-8861
white@shawe.com
vyw@shawe.com

*Attorneys for Defendant, Exelon Business Services Company, LLC*

**JA7**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 25, 2022, a copy of the foregoing Defendant's

Motion to Dismiss Complaint, Memorandum in Support, and proposed Order were electronically

filed and thereby served on:

> Joseph D. Allen
> Simms Showers, LLP
> 201 International Circle, Suite 230
> Baltimore, MD 21030
> jdallen@simmsshowers.com
>
> *Attorney for Plaintiff*

                              /s/
                              _____
                              Lindsey A. White

Doc.984333

**JA8**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| HARRY A. BOLDEN, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Case No.:  1:21-cv-02295-CCB |
| | * | |
| CAEI INC. and | * | |
| EXELON BUSINESS SERVICES | * | |
| COMPANY, LLC, | * | |
| | * | |
| Defendants. | * | |
| _____ | / | |

## MEMORANDUM IN SUPPORT OF DEFENDANT
## EXELON BUSINESS SERVICES COMPANY, LLC'S MOTION TO DISMISS

Defendant, Exelon Business Services Company, LLC ("Defendant" or "Exelon")[1] submits this Memorandum in support of its Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  Outrageously, Plaintiff seeks to sue Exelon in addition to his actual employer, Defendant CAEI, Inc. (a contractor for BGE), based on a 2016 Charge of Discrimination ("Charge") filed and served only on CAEI,[2] presumably because CAEI filed for bankruptcy prior to this lawsuit.  As set forth below, Plaintiff failed to exhaust his administrative remedies as to Exelon, which is required to file a lawsuit pursuant to Title VII, because he failed to file a Charge against Exelon.

---

[1]    Exelon Business Services Company, Inc. is not the correct Defendant. The correct Defendant is Baltimore Gas and Electric Company. This Memorandum refers to "Exelon" because that is how Plaintiff's Complaint is styled.

[2]    CAEI filed a voluntary petition for Chapter 7 bankruptcy on April 9, 2018 in the United States Bankruptcy Court in the District of Maryland.  *See CAEI, Inc.*, Bankruptcy Petition 1:18-bk-14656. Plaintiff served CAEI on December 14, 2021. To date, CAEI has not responded to the instant Complaint.

**JA9**

Accordingly, Exelon is not a proper party to this lawsuit and this case should be dismissed with prejudice as to Defendant Exelon.

On September 7, 2021, Plaintiff, Harry A. Bolden, filed a three-count Complaint against Defendants CAEI and Exelon alleging claims of discrimination and harassment based on race and sex, and retaliatory discharge in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). *See* Compl. (ECF No. 1). The Complaint stems from an underlying October 17, 2016 Charge filed with the Maryland Commission on Civil Rights ("MCCR"). *Id.* at ¶ 6; *see also* Ex. A,[3] Charge of Discrimination.[4]

Notably, CAEI was the only respondent named in the attached Charge, and Plaintiff did not file a separate Charge of Discrimination against Exelon. In addition, the factual allegations contained in Plaintiff's Charge do not in any way implicate Exelon in the basis for his claims of discrimination. Mr. Bolden's failure to name Exelon as a respondent to the Charge, which is a prerequisite to filing suit under Title VII, bars him from pursuing this lawsuit against Exelon because he did not exhaust his administrative remedies. Accordingly, Exelon should be dismissed from this lawsuit with prejudice.

## I.    **RELEVANT FACTS**

CAEI is a Maryland corporation located at 9256 Bendix Road, Suite 102, Columbia, Maryland 21045. Compl. at Caption and ¶ 3. This is the same address Plaintiff identified in his

---

[3]    Exhibits A-F, attached hereto, are authentic documents that were produced by MCCR to Exelon on January 31, 2022 in response to Exelon's January 4, 2022 Maryland Public Information Act request. *See* Section II(C), *infra*, discussing the standard relating to exhibits attached to a motion to dismiss.

[4]    EEOC Charges and related documents are considered integral to the Complaint and will not convert a motion to dismiss to one for summary judgment. *See* Section II(C), *infra*.

**JA10**

Charge.  *See* Ex. A.  The Charge also includes CAEI's business telephone number.[5]  *Id.*  In his

lawsuit, Plaintiff alleged that Exelon is a Delaware limited liability company headquartered in

Chicago, Illinois, which does business in Maryland.  Compl. ¶ 4.  The Complaint identifies

Exelon's business address as Rodney Building #104, Corporate Creations Network, LLC, 3411

Silverside Rd., Chicago, IL 60603. *Id.* at Caption.

In this lawsuit, Plaintiff alleged that he "began working for CAEI and Exelon…at a jointly

operated facility in Columbia, Maryland," and that "Plaintiff was supervised on a day-today basis

by both CAEI and Exelon managers, who both exercised control over Plaintiff's conditions of

work, and had the power to hire, fire, discipline, assign and/or promote Plaintiff." *Id.* ¶ 9.[6]

Plaintiff further alleges that "[i]n accordance with Title VII, Plaintiff timely filed his

Charge with the Maryland Commission on Civil Rights ("MCCR") on October 17, 2016." Compl.

¶ 6. Plaintiff alleges that, "on June 10, 2021, a Notice of Right to Sue was issued by the EEOC."

*Id*. ¶ 7.[7]  Without attaching a copy of the Charge or the Notice of Right to Sue, Plaintiff alleges

that he "has properly exhausted his administrative remedies before timely filing suit." *Id*.  The

Charge was issued against Plaintiff's employer, CAEI, only.  *Id.*  Exelon was not a respondent to

---

[5]      Courts can take judicial notice of this fact, which is public knowledge pursuant to a simple internet search.  *See, e.g.*, citing *Phillips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) ("[C]ourts may take judicial notice of matters of public record[.]'").

[6]      If Defendant's Motion to Dismiss is not granted, Defendant will vigorously dispute that it acted as a joint employer with CAEI.

[7]      Plaintiff did not attach a Notice of Right to Sue to his Complaint, nor was a Notice of Right to Sue included in the MCCR file.

**JA11**

the Charge.[8]  On November 3, 2016, the EEOC issued Notice of the Charge of Discrimination to

CAEI Director of Human Resources, Kia Smoot.  Ex. B**.**

On November 21, 2016, CAEI filed a Position Statement setting forth its response to the

Charge. Ex. C. On February 17, 2017, the MCCR held a fact-finding conference, which was

attended by Plaintiff and CAEI representatives, Ms. Smoot, Vice President of Operations,

Raymond Hubbard, and President and Chief Executive Officer, Steven Barrett.  *See* Ex. D, Fact

Finding Conference.[9]  On this same date, both CAEI and Plaintiff also engaged in unsuccessful

pre-determination settlement negotiations.  *See* Ex. E, Pre-Determination Settlement Agreement.[10]

Exelon did not participate in either the fact-finding conference or the pre-determination settlement

negotiations.  *See* Exs. D-E.

On September 23, 2020, after MCCR conducted an investigation of the Charge allegations,

Civil Rights Officer, Jessica Haskins, and Civil Rights Officer, Alesha Bell, issued a Written

Finding of No Probable Cause.  *See* Written Finding, attached as Ex. F. [11]  The Written Finding

identifies Exelon as one of CAEI's clients.  *Id.* p. 3.  The Written Finding further details that

Plaintiff was terminated by Mr. Hubbard, a CAEI employee, for failing to cooperate with CAEI's

management decision to make changes in the office to improve its services to Exelon.  *Id.* at p. 8-

9. The Charge also alleges Plaintiff was terminated by Mr. Hubbard.  *See id.*; *see also* Ex. B.  At

---

[8]     A review of MCCR's file materials, produced by MCCR in response to Exelon's request,
confirms Exelon was not a respondent to the Charge and was not provided notice of the Charge.
*See* Exs. A & B.

[9]     *See* n.2, *supra*.

[10]     *Id.*  This Exhibit has been redacted to omit confidential settlement negotiations between
Plaintiff and CAEI.

[11]     *See* n.2, *supra*.

**JA12**

no time during the five (5) years before the MCCR did Plaintiff file a Charge of Discrimination against Defendant.

## II.    <u>STANDARDS OF REVIEW</u>

### A.  Courts Consider Motions to Dismiss For Failure to Exhaust Administrative Remedies Under Fed. R. Civ. P. 12(b)(6).

"To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to 'state a claim to relief that is plausible on its face.'" *Rowlette v. Lifebridge Health*, No. RDB-18-2706, 2019 WL 5696841, at *2 (D. Md. Nov. 4, 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (internal citations omitted)).  "The mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012).  "To determine whether a complaint has crossed 'the line from conceivable to plausible,' a court must employ a context-specific inquiry, drawing on the court's 'experience and common sense.'" *Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494, 501 (D. Md. 2019) (quoting *Iqbal*, 556 U.S. at 679-80).

Motions raising the issue of a party's failure to exhaust administrative remedies are properly addressed under Rule 12(b)(6).  Although a plaintiff's exhaustion of administrative remedies is a "claim-processing rule," it is "mandatory in the sense that a court must enforce the rule if a party properly raises it." *Fort Bend Cnty. v. Davis*, 139 S. Ct. 1843, 1849 (2019). Dismissal under Fed. R. Civ. P. 12(b)(6) is warranted where a defendant timely asserts an objection related to administrative exhaustion, as Defendant has done here.  *See Montgomery v. Crothall Healthcare, Inc.*, Civil Action No. RDB-20-1154, 2021 WL 75136, at *3 (D. Md. Jan. 8, 2021); *Johnson v. Silver Diner, Inc.*, No. PWG-18-3021, 2019 WL 3717784 at *2 (D. Md. Aug. 7, 2019).

**JA13**

**B. Title VII Requires Plaintiffs to Exhaust Their Administrative Remedies Prior to Filing Suit.**

Title VII permits a person claiming to be aggrieved to file a civil action "**against the respondent named in the charge**." 42 U.S.C. § 2000e-5(f)(1) (emphasis added). "Before a plaintiff may file suit under Title VII, . . . [ ]he is required to file a charge of discrimination with the EEOC." *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009), abrogated by *Fort Bend Cnty. v. Davis*, 139 S. Ct. 1843, 1849 (2019) on other grounds. "The scope of the plaintiff's right to sue is limited to the parties identified and practices complained of in the charge of discrimination." *Id.* "[T]he failure to name a party on a charge filed with the [EEOC] constitutes a failure to exhaust administrative remedies." *Elzey v. Wal-Mart Assocs., Inc.*, No. RDB-11-2151, 2012 WL 3715321, at *3 (D. Md. Aug. 28, 2012) (citing *Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll.*, 848 F.2d 457, 458-59 (4th Cir. 1988)); *see also* 42 U.S.C. § 2000e-5(f)(1)).

Title VII's naming requirement serves dual purposes: (1) to notify the charged party of the asserted violation and (2) to bring the charged party before the agency to facilitate the goal of securing voluntarily compliance with the law. *See, e.g., Bile v. RREMC, LLC*, No. 3:15-cv-51, 2015 WL 3902391, at *2 (E.D. Va. June 24, 2015). "[T]he United States Court of Appeals for the Fourth Circuit has explained that notice to the employer of the alleged discrimination serves as a vital function in remedying an unlawful employment practice because it gives an employer the opportunity to independently investigate and resolve the alleged discriminatory actions. *Phillips v. Goodwill Indus.*, No. CIV.A. GLR-14-3256, 2015 WL 3844089, at *2 (D. Md. June 19, 2015) (citing *Balas v. Huntington Ingalls Indus., Inc*., 711 F.3d 401, 407 (4th Cir. 2013)).

There are two limited exceptions to the statutory requirement that Plaintiff name a defendant in its EEOC Charge prior to filing suit. First, courts have permitted suit to proceed if (1)

6

**JA14**

defendants received fair notice and (2) the EEOC was able to attempt conciliation. *See Elzey*, 2012 WL 3715321, at *3.

The other limited exception to the statutory requirement that a Plaintiff name a defendant in its EEOC Charge prior to file suit is governed by the four-part substantial identity test, which focuses on:

> 1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint;
>
> 2) whether, under the circumstances, the interests of a named [party] are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings;
>
> 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party;
>
> 4) whether the unnamed party had in some way represented to the complainant that its relationship with the complainant is to be through the named party.

*Id.* at *3. The second and third factors are the most important. *Id.*; *see also Phillips*, 2015 WL 3844089, at *2 ("The substantial identity exception allows an unnamed respondent to be sued in a district court action where the 'unnamed defendants are substantially or 'functionally' identical to named ones.'").

**C.  Standard Governing Exhibits Attached to Motion to Dismiss.**

While a court is generally limited to allegations contained in the complaint, courts may also consider documents explicitly incorporated into the complaint by reference and/or "'a document submitted by the movant that was not attached to or expressly incorporated in the complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity.'" *Gray-Koyier v. Gladding Chevrolet, Inc.*, No. RDB-17-1409, 2017 WL 4883144, *2 (D. Md. Oct. 30, 2017). "A document is 'integral' when 'its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Id.* at *5-6 (quoting *Chesapeake*

JA15

*Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011)).

"Considering such documents does not convert a motion to dismiss to one for summary judgment."

*Id.* (citing *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015)); *see*

*also Garrison v. McCormick & Co.*, No. JFM-10-CV-0298, 2010 WL 2651639, *1 at n.2 (D. Md.

June 30, 2010) (citing *Phillips*, 572 F.3d at 180 ("[C]ourts may take judicial notice of matters of

public record, and they may consider documents attached to a motion to dismiss 'so long as they

are integral to the complaint and authentic.'").  Importantly, "[w]hile the court presumes facts

alleged by the plaintiff are true, in a 'conflict between the bare allegations of the complaint and

any exhibit attached . . . , the exhibit prevails.'"  *Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d

781, 788 (D. Md. 2013) (quoting *Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462,

1465 (4th Cir. 1991)).

The Court may consider agency documents at the motion to dismiss stage, such as the

charge of discrimination, the agency's final determination, and any other document in the agency

file, because these documents give rise to Plaintiff's legal right to pursue employment

discrimination claims.  *See, e.g.*, *Allen v. Montgomery Cnty.*, No. 20-3064-PJM, 2021 WL

3023027, *2, n.2 (D. Md. July 16, 2021) (considering the agency's entire file at the motion to

dismiss stage because the file was integral to Plaintiff's complaint and its authenticity was not

disputed); *Cobb v. Towson Univ.*, No. ELH-14-02090, 2015 WL 3654562, *5 (D. Md. June 10,

2015) (considering the EEOC charge and final determination without converting the motion to

dismiss to a motion for summary judgment).

## III.   ARGUMENT

Plaintiff may not maintain his lawsuit against Exelon because he failed to exhaust his

administrative remedies given that he did not file a charge against Exelon.  In addition, Plaintiff

**JA16**

has not pled that either of the limited exceptions apply here. Therefore, Plaintiff's claims against Exelon must be dismissed with prejudice because he failed to exhaust his administrative remedies as to Exelon.

### A.    Plaintiff Did Not Name Exelon in the Charge.

Simply put, Plaintiff did not name Exelon in his October 17, 2016 Charge of Discrimination referenced in Paragraph 6 of his Complaint, or any other charge of discrimination, which bars him from suing Exelon. *See, e.g.*, *Elzey*, 2012 WL 3715321, at *3. Rather, at the administrative level, Plaintiff only pursued a claim against CAEI. *See* Exs. A-F. Perhaps given CAEI's business status, the Complaint is purposefully vague as to the identity of the respondent(s); however, at the motion to dismiss stage, courts may consider charges of discrimination and other administrative charge documents given that they are integral to the Complaint. The MCCR file documents demonstrate that CAEI was the only respondent that was named in the Charge, participated in the investigation of the Charge via the submission of a Position Statement, attended the fact-finding conference, and participated in pre-determination settlement negotiations. *See* Exs. A-E.

Further, to the extent Plaintiff attempts to rely on a joint employer theory to circumvent Title VII's naming requirement (an allegation that Exelon will vigorously dispute should the claims against Exelon survive dismissal), Plaintiff's strategy still fails. In cases where a plaintiff contends two entities are a joint employer, the plaintiff must file charges of discrimination against both entities to satisfy Title VII's administrative requirement. *See Phillips*, 2015 WL 3844089, at *2 (citing EEOC Compliance Manual, § 2-III(B)(1)(a)(iii)(b)). As such, there is no dispute that Plaintiff did not name Exelon as a respondent to the Charge. Accordingly, this lawsuit should be dismissed as to Exelon on that basis.

**JA17**

**B.    Neither Limited Exception to Pursue Litigation Against a Defendant that Was Not Named in the EEOC Charge Applies Here.**

**a.    Exelon Did Not Receive Fair Notice or Opportunity to Conciliate.**

Not only did Plaintiff fail to name Exelon in his Charge, Exelon was never served with a Notice of Charge of Discrimination like named Respondent CAEI was.  *See* Exs. A-B.  Exelon also did not participate in pre-determination settlement discussions. *See* Ex. E.

**b.  The Substantial Identity Test Does Not Apply and Exelon Should Be Dismissed With Prejudice.**

Exelon anticipates that because Plaintiff cannot rebut the fact that Exelon was not a named respondent to the Charge, he will argue that the substantial identity exception applies.  The Court should reject this argument, given that Plaintiff failed to plead this exception, and because the cases that recognize this exception are wholly distinguishable from this case.

**i.  Plaintiff Has Not Pled That the Substantial Identity Exception Applies.**

As a threshold issue, Plaintiff cannot demonstrate that this exception applies given that his Complaint is devoid of any supporting allegations.  Application of the four-factor test to the instant facts compels dismissal of Exelon with prejudice.

First, Plaintiff has not, and cannot, provide a reason for failing to name Exelon as a respondent to the Charge.  By contrast, Plaintiff expressly pled that "he began working for CAEI and Exelon as a Customer Service Representative II at a jointly operated facility" in September 2014.  *See* Compl. ¶ 9.  The Complaint further alleges that Plaintiff was supervised by Exelon managers. *Id.*  Moreover, it is abundantly clear that both Plaintiff and the MCCR investigator were aware of Exelon's role, as it relates to Plaintiff, because documents within MCCR's file, such as the Written Finding, specifically refer to Exelon as CAEI's client.  *See* Ex. F.  Accordingly, Plaintiff cannot set forth any plausible justification for failing to name Exelon in the Charge.

**JA18**

Plaintiff has likewise failed to plead the second and third factors—which are the most important factors. Specifically, as to the second factor, Plaintiff does not allege that the interests of CAEI and Exelon are so similar that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include Exelon in the EEOC proceedings. The Complaint recognizes and concedes that CAEI and Exelon are distinct entities with different mailing addresses. *See* Compl. ¶¶ 3-4. Rather, the only substantive allegation in the Complaint relating to Exelon is that Exelon managers exercised control over Plaintiff's conditions of work and had the power to hire, fire, discipline, assign, and/or promote Plaintiff. Compl. at ¶ 9. As discussed in *Carter v. CPC Logistics, Inc.*, while allegations related to control may be probative of whether an entity is a joint employer, such allegations are not dispositive of whether the two entities are under common control to such extent that they share a "requisite substantial identity." No. CV 3:12-3637-MBS, 2015 WL 5834136, *8 (D.S.C. Sept. 30, 2015). In fact, even Plaintiff's Charge states: "I was terminated by Mr. Hubbard" (a CAEI employee). *See* Ex. B. There are simply no facts alleged that suggest that CAEI and Exelon were "so similar" that Exelon's interests were adequately represented when CAEI was the only respondent named in the underlying Charge.

Third, Exelon is clearly prejudiced by the fact that it was unable to participate in the investigation on its own behalf and it was not included in the fact-finding conference or the pre-determination settlement discussions. Exelon's exclusion from these events—starting with a 2016 Charge of Discrimination—goes against the very purpose of Title VII's naming and notice requirements altogether. Plaintiff has not asserted any allegations to rebut the obvious prejudice to Exelon.

As to the fourth factor, Plaintiff does not plead that the unnamed party (Exelon) had in some way represented to him that its relationship with him should be through CAEI. In fact, he

**JA19**

pleads the opposite. The Complaint states that both CAEI and Exelon managers exercised control

over Plaintiff's conditions of work, and had the power to hire, fire, discipline, assign, and/or

promote Plaintiff. *See* Compl. at ¶ 9.

> **ii. The Cases That Recognize the Substantial Identity Exception Are Distinguishable.**

The substantial identity exception was not created to provide a backdoor for claimants to

sidestep administrative prerequisites. For example, in *Johnson v. Silver Diner, Inc.*, the plaintiff

filed suit against "Silver Diner, Inc." and its subsidiary "Silver Diner Development, LLC." 2019

WL 3717784, at *1. Defendant "Silver Diner, Inc." moved for dismissal because it was not named

in the charge, but rather, plaintiff only named "Silver Diner" and "Silver Diner Development" as

respondents to the charge. *Id.* at *4. Silver Diner Development, LLC conceded that it had received

notice of the Charge. *Id.* The court denied Silver Diner, Inc.'s motion to dismiss in part because

it conceded that it had the same mailing address as Silver Diner Development, LLC, which speaks

to notice. The court also found it compelling that the plaintiff had used two different names on

the EEOC charges, "Silver Diner" and "Silver Diner Development Corporation," neither of which

were the two named defendants. *Id.* The court explained that dismissal was not appropriate based

on "'overly technical concerns.'" *Id*.

In another case, *EEOC v. Bouzianis*, the plaintiff filed a charge against "Double T Diner,"

the name of the restaurant where she worked. No. RDB-06-2520, 2007 WL 2258898, at *1 (D.

Md. Aug. 2, 2007). At the administrative stage, counsel for Double T Diner and Bouzianis, Inc.

stated to the EEOC that the plaintiff was employed by Bouzianis, Inc., not the Double T Diner.

*Id.* In response, the EEOC provided a copy of the charge of discrimination to Bouzianis, Inc., but

the charge of discrimination was not formally amended. *Id.* Despite Bouzianis, Inc. alleging the

claims against it should be dismissed at the administrative level, it voluntarily participated in the

**JA20**

investigation and engaged in the conciliation process. *Id.* at *2. Based on these facts, at the litigation stage, the court denied Bouzianis Inc.'s motion to dismiss and held that the purpose of Title VII's naming requirement was substantially met because Bouzianis, Inc. had fair notice of the charge and voluntarily engaged in the conciliation process. *Id.* at *7. The court also reasoned that it was reasonable for the plaintiff to believe she should list the name of the restaurant where she worked. *Id.* at *6.

*Johnson* and *Bouzianis* are distinguishable from the instant case because here, there is no "overly technical concern" relating to the names of CAEI and Exelon, which are distinct, and Exelon was not afforded the opportunity to participate in the underlying investigation or the conciliation process. In addition, *EEOC v. Bouzianis* did not involve a second defendant. Instead, the Plaintiff named the restaurant, which was a trade name partially owned by Bouzianis, Inc.—which fully participated in the EEOC administrative process, unlike Exelon. Rather, the instant facts are more akin to cases where courts held that the substantial identity exception did **not** apply. For example, in *Phillips*, the court held that "Goodwill Industries of the Chesapeake, Inc." and "Goodwill Industries International Inc." were not "substantially or 'functionally' identical" because the plaintiff failed to set forth any factual allegations to show any affiliation between the two entities, which were separate business entities with different addresses. 2015 WL 3844089, at *2. Accordingly, the *Phillips* court dismissed Goodwill Industries International Inc. with prejudice. *Id.* at *3.

Similarly, in *Elzey*, the plaintiff argued that although he did not name Wal-Mart in the underlying charge and that he was solely employed by Sam's Club, Wal-Mart was a proper defendant because its name appeared on his salary checks and it participated in his claim for unemployment insurance. 2012 WL 3715321, at *3. The court rejected plaintiff's arguments and

**JA21**

dismissed Wal-Mart with prejudice holding that the purposes of the naming requirement were not met where the plaintiff failed to set forth any facts to establish that the unnamed defendant, Wal-Mart, "participated in the EEOC proceedings or that they had constructive knowledge of the charge." *Id.*

The substantial identity exception does not apply, and Plaintiff should not be permitted to circumvent Title VII's exhaustion requirements and continue to pursue any claims against Exelon.

## IV.    CONCLUSION

Put simply, Plaintiff did not name Exelon in the underlying Charge and there is no exception that applies. Accordingly, Plaintiff did not exhaust his administrative remedies as to Exelon. To permit Plaintiff to proceed with his claims against Exelon would frustrate the purpose of Title VII's requirements. For the foregoing reasons, Exelon respectfully requests that this Court grant this Motion to Dismiss and dismiss Exelon with prejudice.

Respectfully submitted,

_____/s/_____
Lindsey A. White (Bar No. 29183)
Veronica Yu Welsh (Bar No. 10024)
SHAWE ROSENTHAL LLP
One South Street, Suite 1800
Baltimore, Maryland 21202
Telephone: (410) 752-1040
Facsimile: (410) 752-8861
white@shawe.com
vyw@shawe.com

*Attorneys for Defendant, Exelon Business Services Company, LLC*

14

**JA22**

# Exhibit A

# Exhibit A

**JA23**

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | [X] FEPA <br> [ ] EEOC | 1611-0734 <br> 12F-2017-00041 |

| Maryland Commission on Civil Rights | and EEOC |
|---|---|

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| Mr. Harry Bolden | (410) 967-6723 | 10-09-1963 |

| Street Address | City, State and ZIP Code |
|---|---|
| 604 Aldershot Road | Baltimore, MD 21229 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| CAEI, Inc. | Over 500 | (443) 319-5381 |

| Street Address | City, State and ZIP Code |
|---|---|
| 9256 Bendix Road, Suite 102 | Columbia, MD 21045 |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box (es).)*

[X] RACE  [ ] COLOR  [X] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN

[X] RETALIATION  [ ] AGE  [ ] DISABILITY  [ ] GENETIC INFORMATION

[ ] OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE

| Earliest | Latest |
|---|---|
| 11-15-2015 | 02-11-2016 |

[ ] CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

COMPLAINANT CONTACTED MARYLAND COMMISSION ON CIVIL RIGHTS ON 06-28-2016

ISSUES: TERMS AND CONDITIONS, DISCIPLINE, TERMINATION, PROMOTION

I believe that I have been discriminated against on the basis of my sex, male, race, African American, and retaliated against for the following reasons:

I was hired on or about September 15, 2014 in the position, Billing Specialist, IV. My immediate supervisor was Ms. Angelique Watts, Manager. My job performance was excellent.

On or about November 15, 2015, Ms. Watts and Ms. Khadijah Webster, Manager, falsely accused me of violating the employee conduct policy relative to logging in and out of my computer. I am aware of female employees, Ms. Robin Roden and Ms. Nicole Russ, Billing Clerks/Trainers who violated employee conduct rules relative to spending appropriate time on the telephone to address customer complaints, but did not receive a verbal reprimand for this violation.

On or about November 26, 2015, Mr. Raymond Hubbard, Vice President, requested that I meet with him to discuss promotional opportunities. He offered me the position, Supervisor, Financial Solutions. However, on or about November 28, 2015, Mr. Hubbard announced that Ms. Watts was selected to fill the

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. <br> SIGNATURE OF COMPLAINANT |
| 10-17-2016 *Date*     *Harry Bolden* *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE |

**JA24**

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| X  FEPA | 1611-0734 |
| EEOC | 12F-2017-00041 |

| Maryland Commission on Civil Rights | and EEOC |
|---|---|

*State or local Agency, if any*

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

position. I am more qualified and meet the requirements of this position.    Mr. Hubbard made this statement to me in the meeting.

On or about December 7, 2015, Ms. Watts requested that I serve food to over twenty (20) employees during our potluck dinner. I am aware that Ms. Watts did not request that any other employee serve food at the potluck. For example, this request was not placed upon Mr. Robert Haughie (Caucasian) and Ms. Jessica Robinson (female), Billing Specialists. Following the dinner, she gave me a verbal reprimand for not spending the required time on the telephone on this date.

On or about January 15, 2016, I filed a report with the Human Resources Department complaining about workplace harassment and unfair conditions of employment.

On or about February 11, 2016, I was terminated by Mr. Hubbard. The reason given for my termination was "lack of integrity."

I believe that my termination was an act of retaliation because I engaged in the protected activity of reporting workplace harassment and unfair conditions of employment.

I solemnly affirm under the penalty of perjury that the contents of the foregoing paper are true to the best of my knowledge, information, and belief.

| MCCR SUPERVISOR APPROVAL | DATE  11/1/16  TJ |
|---|---|

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| *10-17-2016* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |
| Date            Charging Party Signature | |

**JA25**

# Exhibit B

# Exhibit B

**JA26**

EEOC FORM 131-A (11/09)

## U.S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| Ms. Kia Smoot<br>Director of Human Resources<br>CAEI, INC.<br>9256 Bendix Road, Suite 102<br>Columbia, MD 21045 | **Harry Bolden** |
| | THIS PERSON *(check one or both)* |
| | [X] Claims To Be Aggrieved |
| | [ ] Is Filing on Behalf of Other(s) |
| | EEOC CHARGE NO.<br>**12F-2017-00041** |
| | FEPA CHARGE NO.<br>**1611-0734** |

**NOTICE OF CHARGE OF DISCRIMINATION** IN JURISDICTION WHERE A FEP AGENCY WILL INITIALLY PROCESS
*(See the enclosed for additional information)*

THIS IS NOTICE THAT A CHARGE OF EMPLOYMENT DISCRIMINATION UNDER

[X] Title VII of the Civil Rights Act (Title VII)  [ ] The Equal Pay Act (EPA)  [ ] The Americans with Disabilities Act (ADA)

[ ] The Age Discrimination in Employment Act (ADEA)  [ ] The Genetic Information Nondiscrimination Act (GINA)

HAS BEEN RECEIVED BY

[ ] The EEOC and sent for initial processing to _____ .

*(FEP Agency)*

[X] The **Maryland Commission on Civil Rights**                    and sent to EEOC for dual filing purposes.

*(FEP Agency)*

While EEOC has jurisdiction (upon expiration of any deferral requirement if this is a Title VII, ADA or GINA charge) to investigate this charge, EEOC may suspend its investigation and await the issuance of the Agency's final findings and orders. These findings and orders will be given weight by EEOC in making its own determination as to whether reasonable cause exists to believe that discrimination has occurred.

You are therefore encouraged to cooperate fully with the Agency. All facts and evidence provided by you to the Agency will be considered by EEOC when it reviews the Agency's final findings and orders. In many cases EEOC will take no further action, thereby avoiding the necessity of an investigation by both the Agency and EEOC. This likelihood is increased by your active cooperation with the Agency.

As a party to the charge, you may request that EEOC review the final findings and orders of the above-named Agency. For such a request to be honored, you must notify EEOC in writing within 15 days of your receipt of the Agency's final decision and order. If the Agency terminates its proceedings without issuing a final finding and order, you will be contacted further by EEOC. Regardless of whether the Agency or EEOC processes the charge, the Recordkeeping and Non-Retaliation provisions of the statutes as explained in the enclosed information sheet apply.

For further correspondence on this matter, please use the charge number(s) shown above.

Enclosure(s): Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[X] Race  [ ] Color  [X] Sex  [ ] Religion  [ ] National Origin  [ ] Age  [ ] Disability  [X] Retaliation  [ ] Genetic Information  [ ] Other

See enclosed copy of charge of discrimination.

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| November 3, 2016 | Spencer H. Lewis, JR,<br>District Director | |

**JA27**

*EnClosure with EEOC*
*Form 131-A (11/09)*

## INFORMATION ON CHARGES OF DISCRIMINATION

### EEOC RULES AND REGULATIONS

Section 1601.15 of EEOC's regulations provides that persons or organizations charged with employment discrimination may submit a statement of position or evidence regarding the issues covered by this charge.

EEOC's recordkeeping and reporting requirements are found at Title 29, Code of Federal Regulations (29 CFR): 29 CFR Part 1602 (see particularly Sec. 1602.14 below) for Title VII and the ADA; 29 CFR Part 1620 for the EPA; and 29 CFR Part 1627, for the ADEA. These regulations generally require respondents to preserve payroll and personnel records relevant to a charge of discrimination until disposition of the charge or litigation relating to the charge. (For ADEA charges, this notice is the written requirement described in Part 1627, Sec. 1627.3(b)(3), .4(a)(2) or .5(c), for respondents to preserve records relevant to the charge – the records to be retained, and for how long, are as described in Sec. 1602.14, as set out below). Parts 1602, 1620 and 1627 also prescribe record retention periods – generally, three years for basic payroll records and one year for personnel records. Questions about retention periods and the types of records to be retained should be resolved by referring to the regulations.

**Section 1602.14   Preservation of records made or kept.**  . . . . Where a charge ... has been filed, or an action brought by the Commission or the Attorney General, against an employer under Title VII or the ADA, the respondent ... shall preserve all personnel records relevant to the charge or the action until final disposition of the charge or action. The term *personnel records relevant to the charge*, for example, would include personnel or employment records relating to the aggrieved person and to all other aggrieved employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates or the same position as that for which the aggrieved person applied and was rejected. The date of *final disposition of the charge or the action* means the date of expiration of the statutory period within which the aggrieved person may bring [a lawsuit] or, where an action is brought against an employer either by the aggrieved person, the Commission, or the Attorney General, the date on which such litigation is terminated.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Section 704(a) of Title VII, Section 207(f) of GINA, Section 4(d) of the ADEA, and Section 503(a) of the ADA provide that it is an unlawful employment practice for an employer to discriminate against present or former employees or job applicants, for an employment agency to discriminate against any individual, or for a union to discriminate against its members or applicants for membership, because they have opposed any practice made an unlawful employment practice by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the statutes. The Equal Pay Act contains similar provisions. Additionally, Section 503(b) of the ADA prohibits coercion, intimidation, threats, or interference with anyone because they have exercised or enjoyed, or aided or encouraged others in their exercise or enjoyment, of rights under the Act.

Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made. Please note that the Civil Rights Act of 1991 provides substantial additional monetary provisions to remedy instances of retaliation or other discrimination, including, for example, to remedy the emotional harm caused by on-the-job harassment.

### NOTICE REGARDING REPRESENTATION BY ATTORNEYS

Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you. If you do retain an attorney, please give us your attorney's name, address and phone number, and ask your attorney to write us confirming such representation.

**JA28**

# Exhibit C

# Exhibit C

**CAEI, INC.**    Application Management
Enterprise Management
Infrastructure Management

November 21, 2016

RECEIVED

NOV 28 2016

Maryland Commission on Civil Rights

State of Maryland
Commission on Civil Rights
Ms. JoAnn Simmons-Holmes
William Donald Schaefer Tower
6 St. Paul Street – 9th Floor
Baltimore, Maryland 21202

RE: Harry Bolden vs CAEI, Inc.
MCCR Charge Number: 1611-0734
EEOC/HUD Number: 12F-2017-00041

Dear Ms. Simmons-Holmes:

This is in response to Mr. Harry Bolden's Charge of Discrimination against CAEI, Inc. CAEI, Inc is a minor-owned business in the state of Maryland. We currently have between 50 and 100 employees.

Mr. Bolden was hired as a Billing Clerk IV working on a contract with BGE-Exelon Corporation in the Proactive Collections Team (PAC). Mr. Bolden's position was assigned to a group that assisted in the collection of outstanding funds due on gas/electric bills. A great emphasis was placed on assisting the customer with bringing the bill current and then consulting with the customer to maintain a current bill. The purpose of calls was to reward the customer rather than penalize. Because BGE's service can be life essential and each customer may be in a financially tight position this position can be highly stressful at times.

Below is our response to each item listed in Mr. Bolden's complaint.

Mr. Bolden was hired on September 18, 2014. Ms. Angelique Watts was not his supervisor initially. Ms. Watts moved to that position in late 2015. Mr. Bolden speaks about harassment and discrimination beginning when Ms. Watts became his supervisor. Prior to Ms. Watts becoming his immediate Supervisor, Mr. Raymond Hubbard, Vice President, CAEI did speak with Mr. Bolden about taking on more responsibility of lead representative or possibly becoming the team supervisor. However, Mr. Bolden was "unsure" if he could perform in this position. Ms. Watts was not available at the time that Mr. Hubbard had this conversation with Mr. Bolden, she was working elsewhere for CAEI at BGE. At the same time Mr. Hubbard was discussing a promotion with Mr. Bolden he was also speaking with BGE's manager responsible for this team. CAEI's client stated that they would prefer Ms. Watts be moved to this position. Because Mr. Bolden had stated that he was not sure that he was up to the responsibilities. and because the client voiced a preference to have Ms. Watts moved to this position the decision was made to move Ms. Watts. Allowing Mr. Bolden to gain more experience on the team.

Mr. Bolden mentioned that Ms. Watts and Ms. Khadijah Webster, Manager from BGE-Exelon, falsely accused him of violating employee conduct policy. However, that information was never mentioned to CAEI, Inc and no documentation was ever submitted to his file in reference to this incident. However, it is worth noting that Ms. Watts thought very highly of Mr. Bolden and his work ethic initially, and for a period of time.

Ms. Bolden mentioned that Ms. Watts requested that he serve food during the potluck dinner. This request was made to give Mr. Bolden an opportunity to get off the phones. It is seen as a privilege or reward by most team members. He had the option of saying no and staying on the phone. This request was not mandatory and all representatives in the department have been asked numerous times to assist with this and other small projects around the office. As a matter of fact many team members ask every day and refer to these tasks as breaks. Mr. Bolden mentions other members of his department that didn't have to do the serving. This is because he agreed to assist before any of the other representatives were asked.

Mr. Bolden mentioned that he called Human Resources to complain about workplace harassment and unfair conditions of employment. It is true that Mr. Bolden did call the office many times. However, these were casual conversations, and when Mr. Hubbard asked Mr. Bolden if he would like any actions taken he insisted that was not necessary. When Mr. Hubbard inquired with Ms. Watts about these calls she assured Mr. Hubbard and CAEI human resources that "Harry was doing very well."

Mr. Bolden mentioned that he was terminated by Mr. Hubbard. Mr. Hubbard did terminate Mr. Bolden. The reason for his termination was his combative response to being moved in the call center area. Ms. Watts and Mr. Hubbard spoke with Mr. Bolden in reference to moving his seat in an effort to arrange the group to work on specialized calls. Mr. Bolden's work was excellent, he was very strong on the phone, and was being considered for a lead position in one of the specialized groups. Mr. Bolden was adamant that he didn't want change to his seat. He felt that he was being targeted because he was asked to change seats. All the representatives in the department were being moved around to in order to change the dynamic of the department. The changes did not require the representatives to go to a different area, different building or floor in the building. The change was about moving seats in the area to work more effectively together, building small teams of 3-4 people each. Seat movement is fairly constant in most call centers and that is so in this instance. It is not uncommon to move many people each month or so. It is a tool that allows for optimum team growth and development and flexibility to assist the CAEI's client. On February 5, 2016, Mr. Hubbard and Ms. Watts had a conversation with Mr. Bolden about the changes with the move. In actuality, Mr. Hubbard and Ms. Watts were speaking with Mr. Bolden separately because they wanted him to be the lead in one of the groups with the changes. In this meeting Mr. Bolden took the position that he was being targeted and reprimanded before hearing what all the changes would entail. Mr. Hubbard was very surprised at this turn of events. Ms. Watts had heard rumors from some of Mr. Bolden's co-workers that he was acting "different" recently and seemed angry, stating he was the victim of harassment by Ms. Watts and Mr. Hubbard. So Ms. Watts was disappointed that this opportunity for Mr. Bolden's growth had become a negative issue rather than a rewarding experience for Mr. Bolden.

**JA31**

Mr. Hubbard requested that Mr. Bolden come to the corporate office on February 10, 2016 to have a one on one conversation about the change. I was in the meeting with Mr. Hubbard and Mr. Bolden as I represent Human Resources.   At no point in time was Mr. Bolden ever in danger of losing his job.

Before the meeting, Mr. Hubbard had received notification that Mr. Bolden had made some comments to 3 ladies in his department. Mr. Hubbard asked Mr. Bolden about the conversation. Mr. Bolden stated that nothing really happened and that they always walk to the subway together and joke around all the time. Mr. Hubbard then spoke to Mr. Bolden about his feeling about the changes being made in the department with the seat changes and the changes for the department. Mr. Bolden expressed that he felt that he was being targeted with these changes, that it was unfair that he was being moved after speaking with Human Resources. When I assured Mr. Bolden that his claims had nothing to do with the changes being made, he stated that it was the only reason that the changes were being made. Mr. Bolden was agitated about the changes and would not concede that the changes could be good for the department. Mr. Hubbard asked Mr. Bolden to go home for the day and he would reach out to him the next morning.

During the rest of that day, Mr. Hubbard spoke with BGE's project manager about some of the concerns with Mr. Bolden and the changes in the department. The hiring manager stated that we should move forward with the changes and that if Mr. Bolden did not want to make the changes then he should not return to the office. CAEI, Inc. did not have any other positions available to move Mr. Bolden so he was terminated.

Mr. Bolden stated that he was discriminated against because of his race, sex and retaliation. The people that Mr. Bolden would have interacted with during his employment are Mr. Raymond Hubbard, white male Vice President of CAEI, Inc.; Ms. Angelique Watts, African American female, supervisor for PAC Team; Ms. Kia Smoot, African American female, Human Resources of CAEI, Inc.; and the project manager of BGE-Exelon was a African American Male.

In response to his retaliation claim, at no point in time was Mr. Bolden ever written up or given any warnings that filtered to the corporate office. He was considered a tremendous employee with promotion potential. CAEI, Inc was looking for ways to give him more responsibility and to grow as an employee.

If you have any further questions or concerns in reference to this matter, please feel free to contact me at 443-319-5381 or ksmoot@caeiinc.com.

Thank you,

Kia R. Smoot
Human Resources

**JA32**

# Exhibit D

# Exhibit D

## FACT FINDING CONFERENCE

A complaint has been filed with the Commission charging the Respondent with a violation of Title 20 of the State Government Article, Annotated Code of Maryland (hereinafter "Title 20"); this complaint is identified as follows: ***Complainant, Harry Bolden***

**vs.**

***Respondent, CAEI, Inc.***

**Case No.: 1611-0734**

Pursuant to the Maryland Commission on Civil Rights' Rules of Procedure, COMAR 14.03.01.05C(1), this fact-finding conference has been convened to:

    (a) Define the basis and issues of the Complaint,
    (b) Identify the areas of agreement and disagreement
    (c) Resolve disputes when possible
    (d) Determine if there is a basis for a negotiated settlement of the complaint

Once the parties have had the opportunity to present relevant information and documentation; the Commission staff may take the opportunity to speak with both parties independently to determine if conditions exist for resolving the case immediately. If no settlement can be reached during this process, the case may require further investigation, based on the facts, which may involve additional documentation, site visits and witness interviews. All information gathered prior to, during, and after the fact finding conference by the investigator will be confidential and used for the purposes of resolving the instant case only. Information provided to the investigator ***will not*** be shared with the other party unless the party submitting the information gives consent to share the information with the other party.

If we find that based on the gathered evidence it appears that there is *Probable Cause* to believe that the Complainant was discriminated against, the Investigator will take the necessary steps to conciliate the matter. However, if our conciliatory efforts fail, the case will be forwarded to the Commission's Office of the General Counsel.

If we find that based on the submitted evidence that there is *No Probable Cause* to believe that the Complainant was discriminated against, a written finding of *No Probable Cause* will be issued and the case will be subsequently dismissed. The Complainant will have 15 days to file a written Request for Reconsideration to the Commission's Deputy Director. Once the Deputy Director has reviewed the Complainant's request, a decision will be made to either uphold the finding of the Investigator or remand the case back to the Investigator for further investigation.

*1*

**JA34**

I solemnly swear or affirm under the penalties of perjury and upon personal knowledge that the statements I provide to the State of Maryland Commission on Civil Rights (the Commission) in connection with its investigation into the above-referenced complaint of discrimination filed before the Commission pursuant to Title 20 of the State Government Article, Annotated Code of Maryland are true and correct.


**RESPONDENT:**

_____    DATE: _____

Signature/Title


**RESPONDENT REPRESENTATIVE:**

Kia R Smoot, Human Resources    DATE: 2/17/17

Signature/Title


**RESPONDENT REPRESENTATIVE:**

_____ VP operations    DATE: 2/17/17

Signature/Title


**RESPONDENT REPRESENTATIVE:**

_____ President/C.E.O. DATE: 2-17-2017

Signature/Title


**RESPONDENT REPRESENTATIVE:**

_____    DATE: _____

Signature/Title


**RESPONDENT REPRESENTATIVE:**

_____    DATE: _____

Signature/Title


2

**JA35**

## FACT FINDING CONFERENCE

A complaint has been filed with the Commission charging the Respondent with a violation of Title 20 of the State Government Article, Annotated Code of Maryland (hereinafter "Title 20"); this complaint is identified as follows:

### *Complainant, Harry Bolden*

**vs.**

### *Respondent, CAEI, Inc.*

### Case No.: 1611-0734

Pursuant to the Maryland Commission on Civil Rights' Rules of Procedure, COMAR 14.03.01.05C(1), this fact-finding conference has been convened to:

      (a) Define the basis and issues of the Complaint,
      (b) Identify the areas of agreement and disagreement
      (c) Resolve disputes when possible
      (d) Determine if there is a basis for a negotiated settlement of the complaint

Once the parties have had the opportunity to present relevant information and documentation; the Commission staff may take the opportunity to speak with both parties independently to determine if conditions exist for resolving the case immediately. If no settlement can be reached during this process, the case may require further investigation, based on the facts, which may involve additional documentation, site visits and witness interviews. All information gathered prior to, during, and after the fact finding conference by the investigator will be confidential and used for the purposes of resolving the instant case only. Information provided to the investigator *will not* be shared with the other party unless the party submitting the information gives consent to share the information with the other party.

If we find that based on the gathered evidence it appears that there is *Probable Cause* to believe that the Complainant was discriminated against, the Investigator will take the necessary steps to conciliate the matter. However, if our conciliatory efforts fail, the case will be forwarded to the Office of the General Counsel.

If we find that based on the submitted evidence that there is *No Probable Cause* to believe that the Complainant was discriminated against, a written finding of *No Probable Cause* will be issued and the case will be subsequently dismissed. The Complainant will have 15 days to file a written Request for Reconsideration to the Commission's Deputy Director. Once the Deputy Director has reviewed the Complainant's request, a decision will be made to either uphold the finding of the Investigator or remand the case back to the Investigator for further investigation.

**JA36**

I solemnly swear or affirm under the penalties of perjury and upon personal knowledge that the statements I provide to the State of Maryland Commission on Civil Rights (the Commission) in connection with its investigation into the above-referenced complaint of discrimination filed before the Commission pursuant to Title 20 of the State Government Article, Annotated Code of Maryland are true and correct.

**COMPLAINANT:**

_Harry Bolden_

Signature/Title

DATE: _1-17-2017_

**COMPLAINANT REPRESENTATIVE:**

Signature/Title

DATE: _____

**COMPLAINANT REPRESENTATIVE:**

Signature/Title

DATE: _____

**COMPLAINANT REPRESENTATIVE:**

Signature/Title

DATE: _____

**COMPLAINANT REPRESENTATIVE:**

Signature/Title

DATE: _____

**COMPLAINANT REPRESENTATIVE:**

Signature/Title

DATE: _____

**JA37**

# Exhibit E

# Exhibit E

*Please Note* This is the proposed settlement. It was not accepted by both parties.

## PRE-DETERMINATION SETTLEMENT AGREEMENT

This Agreement is entered into by and among Harry Bolden (hereinafter the "Complainant"), CAEI, Inc. (hereinafter the "Respondent"), and the Maryland Commission on Civil Rights (hereinafter the "Commission"), a duly constituted agency of the State of Maryland.

**WHEREAS**, a complaint has been filed with the Commission charging the Respondent with a violation of Title 20 of the State Government Article, Annotated Code of Maryland (hereinafter "Title 20"); this complaint is identified as follows:

**Harry Bolden**

Complainant

vs.

**CAEI, Inc.**

Respondent

**Case No.: 1611-0734**



**JA39**

Name: Harry Bolden vs. CAEI, Inc.
No.:    1611-0734

2

**JA40**

Name: Harry Bolden vs. CAEI, Inc.
No.:    1611-0734



**ACCEPTED BY THE RESPONDENT:**

**CAEI, Inc.**

**I HEREBY DECLARE,** under the penalties of perjury, this 17th. day of _February, , that I
executed the foregoing Pre-Determination Settlement Agreement on behalf of CAEI, Inc.  at a
time when I was fully authorized to execute the foregoing Pre-Determination Settlement
Agreement on its behalf for the purpose of fully binding CAEI, Inc. to it.

BY:                                                          DATE: 2/17/2017
     Signature/Title

3

**JA41**

Name: Harry Bolden vs. CAEI, Inc.
No.:    1611-0734

**ACCEPTED BY THE COMPLAINANT:**

**Harry Bolden**

_____        DATE: _2 - 1 7 - 2 0 1 6_.

Harry Bolden

**ACCEPTED BY THE STATE OF MARYLAND COMMISSION ON CIVIL RIGHTS:**

_____        DATE: _____

Cleveland L. Horton

Deputy Director

Maryland Commission on Civil Rights

4

**JA42**

# Exhibit F

# Exhibit F

**JA43**

## BEFORE THE MARYLAND COMMISSION ON CIVIL RIGHTS

IN THE MATTER OF:                        *

                                         *

    **Mr. Harry Bolden**                *
    **604 Aldershot Road**
    **Baltimore, MD 21229**             *

**COMPLAINANT**                          *

    **vs.**                             *

                                         *

                                         *

    **CAEI, INC.**                      *
    **9256 Bendix Road, Suite 102**
    **Columbia, MD 21045**              *

**RESPONDENT**                           *

                          **MCCR NUMBER: 1611-0734**

                                         *      **EEOC NUMBER:  12F-2017-00041C**

                                         *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### WRITTEN FINDING

The above-captioned case has been investigated pursuant to State Government Article, Section 20-1005(a), Annotated Code of Maryland and the Commission's Rules of Procedure, COMAR 14.03.01.05. The written finding is made in accordance with COMAR 14.03.01.08A. All procedural requirements have been met.

### SUMMARY OF COMPLAINANT'S POSITION:

The Complainant alleges that he was discriminated against based on his race, African American and his

Page **1** of **14**

**JA44**

sex, male and retaliated against for opposing a discriminatory activity in the workplace.

## SUMMARY OF RESPONDENT'S POSITION:

The Respondent denied discriminating against the Complainant on the basis of his race, sex, and retaliation or for any other reason maintaining, that the Complainant did not want to comply with management's decision to make necessary changes in the office.

## SUMMARY OF THE INVESTIGATION:

*"I was hired on or about September 15, 2014 in the position, Billing Specialist, IV.  My immediate supervisor was Ms. Angelique Watts, Manager.  My job performance was excellent."*

The Respondent asserts the aforementioned allegations.

The investigation revealed that the Complainants first day of employment was September 15, 2014, as a Customer Service Representative II. The investigation revealed that the Complainants immediate supervisor at the time of his hiring was Deborah Chew, then Ms. Chew was replaced by Tabitha Horn on November 18, 2014. Moreover, Angelique Watts became the Complainants immediate supervisor effective on or about May 5, 2015. The investigation revealed that the Complainant met all his performance requirements, and also exceeded expectations in some areas of his performance.

*"On or about November 15, 2015, Ms. Watts and Ms. Khadijah Webster, Manager, falsely accused me of violating the employee conduct policy relative to logging in and out of my computer.  I am aware of female employees, Ms. Robin Roden and Ms. Nicole Russ, Billing Clerks/Trainers who violated employee conduct rules relative to spending appropriate*

Page **2** of **14**

**JA45**

*time on the telephone to address customer complaints, but did not receive a verbal reprimand for this violation."*

According to Ms. Webster, the Complainant left his computer log on. The investigation revealed that the most common issue that happens if an employee has left their desk with some portion of their computer or phone logged in. The investigation revealed that the incident caused no negative impact to the Complainants work place reputation or suitability for his continued employment nor was the Complainant reprimanded for such incident. The investigation revealed that the Respondents performance and development of other employees are not addressed with other team members.

According to the Respondent, it is important that the team meets the goals of its clients specifically BGE, and that both Ms. Russ and Ms. Roden, have successfully worked with many customers who lodged complaints and were able to convert those complaints to compliments that did in fact, make their way up to BGE senior management staff.

The investigation could not find evidence that on or about November 15, 2015, Ms. Watts and Ms. Khadijah Webster, Manager, falsely accused the Complainant of violating the employee conduct policy relative to logging in and out of the Complainants computer. Further, according to the Respondent the Complainant was not reprimanded or disciplined in this instance.

*"On or about November 26, 2015, Mr. Raymond Hubbard, Vice President, requested that I meet with him to discuss promotional opportunities. He offered me the position, Supervisor, Financial Solutions. However, on or about November 28, 2015, Mr. Hubbard announced that Ms. Watts was selected to fill the position. I am more qualified and meet the requirements of this position."*

Page 3 of 14

**JA46**

According to Mr. Hubbard, he has no idea of the meeting on or about November 26, 2015, that the Complainant is refereeing to in this instance. Also according to the Respondent, Ms. Watts had been in the leadership position for the Complainants team for approximate six months. Mr. Hubbard confirmed that he never offered the Complainant a promotion to leadership and there were no vacancies. Although the Complainant alleges that Mr. Hubbard offered him a promotion to leadership, the investigation revealed that as of November 26, 2015, Ms. Watts had been in the leadership position for the Complainants team for approximate six months.

According to the Complainant, Mr. Hubbard verbally offered him the position of Financial Solutions Supervisor on November 26, 2015. The investigation revealed that the Respondent was not considering replacing Ms. Watts's position and there were no other leadership positions open. Moreover, according to the Respondents witness Mr. Hubbard, he never offered the Complainant a leadership position and he has no idea of the meeting on or about November 26, 2015, that the Complainant is refereeing to in this instance.

The investigation revealed that Ms. Watts was more qualified and experienced than the Complainant. The investigation revealed that Ms. Watts worked for the Respondent and BGE since February 2012, where she acquired the requisite skills necessary to lead the Financial Solutions Team with the Respondent. Further, Ms. Watts was also a leader in the Respondents earlier pilot collection program, which was the template for the Financial Solutions team where Ms. Watts and the Complainant worked. According to the Respondent, Ms. Watts also assumed the responsibility for many of BGE's pilot programs. The investigation revealed that Ms. Watts was hand chosen by the BGE management team, with the Respondents approval. Further, because the Financial Solutions team was a pilot program, and in May 2015, Ms. Watts became

Page **4** of **14**

**JA47**

leadership of the Financial Solutions team. The investigation revealed that the Complainant has

experience as a customer service representative, and as a Billing Specialist, and experience with

parking lot cashiers. The investigation revealed that the Respondent was not considering

removing Ms. Watts from her leadership position to replace her with the Complainant.

>*"On or about December 7, 2015, Ms. Watts requested that I serve food to over twenty*
>*(20) employees during our potluck dinner. I am aware that Ms. Watts did not request that any*
>*other employee serve food at the potluck. For example, this request was not placed upon Mr.*
>*Robert Haughie (Caucasian) and Ms. Jessica Robinson (female), Billing Specialists.*
>*Following the dinner, she gave me a verbal reprimand for not spending the required time on*
>*the telephone on this date."*

According to the Respondent, the request for the Complainant to serve food to over

twenty (20) employees during the potluck dinner was made to give the Complainant an

opportunity to get off the phones, and is seen as a privilege if asked. The Respondent confirmed

that the request was not mandatory therefore, the Complainant could have declined to serve other

employees food at the pot luck. According to the Respondent, all employees have been asked

numerous times to assist with pot luck and other small projects around the office. The

Respondent stated that other employees were not asked in this instance because the Complainant

agreed to assist. Also according to the Respondent, there is no indication or record of the

Complainant ever being reprimanded for not meeting his goals.

The investigation revealed that the Complainant agreed to serve food to over twenty (20)

employees during the potluck dinner before any other employees were asked. Further, the

request was not mandatory and the Complainant could have declined to serve at the pot luck.

Page **5** of **14**

**JA48**

The investigation revealed that Mr. Haughie was not employed with the Respondent in this instance because his two year contract ended September 2015. However, according to the Respondent Mr. Haughie did in fact, serve food many times throughout his employment with the Respondent. The investigation also revealed that Ms. Robinson volunteered to serve meals on many occasions. The investigation also revealed that the opportunity was made to give the Complainant an opportunity to get off the phones, and was also seen as a privilege if asked to do so. The investigation revealed that, all employees have been asked on numerous occasions to assist with pot luck and other small projects around the office. The investigation revealed that it is very possible that leadership may have mentioned the Complainants call statistics. The investigation revealed that there is no indication or record that the Complainant was ever reprimanded for not meeting his goals. Moreover, the Complainants call handling volume and productivity in this instance exceeded expectation. The investigation also revealed that Ms. Watts often referred to the Complainant as a team member who consistently met his goals.

*"On or about January 15, 2016, I filed a report with the Human Resources Department complaining about workplace harassment and unfair conditions of employment."*

The Respondent asserts this allegation.

The investigation revealed that on or around January 2016, the Complainant did in fact contact the Respondents witness Ms. Smoot, HR many times however, the Complainant always insisted that it was not necessary to take further actions. The investigation also revealed that Mr. Hubbard and the Respondents HR, also followed up with the Complainant regarding his concerns however, the Complainant confirmed that he was satisfied on numerous occasions with the Respondents follow up. The investigation also revealed that Ms. Smoot confirmed with the

**JA49**

Complainant and Ms. Watts that the situation was resolved to everyone's satisfaction and no

further actions were required. The investigation did not find any other evidence that the

Complainant submitted a formal complaint of discrimination based on his protected classes.

*"On or about February 11, 2016, I was terminated by Mr. Hubbard. The reason given*

*for my termination was "lack of integrity."*

The Respondent asserts this allegation, however, according to the Respondent the reason

for termination given to the Complainant was because of his inappropriate response to being

moved in the Respondent's call center. According to the Respondent, Ms. Smoot and Mr.

Hubbard met with the Complainant in corporate office on February 10, 2016, to discuss the issue

about the Complainants seat change and reports from three female co-workers who felt

uncomfortable at remarks made to them by the Complainant, while walking to the Subway

together. Further, the Complainant admitted that they always joke around. However, the

Respondent confirmed that the Complainants job was not in jeopardy at this time. According to

the Respondent the Complainant became very agitated about the changes and would not

conceded that the changes would be good for the department. According to the Respondent, Ms.

Smoot and Mr. Hubbard felt threatened when the Complainant became very angry and animated,

that Mr. Hubbard asked the Complainant to go home for the day.

The Respondents witness contacted BGE's project manager about their concerns with the

Complainant and the changes they were planning for. The Respondent confirmed that BGE

manager informed the Respondent that they should move forward with the changes and if the

Complainant did not want adhere to the changes he should not return.

**JA50**

The investigation revealed that the Complainant was terminated on February 11, 2016, because he was being uncooperative and did not want to cooperate with the office move per management's decision. The Respondent requested that the Complainant move his seat and he refused. The Respondent's witness Mr. Hubbard stated that, when he met with Complainant, the Complainant was verbally upset and adamant about not wanting to be moved. Further, the Complainant was so disturbed and combative about moving his seat that the Complainant threw his headset down and became belligerent. The investigation revealed that the Respondents changes consisted of moving the Complainant to another desk within the same office location to potentially lead a group of people. The Complainant was ultimately terminated because he didn't want to cooperate with management's decision to make changes in the office.

According to the Respondents witness Mr. Hubbard, on February 11, 2016, during the meeting with Complainant, the Complainant started talking about problems that he was having with Angelique Watts when the purpose of meeting was to discuss options for promotion and moving people around to assume leadership positions. The investigation revealed that the Respondents management intended to rearrange staff desks in order to increase effectiveness by having certain employees specialize in large accounts with team leaders. The investigation revealed that the Complainant had been identified as a potential team leader in this instance but he would have needed to move his desk.

The investigation also revealed that prior to the Complainants termination that on February 5, 2016, Mr. Hubbard and Ms. Watts did speak to the Complainant because they wanted him to lead in one of the groups with the changes. The investigation also revealed that Mr. Hubbard and Ms. Watts were disappointed that the Complainants opportunity for growth had become negative rather than a

Page **8** of **14**

rewarding experience. The investigation revealed that the Complaint did not accept the more senior position that was offered to him. Moreover, the investigation revealed that Robin Roden and Nicole Russ, both African American female, and one African American male, Otis Rease were also offered a more senior position and accepted, the Respondents offer.

*"I believe that my termination was an act of retaliation because I engaged in the protected activity of reporting workplace harassment and unfair conditions of employment."*

The investigation found that the Complainant was terminated due to his inappropriate behavior and refusal to cooperate with the Respondents plan to reorganize work groups to allow the Respondent to improve service to BGE. The investigation found that the Complainants allegations of retaliation, workplace harassment, and unfair conditions of employment are unsubstantiated.


**CONCLUSION:**

In order to establish a violation on a Terms and Conditions of employment issue, the evidence must show in the following order of proof: 1) Charging Party belongs to a protected group; 2) Charging Party was denied equal terms or conditions of employment; 3) others similarly situated but not of Charging Party's group were extended the terms or conditions denied Charging Party; · end 4) Respondent is unable to explain the difference in treatment or Respondent's explanation is in fact pretext for discrimination.

The investigation did find evidence that the Complainant belongs to a protected group, but did not find that the Complainant was denied equal terms or conditions of employment; or that others similarly situated but not of Charging Party's group were extended the terms or conditions denied the Complainant. The investigation did not find that the Respondent was

JA52

unable to explain the difference in treatment or that the Respondent's explanation was in fact pretext for discrimination.

In order to establish a violation on a Discipline issue, the evidence must show in the following order of proof: 1) Charging Party belongs to a protected group; 2) Charging Party was disciplined; 3) Others not of Charging Party's group were not disciplined or were not disciplined in the same manner although they committed the same or similar infractions; and 4) Respondent cannot explain the different treatment or Respondent's articulated reason is in fact pretext for discrimination.

The investigation did find evidence that the Complainant belongs to a protected group but did not find that the Complainant was disciplined, nor did it find that others not of Charging Party's group were not disciplined or were not disciplined in the same manner although they committed the same or similar infractions. The investigation did not find that the Respondent was unable to explain the difference in treatment or that the Respondent's explanation was in fact pretext for discrimination.

In order to establish a violation on a Discharge issue, the evidence must show in the following order of proof: 1) Charging Party belongs to a protected group; 2) Charging Party was discharged; 3) Others similarly situated but not of Charging Party's group were not discharged; and 4) Respondent cannot explain the difference in treatment or Respondent's explanation is in fact pretext for discrimination.

The investigation did find evidence that the Complainant belongs to a protected group and that the Complainant was discharged. The investigate did not find evidence that others similarly

Page **10** of **14**

**JA53**

situated but not of Charging Party's group were not discharged nor that the Respondent was unable to explain the difference in treatment or that the Respondent's explanation was in fact pretext for discrimination. In this instance case the Complainant refused to cooperate with the Respondent's request for the Complainant to move his seat for the purpose of changes in the department. The investigation did not find that other employees refused to move their seat as requested.

To prove retaliation, the investigation must show that (1) the Complainant opposed what she reasonably and in good faith believe to be an unlawful employment practice or that she participated in the EEO process, (2) that Respondent subjected her to adverse treatment and (3) that there was a causal connection between Complainants' protected activity and the adverse treatment.

The investigation showed that the Complainant opposed what he reasonably and in good faith believed to be an unlawful employment practice or that he participated in the EEO process. The investigation did find evidence that the Respondent subjected the Complainant to adverse treatment however, there was not a causal connection between Complainants' protected activity and the adverse treatment. In fact Ms. Smoot, HR spoke with the Complainant on several occasions and confirmed that the situations were resolved and no further actions were required.

In order to establish a violation on a Promotion issue, the evidence must show in the following order of proof: 1) Charging Party belongs to a protected group; 2) Respondent had a vacant position; 3) Charging Party applied for or expressed an interest in the position; 4) Charging Party was qualified for the position; and 5) Charging Party was not selected but a lessor qualified

person not of Charging Party's group was selected.

The investigation established that the Complainant belongs to a protected group; but did not find evidence that the Respondent had a vacant position. Nor did the investigation find evidence that Charging Party applied for or expressed an interest in the position

The investigation could not substantiate that the Complainant was discriminated against based on his protected classes herein, nor could the investigation find evidence that the Complainant was retaliated against. The investigation found that the alleged Leadership position that the Complainant may have been referring to was not vacant as found herein. Further, and if the position was vacant the Complainant would not have otherwise been qualified for such. The investigation established that the Complainant was not selected nor was a lessor qualified person not of the Complainants group was selected because the Respondent did not have a vacant position open.

## FINDING OF NO PROBABLE CAUSE:

Based on the evidence gathered by the Commission staff during this investigation, it has been determined that there is **No Probable Cause** to believe that the Respondent discriminated against the Complainant because of Race, Sex, and retaliation under Title 20, Subtitle 6 of the State Government Article, Annotated Code of Maryland.

Under the Commission's Rules of Procedure, COMAR 14.03.01.08C, the Complainant may submit in writing a Request for Reconsideration of the No Probable Cause finding within fifteen (15) days from the date upon which these findings were mailed. The request shall specifically state the grounds

**JA55**

upon which the request is being made. The Request for Reconsideration shall be directed to:

Cleveland L. Horton II, Deputy Director

Maryland Commission on Civil Rights

William Donald Schaefer Building

6 St. Paul Street, Suite 900

Baltimore, Maryland, 21202

Once the Deputy Director has had the opportunity to review the Request for Reconsideration and the entirety of the case file, all parties will be notified of the decision. In the absence of a Request for Reconsideration, the above captioned complaint will be dismissed and the Commission's proceedings in the matter will be terminated.

Jessica Haskins
Civil Rights Officer

Alesha Bell
Civil Rights Officer Supervisor

Date: 09-23-20

Page **13** of **14**

**JA56**

## CERTIFICATE OF SERVICE

This is to certify that the foregoing Written Finding was issued on this _____23_____ day of

, __September__ and was served on all parties to the complaint by regular mail on said date.

**FOR THE MARYLAND COMMISSION ON
CIVIL RIGHTS**

Page **14** of **14**

**JA57**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

_____
                                                          )
HARRY A. BOLDEN                              )
                                                          )
Plaintiff                                                )          Civil Case No: 1:21-cv-02295-CCB
                                                          )
v.                                                         )
                                                          )
CAEI, INC., et al                                     )
                                                          )
Defendants                                           )
                                                          )
_____)

### PLAINTIFF'S OPPOSITION TO DEFENDANT EXELON'S

### MOTION TO DISMISS

Plaintiff, Harry A. Bolden ("Mr. Bolden"), by and through undersigned counsel,

hereby respectfully opposes the Motion to Dismiss [ECF 11] ("Motion") filed by

Defendant, Exelon Business Services Company, LLC ("Exelon").

### INTRODUCTION

Exelon's Motion should be denied because it fails to establish its asserted

affirmative defense that Plaintiff did not exhaust his administrative remedies under Title

VII before filing suit.  In particular, the Motion fails as a matter of law to establish that

Mr. Bolden is not entitled to rely on the "identity of interest"/"substantial identity"

exception to the Title VII "naming requirement."  Whether this exception applies in this

case is a fact-specific inquiry that should include application of multiple factors,

including Exelon's actual or constructive notice of Mr. Bolden's MCCR/EEOC charge

and the MCCR investigation, its opportunity to participate in the administrative

**JA58**

conciliation process, the extent and contours of its business relationship with the named

Defendant (CAEI, Inc.), and facts bearing on any claimed prejudice.  Discovery is first

needed on these and other relevant topics discussed below, after which Exelon would

have the opportunity to litigate (and the Court to decide) the exhaustion issue on a

developed record.  At this early stage of the proceedings, dismissal is inappropriate under

the circumstances of this case.

## ARGUMENT

### A.  Rule 12(b)(6)[1] Standards as Applied to Affirmative Defenses

Exelon argues that the Court should attach significance to the fact that Plaintiff

did not proactively plead in his Complaint that Exelon's exhaustion defense is

inapplicable.  *See e.g.*, MTD Memo at 10, caption i. ("Plaintiff Has Not Pled That the

Substantial Identity Exception Applies."); *id.* at 10 ("The Court should reject this

argument, given that Plaintiff failed to plead this exception […]").  Contrary to Exelon's

argument, failure to exhaust administrative remedies in Title VII cases is an affirmative

defense that must be asserted by a defendant.  *See* Fed.R.Civ.P. 8(c); *Johnson v.*

*Maryland Dep't of Lab., Licensing, & Regul.*, 386 F. Supp. 3d 608, 614 (D. Md. 2019).

> On the record before it, the Court will not dismiss Plaintiff's claims for failure
> fulfill Title VII's charge-filing requirement. Because the charge-filing requirement
> is an affirmative defense (as opposed to a jurisdictional issue), Plaintiff is not
> required to allege facts sufficient to establish that he satisfied this
> requirement. *Shaukat v. Mid Atl. Pros., Inc.*, Civ. No. TDC-20-3210, 2021 WL
> 5743909, at *5 (D. Md. Nov. 30, 2021) (citing *Zipes v. Trans World Airlines, Inc.*,

---

[1] Plaintiff agrees with Exelon that its current Motion is appropriately analyzed pursuant to Federal Rule of Civil Procedure 12(b)(6).  Memorandum in Support of Exelon's Motion ("MTD Memo") [ECF 11-1], at 5. Plaintiff further agrees that the Court can take judicial notice of the existence and contents (but not the truth thereof) of the MCCR documents attached as exhibits to the Motion without converting it to a motion for summary judgment.  *Id.* at 8; See *Marshall v. Anne Arundel Cty., Maryland*, No. CV ELH-18-74, 2019 WL 568676, at *5 (D. Md. Feb. 12, 2019)("Notably, the court may take judicial notice of the existence and contents of EEOC proceedings 'if necessary to decide issues like exhaustion of administrative remedies[.]'  But, 'it may not take judicial notice of the *truth* of matters outside the challenged pleading.'")(citations omitted).

**JA59**

455 U.S. 385, 393 (1982) and *Fort Bend*, 139 S. Ct. at 1846) (explaining that, "[b]ecause administrative exhaustion" is an affirmative defense rather than a jurisdictional prerequisite, a plaintiff "is not required to plead [it] in the Complaint").

*Spearman v. City of Annapolis*, No. CV JKB-21-1779, 2022 WL 316641, at *5 (D. Md. Feb. 1, 2022).  Thus, the Court should reject Exelon's suggestion that Plaintiff was *required* to plead facts relating to administrative exhaustion in his Complaint.[2]

To the contrary, "a motion to dismiss filed under Federal Rule of Procedure 12(b)(6), which tests the sufficiency of the complaint, generally cannot reach the merits of an affirmative defense."  *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). "But in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6). This principle only applies, however, if all facts necessary to the affirmative defense "clearly appear[ ] *on the face of the complaint*." *Id.* (quoting and adding emphasis to *Richmond, Fredericksburg & Potomac R.R. v. Forst,* 4 F.3d 244, 250 (4th Cir.1993)); *See also Lockhart v. Holiday Inn Exp. Southwind*, 531 F. App'x 544, 547 (6th Cir. 2013)("We, however, are reluctant to dismiss complaints based on affirmative defenses at the pleading stage and before any discovery has been conducted.  Courts generally cannot grant motions to dismiss on the basis of an affirmative defense unless the plaintiff has anticipated the defense and explicitly addressed it in the pleadings.  In fact, we only address affirmative defenses on Rule

---

[2] Nevertheless, Plaintiff did plead here that he had "properly exhausted his administrative remedies before timely filing suit."  Complaint ¶ 7.  This straightforward statement alone has been found by at least one court to suffice to defeat a similar motion to dismiss.  *Berry v. Barrett*, No. 3:19-CV-140, 2021 WL 1424677, at *4 (S.D. Ohio Apr. 15, 2021)("Here, because Plaintiff has pled that he 'has satisfied all administrative requirements,' Defendant must present evidence to prove that Plaintiff failed to exhaust his administrative remedies.").

12(b)(6) motions where the plaintiff's own allegations show that a defense exists that legally defeats the claim for relief.")(cleaned up).

Here, Exelon cannot claim that all of the facts necessary to the Court's analysis of the exhaustion issue "clearly appear on the face of the complaint."  Also, the MCCR documents attached to its Motion (presumably to be considered by the Court as "integral to the complaint") are not probative to the application of the multi-factor "identity of interests"/"substantial identity" equitable exception to the "naming requirement."  At most, the MCCR files show that Exelon was not named in Plaintiff's charge and Exelon apparently did not *officially* participate in the MCCR proceedings; those facts are clearly not sufficient to prove the exception does not apply.

## B.    The Exception(s) to the "Naming Requirement"

The perhaps ill-named "substantial identity" (or "identity of interests") exception applies to this case.  While the 4th Circuit has implied strongly (starting with *Alvarado v. Bd. of Trs. Of Montgomery Cmty. Coll.*, 848 F.2d 457, 458 (4th Cir. 1988) that the exception would likely be established in the Circuit, it has not defined the precise contours of its interpretation.  But it is clear from district court and out-of-circuit decisions that proper application of the exception depends on a fact-specific multi-factor analysis- not simply questioning if the named and unnamed (in this case, joint) employers are "substantially or 'functionally' identical."  MTD Memo at 7.

Any analysis must comport with the underlying purpose of Title VII, which is of course remedial:

> Our conclusion also comports with the broader purpose of Title VII as a "remedial scheme in which laypersons, rather than lawyers, are expected to initiate the process." *Sydnor*, 681 F.3d at 594 (citation omitted); *see also Alvarado v. Board of Trustees of Montgomery Community College*, 848 F.2d 457, 460 (4th

4

**JA61**

Cir. 1988) ("Title VII does not require procedural exactness from lay complainants."). We must be wary of "overly technical concerns" laying a "tripwire for hapless plaintiffs." *Sydnor*, 681 F.3d at 594.

*Stewart v. Iancu*, 912 F.3d 693, 703 (4th Cir. 2019).

> "But, '[t]his [naming] requirement is not applied in a hyper-technical fashion,' given that employees often file EEOC charges without out the assistance of counsel, and "the exhaustion requirement was not intended to create 'insurmountable barriers' based on 'overly technical concerns.' " *Marshall v. Anne Arundel Cty., Maryland*, No. ELH-18-74, 2019 WL 568676, at *10 (D. Md. Feb. 12, 2019) (citations omitted). Accordingly, "'EEOC charges must be construed with utmost liberality,'" and under some "circumstances ... the naming requirement is not strictly enforced" *Id.* (quoting *Alvarado*, 848 F.2d at 460); *see Membreno v. Atlanta Rest. Partners, LLC*, No. 19-369-PX, 2019 WL 3306020, at *5 (D. Md. July 23, 2019). The Court considers whether the purpose of the requirement is satisfied, that is, whether the unnamed defendant had notice and the opportunity to settle the matter before the employee filed a formal lawsuit. *See Marshall*, 2019 WL 568676, at *11 (citing *Alvarado*, 848 F.2d at 458–60). If so, "failure to include a defendant by specific name in the administrative charge does not bar subsequent civil suit." *Membreno*, 2019 WL 3306020, at *5 (citing *Weide v. Mass Transit Admin.*, 628 F. Supp. 247, 249 (D. Md. 1985)).

*Johnson v. Silver Diner, Inc.*, No. PWG-18-3021, 2019 WL 3717784, at *3–4 (D. Md. Aug. 7, 2019).

Against this remedial, liberal backdrop, the relevant factors of the exception have been described somewhat variously by courts in Maryland and the 4th Circuit:

> This Court, however, has previously held that a plaintiff's failure to name a defendant in an EEOC charge does not necessarily bar the subsequent suit if "the purposes of the naming requirement were substantially met," that is if (1) defendants received fair notice, and (2) the EEOC was able to attempt conciliation. *Vanguard Justice Soc. Inc. v. Hughes,* 471 F.Supp. 670, 687 (D.Md.1979) (internal citations omitted); *see also Causey v. Balog,* 162 F.3d 795, 800 (4th Cir.1998) (citing *Alvarado,* 848 F.2d at 460). Additionally, this Court has previously applied a four-part test, referred to as the substantial identity test, to determine whether a civil action can be brought against a defendant not named in the EEOC charge. Specifically, a court should consider:

> 1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint;

**JA62**

2) whether, under the circumstances, the interests of a named [party] are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings;

3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party;

4) whether the unnamed party had in some way represented to the complainant that its relationship with the complainant is to be through the named party.

*McAdoo v. Toll,* 591 F.Supp. 1399, 1403 (D.Md.1984) (citing *Vanguard Justice Soc. Inc.,* 471 F.Supp. at 688).

Of these four factors, the second and third are the most important as they are most reflective of the two-fold purpose of the naming requirement.

*Elzey v. Wal-Mart Assocs., Inc.*, No. CIV.A. RDB-11-2151, 2012 WL 3715321, at *3 (D. Md. Aug. 28, 2012)(quoting *Crosten v. Kamauf,* 932 F.Supp. 676, 682 (D.Md. 1996) (internal citation omitted).

The identity of interests test focuses on four factors: "(1) similarity of interests between named and unnamed parties; (2) ability of the plaintiff to ascertain the unnamed party at the time of the EEOC charge; (3) notice of the EEOC charge by the unnamed party; and (4) prejudice." *Johnson v. Silver Diner, Inc.*, No. PWG-18-3021, 2019 WL 3717784, at *3–4 (D. Md. Aug. 7, 2019).

### C.     The Motion is Premature, and Discovery is Needed

Courts regularly deny Rule 12(b)(6) motions to dismiss based on Title VII claims-processing rules because necessary discovery had not been conducted.

In a case strikingly similar to this one, in *Byrd v. Ta Chen Int'l*, No. CV DKC 19-1873, 2020 WL 4933636 (D. Md. Aug. 24, 2020), the defendant filed a motion to dismiss based on the plaintiff's failure to name the defendant in the EEOC charge.  The plaintiff

6

**JA63**

responded that the "substantial identity" test applied to satisfy the administrative

exhaustion requirement.  Judge Chasanow ruled that discovery should be conducted to

flesh out the relationship between the named and unnamed employer/defendants, and

other topics relevant to the "substantial identity" test:

> The substantial identity test cautions against dismissing Mr. Byrd's claim against Ta Chen until its full relationship to ERI is understood. The first factor of the substantial identity test weighs in Mr. Byrd's favor as the exact role of Ta Chen and ERI could not have been readily ascertained by him at the time of filing. The second factor, likewise, might favor Plaintiff if there is a clear corporate affiliation between ERI and Ta Chen. The third factor cuts against dismissal. As the unnamed party before the EEOC, the forms of advanced notice mentioned above ensure Ta Chen would suffer no undue prejudice in being named in the complaint without being named in the EEO proceedings. While close inspection of the employee handbook or earning statements arguably should have put Mr. Byrd on notice of his mistake, Mr. Byrd alleges that the EEOC office themselves were misinformed as to the proper identity of his employer. (ECF No. 15-1, at 1). If it turns out this misinformation came from ERI itself, the fourth factor would also suggest that ERI and Ta Chen satisfy the substantial identity test. Pending further disclosure as to Ta Chen's corporate affiliations, the court declines to dismiss the claim against Ta Chen in that a similarity of interest between Ta Chen and ERI is not foreclosed.

> *Id.* at *5.

In *Prosa v. Austin*, No. CV ELH-20-3015, 2022 WL 394465 (D. Md. Feb. 8,

2022), the defendants argued in a motion to dismiss that the complaint was filed more

than 90 days after receipt by plaintiff of a right-to-sue letter, and therefore untimely.  The

defendants also argued that certain Title VII claims had not been administratively

exhausted.  Judge Hollander denied the motion and ruled that discovery was required

before a final decision could be reached on timeliness and exhaustion.

> However, these arguments do not provide a basis to dismiss the Complaint at this stage, whether in its entirety or with respect to the events raised in the January 2017 Complaint. The argument that the entire suit is untimely relies on assertions made by plaintiff in a Declaration attached to the Opposition. And, the argument that the events in the January 2017 Complaint are untimely relies on the single mail log photograph indicating that a "Dismissal Letter" was sent to

**JA64**

plaintiff and her then-counsel on that date. *See* ECF 13-7. But, these materials plainly may not be considered with respect to a Rule 12(b)(6) motion.

At the Rule 12(b)(6) stage, the Complaint is the critical document. And, in the Complaint, plaintiff alleges that she received the 2020 FAD on July 18, 2020. ECF 1, ¶ 8. Furthermore, the 2020 FAD provided by plaintiff includes a certificate of service indicating that the FAD was served via FedEx overnight delivery on July 17, 2020, meaning that plaintiff would have received the document on July 18, 2020. ECF 23-2 at 2. And, no documents that I may consider indicate any date of mailing, service, or receipt for the Disputed FAD. At this juncture, I must accept the date of July 18, 2020. On that basis, suit was timely filed on October 16, 2020, *i.e.*, within 90 days of receipt of the 2020 FAD. ECF 1, ¶ 8.

*Id.* at *19.

Discovery may bear out defendant's contentions as to timeliness and exhaustion. But, at the motion to dismiss stage, these arguments do not support dismissing claims from the Complaint. Because I reject defendant's argument on this basis, there is no need to consider plaintiff's arguments as to equitable tolling, or that the claims and events in the January 2017 EEO Complaint are like or related to those in the September 2017 EEO Complaint.

*Id.* at *21.

Similarly, in *Thomas v. Bet Sound-Stage Rest./BrettCo, Inc.*, 61 F. Supp. 2d 448, 455-56 (D. Md. 1999), the defendant filed a motion to dismiss arguing that it was not an "employer" within the meaning of Title VII. The plaintiff argued that the defendant was a joint employer, and that discovery was needed to determine if the "integrated enterprise" doctrine applied. The court ruled that "on a motion to dismiss and prior to discovery, there is not enough evidence in the record to determine whether BrettCo is an "employer" under the integrated enterprise analysis for purposes of Title VII liability. Plaintiff, however, has alleged sufficient facts in her complaint to survive the motion to dismiss." *Id*. at 456; *See also Spearman v. City of Annapolis,* No. CV JKB-21-1779, 2022 WL 316641, at *6 (D. Md. Feb. 1, 2022)(denying "as untimely at this stage" motion to dismiss Title VII claims for lack of exhaustion because the record needed to be

developed through discovery); *Sims v. Univ. of Maryland Med. Sys. Corp.*, No. CV CCB-19-0295, 2019 WL 6718053, at *6 (D. Md. Dec. 10, 2019)(On motion to dismiss for failure to state a claim, ruling that "[t]he court need not decide now the relationship between the drug test, the FFD exam, and Sims's suspension.  As the rest of Sims's claims are going forward, the drug test, FFD exam, and suspension require additional discovery regardless of the eventual disposition of Count II. Accordingly, the court will deny without prejudice the motion to dismiss Count II."); *Miller v. Baltimore Gas & Elec. Co.*, 202 F.R.D. 195, 203 (D. Md. 2001)(motion to dismiss denied in lieu of discovery on employee class certification issues); *Murphy-Taylor v. Hofmann*, 968 F. Supp. 2d 693, 727–28 (D. Md. 2013)("Accordingly, I will deny the County's request for dismissal of the Title VII claims against it on the basis that it was not Ms. Murphy–Taylor's "employer," without prejudice to renewal of this argument in a motion for summary judgment filed after discovery."); *Adamczyk v. Chief, Baltimore Cty. Police Dep't*, 952 F. Supp. 259, 263 (D. Md. 1997), *aff'd sub nom. Adamczyk v. Chief of Police of Baltimore Cty.*, 134 F.3d 362 (4th Cir. 1998).

Here, CAEI and Exelon (as alleged joint employers using a superficial subcontractor staffing structure in large part as a way to insulate Exelon from employment-related legal obligations or liability), certainly had a similarity of interests. Exelon managers were logically aware of Mr. Bolden's EEOC/MCCR charge, including its substance.  Given the close working relationship between CAEI and Exelon on personnel matters (and Exelon's ultimate control over hiring, firing, and promotion decisions), it can be strongly inferred that Exelon (and/or its advisors and insurer) was deeply involved in a coordinated response to the MCCR investigation.  If so, it would be

9

**JA66**

hard to argue that Exelon was prejudiced by not being named in the charge- certainly not where a pro se layman complainant was unaware of the existence and implications of the joint employer doctrine at the time the charge was filed.  Discovery will illuminate these issues and promote the remedial purposes of Title VII.

## CONCLUSION

Based on the foregoing, Plaintiff requests the Court deny Exelon's Motion as premature.

Respectfully Submitted,

/s/ Joseph D. Allen

Joseph D. Allen, Esq. (#20736)
Simms Showers LLP
201 International Circle, Suite 230
Baltimore, Maryland 21030
Phone: 443-290-8710
Facsimile: 410-510-1789
jdallen@simmsshowers.com

Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that, on this 14th day of March, 2022, I caused the foregoing to be served via CM/ECF and email on counsel of record.

/s/ Joseph D. Allen

10

**JA67**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

HARRY A. BOLDEN

    *Plaintiff,*

    v.

CAEI, INC., *et al.,*

    *Defendants.*

Civil No. JRR-21-02295

## MEMORANDUM OPINION

This matter came before the court on Exelon Business Services Company, LLC's Motion to Dismiss Plaintiff's Complaint.  ECF 11.

Plaintiff filed this action against Defendants for various forms of employment discrimination and retaliation under Title VII.  42 U.S.C. §§ 2000e *et seq.*  ECF 1.  Exelon seeks dismissal of the complaint (as against Exelon) for failure to exhaust administrative remedies because Plaintiff failed to name Exelon in his administrative charge of discrimination filed on October 17, 2016.

Exelon is correct that before a plaintiff may sue under Title VII, he is required to file an administrative charge of discrimination.  Exelon is also correct that the scope of a complainant's entitlement to sue is limited to the "parties identified and practices complained of in the charge of discrimination." *Jones v. Calvert Grp. Ltd.*, 551 F.3d 297 (4th Cir. 2009); *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954 (4th Cir.1996).  The naming requirement serves two important purposes: notice to the charged party and an opportunity for the charged party to comply voluntarily with law without resort to litigation.

**JA68**

Plaintiff concedes his administrative charge did not name or identify Exelon and asserts that the substantial identity exception applies to excuse what might otherwise be a fatal omission. *Vanguard Justice Soc. Inc. v. Hughes*, 471 F. Supp. 670, 687 (D. Md. 1979); *McAdoo v. Toll,* 591 F. Supp. 1399, 1403 (D. Md. 1984). In determining whether the substantial identity exception applies, the court considers several factors:

> 1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; 2) whether, under the circumstances, the interests of a named [party] are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party. Consideration of these factors should be initially in the hands of the district court. The goal of conciliation without resort to the already overburdened federal courts is of great importance and should not be lost. However, equally important is the availability of complete redress of legitimate grievances without undue encumbrance by procedural requirements especially when demanding full and technical compliance would have no relation to the purposes for requiring those procedures in the first instance.

*Vanguard*, 471 F. Supp. at 688; *see also McAdoo*, 591 F. Supp at 1403-04 (holding that Title VII administrative procedures are "'not intended to serve as a stumbling block to the accomplishment of the statutory objective,'" and that demanding procedural perfection where the plaintiff filed his administrative charge without the benefit of counsel places a burden "'Congress neither anticipated not intended'").

The complaint alleges that Plaintiff "began working for CAEI and Exelon . . . at a jointly operated facility . . . [Plaintiff] was supervised on a day-to-day basis by both CAEI and Exelon managers, who both exercised control over Plaintiff's conditions of work, and had the power to hire, fire, discipline, assign, and /or promote Plaintiff." ECF 1 at p. 2. CAEI's position statement in response to the administrative charge (Exhibit C to the Motion, ECF 11) asserts that Plaintiff was hired by CAEI and assigned to work on the "BGE-Exelon" "Proactive Collections Team."

**JA69**

Assuming the truth of Plaintiff's allegations and considering the exhibits to the Motion, it appears to the court that Exelon's interests at the administrative level would have been identical to those of Defendant CAEI, Inc.  Following investigation of Plaintiff's administrative charge, the Maryland Commission on Civil Rights issued Written Findings (Exhibit F to the Motion, ECF 11) which include reference to an interview with Ms. Kadijah Webster, a manager with Exelon bearing supervisory authority over Plaintiff (and referred to in Exhibit C to the Motion as "Manager from BGE-Exelon").

For purposes of the Motion only, the court is satisfied that Exelon management was aware of, and in fact was interviewed during, the administrative process; and, therefore, that Exelon was not prejudiced by Plaintiff's failure to identify Exelon as a party to his administrative charge.  In view of the foregoing, the court declines to dismiss the complaint in favor of allowing the parties to exchange discovery that will more fully establish the relationship between the Defendants as relates to Plaintiff's Title VII claims.

For the reasons set forth herein, the Motion will be **DENIED**.


_____/s/_____

Julie R. Rubin

United States District Judge

3

**JA70**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

HARRY A. BOLDEN

    *Plaintiff,*

    v.

CAEI, INC., *et al.,*

    *Defendants.*

Civil No. JRR-21-02295

## ORDER

In accordance with the Memorandum Opinion issued herewith, upon consideration of Defendant Exelon Business Services Company, LLC's Motion to Dismiss Plaintiff's Complaint and Supporting Memorandum (ECF 11), Plaintiff's response in opposition thereto (ECF 14), and Defendant's reply (ECF 16), it is this 9th day of May 2022, hereby

**ORDERED** that Defendant Exelon Business Services Company, LLC's Motion to Dismiss Plaintiff's Complaint is **DENIED.**

                               /s/

                          Julie R. Rubin

                          United States District Judge

**JA71**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| HARRY A. BOLDEN <br> 604 Aldershot Road <br> Baltimore, Maryland 21229 | ) <br> ) <br> ) <br> ) |
| Plaintiff | ) <br> )    Civil Case No: 1:21-cv-02295-JRR |
| v. | ) <br> ) |
| CAEI, INC. <br> 9256 Bendix Rd., Suite 102 <br> Columbia, MD 21045 | ) <br> ) <br> ) <br> ) |
| Defendant 1 | ) <br> ) |
| BALTIMORE GAS AND ELECTRIC <br> COMPANY <br> 2 Center Plaza <br> 110 West Fayette Street <br> Baltimore MD 21201 | ) <br> )    (JURY TRIAL DEMANDED) <br> ) <br> ) <br> ) |
| Defendant 2 | ) <br> ) <br> ) |

## FIRST AMENDED COMPLAINT

Plaintiff, Harry A. Bolden, by and through undersigned counsel, hereby respectfully files this Complaint, and in support states:

## JURISDICTION AND VENUE

1. This court has jurisdiction pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. (hereinafter referred to as "Title VII").

2. That all actions complained of herein took place in Maryland.

3. Defendant, CAEI, Inc., ("Defendant 1" or "CAEI") is a Maryland corporation headquartered in Columbia, Maryland.

4. Defendant, Baltimore Gas and Electric Company, ("Defendant 2" or "BGE") is a Maryland corporation headquartered in Baltimore, MD, which does extensive business in the State of Maryland.

5. That at all times relevant hereto, CAEI and BGE were business entities employing fifteen (15) or more persons, and are both "employers" within the meaning of Title VII.

6. In accordance with Title VII, Plaintiff timely filed a Charge of Discrimination with the Maryland Commission on Civil Rights ("MCCR") on October 17, 2016.

7. Thereafter, on June 10, 2021, a Notice of Right to Sue was issued by the EEOC. Therefore, Plaintiff has properly exhausted his administrative remedies before timely filing suit.

## FACTS COMMON TO ALL COUNTS

8. Plaintiff is an African-American male.

9. In September 2014, Plaintiff began working for CAEI and BGE as a Customer Service Representative II at a jointly operated facility in Columbia, Maryland.  Plaintiff was supervised on a day-to-day basis by both CAEI and BGE managers, who both exercised control over Plaintiff's conditions of work, and had the power to hire, fire, discipline, assign, and/or promote Plaintiff.

10. Plaintiff's job performance was invariably excellent, and he received several awards for his performance during his employment.

2

**JA73**

11. However, Plaintiff was subjected to severe and pervasive harassment by his direct supervisor, Angelique Watts ("Ms. Watts"), an employee of CAEI, who became his supervisor around May 2015.

12. Ms. Watts forced Plaintiff to perform menial and degrading tasks that were not demanded of other employees; these tasks included preparing and serving meals for the office staff.

13. Ms. Watts unjustifiably criticized Plaintiff's work habits, refused to allow him job-related accommodations that were provided to other employees, and repeatedly moved his desk around the office to undesirable locations.

14. Ms. Watts, on many different occasions, told Plaintiff he needed to "thug it up" when speaking with customers on the phone, and also implied repeatedly that he was not behaving stereotypically "black" enough.

15. At one point during his employment, during a review of Plaintiff's call recordings, Ray Hubbard ("Mr. Hubbard"), a CAEI Vice President, told Plaintiff that he didn't sound "black enough" on the phone with customers- and that he should try to change that to be more effective at his job.

16. On approximately January 15, 2016, Plaintiff began complaining to the Human Resources department of CAEI about the harassment and discrimination he felt that he was being subjected to. Plaintiff made several additional complaints, some of which were verbally made to Ms. Smoot (an HR manager).

17. Immediately following his initial complaint to HR, Ms. Watts and Mr. Hubbard began escalating the harassment of Plaintiff, and looking for ways to punish and

3

JA74

provoke him.  For instance, they insisted that Plaintiff move his desk yet again, knowing that this would make him feel degraded and discriminated against.

18. On February 11, 2016, during a meeting with Mr. Hubbard, Plaintiff complained again, this time more vociferously, about the discriminatory and harassing treatment he was perceiving- in particular from Ms. Watts.

19. On the same day, February 11, 2016, Plaintiff was terminated from his position.

### COUNT I- DISCRIMINATION/DISPARATE TREATEEMENT (RACE AND SEX) Title VII of the Civil Rights Act of 196442 U.S.C. §§ 2000e et seq.

20.  Plaintiff incorporates by reference the allegations in paragraphs 1 through 19 as if fully set forth herein.

21. That Defendants carried out the aforementioned acts of discrimination against Plaintiff based on his race and sex (African-American and male) – protected classes under Title VII.

22. That the aforementioned acts constitute unlawful practices pursuant to Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. §§ 2000e et seq.

23. That the effect of the practices complained of above was to deprive Plaintiff of equal employment opportunities and otherwise adversely affect his status as an employee because of his race and sex.

24. That the unlawful employment practices complained of above were intentional.

4

**JA75**

25. That the discriminatory actions as set forth above, have cause and will continue to cause Plaintiff to suffer lost earnings and earning capacity, severe emotional distress, humiliation, and mental anguish.

26. That the intentional discriminatory actions of Defendants, as alleged above, were done with malice and/or reckless indifference to Plaintiff's rights.

### COUNT II- HARASSMENT
### (RACE AND SEX)
### Title VII of the Civil Rights Act of 196442 U.S.C. §§ 2000e et seq.

27. Plaintiff incorporates by reference the allegations in paragraphs 1 through 19 as if fully set forth herein.

28. That Defendants carried out the aforementioned acts of harassment against Plaintiff based on his race and sex (African-American and male) – protected classes under Title VII.

29. That the aforementioned acts constitute unlawful practices pursuant to Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. §§ 2000e et seq.

30. That the effect of the harassment complained of above was to deprive Plaintiff of equal employment opportunities and otherwise adversely affect his status as an employee because of his race and sex.

31. That the unlawful harassment complained of above was intentional.

32. That the harassment as set forth above, have cause and will continue to cause Plaintiff to suffer lost earnings and earning capacity, severe emotional distress, humiliation, and mental anguish.

5

**JA76**

33. That the intentional harassment of Defendants, as alleged above, was done with malice and/or reckless indifference to Plaintiff's rights.

## COUNT III- RETALIATION AND WRONGFUL TERMINATION
## Title VII of the Civil Rights Act of 196442 U.S.C. §§ 2000e et seq.

34. Plaintiff incorporates by reference the allegations in paragraphs 1 through 19 as if fully set forth herein.

35. That Defendants carried out the termination of Plaintiff in retaliation for his good faith complaints of unlawful discrimination and harassment in violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. §§ 2000e et seq.

36. That the aforementioned acts constitute unlawful practices pursuant to Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. §§ 2000e et seq.

37. That the effect of the retaliation complained of above was to deprive Plaintiff of equal employment opportunities and otherwise adversely affect his status as an employee because of his race and sex.

38. That the unlawful retaliation complained of above was intentional.

39. That the retaliation as set forth above, have cause and will continue to cause Plaintiff to suffer lost earnings and earning capacity, severe emotional distress, humiliation, and mental anguish.

40. That the intentional retaliation of Defendants, as alleged above, was done with malice and/or reckless indifference to Plaintiff's rights.

JA77

WHEREFORE, Plaintiff respectfully requests that the Court award him compensatory (economic and non-economic, past and future, including emotional and mental pain and suffering) and punitive damages in an amount to be determined at trial, plus court fees and costs, statutory pre-judgment interest, reasonable attorney's fees, and any further relief as the Court may find necessary and appropriate in the interests of justice.

### DEMAND FOR JURY TRIAL

Plaintiff, Harry A. Bolden, by and through undersigned counsel, hereby demands that this above-captioned matter be tried before a jury on all issues so triable.

Respectfully Submitted,

/s/ Joseph D. Allen

Joseph D. Allen, Esq. (#20736)
Simms Showers LLP
201 International Circle, Suite 230
Baltimore, Maryland 21030
Phone: 443-290-8710
Facsimile: 410-510-1789
jdallen@simmsshowers.com

Attorney for Plaintiff

7

**JA78**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

HARRY A. BOLDEN,                          *
                                          *
            Plaintiff,                    *
                                          *
v.                                        *   Civil Case No.: 1:21-cv-02295-JRR
                                          *
CAEI INC. and                             *
BALTIMORE GAS AND ELECTRIC, CO.           *
                                          *
            Defendants.                   *
_____/

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, Baltimore Gas and Electric Company ("BGE"), by and through its undersigned

counsel, and pursuant to Federal Rule of Civil Procedure 56, hereby moves for summary judgment

on all three counts of Plaintiff's Amended Complaint (ECF No. 37).

This case involves co-Defendant CAEI, Inc.'s ("CAEI")[1] decision to terminate its

employee, Plaintiff Harry Bolden. Co-defendant BGE did not employ Plaintiff, discriminate

against or harass Plaintiff, and was not involved with the decision to terminate Plaintiff. Rather,

CAEI terminated Plaintiff after he demonstrated concerning and unprofessional behavior towards

CAEI management and after three female CAEI employees reported to CAEI management that

Plaintiff made inappropriate and threatening comments to them referencing that he could kill them

with a knife and put their bodies in the trunk of his new car and no one would know.

---

[1] CAEI is a Defendant in this lawsuit. Plaintiff served CAEI on December 14, 2021 and has made no efforts to involve or obtain discovery from CAEI. To date, CAEI has not responded to the Complaint. CAEI filed a voluntary petition for Chapter 7 bankruptcy on April 9, 2018 in the United States Bankruptcy Court in the District of Maryland. *See CAEI, Inc.*, Bankruptcy Petition 1:18-bk-14656.

**JA79**

As set forth more fully in the accompanying Memorandum of Law in Support of this Motion, the undisputed material facts demonstrate that judgment as a matter of law is appropriate because (1) Plaintiff did not satisfy his administrative prerequisites given that he failed to name BGE and the substantial identity exception to the naming requirement does not apply; (2) BGE did not jointly employ Plaintiff; and (3) Plaintiff did not experience discrimination, harassment, or retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII").

WHEREFORE, Defendant respectfully requests this Court enter an Order granting Defendant's Motion for Summary Judgment.

Respectfully submitted,

_____/s/_____
Lindsey A. White (Bar No. 29183)
Veronica Yu Welsh (Bar No. 10024)
SHAWE ROSENTHAL LLP
One South Street, Suite 1800
Baltimore, Maryland 21202
Telephone: (410) 752-1040
Facsimile: (410) 752-8861
white@shawe.com
vyw@shawe.com

*Attorneys for Defendant, Baltimore Gas and Electric Company*

**JA80**

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on January 30, 2023, true and correct copies of

Defendant's Motion for Summary Judgment, Memorandum of Law in Support, and Proposed

Order were electronically filed and thereby served upon:

> Joseph D. Allen
> Simms Showers, LLP
> 201 International Circle, Suite 230
> Baltimore, MD 21030
> jdallen@simmsshowers.com
>
> *Attorney for Plaintiff*

_____
        /s/
Lindsey A. White

**JA81**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

HARRY A. BOLDEN,                          *
                                          *
        Plaintiff,                     *
                                          *
v.                                        *   Civil Case No.:  1:21-cv-02295-JRR
                                          *
CAEI INC. and                             *
BALTIMORE GAS AND ELECTRIC, CO.           *
                                          *
        Defendants.                    *
_____/

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
## <u>MOTION FOR SUMMARY JUDGMENT</u>

Respectfully submitted,

          /s/
Lindsey A. White (Bar No. 29183)
Veronica Yu Welsh (Bar No. 10024)
SHAWE ROSENTHAL LLP
One South Street, Suite 1800
Baltimore, Maryland 21202
Telephone: (410) 752-1040
Facsimile: (410) 752-8861
white@shawe.com
vyw@shawe.com

*Attorneys for Defendant, Baltimore Gas and
Electric Company*

**JA82**

## TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................................1

II.    STATEMENT OF UNDISPUTED MATERIAL FACTS ...................................4

    A.  The Parties and Plaintiff's Hiring Process ..................................................4

    B.  Plaintiff's Employment with CAEI ...........................................................5

    C.  Plaintiff's Termination ...............................................................................8

    D.  Plaintiff's Charge of Discrimination ..........................................................9

III.   SUMMARY JUDGMENT STANDARD .........................................................10

IV.   ARGUMENT ...................................................................................................11

    A.  BGE Is Entitled To Summary Judgment Because The Plaintiff
        Did Not Exhaust His Administrative Remedies As To BGE ....................11

        a.  Exceptions to Title VII's naming requirement are limited ..............12

        b.  BGE and CAEI do not satisfy the substantial identity exception ..............12

           i.  Plaintiff knew BGE's role when he filed his MCCR Charge ...............13

           ii.  BGE and CAEI's interests are not "so similar" that
              it was unnecessary to include BGE in the
              administrative proceedings ............................................................14

           iii.  BGE was prejudiced by not participating in the
               underlying administrative proceeding...........................................15

           iv.  BGE did not represent to Plaintiff that his
               relationship with him should be through CAEI ............................16

    B.  BGE Is Entitled To Summary Judgment Because BGE Was Not A Joint Employer........17

    C.  Even If Plaintiff Exhausted His Administrative Remedies Against BGE,
        And BGE Is A Joint Employer, BGE Is Still Entitled To Summary Judgment
        Because Neither BGE Nor CAEI Engaged In Unlawful Discrimination,
        Harassment, Or Retaliation Against Plaintiff .................................................20

**JA83**

a.  Plaintiff's allegations do not support claims of discrimination
    or harassment ...........................................................................................20

b.  Plaintiff cannot demonstrate BGE or CAEI discriminated against him ...................21

    i.  Plaintiff cannot establish a *prima facie* case of discrimination ...........................22

        1.  Plaintiff's performance was not satisfactory.................................................23

        2.  Plaintiff was not terminated under circumstances that
            give rise to discrimination.................................................................23

    ii.  Even if Plaintiff could establish a *prima facie* case of discrimination,
         CAEI had a legitimate, non-discriminatory reason for
         terminating Plaintiff ...........................................................................25

c.  Plaintiff's hostile work environment claims fail...........................................26

    i.  None of Plaintiff's allegations are based on his sex or race ...........................27

    ii.  CAEI's purported conduct was not severe or pervasive.................................27

d.  Plaintiff's retaliation claim fails because he cannot demonstrate
    a *prima facie* case, and CAEI had a legitimate, non-discriminatory
    reason for termination ...........................................................................29

    i.  Plaintiff cannot establish a *prima facie* retaliation claim......................................30

        1.  Plaintiff cannot show he engaged in protected activity ...................................30

        2.  Plaintiff's termination has no casual connection to his
            alleged protected activity ...................................................................32

    ii.  CAEI had a legitimate non-discriminatory reason for terminating Plaintiff .........34

V.    CONCLUSION.....................................................................................35

**JA84**

## <u>TABLE OF AUTHORITIES</u>

*Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll.*
848 F.2d 457 (4th Cir. 1988) ..................................................................................11

*Amirmokri v. Baltimore Gas and Elec. Co.*
60 F.3d 1126 (4th Cir. 1995) ..................................................................................22

*Anderson v. Liberty Lobby Inc.*
477 U.S. 242 (1986)................................................................................................10

*Bacchus v. Tubular Textile LLC*
No. 1:01-CV00621, 2003 WL 21796550 (M.D.N.C. Mar. 19, 2003) ...........................23

*Balazs v. Liebenthal*
32 F.3d 151 (4th Cir. 1994) ..................................................................................30

*Battle v. Price*
No. PWG-14-2250, 2018 WL 1963791 (D. Md. April 25, 2018) ..........................26, 35

*Bess v. Cty. Of Cumberland*
N.C. No. 5:11–CV–388–BR, 2011 WL 4809879 (E.D.N.C. Oct. 11, 2011)................27

*Bile v. RREMC, LLC*
No. 3:15-cv-51, 2015 WL 3902391 (E.D. Va. June 24, 2015)....................................11

*Bing v. Brivo Sys., LLC*
959 F.3d 605 (4th Cir. 2020) ..................................................................................24

*Boyer-Liberto v. Fontainbleau Corp.*
786 F.3d 264 (4th Cir. 2015) ..................................................................................28

*Butler v. Drive Automotive Indus. of Am.*
793 F.3d 404 (4th Cir. 2015) ................................................................17, 18, 19, 20

*Carson-Johnson v. Baltimore City Police Dept.*
BPG-18-3064, 2021 WL 3930098 (D. Md. Sept. 2, 2021)......................................21

*Casey v. GeekSquad*
823 F. Supp. 2d 344 (D. Md. 2011) ......................................................................11

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986)................................................................................................10

*Chang Lim v. Azar*
310 F. Supp. 3d 588 (D. Md. 2018)........................................................................28

**JA85**

*Coleman v. Kettler Management*
2022 WL 4369969 (E.D. Va. Sept. 21, 2022)..................................................28

*Dindinger v. Allsteel, Inc.*
2013 WL 11727240 (S.D. Iowa Nov. 22, 2013)...............................................29

*Dowe v. Total Action Against Poverty in Roanoke Valley*
145 F.3d 653 (4th Cir. 1998) ...........................................................................32

*Dugan v. Albemarle Cnty Sch. Bd.*
293 F.3d 716 (4th Cir. 2002) ...........................................................................34

*Eaton v. Ind. Dep't of Corr.*
657 F.3d 551 (7th Cir. 2011) ...........................................................................24

*E.E.O.C. v. Cent. Wholesalers, Inc.*
573 F.3d 167, 175 (4th Cir. 2009) ...................................................................27

*E.E.O.C.. 1618 Concepts, Inc.*
432 F. Supp. 3d 595 (M.D.N.C. 2020) ......................................................13, 14

*Elzey v. Wal-Mart Assocs., Inc.*
No. RDB-11-2151, 2012 WL 3715321 (D. Md. Aug. 28, 2012)...............11, 12, 13

*Ennis v. Nat'l Ass'n of Business and Educational Radio, Inc.*
53 F.3d 55 (4th Cir. 1995) .........................................................................10, 11

*Feldman v. Law Enforcement Assocs. Corp.*
752 F.3d 339 (4th Cir. 2014) ...........................................................................32

*Fort Bend Cnty. v. Davis*
139 S. Ct. 1843 (2019).....................................................................................11

*Gordon v. Carl Amber Brian Isaiah and Assocs.*
No. 2:19-CV-3008, 2022 WL 855547 (D.S.C. Mar. 22, 2022)........................19

*Hartz v. Administrators of Tulane Educ. Fund*
275 F. App'x 281 (5th Cir. 2008)......................................................................14

*Iwebo v. Sheppard Pratt Health Sys., Inc.*
No. BPG-19-3008, 2020 WL 4748579 (D. Md. Aug. 14, 2020).................23, 24

*Jiminez v. Mary Wash. Coll.*
57 F.3d 369 (4th Cir. 1995) .............................................................................35

**JA86**

*Jones v. Calvert Grp., Ltd.*
551 F.3d 297 (4th Cir. 2009) .................................................................11

*King v. Rumsfeld*
328 F.3d 145 (4th Cir. 2003) .................................................................23

*Kothe v. Cont'l Teves, Inc.*
461 F. Supp. 2d 466 (W.D. Va. 2006) ....................................................34

*Marshall v. Anne Arundel Cnty., Maryland*
No. CV SAG-18-0074, 2020 WL 1939712 (D. Md. Apr. 22, 2020) ................13, 14, 15

*McDonnell Douglas Corp. v. Green*
411 U.S. 792 (1973)......................................................................21, 25

*Mitchell v. Data Gen. Corp.*
12 F.3d 1310 (4th Cir. 1993) .................................................................10

*Okoli v.City of Balt.*
648 F.3d 216 (4th Cir. 2011) .................................................................30

*Perkins v. Int'l Paper Co.*
936 F.3d 196 (4th Cir. 2019) ....................................................27, 28, 32

*Phillips v. Goodwill Indus.*
No. GLR-14-3256, 2015 WL 3844089 (D. Md. June 19, 2015) ....................11, 12, 13

*Piney Run Pres. Ass'n v. Cty. Comm'rs of Carroll Cty.*
523 F.3d 453 (4th Cir. 2008) .................................................................13

*Proud v. Stone*
945 F.2d 796 (4th Cir. 1991) .................................................................21

*Samnang v. Bouchard Ventures, LLC*
No. CV-SAG-21-01398, 2021 WL 4197662 (D. Md. Sept. 15, 2021)....................32, 34

*Shaughnessy v. Duke Univ.*
No. 1:18-CV-461, 2018 WL 6047277 (M.D.N.C. Nov. 19, 2018) ....................13

*Smith v. CSRA*
12 F.4th (4th Cir. 2021) .......................................................................17

*Smith v. Delaware River Stevedores*
No. 07-1864, 2008 WL 4890135 (E.D. Pa. Nov. 10, 2008) ..........................16

**JA87**

*Spriggs v. Diamond Auto Glass*
242 F.3d 179 (4th Cir. 2001) ................................................................28

*St. Mary's Honor Ctr. v. Hicks*
509 U.S. 502 (1993) ..............................................................................35

*Swaso v. Onslow Cnty. Bd. of Ed.*
689 Fed. App'x 745 (4th Cir. 2017) .....................................................24

*Texas Dep't of Cmt'y Affairs v. Burdine*
450 U.S. 248 (1981) ..............................................................................21

*U.S. E.E.O.C. v. CACI Secured Transformations, LLC*
No. CV JKB-19-2693, 2021 WL 1840807 (D. Md. May 7, 2021).......18

*Univ. of Tex. Southwestern Med. Ctr. v. Nassar*
133 S. Ct. 2517, 2534 (2013) ...............................................................30

*Weil v. Sunrise Senior Living Mgmt., Inc.*
No. CV RDB-20-701, 2021 WL 5742383 (D. Md. Dec. 1, 2021) ........22

**Statues and Rules**

42 U.S.C. § 2000e-5(f)(1) .....................................................................11

FED. R. CIV. P. 56 ................................................................................10

**JA88**

This case involves co-Defendant CAEI, Inc.'s ("CAEI")[1] decision to terminate its employee, Plaintiff Harry Bolden. Co-defendant Baltimore Gas and Electric Company ("BGE") did not employ Plaintiff, discriminate against or harass Plaintiff, and was not involved with the decision to terminate Plaintiff. Rather, CAEI terminated Plaintiff after he demonstrated concerning and unprofessional behavior towards CAEI management and after three female CAEI employees reported to CAEI management that Plaintiff made inappropriate and threatening comments to them referencing that he could kill them with a knife and put their bodies in the trunk of his new car and no one would know. As set forth below, all claims against BGE should be dismissed because (1) Plaintiff did not satisfy his administrative prerequisites because he failed to name BGE, and the substantial identity exception to the naming requirement does not apply; (2) BGE did not jointly employ Plaintiff; and (3) Plaintiff did not experience discrimination, harassment, or retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII").

## I.    INTRODUCTION

BGE contracted with minority-owned business CAEI to provide billing specialists for its Collections Strategy Pilot, which focused on collecting outstanding funds due on bills from BGE's customers. At all relevant times, Plaintiff was a CAEI employee and worked as a billing specialist in BGE's pilot program. CAEI was in the business of providing information and technology consulting and professional services. BGE is Central Maryland's largest gas and electric utility provider.

---

[1] CAEI is a Defendant in this lawsuit. Plaintiff served CAEI on December 14, 2021 and has made no efforts to involve or obtain discovery from CAEI. To date, CAEI has not responded to the Complaint. CAEI filed a voluntary petition for Chapter 7 bankruptcy on April 9, 2018 in the United States Bankruptcy Court in the District of Maryland. *See* Bankruptcy Petition, *In re CAEI, Inc.*, No. 1:18-bk-14656 (D. Md. Apr. 9, 2018).

**JA89**

Plaintiff has filed a three count Amended Complaint[2] against CAEI and BGE, alleging that both entities discriminated against him based on his race (male) and sex (African American); harassed him based on his race and sex; and retaliated against him when CAEI terminated him. BGE hereby moves for summary judgment because (1) Plaintiff failed to exhaust his administrative remedies as to BGE prior to filing suit, (2) BGE was not Plaintiff's "employer," and (3) even if this Court determines BGE is a joint employer along with CAEI (which BGE strongly disputes), Plaintiff's claims still fail because neither entity discriminated, harassed, or retaliated against Plaintiff.

CAEI terminated Plaintiff in February 2016. On October 17, 2016, Plaintiff filed a Charge of Discrimination ("Charge") with the Maryland Commission on Civil Rights ("MCCR") solely against CAEI, where the Charge languished for five (5) years. It is undisputed that neither BGE nor Exelon was named in the Charge or received notice of the Charge until the lawsuit was filed in December 2021. Plaintiff's failure to name BGE as a respondent to the Charge, which is a prerequisite to filing suit under Title VII, procedurally bars him from pursuing this lawsuit against BGE because he did not exhaust his administrative remedies, and none of the limited exceptions to the naming requirement apply here. Despite Plaintiff's failure to properly exhaust his administrative remedies as to BGE, Plaintiff named BGE as a co-defendant in this lawsuit, presumably because CAEI filed for bankruptcy in 2018 and is now defunct. Plaintiff's strategy to name a financially viable Defendant in this lawsuit does not, and should not, render the statutory prerequisites that govern this case meaningless.

---

[2] Plaintiff erroneously sued Exelon Business Services Company, LLC ("Exelon") as a co-defendant with CAEI. On November 30, 2022, with the Court's permission, Plaintiff filed an Amended Complaint to replace Exelon with BGE as the proper Defendant. *See* ECF No. 37.

**JA90**

Plaintiff's claims against BGE also fail because BGE did not employ Plaintiff and BGE did not jointly employ Plaintiff. As discussed below, CAEI vice president Raymond Hubbard both hired and fired Plaintiff without input from BGE. Pursuant to a written contract with BGE, CAEI provided all of the staff to support BGE's new collections initiative. CAEI recruited and hired Plaintiff pursuant to a Temporary Worker Agreement that clearly defined CAEI as Plaintiff's employer. It is undisputed that CAEI provided Plaintiff, and other CAEI employees, with an orientation where they were provided CAEI's Employee Handbook. CAEI also issued Plaintiff's paychecks, paid into his unemployment insurance and worker's compensation, and provided him with benefits. Plaintiff also reported directly to a CAEI supervisor, who was on site daily. Mr. Hubbard made the decision to terminate Plaintiff without any input from BGE. Accordingly, BGE did not jointly employ Plaintiff and should be dismissed for that reason.

Moreover, Defendant is entitled to summary judgment on the merits of all three counts of the Amended Complaint. The decisions made with regard to Plaintiff were based on legitimate, non-discriminatory and non-retaliatory business reasons and there is no evidence of pretext. Plaintiff's complaints of minor workplace slights are neither severe nor pervasive, not objectively offensive, and are not linked to any protected status. Plaintiff did not specifically complain of these issues. Moreover, where the same decisionmaker both hired and fired an employee, as is the case here, the employer receives an inference that the decision was not due to discrimination. For these reasons, more fully discussed herein, the Court should grant BGE's motion for summary judgment and dismiss this case with prejudice.

**JA91**

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. The Parties and Plaintiff's Hiring Process

1.    CAEI was Plaintiff's "employer." Ex. 1, Pl's Dep. 7:3-11. CAEI provided information and technology consulting and professional services to companies. Ex. 2, Hubbard Decl. ¶ 3.[3]

2.    CAEI was headquartered at 9256 Bendix Road in Columbia, Maryland. Ex. 2, Hubbard Decl. ¶ 8. CAEI is a separate and distinct entity from BGE, and CAEI does not share any corporate or business identity with BGE. Ex. 2, Hubbard Decl. ¶ 10; *see also* ECF No. 15, BGE's Corporate Disclosure Statement. BGE is central Maryland's largest gas and electric utility company. Ex. 3, Andrews Decl. ¶ 3.

3.    CAEI's workforce was over 90% Black. Ex. 2, Hubbard Decl. ¶ 13. CAEI was a minority owned business. Ex. 1, Pl's Dep. 99:14-17; Ex. 2, Hubbard Decl. ¶ 3. CAEI took pride in being a minority-owned business and employing diverse employees. *Id*. ¶ 13.

4.    CAEI entered its contractual relationship with BGE with the intention that it would be the entity responsible for the management of its own employees. Ex. 2, Hubbard Decl. ¶ 14.

5.    Plaintiff applied for employment by physically going to CAEI's office at 9256 Bendix Road in Columbia, Maryland. Ex. 1, Pl's Dep. 83:10-17. BGE did not have an office on Bendix Road, nor was the location jointly operated by BGE and/or Exelon. *Id*. 83:18-22; Ex. 2, Hubbard Decl. ¶ 8.

6.    After completing the application, CAEI's Human Resources Director Kia Smoot (Black female) interviewed Plaintiff. Ex. 1, Pl's Dep. 84:5-18; Ex. 2, Hubbard Decl. ¶ 18. CAEI

---

[3] Plaintiff did not take any depositions in this case, so BGE submits several declarations in support of this Motion.

**JA92**

was solely responsible for hiring its employees, and Mr. Hubbard (White male) made the decision to hire Plaintiff. Ex. 2, Hubbard Decl. ¶¶ 8, 15.

**B. Plaintiff's Employment with CAEI**

7.      Plaintiff accepted a position with CAEI to work at BGE's financial solutions department program as a billing specialist. Ex. 1, Pl's Dep. 88:5-17. His first day of employment with CAEI was September 12, 2014. *Id*. 101:13-16.

8.      The financial solutions program was a pilot program and, at the time, planned to be a three (3) to six (6) month program. *Id*. 87:15-21. Plaintiff ultimately worked on the financial solutions program his entire tenure with CAEI, which was until February 2016. *Id*. 140:19-21.

9.      CAEI employed all of the billing specialists for BGE's financial solutions collections program, where Plaintiff worked. *Id*. 91:1-6; *see also* Ex. 2, Hubbard Decl. ¶ 11.

10.      On September 12, 2014, Plaintiff executed a "Temporary Worker Agreement." Ex. 1, Pl's Dep. 109:19-110:1; Ex. 4, Temporary Worker Agreement. "CAEI employees were made aware of the relationship between CAEI and BGE through the Temporary Worker Agreement at the outset of their employment." Ex. 2, Hubbard Decl. ¶ 19. The Temporary Worker Agreement is between Plaintiff, the "temporary worker," and CAEI, who is defined as the "temporary worker's employer." Ex. 4. Plaintiff was aware that CAEI was defined as his employer in the Temporary Worker Agreement. Ex. 1, Pl's Dep. 111:4-6. The Temporary Worker Agreement further states that CAEI contracted with Pontoon Solutions, defined as "Vendor," to provide certain services to Vendor's Customer's "temporary workforce." "Customer" is defined as Exelon Business Services Company. Ex. 4.

11.      Importantly, the Temporary Worker Agreement provides that:

Temporary Worker Acknowledges and agrees that no employment relationship between Temporary Worker and Customer or between Temporary Worker and

**JA93**

Vendor is created by this Agreement between Vendor and Customer or by Employer's Agreement with Vendor.

*Id*. ¶ 2.

12.    When he signed the Temporary Worker Agreement at his hire, Plaintiff was aware that CAEI was a separate entity from Exelon and BGE. Ex. 1, Pl's Dep. 114:19-22, 116:19-21, 205:4-8.

13.    After Plaintiff accepted employment with CAEI, he attended a CAEI orientation conducted by Ms. Smoot and Mr. Hubbard, which took place at CAEI's headquarters. Ex. 1, Pl's Dep. 90:8-16. During orientation, Plaintiff received a CAEI Employee Handbook. *Id*. 93:3-6. The CAEI Handbook was the operative Human Resources manual for Plaintiff. Ex. 2, Hubbard Decl. ¶ 21.

14.    Plaintiff was aware that the CAEI Handbook had policies prohibiting discrimination and harassment on the basis of protected characteristics (including race and sex), and retaliation, as well as a policy that complaints were to be directed to Human Resources. Ex. 5, Discrimination Policy; Ex. 1, Pl's Dep. 153:11-154:16.

15.    In addition, CAEI also had a Workplace Violence Policy, which provided that "Violence, threats, harassment, intimidation, and other disruptive behavior in our workplace will not be tolerated." Ex. 1, Pl's Dep. 155:4-16; Ex. 6, Workplace Violence Policy.

16.    Plaintiff, and the other billing specialists, sat in the same area and performed their work from individual cubicles. Ex. 1, Pl's Dep. 121:9-11.

17.    Plaintiff was supervised by CAEI supervisors, called "team leads," who were on site daily. Ex. 1, Pl's Dep. 107:22-108:13. Originally, Debra Chew (Latina) supervised Plaintiff, then Tabitha Horn (African American), and then Angelique Watts (African American). *Id*. 94:20-95:18, 99:8-13. These three Team Leads supervised Plaintiff in succession and did not overlap in

6

**JA94**

time and were Plaintiff's primary contacts to address work-related questions or issues. *Id*. 108:10-18. Plaintiff directed questions about pay or benefits to Ms. Smoot or to his Team Lead. *Id*. 102:6-103:6. Ms. Smoot also informed Plaintiff of his schedule when he worked for CAEI. *Id*. 103:16-21. The CAEI Team Leads would communicate schedule changes. *Id*. 105:11-17.

18.    CAEI issued Plaintiff's paychecks. *Id*. 103:7-15. CAEI provided Plaintiff with employment benefits (*e.g*., health insurance) and paid into worker's compensation and unemployment insurance for Plaintiff. Ex. 2, Hubbard Decl. ¶¶ 21-22.

19.    CAEI, not BGE, evaluated Plaintiff's performance and was responsible for issuing any discipline or making termination decisions. Ex. 1, Pl's Dep. 120, 127:19-128:17.

20.    Ms. Watts began supervising Plaintiff in approximately April 2015. *Id.* 132:1-12.

21.    Plaintiff believed Ms. Watts had favorites, including co-worker, Otis Rease (Black/Indian male), and that Plaintiff was not one of her favorites. *Id.* 179:12-18, 251:9-11.

22.    Ms. Watts moved Plaintiff's cubicle on two occasions. *Id*. 122:4-10. The first time, Ms. Watts moved everyone's cubicles, and the second time she only moved Plaintiff's cubicle. *Id*. She informed Plaintiff that she was moving his cubicle so that he would be closer to another billing specialist working with commercial accounts. *Id.* 124:6-10.

23.    On February 4, 2016, Plaintiff called Ms. Smoot to request to be moved to a different department. *Id.* 298:12-18, 299:22-300:1, 301:14-20. During this call, he told Ms. Smoot about his challenges with Ms. Watts. *Id*. 201:10-17. Specifically, Plaintiff told Ms. Smoot that Ms. Watts repeatedly asked him to serve food to his team during group celebrations and meals. *Id*. 303:11-304:1.

24.    Plaintiff never reported to either Ms. Smoot or Mr. Hubbard that Ms. Watts told him to "thug it up." *See generally id*. He also never reported that he believed he was being

**JA95**

"harassed" on the basis of his sex or race. *See generally id.* 298-304:1; Ex. 2, Hubbard Decl. ¶ 25-26 (Plaintiff raised general work-related complaints about Ms. Watts but never that she was treating him differently because of race or sex).

25.     Plaintiff did not complain to HR, or anyone else, prior to February 4. Ex. 1, Pl's Dep. 301:10-13.

26.     Plaintiff applied for a position with BGE through BGE's website just before CAEI terminated him. *Id.* 203:6-205:3.

27.     On February 5, 2016, Plaintiff met with Mr. Hubbard and Ms. Watts to discuss Plaintiff's reaction to having his seat being moved in the call center. *Id.* 211:11-212:18. Ms. Watts claimed that Plaintiff had thrown his headset at her and pushed her in response to asking Plaintiff to move his seat. *Id.* 212:14-18.

28.     Thereafter, Mr. Hubbard was notified that three female CAEI employees said that Plaintiff had made inappropriate and threatening comments to them referencing that he could kill them with a knife and put their bodies in the trunk of his new car and that no one would know. Ex. 2, Hubbard Decl. ¶ 28. As a result, these employees did not want to continue to work with Plaintiff. *Id.* Shortly after learning about the complaint, on February 11, 2016, Plaintiff met with Mr. Hubbard and Ms. Smoot at CAEI's facility. Ex. 1, Pl's Dep. 217:1-9. During this meeting, Plaintiff was placed on paid leave and was sent home for the day. *Id.* 219:1-3.

**C. Plaintiff's Termination**

29.     On February 12, 2016, Mr. Hubbard terminated Plaintiff by phone. *Id.* 219:17-20. Mr. Hubbard made the decision to terminate Plaintiff. Ex. 2, Hubbard Decl. ¶ 30.

30.     CAEI terminated Plaintiff based on his agitated demeanor during the February 5, meeting, and also due to inappropriate and threatening reports from three female CAEI employees

**JA96**

that said Plaintiff had made inappropriate and threatening comments to them referencing that he could kill them with a knife and put their bodies in the trunk of his new car and no one would know. *Id*. ¶ 28-30.

31.     BGE did not provide input into the decision to terminate Plaintiff. Ex. 2, Hubbard Decl. ¶ 31; Ex. 3 Andrews Decl. ¶ 11. Ex. 1, Pl's Dep. 96:9-15.

32.     Plaintiff admitted that he kept a cake knife in his drawer, rather than the office kitchen, but that he did not think the knife was "sharp enough to penetrate anyone, unless done with a great amount of force." Ex. 1, Pl's Dep. 192:6-193:11. He also got a new car on or around January 27, 2016. Ex. 7, Text Message from Plaintiff to Watts.

33.     Following his termination, Plaintiff did not file for unemployment insurance against BGE, only CAEI. Ex. 1, Pl's Dep. 29:3-8.

**D. Plaintiff's Charge of Discrimination**

34.     On October 17, 2016, Plaintiff filed a Charge of Discrimination against CAEI, only, with the MCCR. Ex. 8, Charge. Plaintiff did not file a Charge of Discrimination against BGE or Exelon. Ex. 9, Plaintiff's Response to Request for Admissions No. 15. On November 3, 2016, the EEOC issued the Notice of the Charge of Discrimination to Ms. Smoot. Ex. 10, Notice.

35.     During the investigation, the MCCR conducted a fact-finding hearing, which included Plaintiff, Ms. Smoot, Mr. Hubbard, Mr. Barnett (CAEI's CEO), and Mr. Rease. Ex. 1, Pl's Dep. 143:21-144:9. No one from BGE or Exelon attended. *Id*.

36.     During the fact-finding conference with the MCCR, Plaintiff and CAEI entered into a Settlement Agreement to resolve the matter. Both Plaintiff and CAEI signed the Settlement Agreement. Ex. 1, Pl's Dep. 199:1-21; Ex. 11 (MCCR 165-168). BGE did not participate in these discussions. Ex. 1, Pl's Dep. 143:21-144:9, 199:4-12.

37.     Plaintiff does not know whether MCCR interviewed any witnesses during the investigation of the Charge. Ex. 1, Pl's Dep. 145:2-4. The MCCR file does not contain interview notes of any BGE employee. Khadija Duncan (formerly Webster) was not interviewed by the MCCR. Ex. 12, Duncan Decl. ¶ 7.

38.     The MCCR included a date in its Determination that Plaintiff had told the MCCR was incorrect. *Id*. 151:3-152:3 (agreeing that there were mistakes in the MCCR's Determination that represented an "unnecessary carelessness").

39.     On September 23, 2020, the MCCR issued a Written Finding of No Probable Cause. Ex. 13, Written Finding.

40.     The EEOC issued a copy of the Notice of Right to Sue to CAEI on June 10, 2021. Ex. 14, Notice of Right to Sue. Plaintiff filed this suit on September 7, 2021. ECF No. 1.

### III.     SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56, the moving party is entitled to summary judgment if it can demonstrate that: (1) there is no genuine dispute as to any material fact; and (2) summary judgment is appropriate as a matter of law. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). "Genuineness means that the evidence must create a fair doubt; wholly speculative assertions will not suffice." *Ennis v. Nat'l Ass'n of Bus. and Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995). In deciding whether summary judgment is appropriate, the Court "scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp*., 12 F.3d 1310, 1316 (4th Cir. 1993). The mere existence of a scintilla of evidence in support of Plaintiff's position is insufficient; rather, there must be evidence on which a factfinder could reasonably find for Plaintiff. *See Anderson*, 477 U.S. at 252. Moreover,

**JA98**

a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Casey v. GeekSquad*, 823 F. Supp. 2d 344, 349 (D. Md. 2011). "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis*, 53 F.3d at 62 (citations omitted).

## IV.    ARGUMENT

### A. BGE Is Entitled To Summary Judgment Because Plaintiff Did Not Exhaust His Administrative Remedies As To BGE.

Prior to filing suit under Title VII, a plaintiff must exhaust his administrative remedies "against the respondent named in the charge." 42 U.S.C. § 2000e-5(f)(1). One of the administrative prerequisites is filing "a charge of discrimination with the EEOC." *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009), *abrogated on other grounds by Fort Bend Cnty. v. Davis*, 139 S. Ct. 1843, 1849 (2019). "The scope of the plaintiff's right to sue is limited to the parties identified and practices complained of in the charge of discrimination." *Id.* "[T]he failure to name a party on a charge filed with the [EEOC] constitutes a failure to exhaust administrative remedies." *Elzey v. Wal-Mart Assocs., Inc.*, No. RDB-11-2151, 2012 WL 3715321, at *3 (D. Md. Aug. 28, 2012) (citing *Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll.*, 848 F.2d 457, 458-59 (4th Cir. 1988)); *see also* 42 U.S.C. § 2000e-5(f)(1)).

Title VII's naming requirement serves dual purposes: (1) to notify the charged party of the asserted violation and (2) to bring the charged party before the agency to facilitate the goal of securing voluntarily compliance with the law. *See, e.g., Bile v. RREMC, LLC*, No. 3:15-cv-51, 2015 WL 3902391, at *2 (E.D. Va. June 24, 2015). "[T]he United States Court of Appeals for the Fourth Circuit has explained that notice to the employer of the alleged discrimination serves as a vital function in remedying an unlawful employment practice because it gives an employer the opportunity to independently investigate and resolve the alleged discriminatory actions." *Phillips*

11

**JA99**

*v. Goodwill Indus.*, No. GLR-14-3256, 2015 WL 3844089, at *2 (D. Md. June 19, 2015) (citing

*Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 407 (4th Cir. 2013)).

### a. Exceptions to Title VII's naming requirement are limited.

There are two limited exceptions to the statutory requirement that a plaintiff name a

defendant in the underlying EEOC charge prior to filing suit. First, courts have permitted suit to

proceed if (1) defendants received fair notice and (2) the EEOC was able to attempt conciliation.

*See Elzey*, 2012 WL 3715321, at *3. It is not disputed that BGE did not receive "fair notice" and

did not attempt conciliation, or participate in the MCCR's settlement process. The other limited

exception to the statutory requirement that a plaintiff name a defendant in the underlying EEOC

charge prior to filing suit is governed by the four-part substantial identity test:

> 1) whether the role of the unnamed party could through reasonable effort by the
> complainant be ascertained at the time of the filing of the EEOC complaint;
>
> 2) whether, under the circumstances, the interests of a named [party] are so similar
> as the unnamed party's that for the purpose of obtaining voluntary conciliation and
> compliance it would be unnecessary to include the unnamed party in the EEOC
> proceedings;
>
> 3) whether its absence from the EEOC proceedings resulted in actual prejudice to
> the interests of the unnamed party;
>
> 4) whether the unnamed party had in some way represented to the complainant that
> its relationship with the complainant is to be through the named party.

*Id.* at *3. The second and third factors are the most important. *Id.*; *see also Phillips*, 2015 WL

3844089, at *2 ("The substantial identity exception allows an unnamed respondent to be sued in a

district court action where the 'unnamed defendants are substantially or 'functionally' identical to

named ones.'").

### b. BGE and CAEI do not satisfy the substantial identity exception.

As an initial matter, Plaintiff admits that he never filed a Charge against BGE. Ex. 9,

Requests for Admission No. 15. Plaintiff further admits that BGE did not participate in any

conciliation or pre-suit settlement discussions. *Id.* at No. 17. Even though Plaintiff alleges BGE

**JA100**

and CAEI are joint employers, even in cases where a plaintiff contends two entities are a joint employer, the plaintiff must file charges of discrimination against both entities to satisfy Title VII's administrative requirement. *See Phillips*, 2015 WL 3844089, at *2 (citing EEOC Compliance Manual, § 2-III(B)(1)(a)(iii)(b)). Accordingly, the only way Plaintiff could have satisfied his administrative prerequisites is if the substantial identity exception applies. *See, e.g.*, *Elzey*, 2012 WL 3715321, at *3. It bears noting that the Fourth Circuit has not expressly adopted this test, but many district courts within the Fourth Circuit have applied it. *See e.g., E.E.O.C. v. 1618 Concepts, Inc.*, 432 F. Supp. 3d 595, 604 (M.D.N.C. 2020).

Plaintiff bears the burden of proof to show that this exception applies. *See Shaughnessy v. Duke Univ.*, No. 1:18-CV-461, 2018 WL 6047277, at *3 (M.D.N.C. Nov. 19, 2018) (citing *Piney Run Pres. Ass'n v. Cty. Comm'rs of Carroll Cty.*, 523 F.3d 453, 459 (4th Cir. 2008)). The fact that this Court denied BGE's Motion to Dismiss on this basis does not preclude the Court now granting summary judgment. *See, e.g.*, *Marshall v. Anne Arundel Cnty., Maryland*, No. SAG-18-0074, 2020 WL 1939712, at *4 (D. Md. Apr. 22, 2020) (granting summary judgment in favor of the defendant where the court previously denied the defendant's Motion to Dismiss on the basis of the substantial identity test, noting that summary judgment is a "more exacting standard.").

### i. Plaintiff knew BGE's role when he filed his MCCR Charge.

Plaintiff knew of BGE's contractual relationship with CAEI at the time he filed his EEOC complaint. Indeed, Plaintiff testified that he knew from the outset of his employment that he was employed by CAEI to perform work on a BGE project. Plaintiff testified that CAEI is in the business of providing trained employees to other companies, including BGE. Plaintiff further testified that he was aware CAEI and BGE (and Exelon) were separate entities. During his orientation with CAEI, Plaintiff signed a Temporary Worker Agreement, which outlined the

13

**JA101**

different business entities involved and their respective roles. *See Shaughnessy*, 2018 WL 6047277, at *4 (noting that prong one was resolved in the defendant's favor where the plaintiff entered into a separate contract with the unnamed party and would have therefore known the named and unnamed parties were separate entities). Plaintiff told the intake officer about his time "at CAEI & BGE." *See* Ex. 15, (MCCR-28). Plaintiff knew of BGE's role in his employment relationship with CAEI and could have filed a Charge against BGE had he so desired. Plaintiff has wholly failed to articulate any reason for failing to name BGE in his underlying Charge.

### ii. BGE and CAEI's interests are not "so similar" that it was unnecessary to include BGE in the administrative proceedings.

For the second factor, courts consider interrelatedness of operations, management, ownership, and corporate officers when determining whether the unnamed party's interests were so similar as the named party that it was unnecessary for the unnamed party to be included in the administrative proceedings. *See 1618 Concepts, Inc.*, 432 F. Supp. 3d at 605 (finding prong two satisfied because the three defendants shared a main office location where employee files were housed, and shared corporate officers, management, and corporate ownership). By contrast, courts do not find legally distinct entities share interests at the administrative level especially where they do not share these factors. *See, e.g., Hartz v. Adm'rs of Tulane Educ. Fund*, 275 F. App'x 281, 283 (5th Cir. 2008) (rejecting Plaintiff's argument that Tulane Educational Fund ("Tulane") and University Healthcare System LC ("UHS") shared an identity of interest where Tulane was a non-profit educational institution and UHS was a for-profit limited liability company and the two entities were domiciled at different addresses); *Marshall*, 2020 WL 1939712, at *7 (concluding the second factor was in favor of the unnamed party because the County and the State's Attorney's Office were legally distinct and not branches of one another). Indeed, the *Marshall* court noted

14

**JA102**

that because it was a legally separate entity, the County "had an independent interest in defending itself from Plaintiff's charges of discrimination." *Id.*

BGE and CAEI do not share any of the indicia of having similar interests. They do not have interrelated operations, management, ownership, or corporate officers. BGE is a gas and electric utility, and CAEI is a company that provided information and technology consulting and professional services to companies, including BGE. BGE contracted with CAEI to provide resources to staff its Financial Services Program. CAEI's headquarters were in Columbia, Maryland. BGE did not have a presence at that location. The considerations supporting this factor are strongly in BGE's favor. Like the County in *Marshall*, BGE had a strong, independent interest in defending itself from Plaintiff's Charge of discrimination in the administrative stage.

### iii. BGE was prejudiced by not participating in the underlying administrative proceeding.

Third, BGE was actually prejudiced by the fact that it was unable to participate in the investigation and that it was not included in the fact-finding conference or the pre-determination settlement discussions. BGE's exclusion from these events—starting with a 2016 Charge of Discrimination—goes against the very purpose of Title VII's naming and notice requirements altogether. BGE was prejudiced because its interests were not represented in the administrative proceedings, and it was not permitted to provide information that may have resulted in Plaintiff deciding not to pursue action against BGE. Plaintiff submits no evidence to the contrary.

Plaintiff cannot point to any evidence in the record that supports the conclusion that BGE had actual or constructive notice of his Charge. The undisputed evidence shows that BGE did not receive notice of this matter until December of 2021, after this litigation commenced. Ex. 3, Andrews Decl. ¶ 12. The passing reference to Ms. Webster[4]—a BGE employee—in the MCCR's

---

[4] "Webster" is Ms. Duncan's maiden name and last name from 2014-2016.

**JA103**

Written Finding, from which the Court previously inferred that Ms. Webster was interviewed during the investigation, cannot support an inference that BGE had the requisite notice of the Charge for two reasons. First, there is no evidence in the MCCR's file that Ms. Webster, or any other BGE employee, was interviewed. Plaintiff testified he did not know who was interviewed. Ms. Webster herself has testified she was not interviewed or aware of Plaintiff's Charge. Ex. 12, Duncan Decl. ¶ 7. Although it is unclear from where the MCCR sourced this reference to Ms. Webster, there is no evidence that Ms. Webster, or any other BGE employee, was interviewed as part of the investigation. In fact, even Plaintiff admits that the MCCR made numerous mistakes in its investigation. Moreover, a stray statement in the Written Finding is not sufficient to conclude that Ms. Webster was interviewed given her express testimony that she was not. Second, even if Ms. Webster was interviewed—which she was not—the Charge only alleges conduct by CAEI employees and would not put BGE even on constructive notice that Plaintiff had allegations against BGE or that BGE may be responsible for any of the alleged conduct. *See* Ex. 8, Charge.

### iv. BGE did not represent to Plaintiff that his relationship with him should be through CAEI.

The final factor likewise favors BGE. Applying this fourth factor to the instant facts is inherently strained because, as discussed fully above, CAEI and BGE are distinct and separate entities. Plaintiff was also fully aware of this fact. There is simply no evidence in the record to establish that Plaintiff could have reasonably believed that by naming CAEI in the Charge, he was also naming BGE. *See, e.g.*, *Smith v. Delaware River Stevedores*, No. 07-1864, 2008 WL 4890135, at *4 (E.D. Pa. Nov. 10, 2008) (interpreting factor 4 "as asking whether, based on representations made to her, Ms. Smith could have reasonably believed that by naming the Union in her formal charge, she was also naming PMTA, Delaware River, and Greenwich"). In fact, the record is devoid of any representations BGE made to Plaintiff to satisfy this factor.

The distinction between CAEI and BGE is further highlighted by Plaintiff's desire to work for BGE, instead of CAEI. Plaintiff testified that he had applied for a position with BGE just before CAEI terminated him. Indeed, there is no dispute as to prong four of the substantial identity test.

Accordingly, because all four factors favor BGE, the Court should find Plaintiff did not properly exhaust his administrative remedies prior to filing suit.

**B.  BGE Is Entitled To Summary Judgment Because BGE Was Not A Joint Employer.**

In determining whether two entities are joint employers, this Court considers the following factors:

(1) authority to hire and fire the individual;

(2) day-to-day supervision of the individual, including employee discipline;

(3) whether the putative employer furnishes the equipment used and the place of work;

(4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes;

(5) the length of time during which the individual has worked for the putative employer;

(6) whether the putative employer provides the individual with formal or informal training;

(7) whether the individual's duties are akin to a regular employee's duties;

(8) whether the individual is assigned solely to the putative employer; and

(9) whether the individual and putative employer intended to enter into an employment relationship.

*Smith v. CSRA*, 12 F.4th 396, 414 (4th Cir. 2021) (quoting *Butler v. Drive Auto. Indus. of Am.*, 793 F.3d 404, 414 (4th Cir. 2015)).

The Court considers the first three *Butler* factors the most important in determining whether a joint employment relationship exists. *Id*. (citing *Butler*, 793 F.3d at 414). The "principal guidepost" of the joint employer test is control. *Id*. Here, factors 1 and 2 are in BGE's favor because BGE did not have authority to hire or fire Plaintiff, and did not perform daily supervision of Plaintiff, including discipline. "CAEI was solely responsible for hiring and firing its employees

17

**JA105**

and providing day-to-day supervision of its employees at the Collections Strategy Pilot, including disciplining its employees and promoting its employees to senior or lead positions." Ex. 2, Hubbard Decl. ¶ 15 (noting that Hubbard both hired and fired Plaintiff). CAEI had on-site supervisors for the duration of Plaintiff's employment, and to whom he would direct work-related questions and issues. Plaintiff testified that Mr. Hubbard terminated his employment, and Mr. Andrews was not aware of his termination. Mr. Andrews testified that BGE did not provide any input into termination. Plaintiff further testified his offer came from CAEI.

As for the third factor, although Plaintiff worked at a BGE site using BGE equipment, the Fourth Circuit has interpreted the third factor as examining "'where and how the work takes place, [and] is valuable for determining how similar the work functions are compared to those of an ordinary employee.'" *U.S. E.E.O.C. v. CACI Secured Transformations, LLC*, No. JKB-19-2693, 2021 WL 1840807, at *8 (D. Md. May 7, 2021) (quoting *Butler*, 793 F.3d at 415). As such, this factor favored joint employment in *Butler* and *CACI Secured Transformations, LLC*, where employees of both companies "worked 'side by side,' performed the same tasks, and used the same equipment . . . [and] there was little or no effective difference between the work performed by the two sets of employees." *Butler*, 793 F.3d at 415.

Here, even though Plaintiff worked at a BGE site using BGE equipment, Plaintiff only worked side by side with other CAEI employees and only CAEI employees performed billing specialist work for BGE. BGE employees did not perform this role, or equivalent roles, at the BGE site. Given the ultimate considerations when examining the third factor, as explained in *Butler* and *CACI Secured Transformations, LLC*, the fact that only CAEI employees performed the same work functions as billing specialists, and the fact that BGE employees did not perform this role or similar functions, this factor weighs against a finding of joint employment.

18

Remaining factors 7 and 9 strongly support a finding that BGE and CAEI were not joint employers. Plaintiff's Temporary Worker Agreement with CAEI clearly acknowledges that Plaintiff is CAEI's employee ("Temporary Worker acknowledges and agrees that no employment relationship between Temporary Worker and Customer (Exelon) or between Temporary Worker and Vendor (Pontoon) is created by this Agreement, the agreement between Vendor and Customer, or by Employer's agreement with Vendor."). Ex. 4, Temporary Worker Agreement ¶ 1 (defining CAEI as Temporary Worker's "Employer"). In the Temporary Worker Agreement, Employee further acknowledges that Customer has no obligation to pay Temporary Worker wages or benefits. *Id*. CAEI maintained Plaintiff's employment records, including payroll, paid the employer's share of taxes, and contributed to required employer programs, such as unemployment insurance and worker's compensation insurance. All of the billing specialists who worked in the financial solutions project were CAEI employees. None of them were BGE employees.

As for factors 5, 6, and 8, Plaintiff worked for CAEI for approximately one year and five months. BGE employee Ms. Webster provided Plaintiff with some limited training, and Plaintiff worked on a BGE contract during the entirety of his employment with CAEI. Indeed, of the nine *Butler* factors, only three of the ancillary factors marginally favor Plaintiff, whereas the remaining six factors, including the three most important factors, weigh against a finding of joint employment. *See, e.g.*, *Gordon v. Carl Amber Brian Isaiah and Assocs.*, No. 2:19-CV-3008, 2022 WL 855547, at *4 (D.S.C. Mar. 22, 2022) (finding defendant was not plaintiff's joint employer even though some of the *Butler* factors weighed in favor of finding joint employment "when considering all of the factors together as a whole and keeping in mind the ultimate goal of determining whether [defendant] exercised significant control over Plaintiff[.]'") (internal quotation marks omitted).

**JA107**

In weighing the totality of the *Butler* factors, BGE did not have sufficient control over the terms and conditions of Plaintiff's employment, and the three most important factors of the *Butler* test, in addition to factors 4, 7, and 9, are demonstrative of BGE's lack of control. Because BGE was not Plaintiff's employer, the Court should grant BGE's motion for summary judgment.

**C. Even If Plaintiff Exhausted His Administrative Remedies Against BGE, And BGE Is A Joint Employer, BGE Is Still Entitled To Summary Judgment Because Neither BGE Nor CAEI Engaged In Unlawful Discrimination, Harassment, Or Retaliation Against Plaintiff.**

**a. Plaintiff's allegations do not support claims of discrimination or harassment.**

As discussed further below, Plaintiff's allegations regarding CAEI supervisor Ms. Watts' alleged harassment and discrimination, even if accepted as true, simply do not give rise to actionable claims. Notably, Plaintiff does not allege any BGE employee discriminated, harassed, or retaliated against him. The basis for Plaintiff's claims are as follows:

- Being required to serve food (make plates) to his colleagues when meals were shared. Ex. 1, Pl's Dep. 122:4-10. Prior to Plaintiff serving food, Ms. Webster (Black female), a BGE employee, would make plates, as would two other CAEI Team Leads (all female). *Id*. 164:11-165:3, 167:3-6.

- Ms. Watts told him that he could not train Mr. Rease (Black/Indian male) because he was a male, but then the following day told Plaintiff he would be training Mr. Rease. *Id*. Plaintiff stopped training in or around Fall 2015. *Id*. 181:21-182:7.

- Ms. Watts took a training pamphlet that Plaintiff made and said that it was her own creation. *Id*. 173:17-175:14.

- Ms. Watts removed Plaintiff from a safety committee and because the meetings were at 9 a.m. and his shift began at 11 a.m. *Id*. 179:22-180:22.

- Plaintiff was moved between in-bound and out-bound calls frequently and where other employees, such as Mr. Rease, were not. *Id*. 179:12-20, 183:11-185:20.

- Ms. Watts moved Plaintiff's cubicle twice. *Id*. 122:4-10. The first time, Ms. Watts moved everyone's cubicles, and the second time, Ms. Watts only moved Plaintiff moved cubicle to be closer to a representative who was working on commercial account. *Id*.

- Plaintiff also alleges that Ms. Watts told him he was being "too nice" to customers on the phone and that he needed to "thug it up." *Id*. 248:9-15-251:11. Plaintiff stated the phrases "thug it up" and that he was being too nice were interchangeable. *Id*. 252:21-253:13. Plaintiff testified that Ms. Watts said this to him and not, for example, Mr. Rease, because Mr. Rease was a favorite while Plaintiff was not. *Id*. Plaintiff testified that "thug it up" meant to be more "gangster like, to be more

**JA108**

ruthless, aggressive, without integrity, without ethics. Just be a thug. Just to be a one-dimensional individual." *Id*. 321:9-13.

- Finally, Plaintiff alleges that Robin Rodin (Black female) was permitted to use her iPad at her desk, *id*. 187:10-20; 190:2-6, and that he was placed in a location that was very cold. *Id*. 189:2-9.

     **b.   Plaintiff cannot demonstrate BGE or CAEI discriminated against him.**

Based on Plaintiff's allegations, Plaintiff has failed to provide any direct evidence of discrimination to defeat a motion for summary judgment; therefore, he must proceed under the *McDonnell Douglas* burden-shifting method of proof and first make out a *prima facie* case of discrimination. *See, e.g.*, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973):

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for the employee's rejection . . . [T]hird, should the defendant carry this burden, the plaintiff must then prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dep't of Cmt'y Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802, 804). To establish a *prima facie* claim of disparate treatment, Plaintiff must present evidence to demonstrate that (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) his job performance was satisfactory; and (4) the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination. *Carson-Johnson v. Baltimore City Police Dept.*, No. BPG-18-3064, 2021 WL 3930098 at *5 (D. Md. Sept. 2, 2021).

However, as is the case here, "[w]hen the hirer and firer are the same individual, there is a powerful inference relating to the 'ultimate question' that discrimination did not motivate the employer, and the early resolution of this question need not be derailed by strict fealty to proof schemes." *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991). Where the same decisionmaker hires an employee and later terminates the employee, there is a strong presumption that the subsequent

**JA109**

adverse action is not discriminatory because, of course, the decisionmaker was aware of the employee's protected characteristics at the time of both actions. *See, e.g.*, *id.*; *see also Amirmokri v. Baltimore Gas and Elec. Co.*, 60 F.3d 1126, 1130 (4th Cir. 1995) (recognizing "same actor" presumption in a Title VII case, and noting it was "especially unlikely that he was denied a promotion because of bias against his [protected characteristic]" where employer knew of the protected characteristic at hire). Here, there is a strong presumption that CAEI did not discriminate against Plaintiff because Mr. Hubbard both hired and terminated Plaintiff. In the event the Court considers Plaintiff's discrimination under the traditional framework, Plaintiff's claim also fails.

### i.    Plaintiff cannot establish a *prima facie* case of discrimination.

As an initial matter, Plaintiff's discrimination claim fails because he does not plead that he suffered an adverse action as a result of the alleged discrimination. In fact, the only adverse action set forth in the Amended Complaint relates to Plaintiff's termination in retaliation for engaging in protected activity, which is set forth in Count III of the Complaint. Regardless, Plaintiff's claim further fails because he cannot satisfy the third and fourth elements of a *prima facie* discrimination claim. As discussed below, Plaintiff cannot demonstrate the third element because his job performance was not satisfactory given his concerning behavior during the February 5 meeting with Mr. Hubbard and Ms. Watts, and then the employee complaints about Plaintiff. Plaintiff likewise cannot satisfy the fourth element because he cannot show that similarly situated employees outside of the protected class received better treatment. Plaintiff repeatedly identified Mr. Rease, a Black/Indian male, as one of Ms. Watts' "favorites," receiving preferential treatment.

**JA110**

### 1. Plaintiff's performance was not satisfactory.

Courts have found that it is legitimate for employers to expect employees not to engage behavior they find to be harassing. *See, e.g.*, *Weil v. Sunrise Senior Living Mgmt., Inc.*, No. RDB-20-701, 2021 WL 5742383, at *7 (D. Md. Dec. 1, 2021) (citing *Bacchus v. Tubular Textile LLC*, No. 1:01-CV00621, 2003 WL 21796550 at *5 (M.D.N.C. Mar. 19, 2003) (granting summary judgment to the employer where "there is ample evidence that Defendant firmly believed that [plaintiff] was not meeting Defendant's legitimate expectations at the time he was terminated because he was found to be in violation of Defendant's anti-harassment policy")). Additionally, it is "the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) (quoting *Evans v. Tech. Applications &Servs. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996)). In *Weil*, the plaintiff was terminated following several employee complaints of bullying or harassment. 2021 WL 5742383, at *7. Here, too, the undisputed evidence shows that CAEI terminated Plaintiff following employee complaints regarding workplace safety, and Plaintiff's concerning behavior during the meeting in which they discussed his seat being moved.

### 2. Plaintiff was not terminated under circumstances that give rise to discrimination.

Implicit in the fourth element is the requirement that Plaintiff establish that similarly situated employees outside the protected class received more favorable treatment. *See, e.g.*, *Iwebo v. Sheppard Pratt Health Sys., Inc.*, No. BPG-19-3008, 2020 WL 4748579 at *5 (D. Md. Aug. 14, 2020). A plaintiff may also satisfy the fourth element by showing a general pattern of racial discrimination existed in the practices of a defendant. *Id.* "'Overall, the inquiry simply asks whether there are sufficient commonalities on the key variables between plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie

**JA111**

evidence, would allow a jury to reach an inference of discrimination.'" *Swaso v. Onslow Cnty. Bd. of Ed.*, 698 Fed. App'x 745, 748 (4th Cir. 2017) (quoting *Eaton v. Ind. Dep't of Corr.*, 657 F.3d 551, 556 (7th Cir. 2011) (discussing the similarly situated analysis)). Plaintiff's *prima facie* discrimination case must fail because the record does not support that similarly situated employees outside the protected class received more favorable treatment.

Here, CAEI was a minority-owned business, owned by Mr. Burnett (Black male), over 90% of CAEI employees were Black, the majority of the billing specialists were Black, and Ms. Watts is Black. Plaintiff also testified that Ms. Watts had "favorites," including Mr. Rease (Black/Indian male), and that Plaintiff was not one of her favorites. All of these facts undermine Plaintiff's theory that Ms. Watts treated him differently because he was a Black male. Other than Plaintiff's own speculation and bald assertions that he was discriminated against because of his race and sex, the record is devoid of any facts to support a finding that there was a pattern of racial discrimination in CAEI's practices.

Rather, because of the diversity at CAEI and the call center, Plaintiff cannot establish that similarly situated employees outside of his protected classes were treated more favorably. In fact, based on Plaintiff's testimony that Ms. Watts singled him out in certain circumstances and treated Mr. Rease—another Black male—more favorably, it follows that other Black male employees were not treated in this same manner by Ms. Watts.

Other than Plaintiff's own speculative and conclusory allegations, there is no evidence in the record to substantiate any inference that CAEI engaged in a pattern of racial discrimination. *See Iwebo*, 2020 WL 4748579, at *6 (citing *also Bing v. Brivo Sys., LLC*, 959 F.3d 605, 618 (4th Cir. 2020) (stating that the "mere fact that a certain action is potentially consistent with discrimination does not alone support a reasonable inference that the action was motivated by bias"

where the plaintiff provided no additional facts to support a reasonable inference that defendant

was motivated by bias in any of its decisions)).

In fact, in many instances, Plaintiff offered his own non-discriminatory explanation for the

treatment he received or provided no evidence to rebut the explanation he was given for the

treatment he received. For example, Plaintiff testified that he thinks he "got stuck with [serving

food]" because Ms. Watts took issue with the fact that he would not eat the food served at work

and that Ms. Watts questioned whether Plaintiff thought he was "better than us" because he did

not want to eat the food. Ex. 1, Pl's Dep. 165:4-18. In another example, in the one instance that

Ms. Watts moved his seat without moving anyone else's seat, Plaintiff testified that Ms. Watts told

him that he needed to move his seat to be closer to a representative who was working on

commercial accounts. Although Plaintiff speculates that he was moved as a form of punishment,

*id.* 124:7, there is no evidence in the record to support this theory or that he was being discriminated

against based on his protected classes.  Similarly, although Plaintiff speculates that the term "thug

it up" was Ms. Watts trying to tell him that to be nice was inconsistent with being Black, Plaintiff

conceded that Ms. Watts never said these words to him but that "it was a valid deduction that one

could make." *Id.* 254:12-255:14. He also testified that Ms. Watts used the terms "thug it up" and

"too nice" "synonymously or interchangeably" when he was speaking with customers. For the

foregoing reasons, Plaintiff cannot establish the fourth element of a *prima facie* case of

discrimination.

### ii. Even if Plaintiff could establish a *prima facie* case of discrimination, CAEI had a legitimate, non-discriminatory reason for terminating Plaintiff.

If the Court determines that Plaintiff has set forth a *prima facie* case of discrimination, the

burden then shifts to CAEI to articulate a non-discriminatory reason for the adverse employment

action. *See McDonnell Douglas Corp.*, 411 U.S. at 802. Thereafter, it is Plaintiff's burden to

**JA113**

demonstrate that CAEI's proffered reason for the employment action is actually a pretext for discrimination. *Id.* at 804. Although, as discussed above, Plaintiff does not claim he was terminated due to discrimination, CAEI had legitimate non-discriminatory reasons for terminating Plaintiff based on his own conduct in February 2016.

Specifically, Plaintiff's reaction to the February 5 meeting was deeply troubling, as were the complaints from three female co-workers that Plaintiff made inappropriate and threatening comments to them referencing that he could kill them with a knife and put their bodies in the trunk of his new car and no one would know. Moreover, there is absolutely no evidence that this explanation for Plaintiff's termination was pretextual. *See Battle v. Price*, No. PWG-14-2250, 2018 WL 1963791 at *3 (D. Md. April 25, 2018) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) ("'[A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.'")). Accordingly, BGE has satisfied its burden to establish legitimate, non-discriminatory reasons for Plaintiff's termination, and Plaintiff cannot demonstrate these reasons are pretextual.

### c.  Plaintiff's hostile work environment claims fail.

Plaintiff's harassment claim on the basis of his sex (male) and race (African American) is premised on conduct by CAEI employees. None of the conduct that Plaintiff identifies—even viewed in the light most favorable to the Defendant as to disputes of fact—constitutes harassment as a matter of law. To establish a viable claim of hostile work environment, Plaintiff must show that (1) the harassment was unwelcome; (2) the harassment was based on a protected category; (3)

**JA114**

the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 207-08 (4th Cir. 2019). Here, Plaintiff's hostile work environment fails because there is no evidence the alleged harassment was based on a protected category, was sufficiently "severe or pervasive," and there is no basis for imputing liability to Defendants because Plaintiff's termination was for a legitimate reason.

### i. None of Plaintiff's allegations are based on his sex or race.

As discussed above, CAEI (and all of the individuals CAEI employed to work as billing specialists alongside Plaintiff) was approximately 90% African American. Further, Plaintiff testified that Ms. Watts (Black female) treated Mr. Rease (Black/Indian male) more favorably than him, which completely undermines the argument that these incidents are based on Plaintiff's sex and race. *See Bess v. Cty. Of Cumberland, N.C.*, No. 5:11–CV–388–BR, 2011 WL 4809879, at *4 (E.D.N.C. Oct. 11, 2011) (noting the nexus between the harassment and the plaintiff's sex was weak given that the alleged harassers were also members of the same protected class).

### ii. CAEI's purported conduct was not severe or pervasive.

To satisfy the severe or pervasive element under Title VII, "[Plaintiff] must show that a reasonable jury could find that the . . . race-based harassment was so severe or pervasive as to alter the conditions of [Plaintiff's] employment and create an abusive or hostile atmosphere." *E.E.O.C. v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009). The severe or pervasive element has both a subjective and objective component requiring a plaintiff to show that he "did perceive, and a reasonable person would perceive, the environment to be abusive or hostile." *Id.* The Fourth Circuit describes the severe or pervasive element as a "high bar." *Id.* 208-09 (noting that "[I]ncidents that would objectively give rise to bruised or wounded feelings will not on that

27

JA115

account satisfy the severe or pervasive standard. [R]ude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor, are not actionable under Title VII) (internal citations and quotation marks omitted). The "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code." *Id.* at 208 (internal quotation marks omitted).

In determining whether the harassing conduct was objectively severe or pervasive, "[r]elevant considerations may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001) (internal quotation omitted). Callous behavior, differences in opinion, or personality conflicts with one's supervisor do not rise to the level of actionable harassment. *Chang Lim v. Azar*, 310 F. Supp. 3d 588, 599 (D. Md. 2018) (quoting *Boyer-Liberto v. Fontainbleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015)). The "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code." *Perkins*, 936 F.3d at 208 (internal quotation marks omitted).

Here, at most, Ms. Watts had workplace favorites and Plaintiff was not one of them. The conduct that Plaintiff claims to be harassment is, at worst, callous behavior, petty workplace slights, or incidents that gave rise to wounded or bruised feelings. For example, Plaintiff alleges that the singular instance where his manager moved his desk is sufficient to sustain a hostile work environment claim, as does Ms. Watts taking credit for his work. However, Plaintiff's claims fall woefully short of the requisite severe or pervasive conduct necessary for such a hostile work environment claim. *See Coleman v. Kettler Management*, No. 1:22-cv-84, 2022 WL 4369969, at *6 (E.D. Va. Sept. 21, 2022) (rejecting plaintiff's race-based hostile work environment claim,

**JA116**

which was premised on plaintiff's desk being moved, because such allegations are examples of isolated conduct and are insufficiently severe or pervasive).

Likewise, Plaintiff has said that being asked to bring food and help serve coworkers at CAEI potlucks and celebrations also contributed to his hostile work environment. Such conduct cannot form the basis of a hostile work environment claim. *See Dindinger v. Allsteel, Inc.*, No. 3:11-cv-00126, 2013 WL 11727240, at *16 (S.D. Iowa Nov. 22, 2013) (rejecting hostile work environment claim based on the fact that employee was asked to cook and serve hotdogs as part of a safety incentive program). Prior to Plaintiff serving food, Ms. Webster (Black female), a BGE manager, and two CAEI supervisors (one Black female and one Latina female) served food. This negates both the severe and pervasive element, and the assertion that the conduct was "because of" sex or race.

Plaintiff also claims that Ms. Watts told him he was being "too nice" to customers on the phone and that he needed to "thug it up." However, this is not linked to his race; indeed, Plaintiff stated the phrases "thug it up" and that he was being too nice were interchangeable. Plaintiff testified that Ms. Watts said this to him and not, for example, Mr. Rease (Black male). Aside from Plaintiff's own speculation that this phrase had a racial connotation, there is no evidence this is linked to race. Rude treatment by one's supervisor does not constitute a hostile work environment.

### d. Plaintiff's retaliation claim fails because he cannot demonstrate a *prima facie* case, and CAEI had a legitimate, non-discriminatory reason for termination.

Plaintiff's retaliation claim is solely based on his termination. Plaintiff's retaliation claim must fail because he cannot establish a *prima facie* retaliation claim and CAEI had a legitimate, non-discriminatory reason for terminating Plaintiff's employment. At the outset, to the extent Plaintiff relies upon his seat being moved as part of his retaliation claim, that was the impetus of the complaint and therefore cannot be retaliatory.

**JA117**

### i. Plaintiff cannot establish a *prima facie* retaliation claim.

Plaintiff's *prima facie* retaliation claim fails because he cannot demonstrate that he engaged in a protected activity and that there was a causal connection between the protected activity and the adverse action. To make a *prima facie* case of retaliation, Plaintiff must demonstrate that: (1) he engaged in a protected activity; (2) CAEI acted adversely against him; and (3) there was a causal connection between the protected activity and the adverse action. *See e.g.*, *Okoli v.City of Balt.*, 648 F.3d 216, 223 (4th Cir. 2011). If CAEI can articulate a legitimate, nonretaliatory reason, Plaintiff "'must demonstrate that the proffered reason is a pre-text for forbidden retaliation,'" with the Plaintiff always retaining the ultimate burden of persuasion. *Rhoads. v. F.D.I.C.*, 257 F.3d 373, 392 (4th Cir. 2001) (quoting *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 706 (4th Cir. 2001)). Moreover, Plaintiff must demonstrate that his protected activity was the but-for cause of his termination. *University of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013) (but-for causation required under Title VII).

### 1. Plaintiff cannot show he engaged in protected activity.

Plaintiff has failed to make the requisite showing that he opposed an unlawful employment practice under Title VII. *See, e.g., Balazs v. Liebenthal*, 32 F.3d 151, 158-59 (4th Cir. 1994) (finding no protected activity when the charge "had nothing to do with his race, color, religion, sex or national origin.). In an effort to make out a *prima facie* retaliation claim, Plaintiff relies solely on one instance in which he generally complained about Ms. Watts' management style. Plaintiff's retaliation claim must fail because he has not demonstrated that he complained about either race or sex discrimination/harassment. *Id.* at 159 ("The EEOC had no more jurisdiction of this claim than it would have had of a charge that defendant had falsely accused him of reckless driving in the company parking lot.").

**JA118**

Here, Plaintiff testified that the first and only time that he complained about Ms. Watts to anyone, prior to his termination, was on February 4, 2016. He testified that he called Ms. Smoot and requested to be moved from the BGE call center to a different location and that he did not offer a reason for why he wanted to be moved. *Id*. 301:19-20. Plaintiff further testified that in response, Ms. Smoot asked him if he wanted to be moved because Ms. Watts was harassing him. *Id*. 149. Plaintiff answered affirmatively and went on to describe examples of the alleged "harassment." Specifically, he testified that he told Ms. Smoot about issues relating to "auto-in times," (types of calls he would be staffed on), being asked to serve food to his colleagues and then punished, requests for him to train other employees, and that he just wanted to move to a different department. *Id*. 303:11-304:1. Plaintiff did not testify that he complained about discrimination or harassment based on his race or gender.

Interestingly, Plaintiff was interviewed on February 29, 2016 by the hearing examiner in connection with his unemployment insurance claim. *Id*. 237:16-21; *see also* Ex. 16, Exhibit 18 to Pl's Dep. Although Plaintiff disputes the examiner's summary of this interview, the statement provides the following:

> I contacted HR in early January of 2016, about seats being moved. I said that I thought that I was being isolated by Angie.

*Id.* Again, Plaintiff never mentioned that Ms. Watts harassed or discriminated against him.

Further, Mr. Hubbard also denies Plaintiff complained about Ms. Watts treating him differently because of race or sex. Ex. 2, Hubbard Decl. ¶ 25. Rather, Mr. Hubbard stated that Plaintiff made general work-related complaints about Ms. Watts. *Id.* This is consistent with Plaintiff's testimony that the whole team "decided we can't deal with her" and that their complaints related to Ms. Watts' militaristic management style. Ex. 1, Pl's Dep. 301:21-303:3. Because

**JA119**

Plaintiff has failed to establish that he engaged in protected activity by opposing an unlawful employment practice, his *prima facie* retaliation claim must fail.

### 2. Plaintiff's termination has no causal connection to his alleged protected activity.

As a threshold issue, because Mr. Hubbard, the person who fired Plaintiff, has no knowledge about Plaintiff ever complaining about Ms. Watts treating him unlawfully based on his race or gender, Plaintiff cannot establish that his alleged February 4 complaint is causally related to his termination. *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) ("Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case.").

However, to the extent the Court finds that Plaintiff engaged in protected activity on February 4, Plaintiff must still demonstrate a causal connection between the protected activity and the adverse action. "To show a causal connection, a plaintiff asserting a retaliation claim must allege 'that his employer took the adverse action 'because the plaintiff engaged in a protected activity.'" *Samnang v. Bouchard Ventures, LLC*, No. SAG-21-01398, 2021 WL 4197662, at *3 (D. Md. Sept. 15, 2021) (citing *Perkins*, 936 F.3d at 213). A court can also consider the existence of a legitimate intervening event in determining whether causation exists. *Id.* (citing *Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d 339, 348 (4th Cir. 2014)).

Here, Defendant anticipates that Plaintiff will rely exclusively on temporal proximity. However, there are several legitimate intervening events that occurred after Plaintiff's alleged protected activity which resulted in Plaintiff's termination. First, Plaintiff testified that during a meeting with Mr. Hubbard and Ms. Watts, Mr. Hubbard said, "we have a problem. . . . Angelique has given us statements that you harassed her." Ex. 1, Pl's Dep. 209:17-19. During this meeting,

**JA120**

Plaintiff further stated that Ms. Watts accused him of throwing his headset at her or pushing her after she asked him to train another CAEI employee and move his seat. *Id.* 210:2-211:9. He testified that he spoke with Mr. Andrews the following day and "kind of let everything go." *Id.* 202:3-203:16. Plaintiff further testified that after this discussion, Mr. Hubbard told him that he was being terminated due to a lack of integrity after he falsely told BGE that CAEI had accused him of harassing someone. *Id.* 219:17-220:7, 231:10-14. He further testified that he understood that he was also terminated because he "went behind their backs to go to another authority figure at BG&E and tell them that I was falsely accused of harassing someone by CAEI." *Id.* 325:10-22.

       During the unemployment fact-finding interview, Plaintiff told the examiner the following:

> On 02/08/2016, I had told co-workers about my meeting that I was supposed to have continued with Ray on 02/08/2016. I told them that I had been accused of things that never happened between Angie and myself, and I wonder if they were trying to fire me for some reason. . . . I said that I felt isolated by Angie. I said nothing about assault. On 02/11/2016, Ray asked me how co-workers knew about our discussion on 02/05/2016. . . . Ray said that my discussing issues was not good integrity. . . On 2/11/2016, when I was questioned by Kia and Ray about saying assault, I was puzzled. I had said isolated, not assault or assaulted. Perhaps co-workers did not understand what I had said. . . . On 02/11/2016, Ray called me. He told me not to return to work. . . .

Ex. 16, Exhibit 18 to Pl's Dep. Third, Mr. Hubbard explained that in the days leading up to his termination, he was notified that three female CAEI employees reported that Plaintiff had made inappropriate and threatening comments to them and that they did not want to continue working with him. This concerning information, coupled with Mr. Hubbard's own observations of Plaintiff's agitated and angry temperament during his meeting with Plaintiff and Ms. Watts, led to his decision to terminate Plaintiff based on the concerns for the safety and well-being of other CAEI employees. As Plaintiff testified, "[s]afety at BG&E was above and beyond anything that you do of any importance every day at work." Ex. 1, Pl's Dep. 115:8-15.

JA121

Accordingly, based on Plaintiff's own testimony, and Mr. Hubbard's Declaration, there were several developments between February 4 and February 11 that sever any possible causal link between Plaintiff's complaint and his termination. Other than Plaintiff's mere speculation that he was terminated because he complained about Ms. Watts, there is no evidence in the record to support Plaintiff's theory of causation. *See, e.g.*, *Samnang*, 2021 WL 4197662, at *4 (explaining that mere conclusions, without facts to substantiate plaintiff's assertion, cannot render her theory of causation plausible). "An employer cannot face liability for discrimination or retaliation simply for making a decision based on its good faith assessment of a contested set of facts." *Id.*; *see also Kothe v. Cont'l Teves, Inc*., 461 F. Supp. 2d 466, 477 (W.D. Va. 2006) ("Mere assertions of questionable timing, in and of themselves are simply insufficient to counter unrebutted evidence of legitimate, nondiscriminatory reasons for being fired.") (quoting *Dugan v. Albemarle Cnty Sch. Bd.,* 293 F.3d 716, 722 (4th Cir. 2002)). As a consequence, Plaintiff cannot establish the necessary causal connection between her complaint and her termination and, therefore, cannot establish a *prima facie* case of retaliation.

### ii. CAEI had a legitimate non-discriminatory reason for terminating Plaintiff.

Because Plaintiff cannot establish a *prima facie* case, CAEI is not required to articulate a legitimate, nondiscriminatory reason for Plaintiff's termination. *See King*, 328 F.3d at 150. However, even assuming that the Court finds Plaintiff can establish a *prima facie* case, BGE easily meets its burden of production to show that CAEI had a legitimate, nondiscriminatory reason for termination. If BGE articulates that CAEI had a legitimate, nonretaliatory reason, Plaintiff "must demonstrate that the proffered reason is a pre-text for forbidden retaliation," with the Plaintiff always retaining the ultimate burden of persuasion. *Id*. (internal quotations omitted). Plaintiff must establish "*both* that the [employer's] reason was false *and* that [retaliation] was the real reason for

**JA122**

the challenged conduct." *Jiminez v. Mary Wash. Coll.*, 57 F.3d 369, 378 (4th Cir. 1995) (emphasis in original) (internal quotation marks omitted). Thus, "'[i]t is not enough . . . to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination [or retaliation]." *Battle*, 2018 WL 1963791, at *2 (emphasis in original) (quoting *Reeves*, 530 U.S. at 147 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993)). CAEI's reasoning for terminating Plaintiff was legitimate and non-discriminatory and non-retaliatory. Specifically, CAEI terminated Plaintiff based on his own conduct after the alleged February 4 complaint to Ms. Smoot; Plaintiff's reaction to that meeting was deeply troubling, as were the complaints from three female co-workers that he made threatening comments to them. Moreover, there is absolutely no evidence that this explanation for Plaintiff's termination was pretextual. *See Battle*, 2018 WL 1963791 at *3 ("[A]n employer is entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."). Plaintiff cannot cite to any evidence whatsoever that CAEI's proffered reasons are false. Accordingly, BGE has satisfied its burden to establish legitimate, non-discriminatory reasons for Plaintiff's termination, and Plaintiff cannot demonstrate these reasons are pretextual.

## V.    CONCLUSION

For the foregoing reasons, BGE respectfully requests this Court grant summary judgment in favor of BGE.

**JA123**

# Exhibit 2

**JA124**

DocuSign Envelope ID: E637C629-5686-4ED0-90E4-92788591FD2F

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| HARRY A. BOLDEN, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *   Civil Case No.:  1:21-cv-02295-JRR |
| | * |
| CAEI INC., et al., | * |
| | * |
| Defendants. | * |

_____/

## <u>DECLARATION OF RAYMOND K. HUBBARD</u>

1.  My name is Raymond K. Hubbard. I am over the age of eighteen and am competent to testify as to the matters set forth herein based on my personal knowledge.

2.  I understand that my Declaration is being submitted in support of the Motion for Summary Judgment filed by Defendant, Baltimore Gas and Electric Company ("BGE"), in the above-captioned matter ("Defendant's Motion").

3.  I was previously employed by CAEI, Inc. ("CAEI").  CAEI was a minority-owned business that provided information and technology consulting and professional services.  The former President and Owner of CAEI, Steven Burnett, is a Black male.

4.  Between 2014 and 2016, during Plaintiff Harry Bolden's employment with CAEI, I was employed by CAEI and held the position of Vice President of Operations.

5.  As the Vice President of Operations, I was responsible for managing CAEI's customer accounts, including its customer account with BGE, among other companies. I was responsible for managing BGE's Collections Strategy Pilot (the "Collections Strategy Pilot") that focused on collecting outstanding funds due on gas and electric bills from BGE's customers.

6.  CAEI went out of business in 2018.

**JA125**

DocuSign Envelope ID: E637C629-5686-4EC9-90E4-92788591FD2F

7.  CAEI no longer has any employment records.

8.  CAEI was headquartered at 9256 Bendix Road, Suite 102, Columbia, Maryland 21045. This location was never jointly operated by CAEI and either BGE and/or Exelon Business Services Company, LLC ("Exelon").

9.  CAEI never jointly operated a facility with BGE.

10. CAEI is a separate and distinct entity from BGE, and it does not share any corporate or business identity with BGE.

11. Approximately 20 CAEI employees comprised the entire team responsible for placing calls to BGE's customers for the Collections Strategy Pilot. CAEI employed all of the billing specialists on the Collections Strategy Pilot.

12. CAEI also employed employees who worked for several other clients.

13. Over 90% of the CAEI employees were Black, including many Black males. CAEI took pride in being a minority owned business and employing diverse employees.

14. I have personal knowledge of the contracting process between BGE and CAEI. CAEI entered this contractual relationship with the intention that it would be the entity responsible for the management of its own employees.

15. BGE was not responsible for managing or supervising CAEI employees, and BGE did not exercise control over any CAEI employees' work conditions. CAEI was solely responsible for hiring and firing its employees and providing day-to-day supervision of its employees at the Collections Strategy Pilot, including disciplining its employees and promoting its employees to senior or lead positions. I interviewed Mr. Bolden in person and made the decision to hire him.

**JA126**

16. Beginning in late 2015, Angelique Watts, who was employed by CAEI, was the on-site supervisor overseeing the CAEI employees working on the Collections Strategy Pilot. Ms. Watts reported directly to me. Ms. Watts is a Black female.

17. Because CAEI had an on-site manager that was responsible for the day-to-day oversight of CAEI's employees on Collections Strategy Pilot, I rarely visited the site unless my physical presence was requested or required.

18. CAEI had its own Human Resources department that maintained its employees' employment records, including Mr. Bolden's employment records. Kia Smoot, who was employed by CAEI, handled CAEI's Human Resources function. Ms. Smoot is a Black female.

19. CAEI employees were aware of CAEI's contractual relationship with BGE and Exelon, and that CAEI was their employer, not BGE. CAEI employees were made aware of this relationship at the outset of their employment with CAEI through the Temporary Worker Agreement, which Mr. Bolden signed. Exhibit 1.

20. CAEI's Employee Handbook was the operative Human Resources manual for Mr. Bolden and other CAEI employees working on the Collections Strategy Pilot. Mr. Bolden and other CAEI employees were provided CAEI's Employee Handbook at the outset of their employment with CAEI.

21. CAEI paid Mr. Bolden and provided him with employment benefits, such as health insurance, as it did for other CAEI employees working on the Collections Strategy Pilot.

22. CAEI paid into both unemployment and workers' compensation insurance for Mr. Bolden and other CAEI employees working on the Collections Strategy Pilot.

23. CAEI hired Mr. Bolden to work on the Collections Strategy Pilot as a CAEI employee in 2014. Beginning in mid 2015, Ms. Watts was Mr. Bolden's direct supervisor.

**JA127**

DocuSign Envelope ID: E637C629-5686-4ECD-90E4-92788591FD2F

24. CAEI moved each of its employees' seats at the Collections Strategy Pilot site to maintain a positive and dynamic work environment and to avoid the formation of cliques amongst the employees. CAEI believed moving its employees' seats developed team growth and better served its customers.

25. Mr. Bolden took issue with his seat being moved. Mr. Bolden further complained to me that he was being targeted by Ms. Watts because she moved his seat. Mr. Bolden also made general work-related complaints about Ms. Watts. However, he never complained that Ms. Watts was treating him differently because of his race, sex, or any other protected characteristic.

26. Mr. Bolden never complained to CAEI that Ms. Watts told him that he needed to "'thug it up'" or that he was not "stereotypically 'black' enough."

27. CAEI employees were instructed and trained to maintain a polite and accommodating tone when speaking with customers.

28. In February 2016, I was notified that three female CAEI employees said that Mr. Bolden had made inappropriate and threatening comments to them referencing that he could kill them with a knife and put their bodies in the trunk of his new car and that no one would know. As a result, these employees did not want to continue to work with Mr. Bolden.

29. When I addressed Mr. Bolden's seat being moved, Mr. Bolden became very agitated, raised his voice, and appeared angry. I found his behavior very concerning.

30. On or about February 11, 2016, I decided to terminate Mr. Bolden's employment with CAEI based on his demeanor and response during my own conversations with Mr. Bolden, including conversations about his seat being moved, as well as the concerning comments he reportedly made to other CAEI employees. The decision to terminate Mr. Bolden was made based on the concerns for the safety and well being of other CAEI employees. No other CAEI employee

**JA128**

at the Collections Strategy Pilot engaged in the same or similar conduct as Mr. Bolden. I terminated Mr. Bolden almost immediately after learning of the complaints from the three female CAEI employees (within hours or the following day at the longest).

31. Neither BGE nor Exelon were involved in the decision to terminate Mr. Bolden.

32. After Mr. Bolden was terminated, he filed a Charge of Discrimination against CAEI (the "Charge") with the Maryland Commission on Civil Rights ("MCCR").  Neither BGE nor Exelon was named in the Charge of Discrimination.  Neither BGE nor Exelon participated in the investigation, the fact-finding conference, or settlement discussions.

33. To the best of my knowledge, the MCCR did not interview anyone from Exelon or BGE during the course of the investigation.

34. In response to Mr. Bolden's Charge of Discrimination, I prepared a Position Statement on behalf of CAEI and submitted it to the MCCR on January 19, 2017.  A true and correct copy of CAEI's cover letter and position statement is attached hereto as Exhibit 2 (MCCR-263-272).

35. In further response to Mr. Bolden's Charge allegations, I prepared a second response on behalf of CAEI and submitted it to the MCCR on February 5, 2017. A true and correct copy of CAEI's cover letter and further response is attached hereto as Exhibit 3 (MCCR-274-276).

36. I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Dated this __26th__ day of January 2023

Raymond K. Hubbard

5

**JA129**

# Exhibit 3

**JA130**

DocuSign Envelope ID: 28A3F8E4FAD1-46F-08D8-5CFCE192DAC8

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

HARRY A. BOLDEN,           *

           *

        Plaintiff,        *

           *

v.                      *   Civil Case No.: 1:21-cv-02295-JRR

           *

CAEI INC., et al.,        *

           *

        Defendants.     *

_____/

## <u>DECLARATION OF BRIAN ANDREWS, SR.</u>

1. My name is Brian Andrews, Sr. I am over the age of eighteen and am competent to testify as to the matters set forth herein based on my personal knowledge.

2. I understand that my Declaration is being submitted in support of the Motion for Summary Judgment filed by Defendant, Baltimore Gas and Electric Company ("BGE"), in the above-captioned matter.

3. BGE is central Maryland's largest gas and electric utility company.

4. I am currently employed by BGE as the Director of Strategic Initiatives. I have been employed by BGE for a total of 19 years.

5. Between 2014 and 2016, during Plaintiff Harry Bolden's employment with CAEI, Inc. ("CAEI"), I was employed by BGE and held the position of Manager of Customer Care.

6. I have personal knowledge of the contractual relationship between BGE and CAEI, and CAEI's role in operating the financial solutions department program.

7. I have personal knowledge of the fact that Mr. Bolden was employed by CAEI, and that he worked as a billing specialist in the financial solutions program.

8. I did not provide any input into CAEI's decision to hire Mr. Bolden.

**JA131**

9.  I did not provide any input into CAEI's decision to terminate Mr. Bolden.

10. Neither BGE nor Exelon were involved in the decision to hire Mr. Bolden.

11. Neither BGE nor Exelon were involved in the decision to terminate Mr. Bolden.

12. BGE did not receive notice of this matter until December of 2021.

13. I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Dated: ___1/26/2023_____        _Brian Andrews, Sr._____
                                      Brian Andrews, Sr.

2

**JA132**

# Exhibit 4

# TEMPORARY WORKER AGREEMENT

This Temporary Worker Agreement (the "Agreement") is made this __12__ day of __SEPTEMBER__, 2014 by and among __BOLDEN, HARRY__, an individual ("Temporary Worker") and __CAEI, INC.__ a __MARYLAND__ __CORPORATION__, Temporary Worker's employer ("Employer").

**WHEREAS**, Employer has contracted with __PONTOON SOLUTIONS__, a __FLORIDA__ corporation ("Vendor"), for Employer to provide certain services, including work performed on a temporary basis by Temporary Worker, to Vendor's Customer (defined below); and

**WHEREAS**, Vendor has contracted with Exelon Business Services Company, LLC, a Delaware limited liability company, on behalf of itself and its affiliates ("Customer"), for Vendor to provide certain services related to Customer's temporary workforce under a program managed by Vendor (the "Program"); and

**WHEREAS**, Temporary Worker may be assigned by Employer, at Vendor's direction, to work for Customer on a temporary basis.

**NOW, THEREFORE**, for good and valuable consideration, the parties agree as follows:

## 1. Temporary Worker.

Temporary Worker may, in Vendor's sole discretion, be engaged to provide services to Customer through the Program as an employee of Employer and not as an employee of Customer. Temporary Worker shall perform all services or work under the Program to the satisfaction of Customer.

Temporary Worker acknowledges and agrees that no employment relationship between Temporary Worker and Customer or between Temporary Worker and Vendor is created by this Agreement, the agreement between Vendor and Customer, or by Employer's agreement with Vendor. Temporary Worker acknowledges and agrees that he or she is not a third party beneficiary of the agreement between Vendor and Customer and hereby waives any such rights which may arise under such agreement between Vendor and Customer.

Temporary Worker acknowledges and agrees that Employer shall be solely responsible for all payments to Temporary Worker including payment of compensation, premium payments for overtime, and other incentive payments, if any, and payments for vacation, holiday, sick days or other personal days, if any. Temporary Worker acknowledges and agrees that Temporary Worker is not eligible to participate in or receive any benefits under the terms of either Vendor's or Customer's pension plans, savings plans, health plans, vision plans, disability plans, life insurance plans, stock option plans, or any other employee benefit plan sponsored by vendor or by Customer.

1

Temporary Worker acknowledges and agrees that the cash payments and benefits which Temporary Worker receives from Employer shall represent the sole compensation to which Temporary Worker is entitled, and that Employer will be solely responsible for all matters relating to compliance with all employer tax obligations arising from the performance of services in connection with this Agreement. These tax obligations include the obligation to withhold employee taxes under local, state and federal income tax laws, unemployment compensation insurance tax laws, state disability insurance tax laws, social security and Medicare tax laws, and all other payroll tax or similar laws, and in no event shall either Vendor or Customer be liable for any such obligations.

Temporary Worker acknowledges and agrees that Customer and Vendor shall have no liability of any kind to the Temporary Worker related to payment for the time worked, if any, for Customer pursuant to this Agreement, the agreement between Employer and Vendor, or the agreement between Customer and Vendor. Temporary Worker hereby waives any claim he or she may have against Customer or Vendor related to such payment.

## 2. Customer Work Policies and Rules.

Temporary Worker acknowledges and agrees that during the performance of Temporary Worker's job duties for Customer, Temporary Worker will not violate any of Customer's work rules, standards policies, and procedures, including those specified in any code of conduct of Customer or other Customer workplace manual. Temporary Worker shall at all times comply with all rules, standards, policies and procedures of Vendor and/or Customer as provided to Temporary Worker by Employer, Vendor and/or Customer. Temporary Worker agrees that Temporary Worker shall not harm Customer's equipment, property or inventory (other than ordinary wear and tear), and shall not interfere with Customer's business operations. Temporary Worker acknowledges and agrees that it will complete Schedule 1 attached hereto.

Temporary Worker agrees that he or she enters onto Customer's premises at his or her own risk and, to the fullest extent possible under applicable laws, waives any claims he or she may have now or in the future against Customer or Vendor for personal injury or property damage arising out of or connected in any way with Temporary Worker's presence on Customer's premises or his or her assignment to Customer.

## 3. Confidentiality and Non-Disclosure.

For purposes of this Section, "Confidential Information" shall include, but not be limited to: all business or technical information, including proprietary information about costs, customers, pricing, profits, markets, and sales; lists of customers, employees, potential customers, and potential employees; the personally identifiable information of customers, shareholders, employees, and other contractors; methods of doing business; plans for future development; information regarding matters of a technical nature, such as scientific, trade and engineering secrets; all "know-how", formulas, designs, secret processes, machines, inventions, computer programs (including documentation of such programs) and research projects; information

2

**Proprietary and Confidential to Vendor**

obtained by examination of any product, design, production equipment or drawings thereof; and any other information of a similar nature that is marked "Confidential" or that the Temporary Worker knows or has reason to know is the confidential or proprietary information of Customer or Vendor, as the case may be. Notwithstanding the forgoing, Confidential Information shall not include any information that:

is hereafter lawfully disclosed to the Temporary Worker under conditions which do not restrict further disclosure or by a third party which did not acquire the Confidential Information under an obligation of confidentiality to Customer or Vendor, as the case may be;

properly came into the Temporary Worker's possession from a third party which is not under any obligation to maintain the confidentiality of such Confidential Information; or

has become part of the public domain through no act or fault of the part of the Temporary Worker. Confidentiality. The Temporary Worker agrees that he or she will:
Maintain in strict confidence all Confidential Information of Customer or Vendor, as the case may be;

Use or reproduce the Confidential Information solely as necessary for purposes of providing services as an independent contractor to Customer;

Not remove any copyright notices, trademark notices, or other proprietary legends or indications of confidentiality set forth on or contained in any of the Confidential Information;

Immediately notify Vendor or Customer, as the case may be, in writing of any known unauthorized acquisition, disclosure or use of the Confidential Information, providing a detailed description of the circumstances of the acquisition, disclosure or use and the parties involved.

**4. Injunctive Relief.** Temporary Worker acknowledges that it is likely to be difficult to value the damages sustained by Vendor or Customer, as the case may be, due to any breach of Section 3 herein and that such damages are likely to be substantial or irreparable and the damaged party's remedy at law would be inadequate. Therefore, in the event of a breach of Section 3 herein, in addition to any other relief, Vendor or Customer, as the case may be, shall be entitled to temporary and permanent injunctive relief without the necessity of proving actual damages.

**5. Work Product.** Temporary Worker acknowledges and agrees that during and incident to Temporary Worker's work for Customer, Temporary Worker may create inventions, discoveries, improvements, computer or other apparatus programs, and related documentation and other works of authorship ("Work Product"), whether or not patentable, copyrightable, or subject to other forms of legal protection. Temporary Worker agrees to assign to Customer all of Temporary Worker's right, title and interest (including rights in copyright) in and to all Work Product Temporary Worker makes, creates or develops, either solely or jointly with others, during Temporary Worker's assignment to Customer. Temporary Worker agrees that the above

3

assignment is binding upon Temporary Worker's estate, administrators, or other legal representatives or assigns.

**6. No Contractual Restrictions on Temporary Workers.** Nothing herein shall be construed to restrict (i) the ability of the Temporary Worker to be hired for permanent employment by Customer, or (ii) the ability of the Temporary Worker to be transferred to and hired by a Fellow Staffing Company (as such term is defined in the Staffing Company Agreement) in accordance with Section 6.4 of the Staffing Company Agreements. If any such restrictions exist in any agreement between the Employer and the Temporary Worker, the Employer hereby waives any provisions of such agreements that restrict the Temporary Worker's ability to be permanently employed by Customer or by a Fellow Staffing Company.

**7. Excluded Inventions.** Temporary Worker shall not be required to assign to Customer any idea, invention, discovery, innovation or improvement which Temporary Worker developed entirely on his or her own time and without the use of any of Customer's equipment, supplies, facility or Confidential Information (as defined above), and which (i) does not relate to Customer's business or to Customer's actual or anticipated research or development, and (ii) does not result from any work performed by Temporary Worker specifically for Customer (the "Excluded Inventions"). In any dispute with respect to these exclusions, the burden of proof shall be on Temporary Worker to show that the exclusion applies.

**8. Work Made for Hire.** Any and all Work Product prepared by Temporary Worker for Customer that is eligible for copyright protection shall be a work made for hire on behalf of Customer as that term is used under the United States Copyright Act and ownership of all copyrights in such work shall vest in Customer. If for any reason, any such work shall not be deemed a work made for hire or ownership of such copyrights would not vest in Customer, then Temporary Worker shall transfer all right, title and interest in such work, including all copyrights therein to Customer. In those jurisdictions that deem any work performed on a "Work Made for Hire" basis as giving rise to an employee/employer relationship, the parties specifically agree that this provision shall not apply in such jurisdiction and that Temporary Worker shall continue to be deemed an independent contractor of Customer.

**9. Term.** This Agreement shall be effective as of the date first written above, and shall remain in effect notwithstanding Temporary Worker's termination of employment with Employer or termination of Temporary Worker's assignment to Customer.

**10. Severability.** In the event that any provision of this Agreement is held to be invalid or unenforceable, then such invalid or enforceable provisions shall be severed, and the remaining provisions shall remain in full force and effect to the fullest extent permitted by law.

**11. Waiver.** This Agreement may be amended, or its requirements waived, only by a writing signed by the party against whom enforcement of the waiver or amendment is sought.

**12. Governing Law; Jurisdiction.** This agreement shall be governed by the law of the State of Illinois. Any litigation under this Agreement shall be filed and pursued in a court of proper venue in the State of Illinois. All parties expressly consent to the jurisdiction of such courts.

4

JA137

**13. <u>Assignment</u>**. Neither party's rights or obligations under this Agreement can be assigned without the express prior written consent of (i) the other party hereto, and (ii) Vendor. Any attempted or purported assignment of this Agreement without such consent shall be void.

**14. <u>No Inducements.</u>** Temporary Worker warrants and represents that he or she has neither provided nor offered to provide any gifts, payments, or other inducements to any officer, employee or agent of Vendor or Customer for any purpose. Temporary Worker shall not provide or offer any gifts, payments, or other inducements to any officer, employee or agent of Vendor or Customer for any purpose.

**15. <u>Entire Agreement</u>**. This Agreement constitutes the entire Agreement and understanding between the parties with respect to the subject matter hereof, and this Agreement supersedes all prior and contemporaneous negotiations, discussions and understanding of the parties with respect to the subject matter hereof.

[Signature page follows]

5

**Proprietary and Confidential to Vendor**

JA138

# Exhibit 5

CAEI, INC.

Employee Handbook                                    Effective July 1, 2013

II.    **EMPLOYEE HANDBOOK**

A.    **EMPLOYMENT GUIDELINES**

1.    **Equal Employment Opportunity Policy Statement**

It is express written policy of CAEI, INC. that all applicants for employment and all employees are recruited, hired, and assigned on the basis of merit without discrimination because of age, race, color, religion, sex or national origin. The employment policies and practices of CAEI, INC. have been and will continue to be such to ensure that all of its employees are treated equally and that no distinctions are made in rates of pay, opportunities of advancement (including upgrading, promotion, and transfer) because of the employee's age, race, color, religion, sex, or national origin.

CAEI, INC. is pleased to participate in a program in cooperation with the Federal Employment Opportunity Commission in carrying out the principles of the Civil Rights Act of 1964 as amended by the Equal Employment Opportunity Act of 1972 and the policy of the President of the United States embodied in Executive Orders that all qualified persons regardless of age, race, color, religion, sex, disability, veteran status, or national origin are entitled to equal employment opportunities.

CAEI, INC. has voluntarily undertaken to demonstrate its continuing adherence to the principle of merit employment. CAEI, INC.'s policy of non-discrimination in employment has been, and will continue to be, pursued equitably throughout all of its operations.

2.    **Respect and Dignity**

All employees are to be treated with respect and dignity. Sexual and other forms of unlawful harassment of any employee are strictly prohibited.

The term harassment includes, but is not necessarily limited to:

➤ Unwelcome sexual advances; requests for sexual favors; or other verbal, visual, or physical conduct of a sexual nature.
➤ Slurs, jokes, or other verbal, visual or physical conduct relating to an individual's race, color, sex, religion, national origin, age, disability, or other characteristic protected by applicable state or federal law.

21

CAEI, INC.
Employee Handbook                           Effective July 1, 2013

Employees who believe that they have been harassed, or who observe conduct that involves the impermissible harassment of any other employee, must immediately report the incident to their supervisor, the Human Resources Manager, or directly to the Executive Committee.

3.    **Problem Solving**

Open lines of communication are important to the creation of constructive work relationships and the elimination of counterproductive conflicts. If an employee becomes dissatisfied due to a work-related matter which affects him/her personally, it should be discussed with his/her supervisor. In most cases, the employee and the supervisor will be able to resolve the problem promptly and fairly. If the situation is not completely resolved, the employee and/or his/her supervisor should request a meeting with a higher level manager to discuss and obtain final resolution of the situation. The employee may discuss the problem directly with the Human Resources Manager, who will direct the problem to the appropriate management level for resolution.

4.    **Employment at Will/Introductory Period**

In consideration of employment, the employee agrees to conform to the policies and procedures of CAEI, INC.. He/she understands that employment can be terminated at any time, with or without notification, at the option of either CAEI, INC. or the employee, notwithstanding any federal or state laws, in accordance with the principle of employment at will.

New employees are expected to adapt to the organization within an introductory period of up to three months following their hire date. This three month period is provided so the employee and company may ascertain that the employment relationship is mutually rewarding. Should this not be the case, the employment relationship may be terminated by either party without notice. In general practice, every possible consideration is given to the application guidelines provided under the termination section of this Handbook. Successful completion of the introductory period does not, however, guarantee continued employment.

MCCR 0291
JA141

# Exhibit 6

**CAEI, INC.**
Employee Handbook                                   Effective July 1, 2013

G.     **WORKPLACE VIOLENCE POLICY STATEMENT**

It is CAEI, INC.'s policy to promote a safe environment for its employees. CAEI, INC. is committed to working with its employees to continue to maintain a work environment free from violence, threats of violence, harassment, intimidation, and other disruptive behavior.

Violence, threats, harassment, intimidation, and other disruptive behavior in our workplace will not be tolerated. All reports of incidents will be taken seriously and will be dealt with appropriately. Such behavior can include oral or written statements, gestures, or expressions that communicate a direct or indirect threat of physical harm. Individuals who commit such acts may be removed from the premises and may be subject to disciplinary action, criminal penalties, or both.

Do not ignore violent, threatening, harassing, intimidating, or other disruptive behavior. If you observe or experience such behavior by anyone in client's or CAEI, INC.'s workplace, whether he or she is a CAEI, INC. employee or not, report it immediately to a supervisor or manager. Supervisors and managers who receive such reports should seek advice from the Human Resources Office regarding investigation of the incident and initiating appropriate action. **Please Note: Threats or assaults that require immediate attention by police should be reported first to police at 911.**

MCCA 0291
JA143

# Exhibit 7

 

**AW**

Angelique ›



Hello Angie, I will need one more day off. Hopefully, I will have taken care of all that I need to in the time.

Np

Take the time you need

Thank you.

Jan 27, 2016, 8:42 AM

Good morning Angie. I had to buy a used car and could not finish everything yesterday. Been here since 8:00 and they have not finished. I may be late today.

Ok no worries do what you need to do I will explain the situation to leadership

Angie they are waiting for parts eta for arrival is 11:00. I am gonna' stay today to get it finished rather then be late another day.

Ok thanks for letting me know hope all goes well

  iMessage 

      

**JA145**

# Exhibit 8

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | [X] FEPA | 1611-0734 |
| | [ ] EEOC | 12F-2017-00041 |

| Maryland Commission on Civil Rights | and EEOC |
|---|---|

*State or local Agency, if any*

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Mr. Harry Bolden** | | |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| **604 Aldershot Road** | **Baltimore, MD 21229** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **CAEI, Inc.** | **Over 500** | **(443) 319-5381** |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| **9256 Bendix Road, Suite 102** | **Columbia, MD 21045** | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| | | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

[X] RACE   [ ] COLOR   [X] SEX   [ ] RELIGION   [ ] NATIONAL ORIGIN

[X] RETALIATION   [ ] AGE   [ ] DISABILITY   [ ] GENETIC INFORMATION

[ ] OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: **11-15-2015**   Latest: **02-11-2016**

[ ] CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

COMPLAINANT CONTACTED MARYLAND COMMISSION ON CIVIL RIGHTS ON 06-28-2016

ISSUES: TERMS AND CONDITIONS, DISCIPLINE, TERMINATION, PROMOTION

I believe that I have been discriminated against on the basis of my sex, male, race, African American, and retaliated against for the following reasons:

I was hired on or about September 15, 2014 in the position, Billing Specialist, IV. My immediate supervisor was Ms. Angelique Watts, Manager. My job performance was excellent.

On or about November 15, 2015, Ms. Watts and Ms. Khadijah Webster, Manager, falsely accused me of violating the employee conduct policy relative to logging in and out of my computer. I am aware of female employees, Ms. Robin Roden and Ms. Nicole Russ, Billing Clerks/Trainers who violated employee conduct rules relative to spending appropriate time on the telephone to address customer complaints, but did not receive a verbal reprimand for this violation.

On or about November 26, 2015, Mr. Raymond Hubbard, Vice President, requested that I meet with him to discuss promotional opportunities. He offered me the position, Supervisor, Financial Solutions. However, on or about November 28, 2015, Mr. Hubbard announced that Ms. Watts was selected to fill the

| I want this charge filed with both the EEOC and the State or local Agency, if any, I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the above is true and correct. | SIGNATURE OF COMPLAINANT |
| 10-17-2016     *Harry Bolden* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE |
| Date          Charging Party Signature | |

EEOC Form 5 (11/09)

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act
Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| [X] FEPA | 1611-0734 |
| [ ] EEOC | 12F-2017-00041 |

Maryland Commission on Civil Rights
State or local Agency, if any     and EEOC

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

position. I am more qualified and meet the requirements of this position.     Mr. Hubbard made this
statement to me in the meeting.

On or about December 7, 2015, Ms. Watts requested that I serve food to over twenty (20) employees during
our potluck dinner. I am aware that Ms. Watts did not request that any other employee serve food at the
potluck. For example, this request was not placed upon Mr. Robert Haughie (Caucasian) and Ms. Jessica
Robinson (female), Billing Specialists. Following the dinner, she gave me a verbal reprimand for not
spending the required time on the telephone on this date.

On or about January 15, 2016, I filed a report with the Human Resources Department complaining about
workplace harassment and unfair conditions of employment.

On or about February 11, 2016, I was terminated by Mr. Hubbard. The reason given for my termination was
"lack of integrity."

I believe that my termination was an act of retaliation because I engaged in the protected activity of reporting
workplace harassment and unfair conditions of employment.

I solemnly affirm under the penalty of perjury that the contents of the foregoing paper are true to the best of
my knowledge, information, and belief.

MCCR SUPERVISOR APPROVAL _____     DATE _____  TJ

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 10-17-2016     _Harry Balder_ Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

JA148

# Exhibit 9

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

_____
                                                          )
HARRY A. BOLDEN                              )
                                                          )
Plaintiff                                                )          Civil Case No: 1:21-cv-02295-CCB
                                                          )
v.                                                         )
                                                          )
CAEI, INC., et al                                    )
                                                          )
Defendants                                          )
                                                          )
_____)

### PLAINTIFF'S RESPONSE TO BGE'S FIRST REQUESTS FOR ADMISSION

Plaintiff, Harry A. Bolden ("Mr. Bolden"), by and through undersigned counsel, hereby responds to Defendant Baltimore Gas & Electric Company's ("BGE") First Requests for Admission.  Plaintiff reserves the right to amend or supplement this Response pursuant to the Rules of Civil Procedure.

### RESPONSES TO REQUESTS

1.        Admit that CAEI, Inc. is an information and technology management consulting and professional services firm.

**ADMIT**

2.        Admit that CAEI, Inc. provided services to BGE between 2014 and 2016.

**ADMIT, but Plaintiff is without information to admit or deny that CAEI, Inc. provided services to BGE for years other than 2014 and 2016.**

3.        Admit that in August 2014, CAEI Inc. employee, Kia Smoot, e-mailed you regarding an interview for a full-time call center collections position with CAEI, Inc.

**JA150**

to provide services to CAEI, Inc.'s customer, BGE, in Downtown Baltimore.

**ADMIT except to the extent that the question implies that CAEI, Inc. was Plaintiff's only legal employer.**

4.      Admit that on September 12, 2014, you executed a Temporary Worker Agreement between you and your employer CAEI, Inc., attached as **Exhibit 1**.

**ADMIT except to the extent that the question implies that CAEI, Inc. was Plaintiff's only legal employer.**

5.      Admit that Exhibit 1 is genuine.

**ADMIT**

6.      Admit that during your employment with CAEI, Inc. you were directly supervised by CAEI, Inc. employee, Angelique Watts.

**ADMIT to the extent that Angelique Watts was one of Plaintiff's direct supervisors.  Further, Plaintiff is without information to admit or deny that Angelique Watts was the legal employee of only CAEI, Inc.**

7.      Admit that on or about January 15, 2016, you complained about CAEI Inc. employee, Angelique Watts, to CAEI, Inc. Human Resources manager, Kia Smoot.

**DENY**

8.      Admit that during the meeting identified in Request 7, no BGE employee was present.

**Because there was no meeting "on or about January 15, 2016," the Request is too vague and ambiguous to admit or deny.**

9.      Admit that on or about February 5, 2016, CAEI, Inc. Vice President, Raymond Hubbard, and CAEI, Inc. employee, Angelique Watts, met with you to discuss

**JA151**

changing your seat assignment in the call center.

**ADMIT except to the extent the question inaccurately and insufficiently describes the purpose of the presumably referenced meeting, and except to the extent the question suggests that there was only one meeting "on or about February 5, 2016."**

10.    Admit that on or about February 10, 2016, you met with CAEI, Inc. Vice President, Raymond Hubbard, CAEI, Inc. Human Resources manager, Kia Smoot, and CAEI, Inc. employee, Angelique Watts to discuss CAEI, Inc.'s decision to change your seat assignment in the call center.

**ADMIT except to the extent the question inaccurately and insufficiently describes the attendees and purpose of the presumably referenced meeting, and except to the extent the question suggests that there was only one meeting "on or about February 10, 2016."**

11.    Admit that during the same February 10, 2016 meeting with CAEI, Inc. Vice President, Raymond Hubbard, CAEI, Inc. Human Resources manager, Kia Smoot, and CAEI, Inc. employee, Angelique Watts, you were confronted with a complaint against you made by other CAEI, Inc. employees about your inappropriate conduct on the subway.

**DENY**

12.    Admit that during the same February 10, 2016 meeting with CAEI, Inc. Vice President, Raymond Hubbard, CAEI, Inc. Human Resources manager, Kia Smoot, and CAEI, Inc. employee, Angelique Watts, you became agitated, which resulted in Mr. Hubbard ending the meeting.

3

**JA152**

**DENY**

13.    Admit that on or about February 11, 2016, CAEI, Inc. Vice President, Raymond Hubbard, terminated your employment with CAEI, Inc. at CAEI, Inc.'s corporate headquarters located in Columbia, Maryland.

**ADMIT**

14.    Admit that on or about October 17, 2016, you filed a Charge of Discrimination with the MCCR against CAEI, Inc.

**ADMIT**

15.    Admit that you did not file a Charge of Discrimination against BGE or Exelon Business Services Corporation.

**ADMIT**

16.    Admit that your paychecks for the work you performed for CAEI, Inc. were issued to you by CAEI, Inc. and were paid by CAEI, Inc.

**DENY to the extent the question implies that BGE was not also involved with the payroll process regarding Plaintiff.**

17.    Admit that BGE did not participate in the MCCR's settlement conference.

**ADMIT except to the extent Plaintiff is without information sufficient to admit or deny that BGE was aware of and participated indirectly in the settlement conference.**

18.    Admit that BGE did not participate in the MCCR's fact-finding conference.

**ADMIT except to the extent Plaintiff is without information sufficient to admit or deny that BGE was aware of and participated indirectly in the fact-**

4

**JA153**

**finding conference.**

19.     Admit that during your employment with CAEI, Inc. you were aware that you were hired to work on the BGE "Proactive Collections Team."

**ADMIT that "Proactive Collections Team" is one of the names used by CAEI, Inc. and BGE for Plaintiff's team/department.**

20.     Admit that you were provided with a CAEI, Inc. Employee Handbook.

**ADMIT**

21.     Admit that you were not provided with a BGE Employee Handbook.

**DENY to the extent that BGE policies and procedures were provided that were not titled "BGE Employee Handbook."**

<u>/s/ Joseph D. Allen</u>

Joseph D. Allen, Esq. (#20736)
Simms Showers LLP
201 International Circle, Suite 230
Baltimore, Maryland 21030
Phone: 443-290-8710
Facsimile: 410-510-1789
jdallen@simmsshowers.com

Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 31st day of August, 2022, I caused the foregoing to be served via email on counsel of record.

/s/ Joseph D. Allen

5

**JA154**

# Exhibit 10

EEOC FORM 131-A (11/09)

# U.S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| Ms. Kia Smoot<br>Director of Human Resources<br>CAEI, INC.<br>9256 Bendix Road, Suite 102<br>Columbia, MD 21045 | **Harry Bolden** |
| | THIS PERSON (check one or both)<br>[X] Claims To Be Aggrieved<br>[ ] Is Filing on Behalf of Other(s) |
| | EEOC CHARGE NO.<br>12F-2017-00041 |
| | FEPA CHARGE NO.<br>1611-0734 |

## NOTICE OF CHARGE OF DISCRIMINATION IN JURISDICTION WHERE A FEP AGENCY WILL INITIALLY PROCESS
(See the enclosed for additional information)

THIS IS NOTICE THAT A CHARGE OF EMPLOYMENT DISCRIMINATION UNDER

[X] Title VII of the Civil Rights Act (Title VII)     [ ] The Equal Pay Act (EPA)     [ ] The Americans with Disabilities Act (ADA)

[ ] The Age Discrimination in Employment Act (ADEA)     [ ] The Genetic Information Nondiscrimination Act (GINA)

HAS BEEN RECEIVED BY

[ ] The EEOC and sent for initial processing to _____

[X] The     **Maryland Commission on Civil Rights**     (FEP Agency)
        (FEP Agency)          and sent to EEOC for dual filing purposes.

While EEOC has jurisdiction (upon expiration of any deferral requirement if this is a Title VII, ADA or GINA charge) to investigate this charge, EEOC may suspend its investigation and await the issuance of the Agency's final findings and orders. These findings and orders will be given weight by EEOC in making its own determination as to whether reasonable cause exists to believe that discrimination has occurred.

You are therefore encouraged to cooperate fully with the Agency. All facts and evidence provided by you to the Agency will be considered by EEOC when it reviews the Agency's final findings and orders. In many cases EEOC will take no further action, thereby avoiding the necessity of an investigation by both the Agency and EEOC. This likelihood is increased by your active cooperation with the Agency.

As a party to the charge, you may request that EEOC review the final findings and orders of the above-named Agency. For such a request to be honored, you must notify EEOC in writing within 15 days of your receipt of the Agency's final decision and order. If the Agency terminates its proceedings without issuing a final finding and order, you will be contacted further by EEOC. Regardless of whether the Agency or EEOC processes the charge, the Recordkeeping and Non-Retaliation provisions of the statutes as explained in the enclosed information sheet apply.

For further correspondence on this matter, please use the charge number(s) shown above.

Enclosure(s): Copy of Charge

## CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[X] Race   [ ] Color   [X] Sex   [ ] Religion   [ ] National Origin   [ ] Age   [ ] Disability   [X] Retaliation   [ ] Genetic Information   [ ] Other

See enclosed copy of charge of discrimination.

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| November 3, 2016 | Spencer H. Lewis, JR,<br>District Director | |

JA156

...e with EEOC
191-A (11/09)

# INFORMATION ON CHARGES OF DISCRIMINATION

## EEOC RULES AND REGULATIONS

Section 1601.15 of EEOC's regulations provides that persons or organizations charged with employment discrimination may submit a statement of position or evidence regarding the issues covered by this charge.

EEOC's recordkeeping and reporting requirements are found at Title 29, Code of Federal Regulations (29 CFR): 29 CFR Part 1602 (see particularly Sec. 1602.14 below) for Title VII and the ADA; 29 CFR Part 1620 for the EPA; and 29 CFR Part 1627, for the ADEA. These regulations generally require respondents to preserve payroll and personnel records relevant to a charge of discrimination until disposition of the charge or litigation relating to the charge. (For ADEA charges, this notice is the written requirement described in Part 1627, Sec. 1627.3(b)(3), .4(a)(2) or .5(c), for respondents to preserve records relevant to the charge – the records to be retained, and for how long, are as described in Sec. 1602.14, as set out below). Parts 1602, 1620 and 1627 also prescribe record retention periods – generally, three years for basic payroll records and one year for personnel records. Questions about retention periods and the types of records to be retained should be resolved by referring to the regulations.

Section 1602.14  Preservation of records made or kept. . . . . Where a charge ... has been filed, or an action brought by the Commission or the Attorney General, against an employer under Title VII or the ADA, the respondent ... shall preserve all personnel records relevant to the charge or the action until final disposition of the charge or action. The term *personnel records relevant to the charge*, for example, would include personnel or employment records relating to the aggrieved person and to all other aggrieved employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates or the same position as that for which the aggrieved person applied and was rejected. The date of *final disposition of the charge or the action* means the date of expiration of the statutory period within which the aggrieved person may bring [a lawsuit] or, where an action is brought against an employer either by the aggrieved person, the Commission, or the Attorney General, the date on which such litigation is terminated.

## NOTICE OF NON-RETALIATION REQUIREMENTS

Section 704(a) of Title VII, Section 207(f) of GINA, Section 4(d) of the ADEA, and Section 503(a) of the ADA provide that it is an unlawful employment practice for an employer to discriminate against present or former employees or job applicants, for an employment agency to discriminate against any individual, or for a union to discriminate against its members or applicants for membership, because they have opposed any practice made an unlawful employment practice by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the statutes. The Equal Pay Act contains similar provisions. Additionally, Section 503(b) of the ADA prohibits coercion, intimidation, threats, or interference with anyone because they have exercised or enjoyed, or aided or encouraged others in their exercise or enjoyment, of rights under the Act.

Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made. Please note that the Civil Rights Act of 1991 provides substantial additional monetary provisions to remedy instances of retaliation or other discrimination, including, for example, to remedy the emotional harm caused by on-the-job harassment.

## NOTICE REGARDING REPRESENTATION BY ATTORNEYS

Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you. If you do retain an attorney, please give us your attorney's name, address and phone number, and ask your attorney to write us confirming such representation.

# Exhibit 11

Please NOTE: This is the proposed settlement. It was not accepted by both parties.

## PRE-DETERMINATION SETTLEMENT AGREEMENT

This Agreement is entered into by and among Harry Bolden (hereinafter the "Complainant"), CAEI, Inc. (hereinafter the "Respondent"), and the Maryland Commission on Civil Rights (hereinafter the "Commission"), a duly constituted agency of the State of Maryland.

**WHEREAS**, a complaint has been filed with the Commission charging the Respondent with a violation of Title 20 of the State Government Article, Annotated Code of Maryland (hereinafter "Title 20"); this complaint is identified as follows:

**Harry Bolden**

Complainant

vs.

**CAEI, Inc.**

Respondent

Case No.: 1611-0734



**JA159**

Name: Harry Bolden vs. CAEI, Inc.
No.:    1611-0734



**JA160**

Name: Harry Bolden vs. CAEI, Inc.
No.:    1611-0734



**ACCEPTED BY THE RESPONDENT:**

**CAEI, Inc.**

**I HEREBY DECLARE,** under the penalties of perjury, this 17th. day of _February, , that I executed the foregoing Pre-Determination Settlement Agreement on behalf of CAEI, Inc. at a time when I was fully authorized to execute the foregoing Pre-Determination Settlement Agreement on its behalf for the purpose of fully binding CAEI, Inc. to it.

BY: _____    DATE: 2/17/2017
      Signature/Title

3

**JA161**

Name: Harry Bolden vs. CAEI, Inc.
No.:   1611-0734

**ACCEPTED BY THE COMPLAINANT:**

**Harry Bolden**

_Harry Bolden_                                DATE: _2 - 1 7 - 2016._

Harry Bolden

**ACCEPTED BY THE STATE OF MARYLAND COMMISSION ON CIVIL RIGHTS:**

_____        DATE: _____

Cleveland L. Horton

Deputy Director

Maryland Commission on Civil Rights

4

**JA162**

# Exhibit 12

DocuSign Envelope ID: A9837944-8068-46CF-9C82-328AE8B036ED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

HARRY A. BOLDEN,                             *
                                            *
                Plaintiff,                   *
                                            *
v.                                           *   Civil Case No.:  1:21-cv-02295-JRR
                                            *
CAEI INC., et al.,                           *
                                            *
                Defendants.                  *
_____/

### DECLARATION OF KHADIJA DUNCAN

1.  My name is Khadija Duncan.  My previous last name was Webster.  I am over the age of 18 and am competent to testify as to the matters set forth herein based on my personal knowledge.

2.  I understand that my Declaration is being submitted in support of the Motion for Summary Judgment filed by Defendant, Baltimore Gas and Electric Company ("BGE"), in the above-captioned matter.

3.  I have been employed by Exelon Business Services Company as a Senior Supervisor since November 2018.  From February 2007 to November 2018, I was employed by BGE.  Between 2014 to 2016, I was employed by BGE as a Senior Supervisor and my last name was Webster.

4.  I have personal knowledge of the contractual relationship between BGE and CAEI, Inc. ("CAEI"), and CAEI's role in operating the financial solutions program.

5.  I have personal knowledge of the fact that Mr. Bolden was employed with CAEI, and that he worked as a billing specialist in the financial solutions program.

6.  I did not learn about Mr. Bolden's Charge of Discrimination against CAEI, filed with the Maryland Commission on Civil Rights ("MCCR") until after Mr. Bolden filed the instant lawsuit in September 2021.

**JA164**

DocuSign Envelope ID: A9857944-8D68-46CF-9C8E-328AE8B036ED

7.  I was not interviewed by the MCCR in connection with Mr. Bolden's Charge of Discrimination against CAEI.

8.  I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Dated: __1/27/2023__

Khadija Duncan
Khadija Duncan

2

**JA165**

# Exhibit 13

## BEFORE THE MARYLAND COMMISSION ON CIVIL RIGHTS

IN THE MATTER OF:                           *

                                         *

    Mr. Harry Bolden            *
    604 Aldershot Road
    Baltimore, MD 21229         *

                                         *

    COMPLAINANT                 *

    vs.                         *

                                         *

                                         *

    CAEI, INC.                  *
    9256 Bendix Road, Suite 102
    Columbia, MD 21045          *

                                         *

    RESPONDENT                  *
                      MCCR NUMBER: 1611-0734
                                         *
                      EEOC NUMBER:  12F-2017-00041C
                                         *

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

## WRITTEN FINDING

The above-captioned case has been investigated pursuant to State Government Article, Section 20-1005(a), Annotated Code of Maryland and the Commission's Rules of Procedure, COMAR 14.03.01.05.   The written finding is made in accordance with COMAR 14.03.01.08A. All procedural requirements have been met.

## SUMMARY OF COMPLAINANT'S POSITION:

The Complainant alleges that he was discriminated against based on his race, African American and his

Page **1** of **14**

JA167

sex, male and retaliated against for opposing a discriminatory activity in the workplace.

**SUMMARY OF RESPONDENT'S POSITION:**

The Respondent denied discriminating against the Complainant on the basis of his race, sex, and retaliation or for any other reason maintaining, that the Complainant did not want to comply with management's decision to make necessary changes in the office.

**SUMMARY OF THE INVESTIGATION:**

*"I was hired on or about September 15, 2014 in the position, Billing Specialist, IV. My immediate supervisor was Ms. Angelique Watts, Manager. My job performance was excellent."*

The Respondent asserts the aforementioned allegations.

The investigation revealed that the Complainants first day of employment was September 15, 2014, as a Customer Service Representative II. The investigation revealed that the Complainants immediate supervisor at the time of his hiring was Deborah Chew, then Ms. Chew was replaced by Tabitha Horn on November 18, 2014. Moreover, Angelique Watts became the Complainants immediate supervisor effective on or about May 5, 2015. The investigation revealed that the Complainant met all his performance requirements, and also exceeded expectations in some areas of his performance.

*"On or about November 15, 2015, Ms. Watts and Ms. Khadijah Webster, Manager, falsely accused me of violating the employee conduct policy relative to logging in and out of my computer. I am aware of female employees, Ms. Robin Roden and Ms. Nicole Russ, Billing Clerks/Trainers who violated employee conduct rules relative to spending appropriate*

Page **2** of **14**

MC  JA168

*time on the telephone to address customer complaints, but did not receive a verbal reprimand*

*for this violation."*

According to Ms. Webster, the Complainant left his computer log on. The investigation revealed that the most common issue that happens if an employee has left their desk with some portion of their computer or phone logged in. The investigation revealed that the incident caused no negative impact to the Complainants work place reputation or suitability for his continued employment nor was the Complainant reprimanded for such incident. The investigation revealed that the Respondents performance and development of other employees are not addressed with other team members.

According to the Respondent, it is important that the team meets the goals of its clients specifically BGE, and that both Ms. Russ and Ms. Roden, have successfully worked with many customers who lodged complaints and were able to convert those complaints to compliments that did in fact, make their way up to BGE senior management staff.

The investigation could not find evidence that on or about November 15, 2015, Ms. Watts and Ms. Khadijah Webster, Manager, falsely accused the Complainant of violating the employee conduct policy relative to logging in and out of the Complainants computer. Further, according to the Respondent the Complainant was not reprimanded or disciplined in this instance.

*"On or about November 26, 2015, Mr. Raymond Hubbard, Vice President, requested that I meet with him to discuss promotional opportunities. He offered me the position, Supervisor, Financial Solutions. However, on or about November 28, 2015, Mr. Hubbard announced that Ms. Watts was selected to fill the position. I am more qualified and meet the requirements of this position."*

Page **3** of **14**

According to Mr. Hubbard, he has no idea of the meeting on or about November 26, 2015, that the Complainant is refereeing to in this instance. Also according to the Respondent, Ms. Watts had been in the leadership position for the Complainants team for approximate six months. Mr. Hubbard confirmed that he never offered the Complainant a promotion to leadership and there were no vacancies. Although the Complainant alleges that Mr. Hubbard offered him a promotion to leadership, the investigation revealed that as of November 26, 2015, Ms. Watts had been in the leadership position for the Complainants team for approximate six months.

According to the Complainant, Mr. Hubbard verbally offered him the position of Financial Solutions Supervisor on November 26, 2015. The investigation revealed that the Respondent was not considering replacing Ms. Watts's position and there were no other leadership positions open. Moreover, according to the Respondents witness Mr. Hubbard, he never offered the Complainant a leadership position and he has no idea of the meeting on or about November 26, 2015, that the Complainant is refereeing to in this instance.

The investigation revealed that Ms. Watts was more qualified and experienced than the Complainant. The investigation revealed that Ms. Watts worked for the Respondent and BGE since February 2012, where she acquired the requisite skills necessary to lead the Financial Solutions Team with the Respondent. Further, Ms. Watts was also a leader in the Respondents earlier pilot collection program, which was the template for the Financial Solutions team where Ms. Watts and the Complainant worked. According to the Respondent, Ms. Watts also assumed the responsibility for many of BGE's pilot programs. The investigation revealed that Ms. Watts was hand chosen by the BGE management team, with the Respondents approval. Further, because the Financial Solutions team was a pilot program, and in May 2015, Ms. Watts became

Page **4** of **14**

leadership of the Financial Solutions team. The investigation revealed that the Complainant has experience as a customer service representative, and as a Billing Specialist, and experience with parking lot cashiers. The investigation revealed that the Respondent was not considering removing Ms. Watts from her leadership position to replace her with the Complainant.

*"On or about December 7, 2015, Ms. Watts requested that I serve food to over twenty (20) employees during our potluck dinner.  I am aware that Ms. Watts did not request that any other employee serve food at the potluck.  For example, this request was not placed upon Mr. Robert Haughie (Caucasian) and Ms. Jessica Robinson (female), Billing Specialists. Following the dinner, she gave me a verbal reprimand for not spending the required time on the telephone on this date."*

According to the Respondent, the request for the Complainant to serve food to over twenty (20) employees during the potluck dinner was made to give the Complainant an opportunity to get off the phones, and is seen as a privilege if asked. The Respondent confirmed that the request was not mandatory therefore, the Complainant could have declined to serve other employees food at the pot luck. According to the Respondent, all employees have been asked numerous times to assist with pot luck and other small projects around the office. The Respondent stated that other employees were not asked in this instance because the Complainant agreed to assist. Also according to the Respondent, there is no indication or record of the Complainant ever being reprimanded for not meeting his goals.

The investigation revealed that the Complainant agreed to serve food to over twenty (20) employees during the potluck dinner before any other employees were asked. Further, the request was not mandatory and the Complainant could have declined to serve at the pot luck.

Page **5** of **14**

MO    JA171

The investigation revealed that Mr. Haughie was not employed with the Respondent in this instance because his two year contract ended September 2015. However, according to the Respondent Mr. Haughie did in fact, serve food many times throughout his employment with the Respondent. The investigation also revealed that Ms. Robinson volunteered to serve meals on many occasions. The investigation also revealed that the opportunity was made to give the Complainant an opportunity to get off the phones, and was also seen as a privilege if asked to do so. The investigation revealed that, all employees have been asked on numerous occasions to assist with pot luck and other small projects around the office. The investigation revealed that it is very possible that leadership may have mentioned the Complainants call statistics. The investigation revealed that there is no indication or record that the Complainant was ever reprimanded for not meeting his goals. Moreover, the Complainants call handling volume and productivity in this instance exceeded expectation. The investigation also revealed that Ms. Watts often referred to the Complainant as a team member who consistently met his goals.

*"On or about January 15, 2016, I filed a report with the Human Resources Department complaining about workplace harassment and unfair conditions of employment."*

The Respondent asserts this allegation.

The investigation revealed that on or around January 2016, the Complainant did in fact contact the Respondents witness Ms. Smoot, HR many times however, the Complainant always insisted that it was not necessary to take further actions. The investigation also revealed that Mr. Hubbard and the Respondents HR, also followed up with the Complainant regarding his concerns however, the Complainant confirmed that he was satisfied on numerous occasions with the Respondents follow up. The investigation also revealed that Ms. Smoot confirmed with the

Page **6** of **14**

Complainant and Ms. Watts that the situation was resolved to everyone's satisfaction and no further actions were required. The investigation did not find any other evidence that the Complainant submitted a formal complaint of discrimination based on his protected classes.

**"On or about February 11, 2016, I was terminated by Mr. Hubbard.  The reason given for my termination was "lack of integrity."**

The Respondent asserts this allegation, however, according to the Respondent the reason for termination given to the Complainant was because of his inappropriate response to being moved in the Respondent's call center. According to the Respondent, Ms. Smoot and Mr. Hubbard met with the Complainant in corporate office on February 10, 2016, to discuss the issue about the Complainants seat change and reports from three female co-workers who felt uncomfortable at remarks made to them by the Complainant, while walking to the Subway together. Further, the Complainant admitted that they always joke around. However, the Respondent confirmed that the Complainants job was not in jeopardy at this time. According to the Respondent the Complainant became very agitated about the changes and would not conceded that the changes would be good for the department. According to the Respondent, Ms. Smoot and Mr. Hubbard felt threatened when the Complainant became very angry and animated, that Mr. Hubbard asked the Complainant to go home for the day.

The Respondents witness contacted BGE's project manager about their concerns with the Complainant and the changes they were planning for. The Respondent confirmed that BGE manager informed the Respondent that they should move forward with the changes and if the Complainant did not want adhere to the changes he should not return.

The investigation revealed that the Complainant was terminated on February 11, 2016, because he was being uncooperative and did not want to cooperate with the office move per management's decision. The Respondent requested that the Complainant move his seat and he refused. The Respondent's witness Mr. Hubbard stated that, when he met with Complainant, the Complainant was verbally upset and adamant about not wanting to be moved. Further, the Complainant was so disturbed and combative about moving his seat that the Complainant threw his headset down and became belligerent. The investigation revealed that the Respondents changes consisted of moving the Complainant to another desk within the same office location to potentially lead a group of people. The Complainant was ultimately terminated because he didn't want to cooperate with management's decision to make changes in the office.

According to the Respondents witness Mr. Hubbard, on February 11, 2016, during the meeting with Complainant, the Complainant started talking about problems that he was having with Angelique Watts when the purpose of meeting was to discuss options for promotion and moving people around to assume leadership positions. The investigation revealed that the Respondents management intended to rearrange staff desks in order to increase effectiveness by having certain employees specialize in large accounts with team leaders. The investigation revealed that the Complainant had been identified as a potential team leader in this instance but he would have needed to move his desk.

The investigation also revealed that prior to the Complainants termination that on February 5, 2016, Mr. Hubbard and Ms. Watts did speak to the Complainant because they wanted him to lead in one of the groups with the changes. The investigation also revealed that Mr. Hubbard and Ms. Watts were disappointed that the Complainants opportunity for growth had become negative rather than a

JA174

rewarding experience. The investigation revealed that the Complaint did not accept the more senior position that was offered to him. Moreover, the investigation revealed that Robin Roden and Nicole Russ, both African American female, and one African American male, Otis Rease were also offered a more senior position and accepted, the Respondents offer.

*"I believe that my termination was an act of retaliation because I engaged in the protected activity of reporting workplace harassment and unfair conditions of employment."*

The investigation found that the Complainant was terminated due to his inappropriate behavior and refusal to cooperate with the Respondents plan to reorganize work groups to allow the Respondent to improve service to BGE. The investigation found that the Complainants allegations of retaliation, workplace harassment, and unfair conditions of employment are unsubstantiated.

**CONCLUSION:**

In order to establish a violation on a Terms and Conditions of employment issue, the evidence must show in the following order of proof: 1) Charging Party belongs to a protected group; 2) Charging Party was denied equal terms or conditions of employment; 3) others similarly situated but not of Charging Party's group were extended the terms or conditions denied Charging Party; and 4) Respondent is unable to explain the difference in treatment or Respondent's explanation is in fact pretext for discrimination.

The investigation did find evidence that the Complainant belongs to a protected group, but did not find that the Complainant was denied equal terms or conditions of employment; or that others similarly situated but not of Charging Party's group were extended the terms or conditions denied the Complainant. The investigation did not find that the Respondent was

Page **9** of 14

M

JA175

unable to explain the difference in treatment or that the Respondent's explanation was in fact pretext for discrimination.

In order to establish a violation on a Discipline issue, the evidence must show in the following order of proof: 1) Charging Party belongs to a protected group; 2) Charging Party was disciplined; 3) Others not of Charging Party's group were not disciplined or were not disciplined in the same manner although they committed the same or similar infractions; and 4) Respondent cannot explain the different treatment or Respondent's articulated reason is in fact pretext for discrimination.

The investigation did find evidence that the Complainant belongs to a protected group but did not find that the Complainant was disciplined, nor did it find that others not of Charging Party's group were not disciplined or were not disciplined in the same manner although they committed the same or similar infractions. The investigation did not find that the Respondent was unable to explain the difference in treatment or that the Respondent's explanation was in fact pretext for discrimination.

In order to establish a violation on a Discharge issue, the evidence must show in the following order of proof: 1) Charging Party belongs to a protected group; 2) Charging Party was discharged; 3) Others similarly situated but not of Charging Party's group were not discharged; and 4) Respondent cannot explain the difference in treatment or Respondent's explanation is in fact pretext for discrimination.

The investigation did find evidence that the Complainant belongs to a protected group and that the Complainant was discharged. The investigate did not find evidence that others similarly

Page **10** of **14**

MC

situated but not of Charging Party's group were not discharged nor that the Respondent was unable to explain the difference in treatment or that the Respondent's explanation was in fact pretext for discrimination. In this instance case the Complainant refused to cooperate with the Respondent's request for the Complainant to move his seat for the purpose of changes in the department. The investigation did not find that other employees refused to move their seat as requested.

To prove retaliation, the investigation must show that (1) the Complainant opposed what she reasonably and in good faith believe to be an unlawful employment practice or that she participated in the EEO process, (2) that Respondent subjected her to adverse treatment and (3) that there was a causal connection between Complainants' protected activity and the adverse treatment.

The investigation showed that the Complainant opposed what he reasonably and in good faith believed to be an unlawful employment practice or that he participated in the EEO process. The investigation did find evidence that the Respondent subjected the Complainant to adverse treatment however, there was not a causal connection between Complainants' protected activity and the adverse treatment. In fact Ms. Smoot, HR spoke with the Complainant on several occasions and confirmed that the situations were resolved and no further actions were required.

In order to establish a violation on a Promotion issue, the evidence must show in the following order of proof: 1) Charging Party belongs to a protected group; 2) Respondent had a vacant position; 3) Charging Party applied for or expressed an interest in the position; 4) Charging Party was qualified for the position; and 5) Charging Party was not selected but a lessor qualified

Page **11** of **14**

person not of Charging Party's group was selected.

The investigation established that the Complainant belongs to a protected group; but did not find evidence that the Respondent had a vacant position. Nor did the investigation find evidence that Charging Party applied for or expressed an interest in the position

The investigation could not substantiate that the Complainant was discriminated against based on his protected classes herein, nor could the investigation find evidence that the Complainant was retaliated against. The investigation found that the alleged Leadership position that the Complainant may have been referring to was not vacant as found herein. Further, and if the position was vacant the Complainant would not have otherwise been qualified for such. The investigation established that the Complainant was not selected nor was a lessor qualified person not of the Complainants group was selected because the Respondent did not have a vacant position open.

## FINDING OF NO PROBABLE CAUSE:

Based on the evidence gathered by the Commission staff during this investigation, it has been determined that there is **No Probable Cause** to believe that the Respondent discriminated against the Complainant because of Race, Sex, and retaliation under Title 20, Subtitle 6 of the State Government Article, Annotated Code of Maryland.

Under the Commission's Rules of Procedure, COMAR 14.03.01.08C, the Complainant may submit in writing a Request for Reconsideration of the No Probable Cause finding within fifteen (15) days from the date upon which these findings were mailed. The request shall specifically state the grounds

MC

**JA178**

upon which the request is being made. The Request for Reconsideration shall be directed to:

Cleveland L. Horton II, Deputy Director

Maryland Commission on Civil Rights

William Donald Schaefer Building

6 St. Paul Street, Suite 900

Baltimore, Maryland, 21202

Once the Deputy Director has had the opportunity to review the Request for Reconsideration and the entirety of the case file, all parties will be notified of the decision. In the absence of a Request for Reconsideration, the above captioned complaint will be dismissed and the Commission's proceedings in the matter will be terminated.

Jessica Haskins
Civil Rights Officer

Alesha Bell
Civil Rights Officer Supervisor

Date: 09-23-20

Page 13 of 14

## CERTIFICATE OF SERVICE

This is to certify that the foregoing Written Finding was issued on this _____23_____ day of

, _September_ and was served on all parties to the complaint by regular mail on said date.

**FOR THE MARYLAND COMMISSION ON
CIVIL RIGHTS**

JA180

# Exhibit 14

**JA181**

Case 1:21-cv-02295-JRR   Document 20-16   Filed 01/2023   Page 2 of 32

EEOC Form 161 (11/2020)

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: | Harry Bolden<br>604 Aldershot Road<br>Baltimore, MD 21229 | From: | Philadelphia District Office<br>801 Market Street<br>Suite 1000<br>Philadelphia, PA 19107 |
|---|---|---|---|

| | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) | | |
|---|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 12F-2017-00041 | Damon A. Johnson,<br>State, Local & Tribal Program Manager | (267) 589-9722 |

## THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| | |
|---|---|
| [ ] | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
| [ ] | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
| [ ] | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| [ ] | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
| [ ] | The EEOC issues the following determination: The EEOC will not proceed further with its investigation, and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit.  This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge. |
| [X] | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| [ ] | Other (briefly state) |

## - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

_____     June 10, 2021
Dana R. Hutter,     _____
**Deputy Director**     *(Date Issued)*

Enclosures(s)

cc:     Kia Smoot
**Director of Human Resources**
CAEI, INC.
9256 Bendix Road, Suite 102
Columbia, MD 21045

JA182

Enclosure with EEOC
Form 161 (11/2020)

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court <u>under Federal law</u>.
If you also plan to sue claiming violations of State law, please be aware that time limits and other
provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS** -- **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you <u>receive</u> this Notice**. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope or record of receipt, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *issued* to you** (as indicated where the Notice is signed) or the date of the postmark or record of receipt, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS** -- **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than <u>2 years (3 years)</u>** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit **before 7/1/10** – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice <u>and</u> within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION** -- **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE** -- **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request <u>within 6 months</u> of this Notice**. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

JA183

# Exhibit 15

CHARGE NAME: mr. Harry Bolden v. CAEI, inc

CHARGE NUMBER: 12F-201-00041

INTAKE OFFICER: Toni Johns

**What remedy are you seeking?** I had only acted professionally in my time at CAEI +BGE; winning several awards for service and dedication. I in no way deserved to be treated or terminated in the manner in which I was. I therefore ask that the company CAEI be made aware of this harmful mistake; that compensatory and punitive damages be granted for what I have indured. I also ask to be given back my former post

**How did you come to this remedy?**

Illegal discrimination, harasiments is not only a violation; I belive that it is harmful. To fire me when I have not committed any termn violation is an evident violation of liberty and justice; to concoct a false basis is even worse; if such can be the case. I came to this remedy because I was seeking justice and fairness and I believe t a proper recourse of action.

**Summary of Remedy Discussion** (to be completed by Intake Staff)

_____

_____

_____

_____

_____

# Exhibit 16

JA186



**STATE OF MARYLAND**
**DEPARTMENT OF LABOR, LICENSING AND REGULATION**
**OFFICE OF UNEMPLOYMENT INSURANCE**

**FACT FINDING REPORT**

**Date Interviewed:** 02/29/2016
**Claimant's Name:** HARRY BOLDEN
**Social Security Number:** ▮▮▮▮▮
**Effective Date:** 02/14/2016
**Tran Code:** A03
**Issue Established:** FIRED-SIMPLE OR NO MISCONDUCT
**Issue Resolved:** FIRED-SIMPLE OR NO MISCONDUCT
**Seq Number:** 001
**Claimant's Phone Number:** ▮▮▮▮▮

**Employer Name:** CAEI INC
**Employer Account Number:** ▮▮▮▮▮
**Employer Phone Number:** ▮▮▮▮▮
**207 Sent:** 02/18/2016
**207 Due:** 02/26/2016
**207 Received:** N/A

---

## APPOINTMENT HISTORY

**SR-6 Sent Date:** 02/22/2016
**Scheduled Date:** 02/29/2016

**SR-6 Return Date:** NOT RECEIVED
**Scheduled Time:** 08:30 AM

## CLAIMANT INITIAL CLAIM INFORMATION

**Reason For Separation:** FIRED-SIMPLE OR NO MISCONDUCT
**First Day of Work:** 09/15/2014          **Last Day of Work:** 02/10/2016
**Return To Work Date:** N/A
**Occupation:** CUSTOMER SERVICE WORKER          **Rate of Pay:** $14.00 PER HOUR

## CLAIMANT FACT-FINDING STATEMENT

My last day of work was 02/11/2016. I was suspended without pay indefinitely by Kia Smoot, HR and Ray Hubbard, VP Project Management, and later that day Ray called and said that I was discharged per a call from corporate due to an alleged integrity policy violation.

On 02/05/2016, I was to leave early for a prescheduled doctor's appointement.

Angie Watts, supervisor told me that I was to report for a meeting on 02/05/2016. I was talked to about moving up with the company. Ray was in the meeting and he told me that we would continue our conversation on Monday, 02/08/2016, because I had already scheduled to leave early that day for a doctor's appointment.

I think that it was also on 02/05/2016, that Ray also talked to me about allegedly two incidents of being rude with Angie, and allegedly throwing my headset one time. Ray and I were to continue talking on 02/08/2016.

Ray never met with me again on 02/08/2016, as he said that he would. I rode with co-workers on the subway to my car after work on 02/08/2016.

On 02/08/2016, I had told co-workers about my meeting that I was supposed to have continued with Ray on 02/08/2016. I told them that I had been accused of things that never happened between Angie and myself, and I wonder if they were trying to fire me for some reason. I had not been told that I could not discuss the meeting with co-workers. I was just asking co-workers for feedback regarding my meeting with Ray and Angie.

On 02/08/2016, I said that I felt isolated by Angie. I said nothing about assault.

On 02/11/2016, Ray asked me how co-workers knew about our discussion on 02/05/2016. Kia, from HR was also present. I told him that I was looking for feedback from them after I was to meet with him and did not do so on 02/08/2016. I told him that I discussed things with them on our subway ride to our cars. Ray said that my discussing issues was not good integrity. He sent me home without pay for the balance of the day.

On 02/11/2016, when I was questioned by Kia and Ray about saying assault, I was puzzled. I had said isolated, not assault or assaulted. Perhaps co-workers did not understand what I had said. I was on the subway and trying to keep our conversation just between co-workers.

Later on 02/11/2016, Ray called me. He told me not to return to work.

I had been told that seats would be moved in December of 2015. I did say that I did not like change. I did move my seat in mid-January of 2016.

I contacted HR in early January of 2016, about seats being moved. I said that I thought that I was being isolated by Angie. I never said anything about an assault on her or an assault by her on me. I requested another position at that time, and that may have lead to the upper mobility statement, and discussion with Ray on 02/05/2016.

I had no prior warnings or displine. I worked to the best of ablity and followed all instructions.

I did not violate any company policy.

Scheduled Rebuttal:

Examiner advised claimant that he/she would be recontacted on 03/01/2016 between 1:00 and 3:00 pm.


## EMPLOYER 207 INFORMATION

**Reason For Separation:**    (NO REASON CURRENTLY GIVEN)
**First Day of Work:**   N/A                     **Last Day of Work:**   N/A
**Return To Work Date:**   N/A
**Occupation:**   N/A                              **Rate of Pay:**   N/A

**Official Completing Separation:**   N/A
**Official's E-mail Address:**   N/A
**Contact Person:**   N/A
**Contact Phone:**   N/A
**Gross Wages Since:**   10/01/2015    N/A


## EMPLOYER CONTACT INFORMATION

Examiner spoke with Kia Smoot, HR Director at ( ███████ 1 on 02/26/2016 at 1:06 pm.


## EMPLOYER FACT FINDING STATEMENT

Harry Bolden's last day of work was 02/11/2016. He was discharged by phone by Ray, project manager due to his demeanor.

Near the end of December of 2015, the claimant was told that his desk was going to be moved. All desks were being moved just to freshen up the mix of employees, and their seating arrangement. The claimant at that time said that he did not like change. He was reassured that this was not a disciplinary measure, and that everyone would be moving.

Desks were moved in mid-January of 2016.

On 02/05/2016, Ray, project manager had a meeting with the claimant about upper mobility. He was trying to talk to the claimant about other options that were available for him to take on a greater role with the company. He was given some options and was told that he could think about his options, and since we was leaving early that day that the conversation could continue the next working day of Monday, 02/08/2016.

The claimant had already made arrangements to leave early on 02/05/2016.

On Monday, 02/08/2016, the claimant told other representative per those other representatives that the conversation with Ray was

about the claimant assaulting Angie.

Beginning 02/08/2016 through 02/10/2016, numerous representatives started reporting that they were afraid to work with the claimant.

On 02/11/2016, Ray and I questioned the claimant about the reports from the other representatives. He said that he did not remember saying assault when he talked about Angie. When Ray and I were talking to the claimant he had a wild-eyed look about him in our opinion. We were afraid of workplace violence, so we discharged him.

The claimant was told that he was discharged on 02/11/2016. He was paid for four hours of work for that date.

He was discharged due to safety concerns of co-workers. He violated policy with his conversation about assault. His conversations were against the workplace violence policy.

I will fax copies of statements from concerned employees to you by 9:00 am on 03/01/2016. I will also submit a copy of our workplace violence policy. I understand that a decision will be made after that date and time with the information that is provided, and that a copy of the decision will be mailed.

He had no prior warnings or discipline for anything.

It is past the deadline, and no additional information has been provided.

## DETERMINATION SUBMITTED TO MABS ON 03/02/2016 AT 3:39 PM

**SSN:** ▮▮▮▮▮▮▮

| | | |
|---|---|---|
| **First Affected W/E:** 02/20/2016 | **Detected Date:** 02/17/2016 | |
| **Orig. Examiner ID:** EWHG6D | **Submitting Examiner ID:** EWHG6D | |
| **Count?** Y | **JAVA?** N/A | |
| **Penalty?** N | **Start Date:** | **Disq. Weeks:** |
| **OP Source:** | **OP Fault:** | |
| **Statement No:** 0596 | **Text Date:** | |
| **Employer No:** ▮▮▮▮▮ | **Emp. Seq No:** 001 | |
| **Charge?** Chg | **N/C Start Date:** 02/14/2016 | |
| **Federal Pension:** | **Effective Date:** | **Contributory?** N/A |
| **Other Pension:** | **Effective Date:** | **Contributory?** N/A |
| **Salary:** | **LDW:** | |
| **Bonus/Special Pay:** | **Profit Sharing Pay:** | **Contributory?** N/A |
| **Severance Pay:** | **Lump Sum Pension:** | **Contributory?** N/A |
| **Vac/Hol Pay 1:** | **Week Ending:** | |
| **Vac/Hol Pay 2:** | **Week Ending:** | |
| **Vac/Hol Pay 3:** | **Week Ending:** | |

**Nonmonetary Determination text:**
THE CLAIMANT WAS SEPARATED FROM EMPLOYMENT WITH CAEI INC ON 02/11/2016, DUE TO
AN ALLEGED INTEGRITY POLICY VIOLATION. THE EMPLOYER FAILED TO PROVIDE
REQUESTED ADDITIONAL INFORMATION.
THE EMPLOYER OR THE EMPLOYER'S AGENT WAS SENT A LETTER EXPLAINING THE
IMPORTANCE OF BEING AVAILABLE TO DISCUSS THE CLAIMANT'S DISCHARGE FROM
EMPLOYMENT. HOWEVER, WHEN CONTACTED, HE/SHE EITHER DID NOT PROVIDE OR REFUSED
TO PROVIDE THE REQUESTED INFORMATION. AS A RESULT, NO MISCONDUCT IN CONNECTION
WITH THE WORK WAS PROVEN, SO NO PENALTY IS WARRANTED UNDER SECTION 8-1002 OR
8-1003 OF THE MARYLAND UNEMPLOYMENT INSURANCE LAW.

## DECLARATION AND APPEAL RIGHTS

**The Declaration and Appeal Rights were read to the claimant.**

Declaration - I will begin this fact-finding interview by asking you specific questions surrounding the issue that appears on your appointment notice. Once we have completed the questions I will read your statement and make changes to the content if you do not agree. If you agree with the content, the information you provide will become part of your unemployment insurance record and will be used as evidence in any future unemployment insurance proceedings.

BGE.000086
**JA189**

Appeal Rights - As a result of this fact-finding interview you will receive a written decision in the mail. If you disagree with the decision you may file an appeal within 15 days. Instructions will be included with the decision.

BGE.000087
JA190

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| HARRY A. BOLDEN | * |
| | * |
| | * |
| Plaintiff, | *     Civil Action No.: 1:21-cv-02295-JRR |
| vs. | * |
| | * |
| CAEI, INC., et al., | * |
| | * |
| Defendants. | * |
| | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### PLAINTIFF'S RESPONSE IN OPPOSITION TO
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, by and through his undersigned counsel, files this Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment and in support states.

That the Defendant's motion for Summary Judgment should be denied because material facts are in dispute and Defendant is not entitled so summary judgment as a matter of law. Plaintiff incorporates herein Plaintiff's Memorandum of Law in support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment.

Respectfully,

*/s/ George A. Rose*
George A. Rose, Esq.,
Federal Bar No.: 26086
Rose Law Firm, LLC
9134 Liberty Road, Randallstown, MD.  21133
Telephone #: 410-727-7555
Facsimile #: 443-320-0962
Email: grose@roselawfirm.net
Attorney for *Plaintiff Harry A. Bolden*

1

**JA191**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 21st day of March 2023, a copy the foregoing Plaintiff's Response in Opposition to Defendant's Motion For Summary Judgment, along with Plaintiff Memorandum in Support of Plaintiff's Response, was served on counsel of record by the Court's CM/ECF system.

*/s/ George A. Rose*

**JA192**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| HARRY A. BOLDEN | * | |
| | * | |
| | * | |
| Plaintiff, | * | Civil Action No.: 1:21-cv-02295-JRR |
| vs. | * | |
| | * | |
| CAEI, INC., et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Harry A Bolden ("Plaintiff"), by undersigned counsel, and pursuant to Local Rule 105, hereby submits this Memorandum of Law in Support of Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, and states as follows:

### I.     INTRODUCTION

Mr. Bolden began working with Defendants in September 2014 as a billing specialist. Mr. Bolden was recruited through a complex multiparty contract where Defendants contracted Mr. Bolden as a "Temporary Worker" to work for the Defendants. He was recruited, interviewed, hired, hired, and ultimately fired by Defendant BGE and CAEI. Mr. Bolden performed his duties and responsibilities more than satisfactory and received many performance awards and commendations from Defendants' customers. In May 2015, Mr. Bolden got a new supervisor, Ms. Watts, who soon after began to take harassing and discriminatory actions against Mr. Bolden motivated by his race and gender as an African American male, respectively. After a prolong period of coping with Ms. Watts actions, on February 4, 2016, Mr. Bolden initiated a complained to her superiors and on February 12, 2016, Defendants fired Mr. Bolden.

1

**JA193**

## II.   DISPUTED & UNDISPUTED STATEMENT OF FACTS

**A.  Mr. Bolden's Employment By Defendant**

On or about September 12, 2014, Defendants employed Mr. Bolden as a billing specialist. (Plaintiff's Deposition, hereinafter, "Ex. 1, PI's Dep". 81:1-4,101:13-20.

Mr. Bolden was initially interviewed by Ms. Kia smooth, an agent or representative of CAEI. *Id.* 82:5-6.  His application and related recruitment documentation was handled by CAEI at their office in Columbia Maryland. *Id.* 83:10-16.  Mr. Bolden was also interviewed by at least three individuals from BGE. *Id.* 83:1-6,84:1-4, 85:16-19.  Mr. Bolden physically appeared in person for this interview.  Mr. Bolden was employed to work at the BGE Call Center. *Id.* 88:15-17. BGE also conducted orientation for Mr. Bolden and the other CAEI billing specialist who started with Mr. Bolden. *Id.* 89:9-14.

Although directly employed as a temporary worker by CAEI Mr. Bolden was given the impression that BGE was the main employer. *Id.* 113:10-16. The agreement under which Defendants employed Mr. Bolden defines CAEI as Mr. Bolden's employer, who is contracted to Pontoon solutions, Inc a Florida corporation, defined as the vendor for CAEI. *Id.*  111:7-14. The vendor provides the services performed by Mr. Bolden and others, as "temporary workers" to the vendors' customers, in this case, BGE. *Id.* 111:7-14. Plaintiff temporary worker agreement required Mr. Bolden to perform services to the satisfaction of Exelon. *Id.* 113:15,114:1-8.

Mr. Bolden was not aware that BGE and CAEI were separate companies. *Id.* 115:1-4,116:12-15. Mr. Bolden was one of a cohorts of about twenty-three (23) billing specialist, supervised by CAEI team leads and BGE supervisors including Brian Andrews and Ms. Webster. *Id.* 115:16-22. BGE representatives did quality checks. *Id.* 119:14-16.  Mr. Bolden was assigned an e-mail address from BGE that he used throughout his employment for all employment activities

**JA194**

and correspondences. *Id.* 156:10-11. Mr. Bolden also performed his duties and responsibilities under the direct and indirect supervision of CAEI team leads, first by Debra Crew then by Tabitha Horn, and finally by Angelique Watts. *Id.* 95:1-4.

Mr. Bolden performed his job duties satisfactorily as a billing specialist and was given several performance award and commendations by Defendants.  Mr. Bolden received awards for attendance. *Id.* 94:18-19. Mr. Bolden received other performance awards from CAEI team leads and BGE's Brian Andrews. *Id.* 125:3-9. This included the performance related "WOW" award from BGE and several performance awards from CAEI. Mr. Bolden also received many commendations from Defendants' customers. *Id.*  158:1-7, 159:1-3.

### B.  Mr. Bolden Was Target by Angelique Watts

In May 2015, Angelique Watts ("Ms. Watts"), became Plaintiff's direct supervisor. Ms. Watts was directly employed by CAEI. *Id.* 132:10-12. At the time, Mr. Bolden was the go-to person for training new employees and had trained all the new employees or retrained current employees before Ms. Watts became his supervisor. Mr. Bolden was performing this duty at the behest of Ms. Webster, the BGE manager, who Ms. Watts eventually replaced. *Id.* 134:2-7.

After becoming Mr. Bolden's supervisor, Ms. Watts began treating Mr. Bolden less favorable than his co-workers and in a discriminatory and harassing manner.  Ms. Watts regularly forced Mr. Bolder to prepare and serve meals to his co-workers, while female billing specialist like Jessica Robinson and Ms. Whitney were not required to do so. Instead, Ms. Watts often forced Mr. Bolden to pick up lunches for his female co-workers, including Ms. Whitney. *Id.*  159:16-19,163:1-2;11-20. Ms. Watts remark to Ms. Whitney that "you don't have to pick up your food as long as there's a man around. *Id.* 162:1-17,163:1-2. After these occurrences Ms. Watts would then bring Mr. Bolden into her office for disciplinary action for been off the phones and alledgly stealing company time during those periods when he was directed by Ms. Watts to prepare, serve, or pick

3

up employees' food. *Id.* 129:3-8. *Id.* 166:19-22.

Ms. Watts moved around Mr. Bolden's desk or workstation and located him in an area with uncontrol cold temperatures from a broken air conditioner. All the billing specialists were in the same areas in cubicles. *Id.* 121:9-11. Initially they were offered the choice to switch cubicles or where they wanted to sit. *Id.* 121:17-19. When Ms. Watts came on he she had everyone change cubicles again. *Id.* 123:1-5. Later she only demanded Mr. Bolden to move his work location and no one else. *Id.* 124:1-5. She moved him to an area where the air conditioning unit was not functioning and constantly blowing cold air on Mr. Bolden making it uncomfortable and difficult for him to work. *Id.* 124:10-14. To cope with the cold temperature in the area, Mr. Bolden wore a coat and hat inside. However, Ms. Watts compelled him to take his hat off under threat of sending Mr. Bolden home. *Id.* 189:2-9.

On one occasion, Ms. Watts told Mr. Bolden that she didn't want him to train a male employee because "one man shouldn't be training another man." *Id.* 168:1-4. On other occasion Ms. Watts told Mr. Bolden that he only wanted to train "pretty girls" and that he should not worry about it because she had him "covered". *Id.* 171:13-16, 172:2-12.

One day after Mr. Bolden complained to Ms. Smoot on February 4, 2016, Ms. Watts demanded that Mr. Bolden prepare and bring in homemade chili to work for the entire collection specialist team. *Id.* 176:5-8. After Mr. Bolden declined, Ms. Watts invited female collection specialist Robin and Nicole to pressure, Mr. Bolden, to bring in the homemade chili. *Id.* 177:13-21.

On one occasion, Ms. Watts, in the presence of Nicole and Robin, told Mr. Bolden that he should be more like Marvin Gurthrie and Marcus Walker, because they have "all the women after them". *Id.* 178:4-8.

Ms. Watts also began to take away Mr. Bolden's employment benefits. In one instance. Mr. Bolden was appointed to the Safety Committee for BGE. *Id.* 178:15-17. However, he was then

4

**JA196**

removed by Miss Watts. *Id.* 181:3-7. A few days before he was terminated. *Id.* Each billing specialist receives "auto-in" time, which is an hour to an hour and a half each day when they are not dialed in to their computer and instead logged out on "auto-in" time waiting for incoming calls. Ms. Watts took away this benefit from Mr. Bolden. *Id.* 183:21-22, 184:1-5. Furthermore, she harassed Mr. Bolden with constantly requesting Mr. Bolden to switch between dialing into the computer and logging out on "auto-in time. *Id.* 185:12-19. However, Ms. Watts allow billing specialist Robin to use an iPod to watch movies and play games during auto-in time. *Id.* 187:15-17.

Ms. Watts constantly kept telling Mr. Bolden to "thug it up", and often implied that Mr. Bolden was not acting "black enough" or sounded "black enough" on the phone with Defendants' customers and should try to change that to be more effective at his job. *Id.* 255:3-10.

### C. Mr. Bolden's Firing By Defendants

On February 4th. Mr. Bolden complained to Ms. Smoot about Ms. Watts' harassment and requested to change his workstation. Mr. Smoot said she could not do anything about it and would have Mr. Andrews get back to Mr. Bolden on February 7, 2016. *Id.* 150:3-7. *Id.* 149:19-22. *Id.*.201:10-12.

On February 5th. Mr. Bolden had a meeting with Mr. Hubbard and Ms. Watts where Ms. Watts alleged that Mr. Bolden had harassed Ms. Watts. *Id.* 209:17-19. Mr. Bolden denied the allegations and Ms. Watts began screaming that Mr. Bolden was a liar. *Id*. 210:2-9. She alleged that Mr. Bolden refused to train a male employee and toss his headset at Ms. Watts. *Id.* 210:6-9. She also stated that Mr. Bolden had refused another order she gave him to move his workstation. *Id.* 210:10-12. She reported this to Ms. Webster, and slur Mr. Bolden as a person with potential for violence and threaten to have the police come to help moving Mr. Bolden's seat. *Id.* 209-211

On February 7, 2016, Mr. Bolden complained to Mr. Andrews about Ms. Watts' harassment and what may have transpired in the February 5, 2016, meeting. *Id.* 202:1-22.

5

JA197

On February 11, 2016, Mr. Bolden had a meeting with Ms. Hubbard and Ms. Smoot. Per usual, Mr. Bolden appeared with doughnuts and orange juice thinking it was a regular meeting. After waiting for over an hour, Mr. Hubbard and Ms. Smoot came in and shortly began accusing Mr. Bolden of calling someone at BGE and reporting that Mr. Bolden was been accused of harassing Ms. Watts. *Id.* 66:7-12. *Id.* 217:20-22,218:6-10.

On February 12, 2016, Mr. Hubbard called and told Mr. Bolden that Mr. Bolden would be fired from his position as a billing specialist. He again accused Mr. Bolden of falsely reporting to BGE that Mr. Bolden was accused of harassing Ms. Watts and said Mr. Bolden had no integrity. *Id.* 219:17-22, 220:1-7. *Id.* 146:2-6. Subsequently Defendants allege that three unknown and unnamed female billing specialist allege that the heard Mr. Bolden made remarks about assaulting them as the reason for firing Mr. Bolden. *Id.* 196:9-14. Yet, during his employment Mr. Bolden witness African American female billing specialist in physical altercation with each other, with one hitting the other and they were not fired, *Id.* 155:16-22,156:1-7.

## III.    **STANDARD OF REVIEW**

"If the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," then summary judgment may be rendered. Fed R. Civ. P. 56(c). In other words, summary judgment is only to be granted when no genuine and disputed issues of material fact remain, and the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). However, "[if] the moving party has met its responsibility of identifying the basis for its motion, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" White v. Rockingham Radiologists, Ltd., 820 F.2d 98, 101 (4th Cir. 1987) (quoting Celotex Corp. v.

JA198

Catrett, 477 U.S. 317, 324 (1986); Fed. R. Civ. P. 56(e)).

A genuine issue of material fact may exist if the evidence presented to the court is sufficient to indicate the existence of a factual dispute that could be resolved in favor of the non-moving party at trial. Rachael-Smith v. FTDATA, Inc., 247 F. Supp. 2d 734, 742 (citing Anderson v. Liberty Lobby, Inc.,477 U.S. 242 (1986)) Only "facts that might affect the outcome of the suit under the governing law" are material. Anderson, 477 U.S. at 248. Moreover, a dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

In considering a motion for summary judgment, the court does not weigh evidence of a genuine issue of material fact that a party adduces against the movant's evidence but submits it to the trier of fact for resolution. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). In that context, a court must consider the facts and evidence of the non-moving party as true. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In addition, all reasonable inferences drawn from disputed evidence are to be resolved in the light most favorable to the nonmoving party. Pulliam Investment Co., Inc. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir. 1987). The party seeking summary judgment bears the responsibility of demonstrating the "absence of a genuine issue of material fact." Celotex Corp. v. Catrett, All U.S. 317, 323 (1986)."

## IV.    ARGUMENT

### A.  BGE is not Entitled To Summary Judgment Because Plaintiff Exhausted Administrative Remedies Against BGE

Ordinarily, a plaintiff's failure to name a party within an EEOC charge would prohibit suit against the party for failure to exhaust administrative remedies. *See Alvarado v. Bd. Of Trs. Of Montgomery Cmty. Coll.,*848 F.2d 457, 458-59 (4th Cir. 1988) (explaining that the naming requirement "notifies the charged party of the asserted violation [and] brings the charged party

**JA199**

before the EEOC and permits effectuation of [Title VII]'s primary goal, the securing of voluntary compliance with the law"). Some courts, however, recognize the "substantial identity" exception to the naming rule, whereby a plaintiff may bring suit against a defendant unnamed in an EEOC charge. *See, e.g., Sedlacek v. Hach,* 752 F.2d 333, 334-36 (8th Cir. 1985); *Romero v. Union Pac. R.R.,* 615 F.2d 1303, 1311 (10th Cir. 1980). Although the Fourth Circuit has neither explicitly adopted nor rejected the "substantial identity" exception, it has cited the exception with approval in dicta. *See Alvarado,* 848 F.2d at 461 (4th Cir. 1988) (finding it unnecessary to apply the exception in the case *sub judice,* but citing district court decisions within the Fourth Circuit that have applied it); *E.E.O.C. v. Am. Nat'l Bank,* 652 F.2d 1176, 1186 n. 5 (4th Cir. 1981) (reasoning that jurisdiction is proper "where it is clear that the defendant through some relationship with the named respondent had notice of the charges and participated in the conciliation process."). *Lipscomb v. Technologies, Services, Information, Inc.,* Civil Action No. DKC 09-3344, at 13-15 (D. Md. Feb. 18, 2011)

### a.  **Exception to Title VII Name Requirement Should Be Applied in This Case**

In the instant case, this Court should follow Lipscomb and apply the substantial Identity Exception to the naming requirement in the EEOC Charge, as in *E.E.O.C. v. Am. Nat'l Bank,* 652 F.2d 1176, 1186 n. 5 (4th Cir. 1981) (reasoning that jurisdiction is proper "where it is clear that the defendant through some relationship with the named respondent had notice of the charges and participated in the conciliation process."). Here the facts show that through its relationship with CAEI, Defendant BGE had actual and constructive notice of the charge of discrimination filed by Mr. Bolden with Maryland Commission on Civil Rights ("MCCR").

### b.  **BGE & CAEI Relationship satisfies the Substantial Identity Exception**

To determine whether a substantial identity exists between two entities, the court should consider: "(1) similarity of interests between named and unnamed parties; (2) ability of the plaintiff to ascertain the unnamed party at the time of the EEOC charge; (3) notice of the EEOC charge by

**JA200**

the unnamed party; and (4) prejudice."*Zhang,*332 F.Supp.2d at 867 (citing *Thomas v. Bet Sound-Stage Rest./Brett Co, Inc.,*61 F.Supp.2d 448, 457-58 (D.Md. 1999)). *Lipscomb v. Technologies, Services, Information, Inc.*, Civil Action No. DKC 09-3344, at 13-15 (D. Md. Feb. 18, 2011) Also, this Court has previously followed the principle in *McAdoo*, 591 F.Supp. at 1403-04 (holding that Title VII administrative procedures are "'not intended to serve as a stumbling block to the accomplishment of the statutory objective," and that demanding procedural perfection where the plaintiff filed his administrative charge without the benefit of counsel places a burden "'Congress neither anticipated not intended'"). *Bolden v. CAEI, Inc.*, CIVIL JRR-21-02295, at *1 (D. Md. May 9, 2022).

### i.   Plaintiff Did Not Know BGE's role when He Filed His MCCR Charge

The facts shows that Mr. Bolden thought he was working for both BGE and CAEI, as one and the same company. Ex. 1, PI's Dep. 115:1-4,116:12-15. Mr. Bolden did not understand the convoluted agreement between Defendants as vendors, customers and employer. *Id.* 111:2-22, 112:1-9.

### ii.   There is Similarity of Interest Between BGE & CAEI's

This court previously ruled in this case that: "Following investigation of Plaintiff's administrative charge, the Maryland Commission on Civil Rights issued Written Findings (Exhibit F to the Motion, ECF 11) which include reference to an interview with Ms. Kadijah Webster, a manager with Exelon bearing supervisory authority over Plaintiff (and referred to in Exhibit C to the Motion as "Manager from BGE-Exelon"). *Bolden v. CAEI, Inc.*, CIVIL JRR-21-02295, at *2 (D. Md. May 9, 2022). Evidence produced in records of the cases shows that allegations in the pleadings are substantiated denying Defendant's summary judgment as a matter of law.

### iii.   BGE was not prejudice by not Participating in the Administrative proceeding.

9

**JA201**

Defendants were not prejudice because the case was not resolved in the administrative proceeding. "The EEOC filing did not result in an adverse finding against either the County or the Sheriff; it is wholly implausible that, had the County been named in the EEOC filing, it would have altered its course as to Mr. Gamble in the EEOC proceedings because the commission found that Mr. Gamble had not made out a statutory violation. *Gamble v. Charles Cnty.*, 20-cv-3126-PWG, at *21 (D. Md. Aug. 9, 2021) Likewise in this case, BGE clearly demonstrate that naming BGE in the MCCR Charge of discrimination would not have altered its courts as to Mr. Bolden. Indeed, BGE adopts the EEOC positions statement allegations of Defendant CAEI as the core of its factual defences against Mr. Bolden.

### iv.  BGE Led Mr. Bolden to Believe that his relationship with BGE was through CAEI.

By its direct and indirect actions, BGE led Mr. Bolden to believe that he had a relationship with BGE through CAEI.  To begin with, Mr. Bolden was interviewed by three BGE representative during the hiring process. Subsequently, Mr. Bolden was subjected to orientation by BGE representative, and given an official BGE domain email account. During the period of employment BGE representatives were involved in the supervision, and performance evaluation of Plaintiff's work. Ex. 1, PI's Dep. 95:1-4. BGE also issued performance awards to Plaintiff and responsible for promotion and pay increases to CAEI direct employees. *Id.* 127:1-7.

### B.  BGE is Not Entitled to Summary Judgment Because BGE was a Joint Employer of Mr. Bolden

Title VII of the Civil Rights Act of 1964 makes it unlawful for "employers" to discriminate against any individual on the basis of race, colour, religion, sex or national origin. 42 U.S.C. § 2000e-2(a)(1). At least until very recently, it was clear that the Fourth Circuit took the position that, under certain conditions, supervisory personnel could be included in the definition of

JA202

"employers" for purposes of Title VII liability. In the leading decision on this issue, _Paroline v. Unisys Corp.,_ 879 F.2d 100 (4th Cir. 1989), the Fourth Circuit clarified,

> An individual qualifies as an "employer" under Title VII if he or she serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing or conditions of employment. The supervisory employee need not have the ultimate authority to hire or fire to qualify as an employer, as long as he or she has significant input into such personnel decisions. Furthermore, an employee may exercise supervisory authority over the plaintiff for Title VII purposes even though the company has formally designated another individual as the plaintiff's supervisor. As long as the company's management approves or acquiesces in the employee's exercise of supervisory control over the plaintiff, that employee will hold "employer" status for Title VII purposes. 879 F.2d at 104 (citations omitted).

_Crosten v. Kamauf_, 932 F. Supp. 676, 680 (D. Md. 1996)

In the present case, BGE agents, employees and representatives served in a supervisory position over Mr. Bolden, exercised significant control over his hiring, firing, and conditions of employment, or significant input in those personnel decisions. Mr. Hubbard told Mr. Bolden that BGE did not want Mr. Bolden on the project. Ex. 1, PI's Dep. 219:17-22, 220:1-7. Furthermore, Mr. Bolden was interviewed by three BGE employees. _Id._ 83:1-6,84:1-4, 85:16-19. Also, BGE supervisor were significantly involved in the supervision and evaluation of Mr. Bolden's work. _Id._ 125:3-9.

### C. BGE is not Entitled to Summary Judgment Because BGE & CAEI Engage in Unlawful Discrimination, Harassment & Retaliation Against Plaintiff.

#### a. The Facts supports a claim of harassment based on Race & Gender

At least, starting from May 2015 though to his firing on February 12, 2016, Plaintiff suffer harassment from his supervisor Ms. Watts that was motivated because of Plaintiff's racial background as an African American and his sex or gender as male.

#### b. The Facts support Plaintiff's claim that BGE & CAEI discriminated against

1

**JA203**

**Plaintiff based on Race and Gender**.

Title VII prohibits employment discrimination based on race, color, religion, sex, and national origin. *See* 42 U.S.C. § 2000e. There are two methods for proving intentional discrimination in employment under Title VII: (1) through direct or indirect evidence of intentional discrimination, or (2) through circumstantial evidence under the three-step, burden shifting scheme set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). For the first method, an employee may utilize "ordinary principles of proof using any direct or indirect evidence relevant to and sufficiently probative of the issue." *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 606-07 (4th Cir. 1999) (quoting *Tuck v. Henkel Corp.*, 973 F.2d 371, 374 (4th Cir. 1992)). To overcome a summary judgment motion based upon this method of proof, a plaintiff "must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact." *Id.* at 607 (quoting *Goldberg v. B. Green & Co., Inc.*, 836 F.2d 845, 848 (4th Cir. 1988) (brackets existing)). And so, a plaintiff must provide "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (citation omitted *O'Reilly v. Del Toro*, Civil Action 20-cv-00490-LKG, at *6 (D. Md. Aug. 25, 2022)

    **i.  The facts support a prima facie case of race and gender discrimination against Defendants.**

The facts shows that Ms. Watts made it quite clear that her harassing actions towards Mr. Bolden was motivated by the facts that Mr. Bolden was African American and a was a male. Ex. 1, PI's Dep. 255:7-22.

### 1. Plaintiff's performance was satisfactory.

Defendants have not denied that Mr. Bolden received various performance award from Defendants. Mr. Bolden received attendance awards, *Id.* 158:1-7, 159:1-3. He received the "WOW" award from BGE, and many performance awards from CAEI. *Id.* He was also selected for the BGE safety committee. *Id.* 178:15-17. He was the primary person that trained new employees and retrained co-workers. *Id.* 132:16-21. Before the February 5, 2016, meeting where Ms. Watts accused Mr. Bolden of refusing to train an employee and tossing his headphone at her, Mr. Bolden had no performance of conduct issues at work. These allegations came against Mr. Bolden after he complaint about Ms. Watt's harassing actions on February 4, 2016.

### 2. Plaintiff was fired under circumstances that gives rise to an inference of race and gender discrimination.

To begin with Mr. Bolden was fired after he complained about Ms. Watts harassing and discriminatory actions against him. *Id.* 219:17-22, 220:1-7. This would necessarily include asking him tasked and duties outside his job requirements such as preparing and serving food to co-workers. *Id.* 159:16-19,160:1-6. Demanding that Mr. Bolden pickup lunch for the female employee and making remarks that as long as a man is around the female employees did not need to pick up their lunch that they ordered out. *Id.* 162:9-14, 163:1-2. Demanding that Mr. Bolden make homemade chilli and bring in for the female employees and having the female employees gang up on Mr. Bolden when he refused. *Id.* 176:5-8. Directing Mr. Bolden to "thug it up", and making remarks that he is not acting "black enough". *Id.* 255:3-10. Making implicit racial stereotyping of Mr. Bolden as having a "tendency for violence" when he had never shown violence to anyone at work, and instead, was the most compliant to the directives and instructions from his supervisor Ms. Watts. Directing Mr. Bolden to emulate other male employees because they have the ladies going after them, *Id.* 178:4-8. These actions are "evidence of conduct or statements that both

1<del>3</del>

**JA205**

reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision" by Defendants to fire Mr. Bolden.

> ### ii. Female collections specialist was treated More favourably than Mr. Bolden

The female billing specialists, including were not required to prepare and serve food at any of the social events. *Id.* 159:16-19,160:1-6. Ms. Watts did not deprive or deny them their auto-in time or used it to harass any of them. *Id.* 184:13-22. Instead, Ms. Watts allowed one of them to use her iPod and watch movies and play games. *Id.* 187:15-17. Mr. Bolden witness a physical fight between two female employees and Defendants did not fire either of them. *Id.* 122:1-3. Female billing specialist were given the benefit of having their foods picked up by Mr. Bolden. *Id.* 162:9-14, 163:1-2.

> ### iii. Defendant's non-discriminatory reason for firing Plaintiff was a pretext for race and gender discrimination.

Once the defendant has articulated a non-discriminatory reason for the employment action, the plaintiff must then "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination." Burdine, 450 U.S. at 253. To show pretext, a plaintiff must proffer sufficient evidence such that a reasonable trier of fact could conclude that the employer's explanation is false or "'unworthy of credence,'" Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004) (quoting Burdine, 450 U.S. at 256), and that discrimination or retaliation was the true reason for the adverse employment action. Hicks, 509 U.S. at 515. Additionally, "In order to show pretext, a plaintiff may show that an employer's proffered non-discriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact. *E.E.O.C. v. Sears, Roebuck & Co.*, 243 F.3d 846, 852–53 (4th Cir. 2001)."

In this case, to start with, Defendants proffered non-discriminatory reason for firing Mr. Bolden are inconsistent overtime and changing from time to time. On one occasion, Defendants

14

**JA206**

alleged that Plaintiff fired because he refused to train an employee and tossed his headset at Ms. Webb. *Id.* 210:6-9.  Then Defendants said it was due to Plaintiff's lack of integrity because he allegedly falsely reported to BGE that he was been accused of harassing Ms. Webb. *Id.* 219:17-22, 220:1-7. Finally, Defendants settled on allegations that Plaintiff talked about assaulting three unnamed and unknown female co-worker and put them in the trunk of his car. *Id.* 195:13-16.

Furthermore, the explanations are not worthy of credence. Mr. Bolden was the type of employee who brought in donuts and drinks for meetings, gift cards, for holidays, birthdays, for his co-workers. *Id.* 135:16-20. He received various performance awards from both BGE and CAEI and commendations for their customers. *Id.*  158:1-7, 159:1-3. He obediently picked up food for the ladies and served food to his co-workers and then suffers disciplined for been away from his phone without recourse to confrontation. *Id.*  166:1-10. He was selected for the safety committee. *Id.* 178:15-17.  The firing of Mr. Bolden also materially linked in time to Mr. Bolden's reporting that he was been harassed by Ms. Webb.  *Id.* 219:17-22, 220:1-7.

**c.  The facts support Plaintiff's Claim for hostile work environment.**

Beginning with the required elements of a hostile work environment claim, the plaintiff must demonstrate: (1) she experienced unwelcome harassment; (2) the harassment was based on her gender or race; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003). *Evans v. Int'l Paper Co.*, 936 F.3d 183, 192 (4th Cir. 2019) "The severe or pervasive element has both a subjective and objective component. *E.E.O.C. v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009). Evans must show that she "did perceive, and a reasonable person would perceive, the environment to be abusive or hostile." *Id.*"

**JA207**

"[W]hen determining whether the harassing conduct was objectively 'severe or pervasive,' we must look 'at all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " _E.E.O.C. v. Sunbelt Rentals, Inc.,_ 521 F.3d 306, 315 (4th Cir. 2008) (quoting _Harris v. Forklift Sys., Inc.,_ 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). "[P]laintiffs must clear a high bar in order to satisfy the [objective] severe or pervasive test." _Id_. "[I]ncidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard." _Id_. Thus, rude treatment from coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's supervisor are not actionable under Title VII. _Id_. at 315–16. _Evans v. Int'l Paper Co.,_ 936 F.3d 183, 192 (4th Cir. 2019)

  i. **The facts shows that the actions against Plaintiff were based on his sex and gender as a male employee and his Racial Background as An African American**.

Ms. Watts refused to assign Mr. Bolden to train or retrain a male employee, saying "a man should not be training a man". _Id_. 168:1-4. Mr. Watts accused Mr. Bolden of "only want to train pretty girls." _Id_. 171:13-16, 172:2-12. Ms. Watts directed Mr. Bolden to more like other co-workers who have lots of women going after them. _Id_. 178:4-8. Ms. Watts compelled Mr. Bolden to pick up food ordered by female employees and telling the female employees that as long has Mr. Bolden is present, they don't have to pick up their lunches and he will have to do it for them because Mr. Bolden is a man. _Id_. 162:1-17,163:1-2.

More than twenty times Ms. Watts would make remarks to Mr. Bolden telling him to "thug it up" and that he is not acting "black enough" in dealing with Defendants customers. _Id_. 255:3-10. Furthermore, stereotyping Mr. Bolden as a person prone to violence without any reasonable support demonstrates implicit bias against African American males.

16

**JA208**

### ii. The conduct was severe and pervasive.

Ms. Watts harassing conduct toward Mr. Bolden was subjectively severe and pervasive. The act of compelling Mr. Bolden to prepare and served food to his co-workers at most, if not all the social gathering at work, after Ms. Watts became his supervisor, is demeaning of itself. *Id.* 161:1-22. Any reasonable person, including Mr. Bolden would find such a demand by their job offensive and embarrassing, especially since such task is not required by their job position and duties. The act of compelling Mr. Bolden to pick up food for female employees is severed. Moreso, in the context where Ms. Watts stopped the said employee from getting her ordered lunch and directed Mr. Bolden to leave work and go pick up the said lunch for the female employee because he is a man. *Id.*  159:16-19,163:1-2;11-20. Ms. Webb's act of denying Mr. Bolden to role to train a co-worker telling Mr. Bolden that "a man should not be training a man" is severe in the workplace. Also, her remarks to Mr. Bolden that he only wanted to train "pretty girls" and her had him "covered" was severe considering her persistent badgering of Mr. Bolden about his gender and sex as a male person. *Id.* 171:13-16, 172:2-12. *Id.* 168:1-4.  Ms. Watts remarks and comments to Mr. Bolden to "thug it up" or he is not acting "black enough" over twenty times, during the eight months when she was his supervisor between May 2015 and February 2016 was severe in the workplace. *Id.* 255:3-10.

The frequency of Ms. Watts' actions clearly shows a pattern of persistency and escalation with the actions of Ms. Watts during the eight months when she was Mr. Bolden's supervisor. These actions by Defendants were not "incidents of rude treatment from coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's supervisor."  These are illegal discriminatory actions in the workplace.

**JA209**

### d.  The facts support Plaintiff's Claim for Retaliation

The facts show that Mr. Bolden engaged in protected activities, and soon thereafter.

Defendants took adverse actions against him. To establish a prima facie case of retaliation under

Title VII and Section 1981, the plaintiff must show: (1) she engaged in a protected activity; (2) the

employer acted adversely against her; and (3) there was a causal connection between the protected

activity and the adverse employment action. _Guessous v. Fairview Prop. Investments_, LLC, 828

F.3d 208, 216–17 (4th Cir. 2016). "An employee may satisfy the first element by showing that she

opposed a practice that Title VII prohibits." Jenkins v. Gaylord Entm't Co., 840 F. Supp. 2d 873,

880 (D. Md. 2012). "For such activity to constitute opposition, the plaintiff must have a reasonable

and good faith belief that the conduct [] she opposes constitutes unlawful discrimination under

Title VII." Id. at 881 (citing _Clark Cty. Sch. Dist. v. Breeden_, 532 U.S. 268, 271 (2001)).

"Opposition almost always arises when an employee communicates to her employer her reasonable

belief that the employer has engaged in discrimination." Id. (citing _Crawford v. Metro. Gov't of_

_Nash. and Davidson Cty., Tenn._, 555 U.S. 271, 276 (2009)). "[T]the Fourth Circuit has held that

the filing of an EEOC complaint generally constitutes protected activity." _Kearns v. Northrop_

_Grumman Sys. Corp._, Civil No. ELH-11-1736, 2014 WL 2170781, at *10 (D. Md. May 23, 2014).

As to the second element, "[a] plaintiff can demonstrate that an employer 'acted adversely' by

showing that 'a reasonable employee would have found the challenged action materially adverse,

which in this context means it well might have dissuaded a reasonable worker from making or

supporting a charge of discrimination.'" _Lewis v. Baltimore City Bd. of Sch. Commissioners_, 187 F.

Supp. 3d 588, 595 (D. Md. 2016) (quoting _Burlington N. & Santa Fe Ry. Co. v. White_, 548 U.S.

53, 68 (2006)). An adverse action in a retaliation claim must be "materially adverse." _Burlington_

_N._, 548 U.S. at 68.

**JA210**

**i.  There are sufficient facts to establish the prima facie claim for retaliation.**

In this case, the facts shows that Plaintiff engaged in opposition activity against the harassing actions of Ms. Watts.  The facts demonstrate that Mr. Bolden clearly had a reasonable and good faith belief that Watts' actions constitute unlawful harassment and discrimination.

**1.  The facts shows that Plaintiff engaged in protected activities.**

On February 4, 2016, Mr. Bolden reported Ms. Watts foregoing harassing actions to Smooth. *Id.* 150:3-11. Ms. Smoot said she would have Mr. Bolden speak with Mr. Andrews on February 7, 2016. Id. On February 5, 2016, Mr. Bolden reported Watts harassment to Hubbard. *Id.* 209:20-22, *Id.* 210:1. Furthermore, on February 7, 2016, Mr. Bolden reported Watts harassment to Brian Andrews. *Id.* 202:1-22. For such These are opposition activities by Mr. Bolden. For "activity to constitute opposition, the plaintiff must have a reasonable and good faith belief that the conduct [] she opposes constitutes unlawful discrimination under Title VII." Id. at 881 (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001)). "Opposition almost always arises when an employee communicates to her employer her reasonable belief that the employer has engaged in discrimination." Id. Mr. Bolden clearly communicated his protest and opposition to Ms. Watts' actions to Ms. Smoot, Mr. Hubbard, and Mr. Andrews days before he was fired February 12, 2016.

**2.  The facts show casual connection between Plaintiff' protected activities and his firing.**

Causal connection exists between Mr. Bolden's protected opposition activities and the adverse employment action by Defendant against Ms. Iwebo. (*See Waag v. Sotera Def. Sols., Inc.*, 857 F.3d 179, 192 (4th Cir. 2017) (recognizing that "for purposes of establishing a prima facie case, close temporal proximity between activity protected by the statute and an adverse employment action may suffice to demonstrate causation"); "*See, e.g., McNairn v. Sullivan*, 929 F.2d 974, 980 (4th Cir. 1991) (plaintiff stated prima facie case even though there was no evidence

**JA211**

of causal connection other than the fact that plaintiff was fired after bringing a lawsuit)." *Karpel v. Inova Health System Services*, 134 F.3d 1222, 1229 (4th Cir. 1998) Furthermore, except where the adverse action occurred at "'the natural decision point.'" weak evidence of temporal proximity, plus evidence of a disproportionate response, is enough to show causation. *See Wilcox v. Lyons*, 970 F.3d 452, 457 (4th Cir. 2020)

In the instant case, only eight days elapsed after February 4. 2016, when Plaintiff's first complaint against Ms. Watts harassing actions and February 12, 2016, when Plaintiff was fired. This clearly shows causal link in time between Mr. Bolden's protected activities and Defendants' adverse action of firing Mr. Bolden on February 12, 2016.

**3. But for Mr. Bolden's protected activity Defendant would not Have Terminated her Employment.**

On February 4, 2016, when Plaintiff first reported Ms. Watts discriminatory harassment, he was performing his duties well beyond the satisfaction and legitimate expectations of Defendants as his employer. A few weeks before he was fired he was selected, though later revered by Ms. Watts, to be on BGE safety committee. *Id.* 178:15-17 He initiated his complaint of harassment against Ms. Watts on or about February 4, 2016, and was fired eight days later on February 12, 2016. *Id.* 202:1-22.

The evidence of pretext around Defendant's changing non-discriminatory reason offered for Mr. Bolden's firing are material here. What is left is Plaintiff's protected activities as the but for cause for Defendants' firing Plaintiff. This is further supported by Defendants' failure to fire similar alleged conduct against female collections specialist who physical fought on the job. *Id.* 122:1-3.

ii. **Defendant's non-discriminatory reason for firing Plaintiff was a pretext to coverup race and gender discrimination**.

20

**JA212**

Plaintiff incorporates the arguments set forth above showing that Defendants' non-discriminatory reason for firing Plaintiff were pretext for race and gender discrimination, as they are here as pretext to cover up Defendants' retaliatory motives against Mr. Bolden.

### V.    CONCLUSION

WHEREFORE, of the foregoing reasons, Defendant is not entitled to summary judgment any of Plaintiff's Claims, material facts are in dispute and Defendants are not entitled to Judgment as a Matter of Law. Plaintiff is entitled to have the trier of facts decide in his case.

Respectfully,

*/s/ George A. Rose*
George A. Rose, Esq.,
Federal Bar No.: 26086
Rose Law Firm, LLC
9134 Liberty Road, Randallstown, MD.  21202
Telephone #: 410-727-7555
Facsimile #: 443-320-0962
Email: grose@roselawfirm.net
Attorney for *Plaintiff Harry A. Bolden*

### CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of March 2023, a copy of the foregoing Memorandum of Law in Support of Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, was served on counsel of record by the Court's CM/ECF system.

*/s/ George A. Rose*

2

**JA213**



# Transcript of Harry A. Bolden

**Date:** November 18, 2022
**Case:** Bolden -v- CAEI, Inc., et al.

**Planet Depos**
**Phone:** 888-433-3767
**Fax:** 888-503-3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

JA214

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF MARYLAND

3

4   HARRY A. BOLDEN,                    )

5             Plaintiff,               ) Case No.

6        v.                            ) 1:21-CV-02295-JRR

7   CAEI INC. and EXELON BUSINESS      )

8   SERVICES COMPANY, LLC,             )

9             Defendants.              )

10

11

12

13      AUDIO TRANSCRIPTION OF RECORDED DEPOSITION

14            TESTIMONY OF HARRY A. BOLDEN

15            November 18, 2022, 10:09 a.m.

16

17

18

19   Job No. 468499

20   Pages:  1-329

21   Transcribed by:  Annette M. Montalvo, RDR, CRR

22   Notary Public/Court Reporter:  Andrew Stromberg

JA215

Transcript of Harry A. Bolden
November 18, 2022                                    66

1    PayPal, you were -- you had already been terminated

2    from CAEI, correct?

3         A   Correct.

4         Q   And when were you terminated from CAEI?

5         A   Oh.  I think there's a little bit of

6    conflict involved in that answer.  Because they

7    stated that my last date was February 11, 2016, but

8    it was actually February 12, because I was supposed

9    to be waiting for a call from Mr. Hubbard to state

10   that I could return to work.  And when I spoke with

11   him on the 12th, that's when he let me know that I

12   was terminated.

13        Q   Okay.  So either February 11 or 12, 2016?

14        A   Yes, uh-huh.

15        Q   Okay.  And when you -- so when you applied

16   to PayPal, you had already been terminated from

17   CAEI, correct?

18        A   Correct.

19        Q   Okay.

20            (Exhibit 8, resume, marked for

21   identification and attached to the transcript.)

22        Q   You've been handed Exhibit 7, PayPal 318

Transcript of Harry A. Bolden
November 18, 2022                                    81

1      Q   No.  So this is 2014.  Do you remember when

2    you started with CAEI?  I'll just tell you, and then

3    we can look at your complaint, but it was September

4    2014.

5      A   Okay.

6      Q   So at the time -- sometime prior to when you

7    started with CAEI in 2014, you had received

8    unemployment, right?

9      A   Okay.  I wasn't sure.  That could possibly

10   be the case.

11     Q   Okay.  But you don't have any reason to

12   believe that this IRS document you produced would be

13   inaccurate?

14     A   No, I do not think so.

15     Q   But you don't know if you were employed

16   right before going to CAEI?

17     A   I know before I started at CAEI, I was at --

18   I think this might be right.  Because I was at

19   E-ZPass, and then the contract ended with E-ZPass,

20   and so there was a period of time between E-ZPass

21   and CAEI.  So I may possibly have applied for

22   unemployment.

**JA217**

1      Q  Okay.

2         All right.  So you said you applied for the

3  position at CAEI.  Did you receive an interview?

4      A  Yes.

5      Q  Who interviewed you?

6      A  Kia Smoot.

7      Q  Okay.  And did you apply -- did you send an

8  e-mail, or how did you physically apply to CAEI?

9      A  I physically went in.

10     Q  And who is Kia Smoot?

11     A  The human resources director for CAEI.

12     Q  So when you applied, you went in person?

13 Did you fill out a paper application?

14     A  I think I did.  And then there were several

15 interviews afterwards.

16     Q  Did you interact with Ms. Smoot when you

17 were filling out the paper application?

18     A  I'm not sure if she interviewed -- if she

19 gave me the paper application or -- she was part of

20 the interview process, though.

21     Q  And did Ms. Smoot interview you?

22     A  Yes.

JA218

Transcript of Harry A. Bolden
November 18, 2022                                    83

1      Q   Did anybody else interview you?

2      A   Several people from BG&E.

3      Q   How do you know they were from BGE?

4      A   I had to physically go to BG&E to be

5  interviewed by them.  It was three people.  I can't

6  recall their names right now.

7      Q   Were they people that you later interacted

8  with?

9      A   No.

10     Q   And you filled out the paper application at

11  CAEI, correct?

12     A   Yes.

13     Q   Okay.  And where was CAEI based?

14     A   In Columbia, Maryland, 9269 Bendix Road,

15  something like that.

16     Q   9256 Bendix Road?

17     A   Yes.  Sorry.

18     Q   Okay.  And was BGE located at that Columbia

19  location?

20     A   No, they were not.

21     Q   Okay.  So just CAEI?

22     A   Yes.

**JA219**

Transcript of Harry A. Bolden
November 18, 2022                                    84

1        Q   Okay.  And you said that you had several

2    interviews.  Did you have several separate days of

3    interviews?

4        A   Yes.

5        Q   Okay.  So please walk me through the hiring

6    process.  So you fill out a paper application at

7    CAEI's facility, correct?

8        A   Correct.

9        Q   Then Ms. Smoot tells you to come in for an

10   interview?

11       A   Yes.

12       Q   And where did you go for your interview?

13       A   CAEI in Columbia, Bendix Road.

14       Q   Okay.  And who interviewed you?

15       A   Kia Smoot.

16       Q   Okay.  And did anybody else interview you at

17   that time?

18       A   No, not at that time.

19       Q   Okay.  Did Ms. Smoot interview you the same

20   day that you filled out the paper application?

21       A   No, I recall it was a different day.

22       Q   Okay.  And then what happened next?

JA220

Transcript of Harry A. Bolden
November 18, 2022                                    85

```
 1      A  Then I was called in for the interview where

 2   they started asking you like personal questions.

 3   Not personal questions, but just really what I

 4   thought were like really thoughtful kind of

 5   questions.  What would you do if X, Y, and Z

 6   happened, and blah, blah, blah, blah, blah, blah.

 7           And then I got an e-mail saying that they

 8   had a position for me, and would I be interested in

 9   it, which was in a customer service department.

10      Q  Okay.  Can I walk you back to the -- so the

11   first interview was just with Ms. Smoot at CAEI?

12      A  Yes.

13      Q  Then you had a second round of interviews or

14   a second interview.  Who did you interview with

15   then?

16      A  Her name was like Betty Hankinson at BG&E.

17   But that's the person we had to ask for, but when we

18   actually got in the room, there were three other

19   people there.

20      Q  But none of the people that you later

21   interacted with from BGE?

22      A  No.
```

Transcript of Harry A. Bolden
November 18, 2022                                89

1        Because that was a new program, the

2    financial solutions program?

3        A  Uh-huh.

4        Q  Okay.  And --

5        A  Yes.  That's correct.

6        Q  Okay.  Do you know who Brian Andrews is?

7        A  Yes.

8        Q  Did he interview you?

9        A  He never interviewed me directly, but he was

10   there for orientation, and he did a couple of like

11   leadership kind of motivational kind of things.

12       Q  Okay.  Orientation happens after you are

13   already hired, right?

14       A  Yes.

15       Q  Okay.  So let's go back to this.  You said

16   that Ms. Smoot gave you an orientation?

17       A  Yes.

18       Q  Was that at Bendix Road in Columbia?

19       A  Yes.

20       Q  Was anybody else present for your

21   orientation --

22       A  Pretty much the whole team and Raymond

**JA222**

Transcript of Harry A. Bolden
November 18, 2022                                    94

1      A  At one point in time I did.

2      Q  So I would ask that you immediately search

3  and produce.

4      A  I don't think I'll be able to produce it for

5  you because I wasn't able to find it.  I did search

6  for it because I wanted to have it available.

7      Q  Okay.  Do you still have a --

8      A  But I can continue to try, I just don't want

9  to say 100 percent sure that I will be able to

10  produce it.

11     Q  Okay.  So you mentioned that one of the

12  benefits of working at CAEI was being a contract

13  worker, that you could call out if you needed to; is

14  that right?

15     A  They said it was a lot of flexibility.

16     Q  So did you ever have to call out when you

17  worked at CAEI sometimes?

18     A  No.  Thank goodness I did not.  I had

19  actually received awards for attendance.

20     Q  Okay.  But if you had needed to, who would

21  you call out to?

22     A  Your team supervisor.

JA223

Transcript of Harry A. Bolden
November 18, 2022                                    95

```
1        Q  Okay.  Kia?  Would it be Kia Smoot?

2        A  No, it would not be.  It would be Angelique

3   Watts or Tabitha Horn or Debra Chew.  They were all

4   team lead at CAEI.

5        Q  Okay.  I want to make sure I got all those

6   names.

7           So we have Angelina Watts?

8        A  Angelique.

9        Q  Angelique.  I'm sorry.  Angelique Watts,

10  Tabitha Horn, and who is the third?

11       A  Debra Chew.

12       Q  Who is -- so those were your supervisors at

13  CAEI?

14       A  Correct.

15       Q  Who was the first supervisor?

16       A  Debra Chew.

17       Q  Then Ms. Horn, then Ms. Watts?

18       A  Yes.

19       Q  Okay.  So if you were running late or

20  whatever, that's who you would contact?

21       A  Exactly.  Either texting or calling.

22       Q  Okay.  Do you know who made the decision to
```

1  we'll just say about 24, is your recollection.

2      And what was the breakdown of men versus

3  women in the department?

4      A   That changed, actually, throughout --

5      Q   Okay.

6      A   -- because people were hired and left, or

7  fired, and it would increase or decrease.

8      Q   And weren't most of the billing specialists

9  African American?

10     THE COURT REPORTER:  Sorry to interrupt for

11 a second.  My laptop screen went blank for some

12 reason.

13     (Short pause.)

14     Q   So my last question was, weren't most of the

15 billing specialists African American or black?

16     A   There were others as well, but, yes, I think

17 the majority were African American.

18     Q   Okay.  And what is Brian Andrews' race?

19     A   African American, I'm assuming.

20     Q   Okay.  And Brian is male, correct?

21     A   Correct.

22     Q   Do you know the name Khadija Webster?

JA225

Transcript of Harry A. Bolden
November 18, 2022                                    101

1    identification and attached to the transcript.)

2        Q  You've been handed what's been marked as

3    Exhibit 12, HB37 through 39.  This is an e-mail.  I

4    guess this e-mail made its way to you; is that

5    right?

6        A  Correct, yes.

7        Q  Okay.  And in terms of the dates, just to

8    establish the dates here, where it says on Thursday

9    September 11, 2014, can you please come to Bendix

10   Road, is that -- so is that when you went in to have

11   your orientation with Ms. Smoot?

12       A  Yes.

13       Q  And then your first day of work, if you look

14   later in the e-mail, it says September 12, 2014, you

15   will report to your actual work site; is that right?

16       A  Yes.

17       Q  So your first day of work with CAEI was

18   September 12, 2014?

19       A  I believe that's correct.  I wouldn't

20   dispute that.

21       Q  Okay.  So you said you filled out all this

22   paperwork.  Did you give all that employment

**JA226**

1    in co-employers.

2         Q  So looking at this agreement --

3         A  Or Exelon, rather, I should say.

4         Q  So looking at this agreement, CAEI is

5    defined as your employer, correct?

6         A  Yes.

7         Q  And then it goes on to say that the employer

8    has contracted with Pontoon Solutions, a Florida

9    corporation defined as, in quotation marks, vendor,

10   for employer to provide certain services, including

11   work performed on a temporary basis by temporary

12   worker to the vendor's customer.

13        Do you see that?

14        A  Yes.

15        Q  Do you understand that Pontoon was a vendor

16   to provide certain services to their customer?

17        A  Yes.

18        Q  Okay.  And moving to the next paragraph, the

19   agreement states that the vendor has contracted with

20   Exelon Business Services Company.  Then it's defined

21   as the customer, in quotation marks.  For vendor to

22   provide certain services relating to customer's

1    Temporary worker, which is you?

2        A   Yes.

3        Q   Temporary worker acknowledges and agrees

4    that no employment relationship between temporary

5    worker and customer or between temporary worker and

6    vendor is created by this agreement.  The agreement

7    between vendor and customer or by employer's

8    agreement with vendor; do you see that?

9        A   Yes.

10       Q   Okay.  And we just discussed who all of

11   these -- what all of these terms mean, but you would

12   agree that this provision -- in this provision you

13   acknowledged that there was no employment agreement

14   between you and Exelon, correct?

15       A   No.  Because I'm doing service for Exelon in

16   some way.

17       Q   Well, the language says:  Temporary worker

18   acknowledges and agrees that no employment

19   relationship between temporary worker and customer

20   is created by this agreement.

21       A   Give me one second just to read it.

22       Q   Sure.

Transcript of Harry A. Bolden
November 18, 2022                                      114

1      A   Okay.  Yeah, it's kind of confusing because

2   it says temporary worker shall perform all services

3   or work under the program to the satisfaction of the

4   customer.

5         So if you're performing work to the

6   satisfaction of the customer, that would kind of

7   assume a relationship between you, as an individual,

8   and the customer, as an objective entity.

9      Q   So, Mr. Bolden, the question is, you signed

10  this agreement, we've established, right?

11     A   Uh-huh.

12     Q   And the agreement -- in the agreement, you,

13  as a temporary worker, acknowledged that there was

14  no employment relationship between you and the

15  customer, who is Exelon Business Services, correct?

16  I mean, that's what this document says?

17     A   I don't know how to answer that question.

18     Q   Okay.  That's fine.

19        So when you signed this agreement, you were

20  aware that Exelon Business Services was a separate

21  entity from CAEI, correct?

22     A   Correct.

1      Q   Okay.  And that BGE was a separate entity

2   from CAEI, correct?

3      A   No, I did not know that until Mr. -- I don't

4   know.  I thought it was all one company.

5      Q   Did you ever receive any policies from BGE?

6      A   Any policies from BG&E?  No.

7      Q   Written policies?

8      A   Only -- I don't know that this is a policy,

9   but they would reinforce the idea that safety was

10  paramount to everything.  Safety at BG&E was above

11  and beyond anything that you do of any importance

12  every day at work.  And so they wanted you to work

13  in the same fashion.  That's the only thing they

14  stressed every meeting pretty much was about --

15  sorry.

16     Q   Okay.  So you testified earlier that, you

17  know, all these -- your site supervisors were all

18  employed by CAEI, that you and these 23 billing

19  specialists were employed by CAEI, and then other

20  people like Mr. Andrews and Ms. Webster were

21  provided by BGE, correct?

22     A   Yes.

JA230

Transcript of Harry A. Bolden
November 18, 2022     116

1    Q  Okay.  So why would they be -- why would you

2  say that they're all one company?

3    A  In terms of BG&E and Exelon being two

4  separate identities, I thought it was just a rose

5  called by another name.

6    Q  Oh, that BGE and Exelon are the same thing?

7    A  Yes.

8    Q  Okay.  But you recognize that BGE and Exelon

9  are separate from CAEI?

10    A  Now I do.

11    Q  Now you do?

12    A  Oh.  I'm sorry.  I said -- I knew that

13  before.  I thought that BGE and Exelon are separate

14  from each other, I didn't know that.  I thought they

15  were the same.

16    Q  Okay.  So let's clean this up just a little

17  bit.  I think we -- at least I got a little bit

18  confused.

19      So you understand that BGE and CAEI are

20  separate companies?

21    A  Correct.

22    Q  Okay.  And that Exelon and CAEI are separate

JA231

1    but they disciplined us, if that makes any sense.

2    Because with your quality scores, if you said

3    something wrong to the customer, it would detract

4    from your score.  If you got rude with a customer,

5    it would be termination.  There's just no -- there's

6    no leverage.  It's zero tolerance.

7        Q  Were you ever disciplined for your calls

8    with customers?

9        A  No.

10       Q  And if you were to have been disciplined,

11   that would have been CAEI that would have

12   disciplined you?

13       A  That's a tricky question because -- yes,

14   yes.  You probably would have been notified by a BGE

15   representative doing the quality check, that there

16   was an issue.  But it would have been the CAEI

17   representative who would have disciplined.

18       Q  So BGE reps listened to calls --

19       A  As far as I know.

20       Q  How do you -- what's the basis for that

21   belief?

22       A  Just meeting a couple of the people who were

**JA232**

Transcript of Harry A. Bolden
November 18, 2022                          121

1   the -- opposite the training room is where the

2   training -- the lead, CAEI lead, sits, and that desk

3   is independent of the other cubicles.

4        And then further up is another training

5   room, and then a kitchen.  And then to the left of

6   that is a huge training room and -- not a training

7   room, but a conference room.  And then the Xerox

8   machines and whatnot.

9    Q  Were all of the billing specialists in the

10  same area, in cubicles?

11   A  Yes.

12   Q  And during your tenure at CAEI, did you

13  switch cubicles?

14   A  Yes.

15   Q  Did that happen sort of throughout your

16  employment?

17   A  No.  The first time that we switched, they

18  actually had us choose where we wanted to sit, and

19  then we didn't switch for a very, very long time.

20       And then they had us switch -- they had me

21  switch because there were two agents who sit right

22  next to each other, and they were actually

**JA233**

Transcript of Harry A. Bolden
November 18, 2022                                         123

1      Q   I thought you said that once Ms. Watts came

2    on board, she changed everybody's cubicle, and I

3    thought you said that happened two times?

4      A   Yes.  She changed everybody's desk, which

5    her desk didn't change.

6      Q   Yeah, okay.  So sorry if I might have not

7    worded that well.

8          But she, you know, time one, everybody moved

9    cubicles, right?

10     A   Yes.

11     Q   And then time two, everybody moved cubicles?

12     A   Yes.

13     Q   And was those two times, was there any

14   reason given for the cubicle switch?

15     A   No.  Not really.

16     Q   Okay.

17     A   Later they would give a reason for it, you

18   know, after my termination, I would read their

19   responses, but they didn't give a reason for it

20   then.

21     Q   Okay.  But it wasn't just you that moved, it

22   was everyone those two times?

Transcript of Harry A. Bolden
November 18, 2022                                    124

1      A   Those two times.  But then the third time

2   that she moved me, she moved me by myself.  So not

3   that I was isolated, but she moved me to an area,

4   and I was the only person who moved.  So no one else

5   moved other than me.

6      Q   Do you know why you were moved?

7      A   I think that it was punishment.  She told me

8   that she needed to move me closer to another

9   representative who was working with commercial

10  accounts.  But the area that they moved me to, the

11  air-conditioning unit was just crazy.  It was just

12  blowing out like cold air constantly.  The back of

13  the chair was like frost on the chair and on the

14  desk.

15      It was just unbelievably cold.  They

16  couldn't get it to stop, they couldn't get it -- the

17  mechanics were -- the maintenance people were there,

18  they were afraid to cut the wires to stop it because

19  it would affect other floors.

20      But I was the only person who was moved in

21  that location.

22      Q   Did you receive performance evaluations

JA235

1   while you were at CAEI?

2       A   Yes.

3       Q   And who gave those evaluations to you?

4       A   It was Debra Chew, it would be Tabitha Horn,

5   and it would be Angelique Watts.  It would also be

6   Mr. Brian Andrews and Mr. Raymond Hubbard.

7   Mr. Raymond Hubbard only became involved towards the

8   end.  It was usually just that mix, plus

9   Mr. Andrews.

10      Q   Were these evaluations in writing?

11      A   I recall some of them were.

12      Q   Do you have copies of them?

13      A   No.  It's a formal thing where they take

14  you -- I'm sorry to cut you off.  I know you were in

15  mid thought.  They take you into the training room

16  or the conference room, and, you know, go over your

17  stuff.

18      Q   Okay.  And who from -- well, strike that.

19          Would CAEI sign your evaluation?

20      A   I'm not exactly sure the internal component

21  or how that all worked in terms of their signature,

22  but I definitely recall them letting us know.

 1    there's no written proof of it.

 2         Q  Well, what were you disciplined for?

 3         A  Being off the phone, training people.  I was

 4    disciplined for being off the phone, serving my

 5    coworkers.

 6         Q  Serving?

 7         A  Serving.

 8         Q  Food?

 9         A  Yeah.  This would be with Angelique Watts.

10    I would be disciplined because I had helped a

11    coworker not commit -- cut out an error.  I mean, on

12    any given day, you never -- see, that's just it,

13    what made it more difficult to kind of navigate is

14    that you never knew what was going to -- normally

15    with most people, you kind of just figure out what's

16    going to set somebody off, or, you know, what's

17    going to rile them up so that you can stay on their

18    good side.  But you never knew, as least with

19    Ms. Watts, what it was going to take to send her to

20    that state.

21              With the other supervisors, the other thing,

22    too, is that if they were getting on your case a

1      Q  So let's back up a minute.  When did

2  Ms. Watts become your supervisor?

3      A  2015.

4      Q  Late 2015?

5      A  It was April, I think.  It was right after

6  the Freddie Gray riots in Baltimore.  BG&E had

7  closed down their operation at 110 Fayette Street

8  because of the proximity to the courthouse and the

9  danger to the employees.

10        So they cut -- they closed down for a week

11  during that time, and when we re-opened the next

12  week, Ms. Watts was the supervisor.

13     Q  Okay.  And what is this about training?  You

14  were training other people?

15     A  Correct.

16     Q  You were training new employees?

17     A  Yes.  Everyone before Ms. Watts or -- yes.

18  Everyone before Ms. Watts that was retrained or

19  trained to work there as a representative was

20  trained by me.  So I was the only one who was doing

21  it then.

22     Q  Were you at that point the person with the

Transcript of Harry A. Bolden
November 18, 2022                            134

1    used to operate through the system.

2        So a little after that, after Ms. Webster

3    had become better, she then asked me, she's like,

4    Harry, can you put together something, it doesn't

5    have to be too sophisticated, to train the other --

6    the people that we were going to be bringing on

7    more.

8        Q  So then you started being the trainer?

9        A  Well, not formally, just imparting what I

10   knew how to do to other people.

11       Q  Okay.  Did the new people have a different

12   trainer or an additional trainer, or did you train

13   them?

14       A  They would spend a few days with

15   Ms. Webster, also.

16       Q  What was Ms. Webster's role at BGE?

17       A  She's a manager, as I understand, and she

18   had her own team.  But this is what they told us,

19   that this was a pilot program for Mr. Andrews, and

20   he sort of like trusted Khadija to get it off the

21   ground and get it running.

22       And so they had apparently another person

1   a possibility that there might be a misunderstanding

2   because originally I was told by Mr. Hubbard that

3   the reason I was terminated is because of an

4   integrity issue that involved my having told BG&E, a

5   representative -- a manager at BG&E, that I had been

6   harassed by Angelique Watts.  He couldn't understand

7   why I would do that, especially when he only came

8   there to offer me a position, and that it was

9   deceitful, and it was just a lie, and because of

10  that, they were going to fire me.

11         I knew that I hadn't talked to anyone at

12  BG&E to report that I had been harassed by anyone

13  other than Mr. Brian Andrews.  And so I figured that

14  since I had been fired because of that, if that's

15  the reason, then all someone would need to do is

16  just to refine and go back and check and see who it

17  is that I am supposed to have spoken with, and if I

18  have not spoken with anyone, then I have not created

19  an integrity issue, and I should not be fired.  And

20  so I thought it's possible to do that.

21     Q  Okay.  And Ms. Webster never got back to

22  you?

1     A  Oh, I think it does say that Khadija

2  Webster, the respondent, stated.  So unless, of

3  course, she didn't do what she said she was -- they

4  said they spoke with her.

5     Q  Okay.  Going back to this first thing you

6  said that Mr. Hubbard said about an integrity issue,

7  did you say that you went to Brian Andrews to

8  complain about something?

9     A  Actually, Brian Andrews came to me.  I went

10  to Kia Hubbard first, and I told her what was going

11  on between -- I didn't even ask -- tell Kia what had

12  happened.  I simply asked Kia, I said, Kia, remember

13  when you said that if I didn't like what I was

14  doing, you would be able to move me to another

15  location?  Then I said, are you able to move me to

16  another place?

17        And she said, why?  Is Angelique harassing

18  you?

19        And when she said that, I just thought that

20  I had -- there was someone who had an understanding

21  of things.  And so I just let it all out after that

22  and told her everything that was going on, and I

**JA241**

Transcript of Harry A. Bolden
November 18, 2022                                    150

1  just registered a complaint with her on the phone at

2  that time.

3        And she said there wasn't anything that

4  she'd be able to do that day or the next day, but

5  she'd have someone get back in touch with me, and

6  she'd have Mr. Brian Andrews speak with me on

7  February 7, I believe it was.

8     Q  When was your conversation with Ms. Hubbard?

9     A  I'm sorry, Ms.?

10    Q  I'm sorry, not Ms. Hubbard.  Ms. Smoot?

11    A  That was the 4th, I believe, February 4.

12    Q  In the MCCR fact finding it lists the date

13 as being January 15, correct?

14    A  I know.  That was actually the -- when I

15 spoke with the intake person at MCCR, I had tried to

16 give them the dates, and they said approximately,

17 just give an approximate date, and we'll -- our

18 investors will get everything taken care of, but

19 they just need an approximate date, and that was the

20 date that I came up with.

21        I hadn't looked through anything like texts

22 and e-mail to get the exact date.  I just gave them

**JA242**

1  relations HR department because I was trying to just

2  move to another location or a different -- and

3  they're at the same site, just a different posting.

4      Q  Are you aware that CAEI had a workplace

5  violence policy?

6      A  Yeah.  I do recall reading that.

7      Q  Okay.  And that violence, threats,

8  harassment, intimidation, and other disruptive

9  behavior in the workplace would not be tolerated?

10     A  Correct.

11     Q  Okay.  And that such behavior could lead to

12 disciplinary action?

13     A  Correct.

14     Q  And that could include immediate

15 termination, right?

16     A  Yeah.  Although I do want to say that, for

17 instance, one representative hit another

18 representative, and those representatives were able

19 to stay.  So I don't know if we need to kind of

20 think that there's an ability to enforce was written

21 in terms like workplace violence in the CAEI

22 handbook.

Transcript of Harry A. Bolden
November 18, 2022                                    156

```
1       Q   Do you know if those employees were
2    disciplined?
3       A   No, that I don't know.
4       Q   And what was the race of those employees?
5       A   Both African American.
6       Q   Were they male or female?
7       A   Female.
8       Q   Did you have a CAEI e-mail address?
9       A   No.
10      Q   Did you have a BGE e-mail address?
11      A   Yes.
12      Q   Did you use your e-mail address?
13      A   Yes.
14      Q   What did you use it for?
15      A   Everything that -- everything that I did in
16   terms of sending e-mail involved the BGE e-mail
17   address.  You know, for instance, a lot of times in
18   working with the commercial customers, they're not
19   going to pay anything until you send them proof that
20   they owe.  And so I would send -- I'd have to send
21   them statements, but I would use -- I only had the
22   BGE.
```

**JA244**

1      A   Yes.  Oh, in terms of that, yeah.

2      Q   Did you receive --

3      A   There were like lots of awards.

4      Q   Okay.  What would you receive awards for?

5      A   For performances in terms of ringing in

6  dollars for -- apparently, they have WOW awards,

7  and, W-O-W, from BGE.  And these awards are like

8  someone higher up, they have the ability toggle into

9  your call.  And, apparently, if you're caught by one

10  of the higher ups doing what you're supposed to be

11  doing or exceeding what you're expected to do, then

12  they consider that to be a WOW award.  However, if

13  you're caught by one of the higher ups doing

14  something that you're not supposed to do, and it can

15  be really -- it can be really awful.  So those

16  awards have a bit more meaning in the BG&E climate,

17  culture.

18      And then after a while, CAEI started to hand

19  out awards, and so I was getting awards for

20  attendance and performance.  A customer sometimes

21  would, you know, say positive things about you, and

22  you'd get an award for that as well.

**JA245**

Transcript of Harry A. Bolden
November 18, 2022                                    159

```
 1      Q   Okay.  Those WOW awards, were those -- who

 2   handed those out?

 3      A   Mr. Brian Andrews.

 4      Q   Okay.  Did you ever discuss any promotional

 5   opportunities with CAEI?

 6      A   No.  On occasion, Mr. Hubbard strangely came

 7   to me and offered me a position that he gave to

 8   someone else, but I never stated or asked anyone for

 9   a promotion or a raise.

10      Q   All right.  So let's talk about some of the

11   claims in your lawsuit here.

12         Your complaint, which you filed against CAEI

13   and Exelon or BGE, right, you filed against both of

14   them?

15      A   Yes.

16      Q   Okay.  About you allege that Ms. Watts

17   forced you to perform menial and degrading tasks; is

18   that correct?

19      A   Indeed, yes.

20      Q   And the examples that you provided in your

21   complaint are that she required you to serve food;

22   is that correct?
```

Transcript of Harry A. Bolden
November 18, 2022                                    162

1   it would be a case where like I think Whitney

2   Carroll was going to go pick up her lunch, and

3   Ms. Watts had said -- ask Whitney if she -- where

4   she was going, and she said she was going to go get

5   a lunch.

6          She's like, did you order it already?  And

7   she's like, yeah, I ordered it.  And so she's like,

8   did you pay for it?  And she's like, yeah, I paid

9   for it.  So she's like, girl, sit down.  Harry, put

10  yourself in -- no.  She would ask, where'd you get

11  it from?  And then she said, you know, the pizza

12  place, which is at the top there.

13         And she's like, Harry, put yourself in

14  special projects and go pick up X, Y, and Z's lunch.

15         So I'd be on call, in the middle of a call,

16  and I'd put myself in special projects after the

17  phone and go pick up the person's food.

18     Q   How many times did that happen?

19     A   Not as often as -- I want to say maybe two

20  times, two or three times.

21     Q   Okay.

22     A   Oh, and then she told her, no, you don't

Transcript of Harry A. Bolden
November 18, 2022                    163

1    have to pick up your food as long as there's a man

2    around.  You know, something along those lines.

3        Q  So what would you say to the statement that

4    this was an opportunity to get you off of the calls

5    and get you a break from being on calls?

6        A  I would say I am absolutely horrified by the

7    statement that was made by the MCCR when they would

8    state that my servitude is something that should be

9    perceived as an honor if it was asked by anybody

10   else.

11        The fact of the matter is that it was not

12   asked of anyone else, it was only asked of me.  And,

13   additionally, I don't think it is so much -- what is

14   so stinging about it is not having to do it, what is

15   so unsettling is that when I would do it, not 20, 25

16   minutes later or towards the end -- before the end

17   of the day, I would be asked to meet her in the

18   conference room, where she will confront me for

19   having been off the phones to serve, or to go get

20   someone's food, and to be disciplined for it.

21        To be placed in that kind of craziness and

22   that insanity, and I'm sorry to use those words, it

**JA248**

1    this time was a little different because she said

2    that she didn't want me to train Otis Rease because

3    Otis is a male, and one man shouldn't be training

4    another man.

5         And so I thought it was a test, I thought it

6    was a joke, actually.  And I said to her, you know,

7    Ms. Watts, I don't have any trouble training another

8    man, it is not a question of sex or religion or

9    race.  You know, just imparting my knowledge to

10   another person is not something that I see as being

11   gender specific.

12        And so she said, no, she didn't want me to

13   train another man.  Although I had trained other

14   males before in the past.  And so I'm like, okay,

15   you know, it's fine.

16        So she had Otis Rease sit with Jessica

17   Robinson the next day to do a side by side, and

18   apparently it was horrible.  And she then let me

19   know that later that day that I would be training

20   Otis.  And so I trained him an additional three or

21   four days after that.

22        When I was training Christina Hudson, it was

Transcript of Harry A. Bolden
November 18, 2022                              171

1   away, she then said to her, I don't want to ever see

2   that again, or something along those lines.  And

3   then Khadija said, yeah, put it away.  I think

4   that's best.

5          And then after that, like two days later, I

6   told Angelique that I did not want to train anymore

7   because I think it is just -- it is just too

8   dangerous to do it.  It had made something that

9   could be potentially positive into this really

10  dangerous thing.

11         So then she told me that I didn't know my

12  stuff.  But before she told me that I didn't know my

13  stuff, she then told me that I only wanted to train

14  the pretty girls, and that don't worry about it, I

15  have you covered.  So I told her, no, I just didn't

16  want to train at all.

17         After we had gotten new trainers, she made a

18  point of appointing Nicole Russ and Robin Rodin as

19  the trainers.  They had trained for a while.  And

20  then she comes over to me and she's like, Harry, I'm

21  going to have you train a female.  And I was like,

22  oh, Ms. Watts, I'm not training anymore.  You got

**JA250**

1    the trainers.

2           And so she's like, well, I want you to train

3    them, or her.  And I said, well, I'm just not

4    feeling really well.  She's like, well, you go home

5    and you get yourself some rest today.  When you come

6    back in tomorrow, I hope you're feeling better

7    because you're going to train her either today or

8    tomorrow.

9           And I then say, okay.  I'm fine doing it.

10          But given that they had trainers already, it

11   didn't make any sense that she was having me do it,

12   other than as some form of punishment.

13       Q  Okay.  Anything else?

14       A  Yes.  There are tons of issues.

15       Q  You didn't have issues with your first two

16   supervisors, correct?

17       A  You know, not like that.  Of course there

18   were times like when they were getting on your

19   nerves, but everything was always talkable, you

20   know, everything was always seemingly resolvable,

21   you'd just sort of like bring it up to their

22   attention, and then you find that there would be a

1      I came in one day, and for whatever reason

2   she decided that she wanted me to come in -- this

3   was a little bit after I had -- this was a little

4   bit after I had stopped training, and after I had

5   talked to Kia. And she wanted me to come in and --

6   she wanted me to go home and get ingredients for

7   chili to make for like 25 people and bring chili in

8   the next day.

9      So I said, well, Ms. Watts, I take the

10   subway. I ride down to the subway, and then I drive

11   to the subway, and then I take the subway down

12   because I don't like to deal with the traffic and

13   parking. It's just easier for me to do it this way.

14   And I don't want to bring food that other people are

15   going to have to eat on the subway. So maybe I can

16   order something while I'm here, if you want chili

17   for tomorrow. She's like, no, I want homemade

18   chili.

19      And so I'm like, well, I'm not going to

20   bring it on the train. And then we go back and

21   forth, and back and forth, and back and forth, and

22   back and forth, and she's getting really, really

**JA252**

Transcript of Harry A. Bolden
November 18, 2022                    177

1    intense about it.  I go back to my desk, and then

2    she IMs me and says, Harry, why can't you bring in

3    chili for tomorrow.  Why don't you want to be a team

4    player.  I don't understand.

5           And so I reiterate my position and state it

6    is just not hygenic.  And, again, we're going back

7    and forth, and back and forth, and back and forth,

8    and back and forth, in terms of IMs.

9           And then she has me come back over to her

10   desk a little bit before the end of the day.  And

11   Robin sat next to her, and then Nicole sat next to

12   Robin.  And so she has me come over to her desk.

13   She sends an IM.  I go over to her desk.  And then

14   she's like Robin, wouldn't you and Nicole like chili

15   for tomorrow.

16          She's like, can you -- Harry, I have asked

17   Harry to bring in chili for the team tomorrow, and

18   Harry won't bring in chili for the team.  I don't

19   understand why he won't bring in chili for the team.

20   Can you ask Harry why he won't bring in chili for

21   the team.

22          So I told her exactly the same thing that I

JA253

Transcript of Harry A. Bolden
November 18, 2022                    178

1    told her.  And then she just continues on with it.

2    You know, just goes on and on and on and on and on

3    and on.

4         Another example is that one time I was there

5    at a desk with Nicole and Robin, and she was talking

6    about how I should be more like Marvin Guthrie and

7    Marcus Walker because they have all the women after

8    them.  And she just kind of became graphic with it,

9    to the extent that even Nicole and Robin had said,

10   Ms. Watts, you have gone too far this time.  This is

11   just, you know, this is just -- this is not -- this

12   is not good.

13        A little after I had talked to Kia in regard

14   to the issues that I was having, she came to my

15   desk, and she said to me -- I was appointed to the

16   safety committee, which is a really big thing at

17   BG&E.  And it is a committee that Morlon Bell-Izzard

18   is a part of.

19        Q  Who?

20        A  Morlon Bell-Izzard.  M-o-r-l-o-n,

21   B-e-l-l--I-z-z-a-r-d, I think is how it's spelled.

22        Q  And who's that?

**JA254**

Transcript of Harry A. Bolden
November 18, 2022                                    181

1    of like next to where I am so I can see that they

2    are bringing each other up to speed.

3         So she had taken me off the safety

4    committee, which was something that was appointed by

5    Brian Andrews and wasn't her privilege or

6    prerogative to have me taken off of.  And this was

7    just a few days before I was terminated.

8         Previously to being terminated, each

9    person -- or let me just say that a little after I

10   had said that I didn't want to train, one of the

11   other ways that she attempted to punish me was that

12   everybody since the beginning had --

13   Q  Can I just ask you a question?  Or two

14   questions.

15        When did you stop training?  In your --

16   A  After Christina -- after Otis and Christina.

17   So that was the last person I trained.

18   Q  So I'm trying to get a time frame here.  So

19   your employment ended February 2016?

20   A  Yes.

21   Q  So when did you stop training?

22   A  I want to say like maybe about three months,

1    next?

2        A  You said you had two questions.  Was there

3    another one?

4        Q  Those were my two.

5        A  Okay.

6        Q  The time and the IMs.

7        A  So she had me taken off the committee.  And

8    prior to that, after I had stopped training with

9    Christina, to get back at me, what she did was she

10   had taken my auto-in time away from me.

11       So everybody has a certain amount of time

12   each day that they're able to log in and out of the

13   computer and just be off the computer and just wait

14   for incoming calls.  It started as an hour, and then

15   it escalated to an hour and a half.

16       And a lot of people like that time because

17   it is less demanding than being on the dialer while

18   making outbound calls because during that time

19   you'll just get like very few calls, if any, unless,

20   of course, there's something going on.

21       After I said I didn't want to train any

22   more, I go into my auto-in time like I normally do

Transcript of Harry A. Bolden
November 18, 2022                    184

1    every day, and I get an IM from her saying, Harry, I

2    need you to go back on the dialer.

3          So I'm like, it's my auto-in time.  And then

4    she says, I don't care, I need you to go back on the

5    dialer.

6          So I get off of the auto-in, and I go back

7    on the dialer.  The next day happens, and I go on

8    the dialer at my scheduled time.  When I go on the

9    dialer -- I'm sorry, auto-in at my scheduled time, I

10   get a message from her.  Either she came there or

11   IM'd it and said, I need you to go back on the

12   dialer.

13         So it continued on for about a week, and

14   then after that, I would just go on -- I would just

15   continue all day on the dialer.  What she would do

16   is that because she needed to cover my auto-in time,

17   she would then have people that would normally be on

18   the dialer, who would have their auto-in time, their

19   scheduled time, and then my time as well.

20         So she would have -- for instance, she would

21   have like Otis Rease in my dialer auto-in time, or

22   whomever it is that she wanted.  Additionally, she

JA257

Transcript of Harry A. Bolden
November 18, 2022                                   185

1    would have people who -- like Nicole Russ and Otis

2    and a few others, where they would be in auto-in

3    like half the day or the whole day, like six hours

4    or eight hours, you know, shifts, where everyone

5    else just sort of like had an hour.

6        Q   Okay.

7        A   And that continued up until the very last

8    day, the day before I'm fired.  I'm on the dialer,

9    and then I get an IM from her, Harry, it is your

10   auto-in time, why aren't you in auto-in.  I expect

11   you to be in auto-in when you're supposed to be in

12   auto-in.  I go in auto-in, and then I'm working like

13   maybe ten minutes or so, and then she IMs me, Harry,

14   I need you to be off of auto-in, auto-in, and on the

15   dialer.

16          And then I go in the dialer, and then she'll

17   wait like maybe 15 minutes later, she'll IM me

18   again, I need you to go back in auto-in.  And that

19   happened all day, pretty much that same day.  It's

20   just really bizarre.

21          There were a few other things.  But did you

22   have any other questions?

JA258

Transcript of Harry A. Bolden
November 18, 2022                                    186

1     Q   No.  I just want to hear all of the things

2   that you, you know, claim were discriminatory or

3   harassing that Ms. Watts did.  So if you have more,

4   feel free to continue.

5     A   I lost my train of thought with the auto-in

6   thing because they were --

7     Q   Are you saying auto-in, i-n, or end, e-n-d?

8     A   Auto-in, i-n.

9     Q   Okay.

10    A   It means automatic calls coming in.

11    Q   Okay.  And the dialer is the system is

12  dialling and then, you know --

13    A   Every time you disposition it --

14    Q   -- you hear a voice?

15    A   -- and you send that away, the next call

16  comes in.

17    Q   Okay.  Got it.

18        So inbound versus outbound?

19    A   Yes.

20    Q   Okay.  Anything else about Ms. Watts?

21    A   I know there was something else I was

22  thinking about.  It's gone.  Maybe it will come

JA259

Transcript of Harry A. Bolden
November 18, 2022                              189

```
1    and to keep your like voice warm.
2          But she comes over to me and she tells me,
3    knowing that it's freezing, right, that for you to
4    wear your hat and your coat indoors is against
5    company policy.  You either have to take them off or
6    go home.  It's one or the other.  And I'd be like,
7    Ms. Watts, this is just too cold to endure, you
8    know.  I need a hat on.  And she's like, you can go
9    home.
10       Q   Okay.
11       A   That's all I can think of --
12       Q   Okay.
13       A   Right now.
14       Q   Thank you.
15          Was that -- so you testified earlier that
16   you had your desk in three different locations --
17       A   Yes.
18       Q   Over your tenure.
19          Was that the final location or the middle
20   location that --
21       A   That's where I ended up being.
22       Q   The final location?
```

1   women were, and then they said that they were tired

2   and they needed to take a break for lunch.

3          When we came from lunch, they said they

4   wanted to settle.

5      Q   Okay.  So we'll get to that settlement in a

6   minute, but didn't Mr. Hubbard say that women heard

7   you talk about assault, not that they were saying

8   you assaulted them?

9      A   Well, apparently in the DLL report, that's

10  what he said.  But in the MCCR report, he said I

11  assaulted three women, which is different than three

12  women heard me talk about assault.  But he made it

13  lascivious, like I had done something to three

14  women.

15     Q   So with respect to settlement, there were

16  settlement discussions at the MCCR, correct?

17     A   Yes.

18     Q   And that happened during the fact finding

19  hearing, correct?

20     A   I didn't know how to do anything like that,

21  and Ms. Joann Simmons-Holmes had started, when I

22  came back, she said, Harry, I've got some good news

Transcript of Harry A. Bolden
November 18, 2022                                        201

```
1   because I had not agreed to the settlement.
2       Q  So we talked about your -- you know, the
3   specific conduct of Ms. Watts that, you know,
4   underlies your complaint here, but what I want to
5   talk a little bit more about is your conversation --
6   your complaint to Ms. Smoot, and then your
7   conversation with Mr. Andrews and your termination,
8   okay?
9       A  Okay.
10      Q  So you -- I believe you testified you went
11  to Ms. Smoot on February 4; is that right?
12      A  Correct.
13      Q  So it was just Ms. Smoot, and that's when
14  you asked to move, and then during that conversation
15  you told her the issues that you were having with
16  Ms. Watts, correct?
17      A  Yes.  Yes.
18      Q  Okay.  And then she -- well, I'm a little
19  confused because I thought that you just went to
20  Mr. Andrews on your own?
21      A  No.
22      Q  Okay.  So the meeting on February 4, 2016
```

1   was just with Ms. Smoot, not Mr. Hubbard?

2        A   Correct.  And that was over the phone.

3        Q   Then the next thing that happened was you

4   spoke with Mr. Andrews on February 7?

5        A   Yes.  He came to the BGE building at -- on

6   110 Fayette Street, and we went into the training

7   room, or the conference room.

8        Q   Okay.  And what did you discuss?

9        A   He asked me what was going on, and I just

10  kind of like let everything go.  And then he said,

11  Harry, why did you wait so long to say something?  I

12  said, you know, I thought that things were going to

13  get better, that things were going to change, and I

14  was absolutely wrong about it.  And I said that, you

15  know, nobody was perfect, and that we had all

16  collectively been trying to do our best, and I

17  thought that once we were aware of what each other's

18  limitations were, we would try to do better.  But it

19  was just getting worse.

20          And he told me that I was absolutely right,

21  I shouldn't have waited so long.  He said that he

22  thinks that the reason that the things were

Transcript of Harry A. Bolden
November 18, 2022                                      209

1      Q   Okay.  And that meeting was about moving

2   your seat, correct?

3      A   No.

4      Q   No?

5      A   That meeting -- that's what they told the --

6   the MCCR.  That meeting, I actually had scheduled to

7   have a doctor's appointment, and a moment before --

8   a minute before I was supposed to leave, Angelique

9   came over to me and told me to put myself in special

10  projects and to meet her in the conference room --

11  in the training room.

12       When I get into the training room, there's

13  her and Raymond Hubbard.  Mr. Hubbard also tells the

14  MCCR that this is the day that -- or this is one of

15  the times that he had offered me a promotion or

16  position of supervision.  That's not what happened.

17       On the 5th, I spoke with Mr. Hubbard, and he

18  said that we have a problem.  He said, Angelique has

19  given us statements that you have harassed her.

20       And I was just in a state of disbelief.  And

21  I said, I can't believe it.  If there's anyone who

22  has harassed anybody, it's been Angelique who

1    harassed me.

2            And then Angelique started screaming out,

3    don't sit there and lie in my face.  She told

4    Mr. Hubbard -- or she told us that she had asked me

5    to train -- I can't think of the gentleman's name.

6    He was brand new.  And when she had asked me to do

7    it, I apparently, you know, told her I wasn't going

8    to do it, and I threw my headset at her or pushed

9    her, one of the two.

10           And then the other one, you're right, she

11   did state that she had asked me to move my seat, and

12   I had refused to move my seat.

13           She said to Mr. Hubbard that she was so

14   concerned about it that she had talked to Kia --

15   Khadija Webster.  And Khadija Webster had told her

16   that if I didn't move my seat, because of my

17   potential for violence, don't try to do anything,

18   just call the police, and the police will come there

19   and assist her in having me move my seat.

20           So I then had an opportunity to talk after

21   she had finished.  And I told Mr. Hubbard that none

22   of what she had stated was true, that when she had

JA265

1    asked me to move my seat, which, by the way, wasn't

2    done on the day that she had indicated, but had been

3    done weeks before, when I moved my seat, Crystal

4    Nebanet actually moved into my seat, and she was

5    there, and she would have been able to witness the

6    move.

7           I did it without any kind of attitude and in

8    a timely manner.  You know, I just moved my file

9    cabinet to the new seat.

10          And in terms of the training --

11     Q   Wait.  I just got a little lost there.  So

12   this meeting was on February 5 with Hubbard and

13   Watts?

14     A   Yes.

15     Q   And because Watts claimed that you were

16   harassing her?

17     A   Yes.  Correct.

18     Q   And you denied that, right?

19     A   Correct.

20     Q   And then your seat was moved after this

21   meeting?

22     A   No.  She was saying that she had asked me to

Transcript of Harry A. Bolden
November 18, 2022                              217

1      A   Now, it's important because I didn't meet

2   with Mr. Hubbard anywhere on February 10.  So we

3   didn't meet at CAEI, we didn't meet at 110 Fayette

4   Street.

5      Q   Okay.  You met -- that meeting occurred on

6   the 11th?

7      A   On the 11th, correct.

8      Q   And then on the 11th you met with Hubbard

9   and Smoot at CAEI?

10     A   Correct.

11     Q   Okay.  And what happened at that meeting?

12     A   I came there at the time, appointed time.  I

13  brought oversized doughnuts and orange juice,

14  because I thought it was just going to be, you know,

15  a regular meeting, and I was just trying to be nice.

16  And they have you wait for like about an hour and a

17  half in a conference room before they came in.

18          When they came in, Mr. Hubbard said, Kia is

19  going to be sitting in on the meeting, if you don't

20  mind.  I said sure, fine.  And then he started

21  asking me about what went on between myself and

22  Angelique Watts.

JA267

Transcript of Harry A. Bolden
November 18, 2022                                    218

1       So I explained that for like about ten or 15

2   minutes.  Or 20 minutes.  Maybe a little longer than

3   that.  It was quite a while.  And then he said,

4   Harry, we have a problem.  And I said, what's going

5   on?

6       And he said, did you call someone at BG&E

7   and tell them that you were accused of harassing

8   Angelique Watts on -- and I said no.  I said, the

9   only person that I talked to at BG&E was Brian

10  Andrews.

11      He said, well, Harry, I've got to let you

12  know that they know, and the issue that we're having

13  is that I offered you -- when I came to speak with

14  you, I offered you a position, and that position was

15  a promotion.  So why would you go to BG&E and tell

16  them that you have been accused of being harassed,

17  when when I spoke with you you were offered a

18  position of advancement?

19      And I said, I never spoke to anybody at

20  BG&E.

21      He said, well, they know, and I'm supposed

22  to be talking with them and I'm going to try to get

**JA268**

1    it all straightened out.  I have a text here.  So

2    you're going to be paid for the day.  You can go on

3    home.  I'm going to talk to them.  I now know where

4    you stand.  I'm going to try to get this all

5    straightened out, and I'll give you a call later on

6    today.

7         So he calls, he actually sends me a text and

8    says that he hasn't been able to make the phone

9    calls that he needed to make, and that he will call

10   me back.

11        Now, this is the same day that he's also

12   saying that to the MCCR, that I threw the headset at

13   him, okay.  And then later on he sends me a text and

14   he says that I wasn't able to talk to the people

15   that I needed to speak to, and I'll firm this up and

16   give you a call tomorrow.

17        On the 12th he called, like about 9:00 or

18   so, and he said that, unfortunately, I'm going to be

19   terminated.  And I asked him why.  I just wanted to

20   know the reason why I was going to be terminated.

21        And he said, Harry, it's real simple.  It's

22   a matter of the fact that you don't have any

Transcript of Harry A. Bolden
November 18, 2022                                    220

1   integrity.  He said, when you go to BG&E and you

2   tell them that you have been -- when you falsely say

3   to them that you have been accused of harassing

4   someone, when all we tried to do was to offer you a

5   position, it indicates that you don't have

6   integrity.  And, unfortunately, BG&E doesn't want

7   you back, and you're going to be terminated.

8        And so I asked him again if I could just --

9   if he could just help me to understand why I am

10  being fired.  And so he repeated the same thing.

11       I then asked about my things.  And he said

12  that he would have them to me in about two weeks.  I

13  asked him if he needed the keys to my file cabinet,

14  and he said, no, they have copies of all my keys,

15  and I'll be able to pick everything up in about two

16  weeks.

17       I hang up the phone with him, and then

18  immediately after I get off the phone with him, I

19  then sent a text to Khadija Webster, and she doesn't

20  respond to that text.

21       About two weeks later, instead of giving

22  them a call to find out if they have my things, I

**JA270**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| HARRY A. BOLDEN, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *   Civil Case No.: 1:21-cv-02295-JRR |
| | * |
| CAEI INC. and | * |
| BALTIMORE GAS AND ELECTRIC, CO., | * |
| | * |
| Defendants. | * |
| _____/ | |

**REPLY TO PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Date: April 24, 2023                 Respectfully submitted,


                    _____/s/_____
                    Lindsey A. White (Bar No. 29183)
                    Veronica Yu Welsh (Bar No. 10024)
                    SHAWE ROSENTHAL LLP
                    One South Street, Suite 1800
                    Baltimore, Maryland 21202
                    Telephone: (410) 752-1040
                    Facsimile: (410) 752-8861
                    white@shawe.com
                    vyw@shawe.com


                    *Attorneys for Defendant, Baltimore Gas and
                    Electric Company*

**JA271**

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on April 24, 2023, true and correct copies of Reply in Response to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment was electronically filed and thereby served upon:

> George A. Rose, Esq.
> Rose Law Firm, LLC
> 9134 Liberty Road
> Baltimore, MD 21133
> grose@roselawfirm.net
>
> *Attorney for Plaintiff*

_____
/s/
Veronica Yu Welsh

**JA272**

Defendant, Baltimore Gas and Electric Company ("Defendant" or "BGE"), by and through its undersigned counsel, hereby files this Reply to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment ("BGE's Motion").

## I.    INTRODUCTION

Defendant is entitled to summary judgment on Plaintiff's three-count Amended Complaint because (1) Plaintiff failed to exhaust his administrative remedies as to BGE, (2) BGE was not Plaintiff's joint employer, and (3) even if the Court denies BGE's Motion as to the first two arguments, neither BGE nor co-Defendant CAEI, Inc. ("CAEI") discriminated, harassed, or retaliated against Plaintiff. Because BGE has satisfied its initial burden of demonstrating the absence of a genuine dispute as to any material fact, Plaintiff was required to show that a genuine dispute does, in fact, exist. *See, e.g.*, *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013); *see also Matsushita Elec. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Plaintiff has failed to meet this burden. *See Sanders v. Bernhardt*, No. 1:19-cv-712, 2020 WL 6323731, *2 (E.D. Va. Oct. 28, 2020) ("Once a motion for summary judgment is properly made, the opposing party has the burden to show that a genuine dispute of material facts exists.").

Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Opposition") fails to set forth any basis upon which the Court should deny Defendant's Motion for Summary Judgment. As set forth herein, Plaintiff's Opposition is not grounded in record evidence, but rather, at times mischaracterizes the record and relies on unsupported opinions and conclusions.

Indeed, the record evidence demonstrates that Plaintiff was employed by CAEI, a defunct corporation that has not answered either Plaintiff's Complaint or Amended Complaint. Plaintiff does not dispute that CAEI is the only party that Plaintiff named in his underlying Charge of Discrimination ("Charge") filed with the Maryland Commission on Civil Rights ("MCCR").

1

**JA273**

Therefore, the only way that Plaintiff can proceed against BGE is if he establishes that the "substantial identity" exception to the naming requirement applies. Plaintiff cannot do so, which is fatal to Plaintiff's claims against BGE. Despite Plaintiff's failure to exhaust his administrative remedies as to BGE, Plaintiff has charged forward with litigating this matter against BGE without CAEI's involvement whatsoever.[1] Plaintiff has also failed to set forth facts to establish BGE was Plaintiff's joint employer, which provides a separate basis for summary judgment and dismissal of this entire lawsuit.

Summary judgment is also warranted in BGE's favor because Plaintiff has also failed to set forth facts to generate a genuine dispute of fact that CAEI (or BGE) discriminated, harassed, or retaliated against him. Moreover, all of Plaintiff's allegations in the Amended Complaint are directed at CAEI employees, not BGE. Plaintiff has failed to set forth facts to create an issue of fact as to CAEI's legitimate, nondiscriminatory reasons for terminating Plaintiff, or that the legitimate, non-discriminatory reasons were pretextual. In fact, Plaintiff cannot refute that he was terminated by CAEI, in part, after three female CAEI employees reported to CAEI that Plaintiff stated that he could kill them with a knife and put their bodies in the trunk of his new car, and no one would know. As a result, BGE's Motion for Summary Judgment should be granted, and the Amended Complaint should be dismissed with prejudice.

## II.    ARGUMENT

### A. <u>Plaintiff Did Not Exhaust His Administrative Remedies Because The Substantial Identity Exception Does Not Apply</u>.

Plaintiff concedes that he failed to name BGE in his underlying Charge and that he must demonstrate that an exception applies to survive summary judgment to show he exhausted his

---

[1] Plaintiff did not depose or otherwise seek any discovery from CAEI or its representatives during discovery in this case. Plaintiff did not depose any individual from BGE.

administrative remedies as to BGE. As for the first limited exception, which requires that a defendant receive fair notice and the EEOC attempt conciliation, Plaintiff has failed to identify evidence that supports BGE had actual or constructive notice of the Charge, other than his bald and conclusory assertions. "Notice" under this limited exception means putting a defendant on notice that it was "potentially subject" to "liability for the alleged violations." *Causey v. Balog*, 162 F.3d 795, 800–01 (4th Cir. 1998). There is no such evidence BGE was ever on notice that it was "potentially subject" to liability for any alleged violations. In addition, it is undisputed that the EEOC (or MCCR) did not attempt conciliation, which is the second required showing under the first exception to the naming requirement.

The four-factor substantial identity exception, which does not consider notice, also does not apply. Throughout the Opposition, Plaintiff refers to BGE and CAEI collectively as "Defendants" in a strained attempt to ascribe CAEI's conduct to BGE. Plaintiff also relies on conclusory statements and mischaracterizations of the record in efforts to convince the Court that the substantial identity exception applies. Pl.'s Opp. pp. 7-10. However, at the summary judgment stage, "mere unsupported speculation" is insufficient to defeat a summary judgment motion. *Ennis v. Nat'l Ass'n of Bus. and Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995). It is also worth noting that, to the extent Plaintiff seeks a pass at the administrative requirements for being *pro se* at the administrative stage, his *pro se* status at the administrative stage does not obviate the exhaustion requirement. *Byington v. NBRS, Fin. Bank*, 903 F. Supp. 2d 342, 349-50 (D. Md. 2012) ("Rather, the primary effect a pro se filing has on the administrative charge is to remove strict adherence to the charge and replace it with reasonable relatedness and investigation. This inquiry ensures that 'plaintiffs are not tripped up over technicalities' while honoring the notice requirement inherent in the administrative process.").

3

**JA275**

As discussed in detail below, Plaintiff has failed to meet his burden in demonstrating that the four-part substantial identity exception applies, and summary judgment in favor of BGE is warranted. *See, e.g.*, *Marshall v. Anne Arundel Cnty., Maryland*, No. SAG-18-0074, 2020 WL 1939712, at *4 (D. Md. Apr. 22, 2020) (granting summary judgment in favor of the defendant where the court previously denied the defendant's motion to dismiss on the basis of the substantial identity test, noting that summary judgment is a "more exacting standard.").

### 1. Plaintiff cannot refute the record evidence that he knew BGE's role when he filed his Charge with the MCCR.

Plaintiff cannot demonstrate that he was unaware of BGE's role at the time he filed his Charge. In fact, the standard under this prong is "[w]hether the role of the unnamed party could through reasonable effort be ascertained at the time of the EEOC Complaint." *Elzey v. Wal-Mart Assocs., Inc.*, No. RDB-11-2151, 2012 WL 3715321, at *3 (D. Md. Aug. 28, 2012). Here, not only could Plaintiff ascertain BGE's role, but Plaintiff clearly knew BGE's identity. In fact, Plaintiff told the intake officer about his time with "CAEI & BGE." Ex. 15 to ECF No. 39-1. Plaintiff's Opposition states in the undisputed statement of facts that "Mr. Bolden was given the impression that BGE was the main employer." ECF No. 45-1, at 2. It defies logic that Plaintiff had the impression that BGE was his main employer, yet was unable to determine BGE's identity for inclusion in the Charge.

In support of the first factor of the substantial identity test, Plaintiff asserts that he "thought he was working for both BGE and CAEI, as one and the same company" and that he did not understand the Temporary Worker Agreement he signed, Pl.'s Opp. at 9, which mischaracterizes Plaintiff's deposition testimony. Plaintiff expressly testified that when he read and signed the Temporary Worker Agreement in 2016 at the time CAEI hired him, he was aware that Exelon Business Services was a separate entity from CAEI and that BGE was also a separate entity from

4

**JA276**

CAEI. Ex. 1, Pl.'s Dep. 112:10-16; 114:19-22; 205:4-8 ("Q: …So when you signed this agreement, you were aware that Exelon Business Services was a separate entity from CAEI, correct? A: Correct"; "Q: And just to be clear, this is something we talked about a little while ago, but in – at least as of 2016, you knew that BGE and CAEI were separate companies? A: Correct.").

Further, there is no evidence in the record to support that any alleged confusion by Plaintiff about the Temporary Worker Agreement interfered with his knowledge that BGE and CAEI were separate entities at the time he filed the Charge. Rather, Plaintiff testified that he knew he was employed by CAEI and worked as a temporary contractor at the BGE call center. *Id.* 88:15-21; 92:10-20. Moreover, the fact that Plaintiff sought employment with BGE while still employed by CAEI further undercuts any contention that Plaintiff thought CAEI and BGE were separate entities and demonstrates that he was aware of BGE's status as a separate entity. *Id.* 203:19-205:22. For these reasons, the record evidence supports that Plaintiff knew BGE's role when he filed his Charge.

### 2. Plaintiff has failed to set forth facts to establish that Defendants' interests are "so similar" that it was unnecessary to name BGE in the Charge.

Although Plaintiff's Opposition solely relies on the MCCR's Written Finding, which makes a passing reference to an interview with BGE employee, Khadija Duncan,[2] Plaintiff cannot rely upon this reference, at the summary judgment stage, to demonstrate BGE had a similarity of interests with CAEI, particularly where Ms. Duncan executed a declaration stating that she was not interviewed by the MCCR. *See* ECF No. 39-14. Plaintiff also concedes that he has no personal knowledge as to who the MCCR investigator interviewed in connection with the underlying investigation. Ex. 1, Pl's. Dep. 144:21-145:4. There is simply no evidence in the record that BGE

---

[2] Formerly Khadija Webster.

JA277

had a similarity of interests with CAEI for purposes of the substantial identity test. Furthermore,

even if Ms. Duncan was interviewed by the MCCR in the underlying investigation, which it is

undisputed that she was not, mere participation as a third-party witness with no understanding that

BGE was alleged to have engaged in wrongdoing does not mean that BGE shares interests "so

similar" with CAEI that naming was unnecessary.

Plaintiff does not identify any material issue of fact to refute BGE's analysis of the factors

courts consider under this prong, which weigh in its favor and include the interrelatedness of

operations, management, ownership, and corporate officers. In fact, Plaintiff's Opposition

completely ignores these factors. This prong, and the third prong, are the most important factors

of the substantial identity test. *Elzey*, 2012 WL 3715321, at *3.

### 3. Plaintiff has failed to refute that BGE was prejudiced by not participating in the underlying administrative proceeding.

As discussed above and in BGE's moving Memorandum, it is undisputed that BGE did not

participate in the administrative Charge process. Plaintiff does not refute this. Instead, Plaintiff,

relying on *Gamble v. Charles Cnty.*, 20-cv-3126-PWG, 2021 WL 3491823 (D. Md. Aug. 9, 2021),

claims that BGE was not prejudiced because the Charge was not resolved at the administrative

proceeding, and thus, whether BGE was a named party to the Charge would have made no

difference to the outcome of the investigation. Pl.'s Opp. at 9. However, the facts in *Gamble* are

readily distinguished from the facts herein. In *Gamble*, the underlying charge was pending with

the Equal Employment Opportunity Commission ("EEOC"), not MCCR, and therefore, the charge

in *Gamble* was subject to different administrative procedures. There, the court held that there was

no prejudice because "the EEOC filing did not result in an adverse finding" against either party,

and therefore, the naming of an additional party would have not altered the EEOC proceedings

because it found that the plaintiff had not made out a statutory violation. Here, the MCCR held a

6

**JA278**

Fact Finding Conference where Plaintiff and CAEI both had the opportunity to engage in settlement discussions. Plaintiff admits that BGE did not participate in either the Fact Finding Conference or the settlement discussions. *See* Ex. 1, Pl.'s Dep. 144:6-9. Therefore, Plaintiff's reliance on *Gamble* is misplaced because it is unknown whether BGE's participation in the settlement discussions could have resulted in a complete resolution of this matter. In fact, CAEI and Plaintiff reached a binding settlement agreement that was almost immediately rescinded by Plaintiff. *Id.* 196:15-200:9. BGE was deprived of the ability to resolve the matter before suit ensued, and to present its position, which may have deterred Plaintiff from filing suit against BGE. *Phillips v. Goodwill Indus.*, No. GLR-14-3256, 2015 WL 3844089, at *2 (D. Md. June 19, 2015) (citing *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 407 (4th Cir. 2013) ("[T]he United States Court of Appeals for the Fourth Circuit has explained that notice to the employer of the alleged discrimination serves as a vital function in remedying an unlawful employment practice because it gives an employer the opportunity to independently investigate and resolve the alleged discriminatory actions.")

Lastly, the Plaintiff's Opposition points out that BGE relies on CAEI's position statement at the administrative level as part of its defense. Pl.'s Opp. at 10. This point only further highlights the prejudice to BGE because of CAEI's noticeable absence from this litigation. Because the allegations involve CAEI employees (not BGE employees) and CAEI is defunct, BGE was forced to rely on prior statements made by CAEI years ago to defend itself against the claims in this litigation. As such, there is no issue of fact as to the third factor of the substantial identity test, which is also one of the most important factors. *See Elzey*, 2012 WL 3715321, at *3.

**4. Plaintiff has failed to set forth facts to refute that BGE did not represent to Plaintiff that its relationship with him should be through CAEI.**

Plaintiff has failed to identify any facts to support the fourth prong, which is that BGE represented to Plaintiff that his relationship with BGE should be through CAEI. In fact, Plaintiff testified that he felt comfortable discussing the possibility of employment with BGE directly with BGE Manager, Brian Andrews.

Nevertheless, in support of this fourth factor, Plaintiff alleges that he could infer from BGE's conduct that his relationship with BGE should be through CAEI, including: that BGE representatives interviewed him; he was provided an official BGE domain email account; BGE "subjected" him to orientation; BGE supervised and evaluated his work; BGE issued performance awards to Plaintiff; and BGE was responsible for promotions and raises to CAEI employees. Pl.'s Opp. at 10. In some instances, Plaintiff's Opposition misstates Plaintiff's testimony. First, BGE did not "subject" Plaintiff to orientation; rather, Plaintiff testified that orientation took place at CAEI's office, was conducted by CAEI employees, and that the attendees were all CAEI employees. Ex. 1, Pl.'s Dep. 90:8-91:6. Second, BGE was not responsible for providing raises and promotions to CAEI employees; rather, Mr. Andrews **infrequently** appeared at evaluation meetings and provided generic positive comments about Plaintiff's performance. *Id.* 126:22-128:18 (emphasis added).

Regardless, these facts fail to establish the fourth factor because Plaintiff's own testimony demonstrates that he was aware that CAEI and BGE were separate entities and that his employer was CAEI, a company that contracted with BGE. Plaintiff's examples support BGE's arguments because they demonstrate that Plaintiff directly interacted with BGE while he was staffed by CAEI on BGE's project. In fact, Plaintiff testified that: (1) he saw an ad for employment with CAEI, called CAEI to inquire about the position, and then proceeded to apply for the position in-person

**JA280**

at CAEI's office;[3] (2) he interviewed with CAEI Director of Human Resources, Kia Smoot, at CAEI's office; (3) BGE was not located at CAEI's office; (4) at orientation led by CAEI employees, Ms. Smoot and CAEI Vice President, Raymond Hubbard, he learned about the benefits of being a contract worker; (5) Plaintiff was aware his position with CAEI on the BGE project was a temporary position; (6) he read and signed the Temporary Worker Agreement and was aware that Exelon Business Services was a separate entity from CAEI; (7) he understood that BGE and CAEI were separate companies; (8) he applied for a job with BGE while employed by CAEI, and (9) he discussed employment with BGE with Mr. Andrews. Ex. 1, Pl.'s Dep. 79:15-19; 82:2-22; 83:10-22; 88:19-21; 90:8-92:20; 112:10-16; 114:19-22; 116:16-21; 203:19-205:13; 235:8-11; 236:17-19. Further, Plaintiff's BGE e-mail address clearly distinguished that he was a "Contractor" as opposed to a BGE employee. *See, e.g.*, Ex. 2, MCCR.0133. Also, Plaintiff's assertion that Mr. Andrews and Ms. Duncan supervised him is not supported by his own testimony.[4] Rather, Mr. Andrews infrequently provided generic positive comments regarding Plaintiff's performance, and Ms. Duncan was only temporarily on site while conducting initial training of the CAEI contractors. Ex. 1, Pl.'s Dep. 126:22-128:18, 134:16-135:11. In considering Plaintiff's own testimony, it is nonsensical that Plaintiff would think that filing a Charge against CAEI was the same as filing a charge against BGE. *See, e.g., Smith v. Delaware River Stevedores*, No. 07-1864, 2008 WL 4890135, at *4 (E.D. Pa. Nov. 10, 2008) (interpreting factor four "as asking whether, based on representations made to her, Ms. Smith could have reasonably believed that by naming the Union in her formal charge, she was also naming PMTA, Delaware River, and Greenwich").

---

[3] Plaintiff was not recruited by either BGE or CAEI as alleged in the Opposition. Pl.'s Opp. at 1.
[4] CAEI employees supervised Plaintiff. Ex. 1, Pl.'s Dep. 94:20-95:14; 107:22-108:18. Plaintiff's Opposition incorrectly asserts that Ms. Watts replaced Ms. Duncan. Pl.'s Opp. at 3.

Accordingly, because Plaintiff cannot establish any of the factors of the substantial identity test, BGE is entitled to summary judgment and this lawsuit should be dismissed in its entirety as to BGE.

### B. **Plaintiff Has Failed To Create A Genuine Dispute Of Material Fact To Refute That BGE Was Not A Joint Employer.**

As an additional basis for summary judgment, BGE was not a joint employer with CAEI. In support of the argument that BGE was Plaintiff's joint employer, Plaintiff advances three facts: (1) Mr. Hubbard told Plaintiff that BGE did not want him on the project; (2) BGE employees interviewed Plaintiff; and (3) BGE supervisors were "significantly involved" in supervising and evaluating Plaintiff's work. Pl.'s Opp. at 11. These facts are insufficient to establish joint employment and are not supported by the record evidence. In further support thereof, Plaintiff relies on *Paroline v. Unisys Corp.*, 879 F.2d 100, 104 (4th Cir. 1989) and *Crosten v. Kamauf*, 932 F. Supp. 676, 680 (D. Md. 1996) (citing *Paroline*, *supra*) for the proposition that "supervisory personnel can be included in the definition of 'employers' for purposes of Title VII liability." *Id.* However, Plaintiff's reliance on *Paroline* and *Crosten* is misplaced because they do not analyze joint employer liability and Plaintiff has not named an individual supervisor in this lawsuit. Moreover, *Paroline* was overruled in 1998 by the Fourth Circuit, which found that supervisors are not liable in their individual capacities under Title VII. *See Lissau v. Southern Food Serv., Inc.*, 159 F.3d 177, 181 (4th Cir. 1998).

Plaintiff's Opposition only analyzes the first two *Butler* factors, which are whether BGE had the authority to hire and fire Plaintiff and whether BGE had day-to-day supervision over Plaintiff. Plaintiff fails to address the remaining seven factors. First, even if accepted as true, the first two factors Plaintiff discusses do not support that BGE had the authority to hire and fire him. In fact, Plaintiff does not dispute that Mr. Hubbard terminated him. Ex. 1, Pl.'s Dep. 219:17-220:7.

10

JA282

Plaintiff also concedes that CAEI, not BGE, extended a job offer to him. *Id.* 86:2-88:14. Moreover, there is simply no evidence in the record to refute Mr. Hubbard's declaration stating that "CAEI was solely responsible for hiring and firing its employes" and that he made the decision to hire and fire Plaintiff. ECF No. 39-4, Hubbard Decl. ¶ 15.

Second, the portion of the record cited by Plaintiff to support that BGE was "significantly involved" in supervising and evaluating Plaintiff's work does not support such conclusion. Rather, the cited testimony reflects that either Plaintiff's direct supervisors (CAEI employees), Mr. Hubbard (a CAEI employee), and/or Mr. Andrews (a BGE employee), were present during his performance evaluations. Ex. 1, Pl.'s Dep. 125:3-9. However, as discussed above, Plaintiff thereafter clarified that although these evaluations occurred monthly, Mr. Andrews appeared "infrequently" on two occasions and provided him with generic positive comments. *Id.* 127:19-128:18. He further testified that he was disciplined by Ms. Watts, a CAEI employee, not BGE. *Id.* 128:19-129:9. There is also no evidence in the record to refute Mr. Hubbard's Declaration stating that "BGE was not responsible for managing or supervising CAEI employees . . . [and that] CAEI was solely responsible for . . . providing day-to-day supervision of its employees[.]" ECF No. 39-4, Hubbard Decl. ¶ 15. Accordingly, the three most important factors all favor BGE, and Plaintiff has not refuted BGE's facts as to the remaining factors.

Accordingly, BGE is entitled to summary judgment because Plaintiff has failed to create a genuine dispute of fact that BGE was not his joint employer.

**C. Plaintiff Has Failed To Create A Genuine Dispute Of Material Fact As It Relates To His *Prima Facie* Discrimination Claim.**

Should the Court not grant summary judgment because Plaintiff failed to exhaust his administrative remedies, or because BGE was not a joint employer, summary judgment is warranted on the merits of Plaintiff's claims. In efforts to establish a *prima facie* case of

discrimination, Plaintiff alleges that his performance was satisfactory and that it can be inferred by Ms. Watts's conduct that Plaintiff's termination was motivated by discrimination. Plaintiff presents no evidence to refute that he was terminated by CAEI for several non-discriminatory reasons, including a reported complaint by three female CAEI employees that Plaintiff stated that he could kill them with a knife and put their bodies in the trunk of his new car, and no one would know. For the below reasons, Plaintiff's arguments must fail.

First, Plaintiff's past performance prior to February 2016 is not determinative of his subsequent performance and conduct. Indeed, "[a] court, in analyzing an employee's performance in relation to the reasonable expectations, focuses on the employee's performance at the time the employment action occurred; thus, summary judgment for the employer is appropriate where poor job performance at the time of employment action is only contradicted by evidence the employee performed well in the past." *Holtz v. Jefferson Smurfit Corp.*, 408 F. Supp. 2d 193, 204 (M.D.N.C. 2006) (evidence that plaintiff received excellent evaluations, lowered spoilage, and increased profits during the first few years of his employment did not trump evidence of his failings at the time of his termination). Rather, based on Mr. Hubbard's own observations and complaints about Plaintiff, he decided that Plaintiff should be terminated. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996) ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff."). Therefore, Plaintiff's mere reliance on his past performance and subjective belief that he was meeting CAEI's legitimate expectations at the time of his termination cannot defeat summary judgment.

Second, in support of finding an inference of discrimination, Plaintiff solely relies on Ms. Watts's conduct prior to February 2016 as evidence to establish that Mr. Hubbard terminated

**JA284**

Plaintiff for discriminatory reasons.[5] However, there is no evidence in the record to establish that

any of Ms. Watts's alleged past conduct influenced the termination decision, or that Ms. Watts had

any role in Plaintiff's termination. In fact, Plaintiff's Opposition fails to provide any evidence to

refute the powerful same actor inference generated by this undisputed fact. *Proud v. Stone*, 945

F.2d 796, 798 (4th Cir. 1991) ("When the hirer and firer are the same individual, there is a powerful

inference relating to the 'ultimate question' that discrimination did not motivate the employer, and

the early resolution of this question need not be derailed by strict fealty to proof schemes."). Here,

Plaintiff does not refute that Mr. Hubbard, not Ms. Watts, both hired and fired Plaintiff. Further,

Mr. Hubbard terminated Plaintiff based on his own observations of Plaintiff's demeanor and

response in February 2016, his concerning comments reportedly made to other CAEI employees

in February 2016, and him falsely telling BGE that he was accused of harassing someone. ECF

No. 39-4, Hubbard Decl. ¶¶ 28-30; Ex. 1, Pl.'s Dep. 219:17-220:7.

Lastly, Plaintiff alleges Ms. Watts treated female billing specialists more favorably than

Plaintiff because females were not required to pick up, prepare, and/or serve food;[6] Ms. Watts did

not deprive or deny them their auto-in time;[7] Ms. Watts allowed a female employee to use an iPad;

and two female employees engaged in a physical fight but were not terminated. Pl.'s Opp. at 14.

Plaintiff, however, has failed to identify a comparator that engaged in the same conduct as him but

was treated more favorably. *See Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir.

---

[5] For example, contrary to the Opposition's timeline of events, Ms. Watts's alleged conduct towards Plaintiff took place at various times during his employment <u>not</u> after he allegedly complained on February 4, 2016. *See, e.g.*, Ex. 1, Pl.'s Dep. 164:9-165:3, 162:18-20, 176:3-5, 252:8-20.

[6] Plaintiff testified that during his employment with CAEI, he observed several female employees, including his CAEI supervisors, serve food to the CAEI team. *Id.* 164:13-22 (demonstrating that females also served food to the team).

[7] Plaintiff testified that Otis Rease (Black/Indian male), one of Ms. Watts's favorites, was permitted to remain on auto-in time. *Id.* 184:20-185:5.

13

2019) (setting forth the elements of a *prima facie* case of discrimination). "[T]o establish a valid comparator, the plaintiff must produce evidence that the plaintiff and comparator. . . **engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.**'" *Id.* at 223-24 (quoting *Haywood v. Locke*, 387 Fed. Appx. 355, 359 (4th Cir. 2010) (emphasis added). Here, the above facts are either completely unrelated to Plaintiff's conduct, which resulted in his termination, or state conduct different than the conduct Plaintiff engaged which resulted in his termination, including exhibiting concerning behavior towards Mr. Hubbard and reportedly making threatening comments to other employees. For these reasons, Defendant is entitled to summary judgment as to Plaintiff's discrimination claims (Count I).

### D. Plaintiff Has Failed to Establish that CAEI's Legitimate Non-discriminatory Reasons For His Termination Were Pretext.

Notably, Plaintiff's Opposition does not dispute that CAEI had a legitimate non-discriminatory reason for Plaintiff's termination. Rather, in an attempt to establish pretext, Plaintiff erroneously argues that CAEI gave inconsistent reasons for Plaintiff's termination, that Plaintiff was not the type of employee to engage in misconduct, and that Plaintiff was terminated shortly after he reported Ms. Watts's harassment. Pl.'s Opp. at 15.

First, the undisputed evidence supports that Mr. Hubbard decided to terminate Plaintiff based on his behavior during his meeting with Mr. Hubbard, Plaintiff's lack of integrity for falsely telling BGE that he was accused of harassing someone, and as a result of the disturbing comments Plaintiff reportedly made to three female CAEI employees about the fact that he could kill them with a knife and put their bodies in the trunk of his new car, and no one would know. *See* ECF No. 39-4, Hubbard Decl. ¶¶ 28, 30; Pl.'s Dep. 219:17-220:7. The record evidence does not support that CAEI terminated Plaintiff because he refused to train an employee and tossed his headset at Ms.

14

**JA286**

Watts, as alleged in Plaintiff's Opposition. Ex. 1, Pl.'s Dep. 208:18-212:18. The mere fact that Mr. Hubbard did not tell Plaintiff about each and every reason for his termination, including the employee complaints made against him immediately prior to his termination, does not render CAEI's decision to terminate him for this reason as pretext. Moreover, CAEI has not engaged in shifting rationales simply because it had several reasons for his termination. CAEI told the MCCR that it received information of inappropriate and threatening comments that Plaintiff made to three ladies in his department. Here, Plaintiff has set forth no evidence, other than mere speculation, to refute that employee complaints were made against him or to establish that CAEI's reasons for terminating him were pretextual.

Second, whether Plaintiff was the "type of employee who brought in donuts and drinks for meetings" or generally engaged in niceties for his co-workers, received awards for his performance, etc. cannot refute the record evidence, as the Opposition suggests, regarding CAEI's reasons for his termination based on his conduct immediately prior to his termination.

Moreover, Plaintiff has failed to set forth any evidence to establish that his race or sex were the real reasons for the termination decision. *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 278 (4th Cir. 2000) (explaining that a plaintiff must prove that the defendant's proffered reason was mere pretext and that the employee's protected characteristic was the real reason for the termination decision). Further, once an employer gives a legitimate, non-discriminatory reason for discharging the plaintiff, it is outside the Court's "province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Id.* at 279. Here, as discussed above, there is no evidence in the record to establish that Ms. Watts's alleged discriminatory attitude toward Plaintiff influenced Mr. Hubbard's decision to terminate Plaintiff. *See Smith v. Rental Treatment Centers-Mid-Atlantic, Inc.*, No. RDB-16-3656, 2018 WL 950018,

15

**JA287**

*8 (D. Md. Feb. 20, 2018) (quoting *Young v. United Parcel Serv.*, 707 F.3d 437, 449 (4th Cir. 2013) ("a plaintiff may show that 'the subordinate with discriminatory animus intended to influence the person with decision making authority and was a proximate cause of the ultimate adverse employment action.'"). In fact, Mr. Hubbard terminated Plaintiff within hours, or a day at most, of learning of the three female CAEI employees' complaints pertaining to Plaintiff, which breaks any causal connection. *See* ECF No. 39-4, Hubbard Decl. ¶¶ 28, 30.

For these reasons, Plaintiff cannot establish that CAEI's reasons for terminating him were pretextual, and Count I of the Amended Complaint should be dismissed with prejudice.

**E.   Plaintiff Has Failed To Create A Genuine Dispute Of Material Fact As To His Harassment Claim.**

Plaintiff's evidence is insufficient as a matter of law to establish an issue of fact as to race or sex discrimination. To establish harassment based on sex, Plaintiff references three alleged comments by Ms. Watts, including that: a man should not train a man, Plaintiff only wanted to train the pretty girls, and Plaintiff should be more like other co-workers who "have all the women after them." Pl.'s Opp. at 16. He also alleges that Ms. Watts requested he pick up food for female employees "two or three times." *Id.*; *see also* Ex. 1, Pl.'s Dep. 162:18-20. Although Plaintiff summarily concludes that Ms. Watts's statements were "severe and pervasive," (the law requires harassment be severe or pervasive) there is insufficient evidence in the record to demonstrate that these statements invoke animus towards men or are sexually suggestive such that they violate Title VII. Rather, such statements are more akin to simple teasing, offhand comments, or isolated incidents that do not invoke the protections of Title VII. *See, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Further, Plaintiff concedes that Ms. Watts's favorite was a Black-Indian male. Ex. 1, Pl.'s Dep. 251:6-11. As to Ms. Watt's requests for Plaintiff to serve food to his colleagues and pick up food for his colleagues, such gender-neutral requests, without more, cannot

16

**JA288**

form the basis of a hostile work environment—particularly where female employees also served food. *See Dindinger v. Allsteel, Inc.*, No. 3:11-cv-00126, 2013 WL 11727240, at *16 (S.D. Iowa Nov. 22, 2013) (rejecting hostile work environment claim based on the fact that employee was asked to cook and serve hotdogs as part of a safety incentive program).

Plaintiff alleges Ms. Watts, a Black female, told him that he was either "too nice" or to "thug it up" when speaking with customers about ten to fifteen times, not "more than twenty times" as the Opposition alleges. Ex. 1, Pl.'s Dep. 253:10-21. Moreover, contrary to the arguments set forth in his Opposition, Plaintiff **<u>never</u>** testified that Ms. Watts told him he was "not acting 'Black enough'" or any other express reference to his race. *Id.* 255:7-14. Rather, Plaintiff testified that Ms. Watts told Plaintiff either that he was "too nice" or to "thug it up" interchangeably, which undercuts Plaintiff's race-based hostile work environment claim because it provides a non-discriminatory context to her request for Plaintiff to "thug it up"—he was "too nice" in performing his collection duties. "To establish a hostile environment claim, [Plaintiff] must show that 'but for' his race ..., he would not have been the victim of the alleged discrimination." *Tawwaab v. Virginia Linen Serv., Inc.*, 729 F. Supp. 2d 757, 775 (D. Md. 2010) (internal citation omitted). Based on Plaintiff's testimony, he cannot establish that but for his race, he would not have been harassed by Ms. Watts because she still would have taken issue with him being "too nice." Further, there is also evidence in the record that Plaintiff described Ms. Watts as "kind of military" and that everyone took issue with her management style. Ex. 1, Pl.'s Dep. 302:20-303:3. In fact, this is not the only time Plaintiff has used the term "harassment" when speaking about general workplace grievances. Ex. 3, PAYPAL005-007.  Plaintiff also filed an internal complaint against his supervisor while working for PayPal because she was managing his performance and telling him to do one thing and then changing expectations. *Id.*; Ex. 1, Pl.'s Dep. 77:11-78:2. Plaintiff

**JA289**

described his supervisor at PayPal as "militaristic," which is the same way he described Ms. Watts's management style. *Id.* 75:5-76:3; 303:2-3. Other than summarily concluding that such conduct was because of Plaintiff's race and sex and was severe and pervasive, Plaintiff fails to offer any evidence, or legal authority, to overcome summary judgment on Count III of the Amended Complaint.

### F. Plaintiff Has Failed To Create A Genuine Dispute Of Material Fact As To His Retaliation Claim.

Plaintiff alleges he engaged in protected activity when he complained about Ms. Watts to Ms. Smoot, Mr. Hubbard, and Mr. Andrews. However, Plaintiff never complained about actionable discrimination or harassment based on his race or gender such that it constituted protected activity. *See, e.g.*, *Bowman v. Baltimore City Bd. of Sch. Commissioners*, 173 F. Supp. 3d 242, 248 (D. Md. 2016) ("General complaints of unfair treatment are not protected activity.").

Plaintiff has not provided any evidence that he complained about conduct protected by Title VII, other than to summarily assert he complained about "harassment." On February 4, Plaintiff testified that he told Ms. Smoot about auto-in times, being asked to serve food and then being punished for it, training issues, and some of the things that Ms. Watts would say about being like his male co-workers, and that he wanted to be moved to a different department. Ex. 1, Pl.'s Dep. 303-304. He did not testify that he complained about race and sex discrimination or harassment.

Similarly, on February 5, Plaintiff testified that he told Mr. Hubbard, "If there's anyone who has harassed anybody, it's been Angelique who harassed me." He then refuted Ms. Watts's allegations against him and explained to Mr. Hubbard that Ms. Watts had asked him to move his seat. *Id.* 209:17-211:9. Plaintiff never testified that he complained about harassment based on his race or gender to Mr. Hubbard. In fact, Mr. Hubbard's declaration states expressly that Plaintiff

18

**JA290**

complained about general work-related complaints, but that he never complained about mistreatment based on his protected characteristics. ECF No. 39-4, Hubbard. Decl. ¶¶ 25-26.

Plaintiff further testified that when he spoke to Mr. Andrews, he told him about "what had been transpiring with Angelique Watts over a period of time[.]" Ex. 1, Pl.'s Dep. 311:5-13. When Plaintiff's own counsel asked him to specifically state what he told Mr. Andrews, Plaintiff testified: "I told Mr. Andrews about – serving lunches, and how she would have me do it, and then after I did it she would then threaten me. And she had stated many times that she had e-mailed him. He didn't say whether or not he had gotten those e-mails or not, but I let him know about that and the punishments that were coming with that. I let him know about the auto-in time, I let him know, you know, about having me train people and then being punished for doing it." *Id.* 311:2-312:15. There is no evidence that Plaintiff complained about harassment based on his race or gender to Mr. Andrews.

Plaintiff's *prima facie* retaliation claim must also fail because he cannot establish a causal link between the protected activity and his termination. As discussed in BGE's Motion, there are several intervening events that occurred after Plaintiff's alleged protected activity which resulted in Plaintiff's termination, including several developments between February 4 and February 11 that sever any possible causal link between Plaintiff's complaint and his termination. The most notable event is Mr. Hubbard's knowledge of the complaint by three females that Plaintiff said he would kill them, in conjunction with Plaintiff's concerning demeanor during a meeting with Mr. Hubbard, after which Plaintiff was almost immediately terminated. Even if Plaintiff had engaged in protected activity, these facts clearly break any causal connection. Other than Plaintiff's mere speculation that he was terminated because he complained about Ms. Watts, there is no evidence in the record to support Plaintiff's theory of causation. *See, e.g., Samnang v. Bouchard Ventures,*

**JA291**

*LLC*, No. SAG-21-01398, 2021 WL 4197662, at *4 (D. Md. Sept. 15, 2021) (explaining that mere conclusions, without facts to substantiate plaintiff's assertion, cannot render her theory of causation plausible). "An employer cannot face liability for discrimination or retaliation simply for making a decision based on its good faith assessment of a contested set of facts." *Id.*; *see also Kothe v. Cont'l Teves, Inc.*, 461 F. Supp. 2d 466, 477 (W.D. Va. 2006) (quoting *Dugan v. Albemarle Cnty Sch. Bd.,* 293 F.3d 716, 722 (4th Cir. 2002) ("Mere assertions of questionable timing, in and of themselves are simply insufficient to counter unrebutted evidence of legitimate, nondiscriminatory reasons for being fired.")).

Lastly, Plaintiff claims that his alleged protected activity was the but-for cause of his termination and that CAEI's legitimate non-discriminatory reasons for his termination were pretextual.[8] For the same reasons discussed above in Section D, Plaintiff cannot establish pretext. Moreover, Plaintiff cannot rely on temporal proximity alone to establish pretext. *See Riddick v. MAIC, Inc.*, Civil No. JKS-09-33, (D. Md. Nov. 10, 2010), at *6 (holding timing alone is not sufficient to establish pretext for purposes of a retaliation claim).

For these reasons, Plaintiff's retaliation claim must fail, and Count III of the Amended Complaint should be dismissed with prejudice.

## III.   CONCLUSION

For the foregoing reasons, BGE respectfully requests that the Court grant its Motion for Summary Judgment and dismiss Plaintiff's Amended Complaint with prejudice.

---

[8] Pretext is established by showing that the adverse action would not have occurred "but for" the employer's retaliatory reason for the action. *See Foster v. Univ. of Md. Eastern Shore*, 787 F.3d 243, 252 n. 15 (4th Cir. 2015).

# Exhibit 1

# Exhibit 1



# Transcript of Harry A. Bolden

**Date:** November 18, 2022
**Case:** Bolden -v- CAEI, Inc., et al.

**Planet Depos**
**Phone:** 888-433-3767
**Fax:** 888-503-3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MARYLAND

3

4  HARRY A. BOLDEN,            )

5         Plaintiff,      ) Case No.

6       v.             ) 1:21-CV-02295-JRR

7  CAEI INC. and EXELON BUSINESS  )

8  SERVICES COMPANY, LLC,      )

9         Defendants.      )

10

11

12

13    AUDIO TRANSCRIPTION OF RECORDED DEPOSITION

14        TESTIMONY OF HARRY A. BOLDEN

15        November 18, 2022, 10:09 a.m.

16

17

18

19  Job No. 468499

20  Pages: 1-329

21  Transcribed by: Annette M. Montalvo, RDR, CRR

22  Notary Public/Court Reporter: Andrew Stromberg

```
1           Deposition testimony of HARRY A. BOLDEN,

2    held at:

3

4           One South Street, Suite 1800

5           Baltimore, Maryland  21202

6

7

8

9

10      Pursuant to agreement, before Andrew Stromberg,

11   Notary Public in and for the State of Maryland.

12

13

14

15

16

17

18

19

20

21

22
```

```
 1    APPEARANCES:

 2

 3

 4    ON BEHALF OF THE PLAINTIFF:

 5    Joseph D. Allen, Esq.

 6    Simms Showers, LLP

 7    201 International Circle, Suite 230

 8    Baltimore, Maryland  21030

 9    443-290-8710

10

11

12

13    ON BEHALF OF THE DEFENDANTS:

14    Lindsey A. White, Esq.

15    Shawe Rosenthal LLP

16    One South Street, Suite 1800

17    Baltimore, Maryland  21202

18    410-752-1040

19

20

21

22
```

JA297

Transcript of Harry A. Bolden
November 18, 2022                                        75

```
 1        A   Quality.

 2        Q   Okay.

 3        A   It was -- yeah.  It wasn't really -- yeah.

 4   Okay.  That's fine.

 5        Q   And you also complained about somebody named

 6   Jeanette staying your handle time was high?

 7        A   Yes, yes.

 8        Q   Who is Jeanette?

 9        A   The team was led by Matthew Anton for quite

10   a while, and then Matthew Anton stepped down, and it

11   was taken over by Jeanette.  She was just going to

12   be the interim person until they found a permanent

13   team lead.

14        And Jeanette is just -- oh, my gosh.  She

15   will tell you when you first meet her that she's a

16   product of a military family, that her family was

17   raised -- that she was raised by -- you know, she

18   runs everything like a drill sergeant.

19        And it became problematic for me.  Although

20   my father served in the army, he didn't treat his

21   family like they were shoulders.  And so when

22   somebody is just militaristic for the sake of being
```

1    militaristic, and there's not a context to place

2    that in, it just becomes a problem.  It becomes a

3    problem.

4         Q  So it sounds like you have had a lot of

5    interpersonal conflict with your supervisors; is

6    that right?

7         A  No, because there's some supervisors that I

8    don't have an issue with, at all, and then there are

9    others who will lie to me, who will tell me to do

10   one thing, and when I do it, I am then punished for

11   it, as it was with Jeanette.  Or Jeanette would come

12   to me and say, oh, Harry, you're being unfairly

13   treated.  I saw this quality score, I saw this

14   quality score, I saw this quality score, I saw this

15   quality score.  Let me go ahead and review those,

16   and then I'm going to have them changed for you.  So

17   I'm sort of like happy and then, you know, she'll

18   wait a long period of time after you have like -- I

19   think she thinks that you've forgotten about it, and

20   then she will come back to you, oh, I'm not going to

21   do anything about those quality scores.

22        Q  You also complained that you weren't trained

Transcript of Harry A. Bolden
November 18, 2022                    77

1    on the app pen process, correct?

2        A   Correct.

3        Q   And you also took issue with the written

4    warning that referenced a conversation from May; is

5    that right?

6        A   Yes.  That was with Jeanette -- this is what

7    happen -- can I explain what happened?

8        Q   Well, no, I --

9        A   It's not necessary?  Okay.

10       Q   No, not right now.  Thanks.

11           So, really, the sum of your complaint at

12   PayPal is you were being performance managed?

13       A   I guess that's a great way of saying it,

14   yeah.

15       Q   Okay.

16       A   No, no.  That is incorrect.  I am not going

17   to say that I was performance managed, it was -- I

18   don't mind the performance management.  It's when

19   you've been told what to do, and you do what you've

20   been told what to do, and it's not like the rules

21   will change and you have to conform to the rules,

22   but the rules will change, and you can be punished

**JA300**

Transcript of Harry A. Bolden
November 18, 2022                                    78

1   for doing what you've been told that you're already

2   supposed to do as law.

3       Q   Okay.  When you filed this internal

4   complaint, did you say that it was discrimination or

5   hostile work environment?

6       A   I didn't specify that it was discrimination

7   or hostile work environment, I don't think.  I'm not

8   sure.  But I knew that -- I thought it was something

9   that could be resolved peacefully.

10         The reason that I did file the complaint is

11  because I brought it to Jeanette Sheehan's boss,

12  himself, and here he doesn't do anything about it

13  and sort of like made a joke out of it.  And that's

14  when I thought I needed to do this.

15      Q   And aside from this internal complaint

16  against PayPal and the charge you filed against

17  CAEI, did you ever file any other internal or

18  external complaints of discrimination against an

19  employer?

20      A   No.

21      Q   So going back to Exhibit 1, which I see you

22  have in front of you, are you on page 7?

JA301

Transcript of Harry A. Bolden
November 18, 2022                    79

1      A  Yes.

2      Q  Going up to number 5, it says identify any

3  internal or external complaint that you filed

4  against any of your employers, including, but not

5  limited to, claims of discrimination, harassment,

6  retaliation, and/or wrongful termination.

7          Answer:  Plaintiff has not filed any

8  internal or external complaints or legal action

9  against any of his employers except for those

10  underlying this complaint against CAEI.

11         So why didn't you disclose your complaint

12  against Bill Me Later?

13     A  I thought it meant like legal civil action

14  as opposed to internal company action.

15     Q  Okay.  Let's talk about your employment with

16  CAEI.  How did you come to be employed by CAEI?

17     A  I saw an ad for employment, and I called and

18  spoke with someone who said you can come in and fill

19  out the application.  I came in.

20     Q  Okay.  Were you unemployed at the time?

21     A  Yes.

22     Q  Were you receiving unemployment payments at

JA302

1      Q  Okay.

2          All right.  So you said you applied for the

3   position at CAEI.  Did you receive an interview?

4      A  Yes.

5      Q  Who interviewed you?

6      A  Kia Smoot.

7      Q  Okay.  And did you apply -- did you send an

8   e-mail, or how did you physically apply to CAEI?

9      A  I physically went in.

10     Q  And who is Kia Smoot?

11     A  The human resources director for CAEI.

12     Q  So when you applied, you went in person?

13  Did you fill out a paper application?

14     A  I think I did.  And then there were several

15  interviews afterwards.

16     Q  Did you interact with Ms. Smoot when you

17  were filling out the paper application?

18     A  I'm not sure if she interviewed -- if she

19  gave me the paper application or -- she was part of

20  the interview process, though.

21     Q  And did Ms. Smoot interview you?

22     A  Yes.

**JA303**

Transcript of Harry A. Bolden
November 18, 2022                                    83

1       Q   Did anybody else interview you?

2       A   Several people from BG&E.

3       Q   How do you know they were from BGE?

4       A   I had to physically go to BG&E to be

5   interviewed by them.  It was three people.  I can't

6   recall their names right now.

7       Q   Were they people that you later interacted

8   with?

9       A   No.

10      Q   And you filled out the paper application at

11  CAEI, correct?

12      A   Yes.

13      Q   Okay.  And where was CAEI based?

14      A   In Columbia, Maryland, 9269 Bendix Road,

15  something like that.

16      Q   9256 Bendix Road?

17      A   Yes.  Sorry.

18      Q   Okay.  And was BGE located at that Columbia

19  location?

20      A   No, they were not.

21      Q   Okay.  So just CAEI?

22      A   Yes.

**JA304**

Transcript of Harry A. Bolden
November 18, 2022                                86

1      Q   And you don't know their names?

2      A   No.  I can't remember.  I'm sure they

3  introduced themselves, but I can't remember their

4  names.

5      Q   Do you know their titles?

6      A   No.

7      Q   Was Ms. Smoot in the room as well?

8      A   No.

9      Q   Was anyone else in the room?

10     A   No.

11     Q   When did this interview take place?

12     A   I want to say like maybe about a week.  I am

13  not sure on the time.  I am just approximating.

14  About a week after the interview with Ms. Smoot.

15     Q   Did you have any other interviews after

16  that?

17     A   Yes, there was one more interview with

18  Ms. Smoot where it was like an orientation to CAEI.

19     Q   Was that after you were given a job offer,

20  though?

21     A   Yes.

22     Q   So who extended you the job offer?

JA305

Transcript of Harry A. Bolden
November 18, 2022                                    87

1     A   Well, there was two.  I think -- well, let
2   me just explain.
3         They told me that there was a position that
4   was available for the customer service
5   representative, which is what I thought I had
6   originally hired for.  And then Ms. Smoot said,
7   Harry, because of your extensive customer service
8   background, we have something that might be
9   interesting to you or a better fit for you in the
10  financial solutions department, would you be
11  interested in that.
12        And so I said yes.  She said she didn't have
13  a lot of information, but I had already been told
14  that I was going to be working at the BG&E on
15  Woodlawn Boulevard in Windsor Mill.  And so they
16  then told me that the other position was on Fayette
17  Street, 110, 111 Fayette Street, in the financial
18  solutions department.
19        Ms. Smoot told me that it was a pilot
20  program.  It was only supposed to be like a
21  six-month program or three-month program, and if at
22  any time it was something that I felt uncomfortable

**JA306**

Transcript of Harry A. Bolden
November 18, 2022                              88

1    or I didn't think I was good at, she would be able

2    to move me to a different department or have a

3    different -- I could get moved to a different thing

4    if it wasn't working out for me.

5         Q  Okay.  So Ms. Smoot gave you an offer

6    originally to be working out of Woodlawn, correct?

7         A  Yes.

8         Q  And then later contacted you with a

9    different opportunity on Fayette Street?

10        A  Correct.

11        Q  And you did, in fact, start at the financial

12   solutions department program on Fayette Street,

13   right?

14        A  Correct.

15        Q  Okay.  And you knew from kind of the get go

16   this was going to be for the BGE call center, right?

17        A  Yes.

18        Q  Okay.  And everybody --

19        A  Can I also interject one more thing?  Sorry

20   to cut you off.  I thought it was going to just be

21   for a small period of time, too.

22        Q  Understood.

JA307

Transcript of Harry A. Bolden
November 18, 2022                                    90

1    Hubbard.

2         Q   I just want to remind you just -- I know

3    when you have a conversation, it feels like you go

4    back and forth, but just so we don't talk over each

5    other, for our court reporter's benefit.

6         A   I do apologize.

7         Q   No, no.  It's just completely fine.

8             Okay.  Just so the record's clear, so the

9    orientation took place at CAEI on Bendix Road in

10   Columbia, and it was conducted by Ms. Smoot and Ray

11   Hubbard?

12        A   Correct.

13        Q   And Ray Hubbard is or was a CAEI employee,

14   correct?

15        A   A vice president, correct.

16        Q   Vice president, okay.

17            And you said your other, I guess, CAEI

18   colleagues were there as well?

19        A   Correct.

20        Q   How many people were there?

21        A   The original class was 24, so I'm assuming

22   24 people.

Transcript of Harry A. Bolden
November 18, 2022                                    91

1       Q   And those 24, were those all the people that

2   handled the calls in that particular financial

3   solutions department?

4       A   Correct.

5       Q   Okay.  So they were all with CAEI?

6       A   Correct.

7       Q   Okay.

8       A   As far as I know.  I'm sorry.

9       Q   Okay.

10      A   I don't know their backgrounds, pretty much,

11  or the deals that they've created.

12      Q   Okay.  That's fair.

13          And 24 people, was that about the same

14  number of people that were in that role for your

15  tenure with CAEI?

16          Was it always about 24 people answering the

17  phones, or did it drop or increase?

18      A   It was pretty much 24 people.

19      Q   And I'm only talking about your project

20  because I assume that's all you really know about;

21  is that fair?

22      A   That's correct.  I do know that they had --

1  they had other people there in the building who were

2  CAEI employees working in different departments,

3  like collections, finance.  You name it, and they

4  had other employees working there.

5      Q  Okay.  So was this -- how long was the

6  orientation that you attended at CAEI?

7      A  Like pretty much that day.

8      Q  And what did you --

9      A  A few hours.

10      Q  What did you learn at that orientation?

11      A  Just what their expectations were in

12  terms -- I'm glad you brought that up.  They would

13  then tell us that as a contract worker, you know,

14  the benefits of being a contract worker is that if

15  you're not able to make it to work that particular

16  day and you don't have any, you know, PTO saved up,

17  you don't have to worry about it.  You won't get

18  paid, but you won't get penalized for not being

19  there at work.  So people were just like really,

20  really motivated, you know.

21          The dress code being business casual, what

22  they expected in terms of relationships between

JA310

Transcript of Harry A. Bolden
November 18, 2022                                    94

```
1        A   At one point in time I did.

2        Q   So I would ask that you immediately search

3   and produce.

4        A   I don't think I'll be able to produce it for

5   you because I wasn't able to find it.  I did search

6   for it because I wanted to have it available.

7        Q   Okay.  Do you still have a --

8        A   But I can continue to try, I just don't want

9   to say 100 percent sure that I will be able to

10  produce it.

11       Q   Okay.  So you mentioned that one of the

12  benefits of working at CAEI was being a contract

13  worker, that you could call out if you needed to; is

14  that right?

15       A   They said it was a lot of flexibility.

16       Q   So did you ever have to call out when you

17  worked at CAEI sometimes?

18       A   No.  Thank goodness I did not.  I had

19  actually received awards for attendance.

20       Q   Okay.  But if you had needed to, who would

21  you call out to?

22       A   Your team supervisor.
```

JA311

Transcript of Harry A. Bolden
November 18, 2022                                    95

1          Q   Okay.  Kia?  Would it be Kia Smoot?

2          A   No, it would not be.  It would be Angelique

3     Watts or Tabitha Horn or Debra Chew.  They were all

4     team lead at CAEI.

5          Q   Okay.  I want to make sure I got all those

6     names.

7              So we have Angelina Watts?

8          A   Angelique.

9          Q   Angelique.  I'm sorry.  Angelique Watts,

10    Tabitha Horn, and who is the third?

11         A   Debra Chew.

12         Q   Who is -- so those were your supervisors at

13    CAEI?

14         A   Correct.

15         Q   Who was the first supervisor?

16         A   Debra Chew.

17         Q   Then Ms. Horn, then Ms. Watts?

18         A   Yes.

19         Q   Okay.  So if you were running late or

20    whatever, that's who you would contact?

21         A   Exactly.  Either texting or calling.

22         Q   Okay.  Do you know who made the decision to

1   would spend like hours on like just really -- you

2   know, it was just hard to put together a whole

3   picture.  But with Ms. Jenkins, you knew how to get

4   from this to the other screen.

5          What I wanted to say about it was that they

6   then put us on the phones that Friday.  So we only

7   had three days of training and they put us on the

8   phones that Friday.  Everybody was just terrified

9   because we wanted to be prepared before we hit the

10  phones.  But we managed.

11     Q  And so Debra Chew was employed by CAEI,

12  correct?

13     A  I think so.

14     Q  And Ms. Horn was employed by CAEI?

15     A  Correct.

16     Q  And Ms. Watts was employed by CAEI?

17     A  Correct.

18     Q  Was Penny Jenkins employed by CAEI?

19     A  No.  I think she's BG&E.

20     Q  Okay.

21     A  She was there one orientation day as well.

22     Q  Okay.  And I think you referred to

Transcript of Harry A. Bolden
November 18, 2022                    108

1   Ms. Watts, Horn, and Chew, as site supervisors?

2        A   Yes.

3        Q   So were they on site with you every day?

4        A   Yes.

5        Q   And just to be clear, they did not overlap,

6   it was -- did they all work at the same time?

7        A   No.

8        Q   I thought it was one, then one, then one?

9        A   Exactly.  Exactly.

10       Q   So were they -- whoever the site supervisor

11  was, were they on site the entire time that you were

12  working?

13       A   Yes.

14       Q   Okay.  And that's who you would go to if you

15  had questions?

16       A   Yes.

17       Q   And issues?

18       A   Yes.

19       Q   Okay.  So let's talk about your -- you

20  referenced a temporary work agreement.

21           (Exhibit 13, temporary worker agreement,

22  marked for identification and attached to the

Transcript of Harry A. Bolden
November 18, 2022                                    112

1    temporary workforce under a program managed by the

2    vendor.

3        Do you see all of that?

4    A  Yes.

5    Q  Okay.  So do you understand that Exelon

6    Business Services Company was Pontoon's customer?

7    A  I don't know the legal definitions or

8    associations.  But I didn't think of it in those

9    terms.

10   Q  Okay.  But you signed this agreement,

11   correct?

12   A  Yes.

13   Q  Okay.  So let's go down to paragraph 1,

14   temporary worker.  Did you read this agreement

15   before you signed it?

16   A  Yes.

17   Q  Did anyone explain this agreement to you?

18   A  No.

19   Q  Did you sign it when you were at CAEI --

20   A  Yes.

21   Q  -- that day?

22       Okay.  Temporary worker, paragraph 2.

**JA315**

1      A   Okay.  Yeah, it's kind of confusing because

2  it says temporary worker shall perform all services

3  or work under the program to the satisfaction of the

4  customer.

5          So if you're performing work to the

6  satisfaction of the customer, that would kind of

7  assume a relationship between you, as an individual,

8  and the customer, as an objective entity.

9      Q   So, Mr. Bolden, the question is, you signed

10  this agreement, we've established, right?

11     A   Uh-huh.

12     Q   And the agreement -- in the agreement, you,

13  as a temporary worker, acknowledged that there was

14  no employment relationship between you and the

15  customer, who is Exelon Business Services, correct?

16  I mean, that's what this document says?

17     A   I don't know how to answer that question.

18     Q   Okay.  That's fine.

19          So when you signed this agreement, you were

20  aware that Exelon Business Services was a separate

21  entity from CAEI, correct?

22     A   Correct.

**JA316**

Transcript of Harry A. Bolden
November 18, 2022                                    116

```
1      Q  Okay.  So why would they be -- why would you
2   say that they're all one company?
3      A  In terms of BG&E and Exelon being two
4   separate identities, I thought it was just a rose
5   called by another name.
6      Q  Oh, that BGE and Exelon are the same thing?
7      A  Yes.
8      Q  Okay.  But you recognize that BGE and Exelon
9   are separate from CAEI?
10      A  Now I do.
11      Q  Now you do?
12      A  Oh.  I'm sorry.  I said -- I knew that
13   before.  I thought that BGE and Exelon are separate
14   from each other, I didn't know that.  I thought they
15   were the same.
16      Q  Okay.  So let's clean this up just a little
17   bit.  I think we -- at least I got a little bit
18   confused.
19          So you understand that BGE and CAEI are
20   separate companies?
21      A  Correct.
22      Q  Okay.  And that Exelon and CAEI are separate
```

JA317

1    while you were at CAEI?

2        A   Yes.

3        Q   And who gave those evaluations to you?

4        A   It was Debra Chew, it would be Tabitha Horn,

5    and it would be Angelique Watts.  It would also be

6    Mr. Brian Andrews and Mr. Raymond Hubbard.

7    Mr. Raymond Hubbard only became involved towards the

8    end.  It was usually just that mix, plus

9    Mr. Andrews.

10       Q   Were these evaluations in writing?

11       A   I recall some of them were.

12       Q   Do you have copies of them?

13       A   No.  It's a formal thing where they take

14   you -- I'm sorry to cut you off.  I know you were in

15   mid thought.  They take you into the training room

16   or the conference room, and, you know, go over your

17   stuff.

18       Q   Okay.  And who from -- well, strike that.

19           Would CAEI sign your evaluation?

20       A   I'm not exactly sure the internal component

21   or how that all worked in terms of their signature,

22   but I definitely recall them letting us know.

JA318

Transcript of Harry A. Bolden
November 18, 2022                                         126

1   Everything used to be -- can I just say this?
2   Everything used to be written, and the evaluations
3   were written where you would actually have to sign
4   them, and you would get a copy of them so you could
5   keep.  And I do remember keeping a few of them in my
6   desk and having like the good ones in my desk.  And
7   then all of the sudden, the agents started to ask --
8   Khadija Webster would get in their feelings about
9   the reviews.
10          So they had determined that the best course
11  of action would be to only let a person know if they
12  were like in jeopardy of failing or if they were in
13  jeopardy.  Otherwise, they wouldn't bring to their
14  attention their bad performances because it would
15  alter their ability to work.
16          And so they stopped doing the written
17  evaluations, but you would still go in and have an
18  evaluation anyway, and it would be mostly verbal.
19      Q  Did you get an evaluation on a yearly basis?
20      A  It's more like monthly.
21      Q  Okay.  Monthly.
22          And what was Mr. Andrews' involvement in --

JA319

Transcript of Harry A. Bolden
November 18, 2022                                    127

1      A  Mr. Andrews, he would just sort of like be

2  there for like if you could get a raise, those kind

3  of evaluations, and let you know that you were doing

4  well, and that so many people had been promoted

5  because of your good work.  And, you know, he

6  doesn't see anything but, you know, good things in

7  your future.  That kind of thing.

8          So that happened, I want to say, like maybe

9  two times.  And then Mr. Andrews -- then Mr. Hubbard

10  started to do the same thing, when you would get a

11  promotion, you would get -- I mean, a raise, you'd

12  get a raise, and then you'd speak to Mr. Andrews,

13  and then Mr. Hubbard would be there like two days

14  later to speak with you as well.

15      Q  So you said that you were evaluated on a

16  monthly basis, correct?

17      A  If not more often.  But, yes.

18  Approximately.

19      Q  You were evaluated at least on a monthly

20  basis, correct?

21      A  Yes.

22      Q  And of those times, Mr. Andrews appeared at

JA320

Transcript of Harry A. Bolden
November 18, 2022                                          128

```
 1   those evaluation meetings about two times?

 2       A   Infrequently.  Yes.

 3       Q   And that's when it was discussed that, you

 4   know, either you were doing well, or you got a

 5   raise?

 6       A   Yes.

 7       Q   Okay.  So your performance feedback was

 8   coming from your site supervisors in these monthly

 9   meetings?

10       A   Correct.  I'm sorry, and, also, Mr. Andrews

11   would talk about your performance as well, so.

12       Q   In those two meetings?

13       A   Yes.

14       Q   In terms of what?

15       A   Just like if you're doing well, that kind of

16   thing, keep up the good work.

17       Q   So generic positive comments?

18       A   Yes.

19       Q   Okay.  And did you ever receive any

20   discipline at CAEI?

21       A   Now, that's really tricky because the

22   discipline happened all the time, but apparently
```

JA321

1  there's no written proof of it.

2       Q   Well, what were you disciplined for?

3       A   Being off the phone, training people.  I was

4  disciplined for being off the phone, serving my

5  coworkers.

6       Q   Serving?

7       A   Serving.

8       Q   Food?

9       A   Yeah.  This would be with Angelique Watts.

10 I would be disciplined because I had helped a

11 coworker not commit -- cut out an error.  I mean, on

12 any given day, you never -- see, that's just it,

13 what made it more difficult to kind of navigate is

14 that you never knew what was going to -- normally

15 with most people, you kind of just figure out what's

16 going to set somebody off, or, you know, what's

17 going to rile them up so that you can stay on their

18 good side.  But you never knew, as least with

19 Ms. Watts, what it was going to take to send her to

20 that state.

21      With the other supervisors, the other thing,

22 too, is that if they were getting on your case a

Transcript of Harry A. Bolden
November 18, 2022                              134

1    used to operate through the system.

2         So a little after that, after Ms. Webster

3    had become better, she then asked me, she's like,

4    Harry, can you put together something, it doesn't

5    have to be too sophisticated, to train the other --

6    the people that we were going to be bringing on

7    more.

8         Q  So then you started being the trainer?

9         A  Well, not formally, just imparting what I

10   knew how to do to other people.

11        Q  Okay.  Did the new people have a different

12   trainer or an additional trainer, or did you train

13   them?

14        A  They would spend a few days with

15   Ms. Webster, also.

16        Q  What was Ms. Webster's role at BGE?

17        A  She's a manager, as I understand, and she

18   had her own team.  But this is what they told us,

19   that this was a pilot program for Mr. Andrews, and

20   he sort of like trusted Khadija to get it off the

21   ground and get it running.

22        And so they had apparently another person

JA323

Transcript of Harry A. Bolden
November 18, 2022                                    135

1  who was training representatives prior to -- I can't

2  think of her name.  She actually was supposed to

3  train us before Khadija Webster.  So when Khadija

4  Webster became ill, I thought she was going to take

5  over, but she did not.

6          And so she kind of chiseled the group that

7  we had for those three days, and then she became

8  ill.  And then after she returned, she stayed for, I

9  want to say, close to about a year, maybe a little

10 longer, although she had her own team back at Spring

11 Garden.

12     Q  Okay.  Did you interact with Ms. Webster

13 very often?

14     A  Yes.

15     Q  In that year you did?

16     A  Yes.  I would -- everyone's birthdays, I

17 would bring in cake and a card and a gift card.  I

18 would do it for all employees and for the managers

19 as well, and Christmas gifts, birthday gifts, those

20 kind of things.

21     Q  That's nice.

22          So is that how you interacted with

**JA324**

Transcript of Harry A. Bolden
November 18, 2022                                    144

1    attended the fact finding in addition to you?

2         A   Correct.

3         Q   And all four of those individuals are CAEI

4    employees?

5         A   Correct.

6         Q   Okay.  No one from BGE attended?

7         A   No.

8         Q   Or Exelon attended?

9         A   No.

10        Q   Did you participate in any other interviews

11   with MCCR?

12        A   Personal phone interviews.  I came in, of

13   course, for the interview.  I had came in one time,

14   spoke with Toni Johns, and then I had to come in a

15   second time for the interview.  And then there were

16   multiple, I want to say maybe about ten or 15

17   different conversations that I would have.

18        Q   And those conversations were you and an

19   investigator?

20        A   Correct.

21        Q   Did you ever sit in on any interview that

22   the MCCR investigators did on others?

Transcript of Harry A. Bolden
November 18, 2022                                          145

```
 1        A   No.

 2        Q   So you don't know who they might -- who the

 3   MCCR interviewed?

 4        A   No.

 5        Q   Okay.  Let's go back to your employment with

 6   CAEI.

 7            You testified earlier before we took a break

 8   that Mr. Andrews said that he didn't have any role

 9   in your termination; is that right?

10        A   Yes.

11        Q   Did you ever have any conversation with

12   Ms. Webster about your termination?

13        A   I tried to.  On -- was it February 12?  The

14   day after?  The day that -- right after I got off

15   the phone with Mr. Hubbard, I texted Khadija, as I

16   normally would, to let her know that I had been

17   discharged from the program.  I had some questions,

18   would it be possible to speak with her.  She never

19   responded to me, so.

20        Q   Well, what did you want to speak to her

21   about?

22        A   I just wanted to get -- I thought there was
```

JA326

Transcript of Harry A. Bolden
November 18, 2022                                    162

1    it would be a case where like I think Whitney

2    Carroll was going to go pick up her lunch, and

3    Ms. Watts had said -- ask Whitney if she -- where

4    she was going, and she said she was going to go get

5    a lunch.

6            She's like, did you order it already?  And

7    she's like, yeah, I ordered it.  And so she's like,

8    did you pay for it?  And she's like, yeah, I paid

9    for it.  So she's like, girl, sit down.  Harry, put

10   yourself in -- no.  She would ask, where'd you get

11   it from?  And then she said, you know, the pizza

12   place, which is at the top there.

13           And she's like, Harry, put yourself in

14   special projects and go pick up X, Y, and Z's lunch.

15           So I'd be on call, in the middle of a call,

16   and I'd put myself in special projects after the

17   phone and go pick up the person's food.

18       Q  How many times did that happen?

19       A  Not as often as -- I want to say maybe two

20   times, two or three times.

21       Q  Okay.

22       A  Oh, and then she told her, no, you don't

Transcript of Harry A. Bolden
November 18, 2022                           163

1    have to pick up your food as long as there's a man

2    around.  You know, something along those lines.

3        Q  So what would you say to the statement that

4    this was an opportunity to get you off of the calls

5    and get you a break from being on calls?

6        A  I would say I am absolutely horrified by the

7    statement that was made by the MCCR when they would

8    state that my servitude is something that should be

9    perceived as an honor if it was asked by anybody

10   else.

11       The fact of the matter is that it was not

12   asked of anyone else, it was only asked of me.  And,

13   additionally, I don't think it is so much -- what is

14   so stinging about it is not having to do it, what is

15   so unsettling is that when I would do it, not 20, 25

16   minutes later or towards the end -- before the end

17   of the day, I would be asked to meet her in the

18   conference room, where she will confront me for

19   having been off the phones to serve, or to go get

20   someone's food, and to be disciplined for it.

21       To be placed in that kind of craziness and

22   that insanity, and I'm sorry to use those words, it

1  is horrifying, you know, it is truly horrifying

2  because I couldn't understand it.  I just could not

3  understand it at all.

4      It is one thing, I think, to ask someone to

5  do something, and then it's another thing to ask

6  someone to do something and then to punish that

7  person for doing it.  There's a world of difference

8  between the two.

9  Q  So when did this start during her tenure

10  when she asked you to --

11  A  When she first started -- before she

12  started, Khadija Webster was still there, while she

13  was settling in.  And so Khadija, she would always

14  serve.  Whenever there would be potlucks or dinners

15  or whatever the case may be, she, as the team, you

16  know, the manager or whatever you want to call it,

17  the person in charge, would make everyone's plates.

18  And then she would, you know, serve it that way.

19      And before her, Debra -- Tabitha Horn did

20  the same thing.  Tabitha Horn would serve everyone's

21  meals.  And Debra Chew would do the same thing as

22  well.  But Debra Chew, she would actually have

Transcript of Harry A. Bolden
November 18, 2022                                     165

1   people come up and get their things as opposed to

2   serving them.  I think it was just the rare occasion

3   that she would hand out food to people.

4        The one thing I didn't do is that I didn't

5   eat because I was having issues with food allergies.

6   And so whenever they would buy food, I would just

7   let them know that I was having food allergies and I

8   wouldn't eat.  I would bring my own food, and as

9   long as I was able to bring my food, it was

10  something I was able to eat.  And all of the other

11  supervisors seemed to be able to understand that and

12  accept it.  However, with Angelique Watts, it was

13  always a question of, oh, he doesn't want to eat the

14  food, does he think he's better than us, or, you

15  know, something along those kinds of lines.

16      Q  Okay.

17      A  And so I think that's how I got stuck with

18  it.

19      But to answer your question, when was the

20  first time?  I think it was a little after Khadija

21  had left.

22      Q  Which seems to be maybe fall of 2015?

```
 1          I came in one day, and for whatever reason
 2    she decided that she wanted me to come in -- this
 3    was a little bit after I had -- this was a little
 4    bit after I had stopped training, and after I had
 5    talked to Kia.  And she wanted me to come in and --
 6    she wanted me to go home and get ingredients for
 7    chili to make for like 25 people and bring chili in
 8    the next day.
 9          So I said, well, Ms. Watts, I take the
10    subway.  I ride down to the subway, and then I drive
11    to the subway, and then I take the subway down
12    because I don't like to deal with the traffic and
13    parking.  It's just easier for me to do it this way.
14    And I don't want to bring food that other people are
15    going to have to eat on the subway.  So maybe I can
16    order something while I'm here, if you want chili
17    for tomorrow.  She's like, no, I want homemade
18    chili.
19          And so I'm like, well, I'm not going to
20    bring it on the train.  And then we go back and
21    forth, and back and forth, and back and forth, and
22    back and forth, and she's getting really, really
```

Transcript of Harry A. Bolden
November 18, 2022                              184

1   every day, and I get an IM from her saying, Harry, I

2   need you to go back on the dialer.

3         So I'm like, it's my auto-in time.  And then

4   she says, I don't care, I need you to go back on the

5   dialer.

6         So I get off of the auto-in, and I go back

7   on the dialer.  The next day happens, and I go on

8   the dialer at my scheduled time.  When I go on the

9   dialer -- I'm sorry, auto-in at my scheduled time, I

10  get a message from her.  Either she came there or

11  IM'd it and said, I need you to go back on the

12  dialer.

13        So it continued on for about a week, and

14  then after that, I would just go on -- I would just

15  continue all day on the dialer.  What she would do

16  is that because she needed to cover my auto-in time,

17  she would then have people that would normally be on

18  the dialer, who would have their auto-in time, their

19  scheduled time, and then my time as well.

20        So she would have -- for instance, she would

21  have like Otis Rease in my dialer auto-in time, or

22  whomever it is that she wanted.  Additionally, she

JA332

Transcript of Harry A. Bolden
November 18, 2022                              185

1   would have people who -- like Nicole Russ and Otis

2   and a few others, where they would be in auto-in

3   like half the day or the whole day, like six hours

4   or eight hours, you know, shifts, where everyone

5   else just sort of like had an hour.

6        Q  Okay.

7        A  And that continued up until the very last

8   day, the day before I'm fired.  I'm on the dialer,

9   and then I get an IM from her, Harry, it is your

10  auto-in time, why aren't you in auto-in.  I expect

11  you to be in auto-in when you're supposed to be in

12  auto-in.  I go in auto-in, and then I'm working like

13  maybe ten minutes or so, and then she IMs me, Harry,

14  I need you to be off of auto-in, auto-in, and on the

15  dialer.

16       And then I go in the dialer, and then she'll

17  wait like maybe 15 minutes later, she'll IM me

18  again, I need you to go back in auto-in.  And that

19  happened all day, pretty much that same day.  It's

20  just really bizarre.

21       There were a few other things.  But did you

22  have any other questions?

**JA333**

Transcript of Harry A. Bolden
November 18, 2022                                    196

1    women were, and then they said that they were tired

2    and they needed to take a break for lunch.

3           When we came from lunch, they said they

4    wanted to settle.

5       Q   Okay.  So we'll get to that settlement in a

6    minute, but didn't Mr. Hubbard say that women heard

7    you talk about assault, not that they were saying

8    you assaulted them?

9       A   Well, apparently in the DLL report, that's

10   what he said.  But in the MCCR report, he said I

11   assaulted three women, which is different than three

12   women heard me talk about assault.  But he made it

13   lascivious, like I had done something to three

14   women.

15      Q   So with respect to settlement, there were

16   settlement discussions at the MCCR, correct?

17      A   Yes.

18      Q   And that happened during the fact finding

19   hearing, correct?

20      A   I didn't know how to do anything like that,

21   and Ms. Joann Simmons-Holmes had started, when I

22   came back, she said, Harry, I've got some good news

Transcript of Harry A. Bolden
November 18, 2022                                    197

1    for you, they want to settle.

2          And I said -- I was glad at first.  And then

3    she said -- or I told her I didn't know what to do

4    or what was required.  Do I need to get an attorney,

5    or, you know, what do I need to do.  And she's like,

6    well, she had a lot of experience with this.  And

7    then she said, you want to get an apology, number

8    one.  You want to have a good rating.  You want to

9    turn that from being terminated to you left or a

10   positive.  And you want to get a symbolic amount.

11   And she said 1,500, I think, is what she originally

12   came back with, or came up with, because it was a

13   symbolic amount.

14         And I said, you know, I don't know how to do

15   this.  That's fine.

16         And then when she came back, she said, they

17   can't agree on the $1,500, they want to make it

18   $750.

19         So I said, well, you know, it's so

20   interesting because now I am thinking of this, I

21   assaulted three women, this, you know, they're

22   lying, and this is just not a good thing.  I don't

**JA335**

Transcript of Harry A. Bolden
November 18, 2022                                          198

1　think I want to settle.  I want to, you know, keep

2　on with it.  And she was trying to make it seem as

3　if I didn't have the ability not to do that.

4　　　　And then Awilda Pena, who is her supervisor,

5　came in and told me that I could continue on with

6　the investigation, I didn't have to settle.  And

7　that ended that argument.

8　　　Q  But you signed a settlement agreement,

9　didn't you?

10　　　A  No, I did not.  I actually tore it up.

11　There may be one signed there, but I didn't agree to

12　it.

13　　　　THE COURT REPORTER:  Who did you say the

14　supervisor was?

15　　　　THE WITNESS:  Awilda, A-w-i-l-d-a, P-e-n-a.

16　　　A  Maybe you have it there, but it was not

17　signed.

18　　　Q  Okay.  Well, let's just take a look.

19　　　A  It was signed at first, and then I didn't

20　agree to it.

21　　　　(Exhibit 15, predetermination settlement

22　agreement, marked for identification and attached

Transcript of Harry A. Bolden
November 18, 2022                                              199

```
 1   to the transcript.)
 2        Q   You've been handed what's been marked as
 3   MCCR 165 through 168.
 4            So on the first page, you see it says
 5   predetermination settlement agreement?
 6        A   Yes.
 7        Q   Okay.  Between Harry Bolden and CAEI, right?
 8        A   Correct.
 9        Q   And this is the same meeting where it was
10   the fact finding with the four CAEI individuals that
11   you identified previously?
12        A   Correct.
13        Q   Okay.  On the last page, MCCR 168, is that
14   your signature?
15        A   Yes, it is.  But I tore that up, so --
16        Q   Okay.
17        A   -- I signed it at one time, but I did not --
18   I didn't accept the complaint.
19        Q   But you signed this agreement that was a
20   settlement for 750, correct?
21        A   At first.  And, like I said, because of the
22   lies with the three -- attacking the three women, I
```

**JA337**

Transcript of Harry A. Bolden
November 18, 2022                                200

1    wanted to go on.  It was either the settlement or

2    you can continue on with the investigation.  And so

3    I continued on with the investigation, even though

4    originally I had signed it.  So I tore it up after

5    that.

6        Q  Okay.  But there was -- you did sign this

7    agreement for $750, and then you later decided to

8    tear it up?

9        A  Moments later.

10       Q  Okay.

11       A  I decided not to, to go with the settlement,

12   that is correct.  So I -- the only way that you

13   would have gotten this, I don't know how -- I don't

14   know, I don't know how that happened, but I know

15   that we had Awilda Pena came in, and she was the

16   supervisor, and she told me I didn't have to make

17   the settlement.  So, again, I tore that -- I tore my

18   part of it up.

19       Q  I mean, it was produced to us by the MCCR,

20   it was in their file.

21       A  Got to love it.  But, no, the investigation

22   would have ended at that point.  But it continued on

Transcript of Harry A. Bolden
November 18, 2022                          203

1    happening is because Andy doesn't have the ability

2    to -- there's an issue with analysis of what's going

3    on.

4           And another way -- I can't recall it right

5    now, I'm a little on edge.

6           And so he said he was going -- he asked me

7    if I had filled an application out -- if I was

8    offered the position at BGE that was offered by

9    Morlon Bell-Izzard, if I had filled that application

10   out.  I said, yeah, Angie had sent us the link, and

11   I filled it out.

12          He said that he was going to schedule

13   interviews within the next few weeks, and he said he

14   was going to bring me over to the BGE side of the

15   business, and would I feel better with that.

16          And I said, you know, I would be grateful.

17     Q   So, okay.  So I want to break this down a

18   little bit.

19          So you filled out an application for BGE?

20     A   Yes.

21     Q   Online?

22     A   Yes.

JA339

Transcript of Harry A. Bolden
November 18, 2022                              204

```
 1        Q   Through the BGE website?

 2        A   Yes.  They sent it to us.  Sent the link to

 3    us.

 4        Q   And who -- what was the name you said?

 5    Aside from Brian Andrews, you said another name.

 6        A   I think it was sent by Morlon Bell-Izzard.

 7        Q   Okay.  The one that you said before?

 8        A   Yes.

 9        Q   And had you had conversations with that

10    individual about working at BGE?

11        A   No.

12        Q   So how did that -- I am not clear on that

13    person's involvement here.  Morlon was posting for

14    the job?  Or, I mean, advertising for the job?

15        A   Not advertising exactly.  I'm not sure of

16    the parameters myself.  All I know is that

17    apparently she sent it to Angie, and asked Angie if

18    she knew that there were people at CAEI who wanted

19    to work at BG&E.

20        Q   Okay.

21        A   And, if so, they could fill out this link.

22    So Angie sent the link to everyone.
```

**JA340**

Transcript of Harry A. Bolden
November 18, 2022                                    205

```
1        Q  Okay.  Got it.
2           And you had actually applied at this point?
3        A  Yes.
4        Q  And just to be clear, this is something we
5     talked about a little while ago, but in -- at least
6     as of 2016, you knew that BGE and CAEI were separate
7     companies?
8        A  Correct.
9        Q  Okay.  So you filled out this job
10    application, you talked to Mr. Andrews about your
11    application --
12       A  No.  The application was filled out way
13    before any of that happened.
14       Q  Right.  I got that.  But during this
15    conversation with him on 2-7, you talked to him
16    about that you had applied, right?
17       A  Yes.  He asked.
18       Q  Okay.  And you told him about what had been
19    happening with Ms. Watts, was there anything else
20    that happened at that meeting?
21       A  We shook hands and, you know, he's like, I'm
22    hoping that you'll feel better coming over to BG&E.
```

**JA341**

Transcript of Harry A. Bolden
November 18, 2022          208

```
 1      A  Yes.

 2      Q  Okay.  And you were going to refer to your

 3   timeline because I had asked you, essentially, after

 4   this February 7 meeting with Brian Andrews, sort of

 5   what were your meetings that happened between then

 6   and your termination.  And you were going to refer

 7   to your timeline.

 8      A  Correct.  I think you had also mentioned

 9   that on February 10, I was supposed to have met with

10   Mr. Hubbard, Kia Smoot, Angelique Watts, and did you

11   say someone else?  And I never met with them on the

12   10th.

13      Q  Okay.  So I guess let's look at this

14   timeline.

15          So February 14, 2016, you made your

16   complaint to Kia Smoot.  We discussed that, right?

17      A  Correct.

18      Q  February 5, there was another meeting with

19   CAEI vice president, who's Ray Hubbard, right?

20      A  Yes.

21      Q  And Angelique?

22      A  Yes, Watts.
```

**JA342**

Transcript of Harry A. Bolden
November 18, 2022                                    209

1      Q   Okay.  And that meeting was about moving

2   your seat, correct?

3      A   No.

4      Q   No?

5      A   That meeting -- that's what they told the --

6   the MCCR.  That meeting, I actually had scheduled to

7   have a doctor's appointment, and a moment before --

8   a minute before I was supposed to leave, Angelique

9   came over to me and told me to put myself in special

10  projects and to meet her in the conference room --

11  in the training room.

12        When I get into the training room, there's

13  her and Raymond Hubbard.  Mr. Hubbard also tells the

14  MCCR that this is the day that -- or this is one of

15  the times that he had offered me a promotion or

16  position of supervision.  That's not what happened.

17        On the 5th, I spoke with Mr. Hubbard, and he

18  said that we have a problem.  He said, Angelique has

19  given us statements that you have harassed her.

20        And I was just in a state of disbelief.  And

21  I said, I can't believe it.  If there's anyone who

22  has harassed anybody, it's been Angelique who

JA343

Transcript of Harry A. Bolden
November 18, 2022                           210

1    harassed me.

2            And then Angelique started screaming out,

3    don't sit there and lie in my face.  She told

4    Mr. Hubbard -- or she told us that she had asked me

5    to train -- I can't think of the gentleman's name.

6    He was brand new.  And when she had asked me to do

7    it, I apparently, you know, told her I wasn't going

8    to do it, and I threw my headset at her or pushed

9    her, one of the two.

10           And then the other one, you're right, she

11   did state that she had asked me to move my seat, and

12   I had refused to move my seat.

13           She said to Mr. Hubbard that she was so

14   concerned about it that she had talked to Kia --

15   Khadija Webster.  And Khadija Webster had told her

16   that if I didn't move my seat, because of my

17   potential for violence, don't try to do anything,

18   just call the police, and the police will come there

19   and assist her in having me move my seat.

20           So I then had an opportunity to talk after

21   she had finished.  And I told Mr. Hubbard that none

22   of what she had stated was true, that when she had

Transcript of Harry A. Bolden
November 18, 2022                          211

1   asked me to move my seat, which, by the way, wasn't

2   done on the day that she had indicated, but had been

3   done weeks before, when I moved my seat, Crystal

4   Nebanet actually moved into my seat, and she was

5   there, and she would have been able to witness the

6   move.

7           I did it without any kind of attitude and in

8   a timely manner.  You know, I just moved my file

9   cabinet to the new seat.

10          And in terms of the training --

11      Q   Wait.  I just got a little lost there.  So

12  this meeting was on February 5 with Hubbard and

13  Watts?

14      A   Yes.

15      Q   And because Watts claimed that you were

16  harassing her?

17      A   Yes.  Correct.

18      Q   And you denied that, right?

19      A   Correct.

20      Q   And then your seat was moved after this

21  meeting?

22      A   No.  She was saying that she had asked me to

1   move my seat the day before.  And she did not.  She

2   had fabricated the story, in other words.

3       Q  Okay.

4       A  I had moved a while ago.  And in order to

5   confirm that, I wanted to have Mr. Hubbard bring

6   in -- I mean, everybody moves seats.  And even when

7   I made my secondary move, it was done in an open

8   area where everyone can see everything, and so there

9   would have been witnesses.  If I had done something

10  to -- if I had thrown anything at anybody, it would

11  have been observable, and it would have been

12  something that was reported in the moment and not

13  tolerated for a later period in time.

14      Q  So she said that when you moved your seat,

15  you threw something at her, you threw like your

16  headset at her?

17      A  Yes.  And then she also said that I pushed

18  her as well.

19      Q  Okay.  Do you know if there were cameras in

20  the facility?

21      A  Yes.  There were -- thank you.  That's what

22  I brought to the attention of the MCCR.  They

1   it all straightened out.  I have a text here.  So

2   you're going to be paid for the day.  You can go on

3   home.  I'm going to talk to them.  I now know where

4   you stand.  I'm going to try to get this all

5   straightened out, and I'll give you a call later on

6   today.

7          So he calls, he actually sends me a text and

8   says that he hasn't been able to make the phone

9   calls that he needed to make, and that he will call

10  me back.

11         Now, this is the same day that he's also

12  saying that to the MCCR, that I threw the headset at

13  him, okay.  And then later on he sends me a text and

14  he says that I wasn't able to talk to the people

15  that I needed to speak to, and I'll firm this up and

16  give you a call tomorrow.

17         On the 12th he called, like about 9:00 or

18  so, and he said that, unfortunately, I'm going to be

19  terminated.  And I asked him why.  I just wanted to

20  know the reason why I was going to be terminated.

21         And he said, Harry, it's real simple.  It's

22  a matter of the fact that you don't have any

1  integrity.  He said, when you go to BG&E and you

2  tell them that you have been -- when you falsely say

3  to them that you have been accused of harassing

4  someone, when all we tried to do was to offer you a

5  position, it indicates that you don't have

6  integrity.  And, unfortunately, BG&E doesn't want

7  you back, and you're going to be terminated.

8       And so I asked him again if I could just --

9  if he could just help me to understand why I am

10  being fired.  And so he repeated the same thing.

11       I then asked about my things.  And he said

12  that he would have them to me in about two weeks.  I

13  asked him if he needed the keys to my file cabinet,

14  and he said, no, they have copies of all my keys,

15  and I'll be able to pick everything up in about two

16  weeks.

17       I hang up the phone with him, and then

18  immediately after I get off the phone with him, I

19  then sent a text to Khadija Webster, and she doesn't

20  respond to that text.

21       About two weeks later, instead of giving

22  them a call to find out if they have my things, I

Transcript of Harry A. Bolden
November 18, 2022                              235

1    court.

2        A   No, I think it was actually after.  After it

3    was done.

4        Q   Okay.

5        A   I can't remember.  I can't remember the -- I

6    know that around that time it was done, or I was

7    told that they were in bankruptcy.

8        Q   So you mentioned that you had applied for a

9    job with BGE towards the end of your employment with

10   CAEI; is that right?

11       A   Yes.

12       Q   Did you look for employment with any other

13   employer while you were still employed by CAEI?

14       A   No.

15       Q   Okay.  And you mentioned that you've been

16   getting sort of portions of settlement checks I

17   think periodically; is that right?

18       A   Correct.

19       Q   Okay.  And are those reflected on your --

20   well, you produced IRS transcripts.  Are those

21   reflected in your IRS transcripts?

22       A   No, I do not think that they are.

JA349

Transcript of Harry A. Bolden
November 18, 2022                                    236

1      Q   Okay.  Do you know why that would be?

2      A   I'm not sure of the legal reasons behind it

3   other than that there was a judgment.

4      Q   Are you still getting -- collecting moneys

5   from various judgments?

6      A   No.  Just the one -- there was a monetary

7   judgment that was made -- sorry, Natasha Rossbach,

8   but that was done in an attempt to try to get --

9   just get back my file.  She has not made any

10  payment, and I believe that currently there is an

11  arrest warrant for her, or there's going to be an

12  arrest that she's involved with with the State.

13       The matter with Kenneth Ward, they're still

14  trying to get the money that was owed to them in

15  terms of the judgment, but it has not been reflected

16  in my income taxes.

17     Q   And you filed for unemployment after you

18  were terminated from CAEI, correct?

19     A   Yes.

20     Q   And do you remember being -- giving

21  testimony under oath during that process?

22     A   I'm sorry, in regard to?

JA350

1    hostile and aggressive with this person.

2        Q  Did Ms. Watts say a similar thing to anyone

3    else that you worked with?

4        A  Not that I can recall.  No.  No, she did

5    not.

6        Q  Did she saying anything like that to Otis,

7    for example?

8        A  No.

9        Q  Why do you think that was?

10       A  Well, in popular opinion, she had favorites,

11   and Otis was a favorite, and I was not.

12       Q  How often did she say to you that you needed

13   to thug it up?

14       A  Quite often.  Like I said, so much so that

15   my coworkers wrote a thug dictionary for me so that

16   I would be better at it.  Like, in other words, I

17   would say -- like one line it said in the

18   dictionary, to tell the customer, instead of did you

19   make that payment, F the customer, did you secure

20   the bag.  Stuff like that.

21       Q  Do you still have that book?

22       A  I think, actually, it is in my desk with my

JA351

1   possessions there.  I just kept it.

2       Q   Okay.  So Ms. Watts supervised you, it looks

3   like, about ten months; is that right?

4       A   I'm not sure.

5       Q   Okay.

6       A   Like about a year, it seemed.

7       Q   About a year, okay.

8           So when did she first start telling you you

9   needed to thug it up or be -- that you were too

10  nice?

11      A   I think it was like a little after Khadija

12  had left.

13      Q   Which was halfway through your --

14      A   Yeah.  About half.

15      Q   So Ms. Webster left halfway through your

16  tenure under Ms. Watts, right?

17      A   Yes, roughly.

18      Q   Okay.  So she -- so Ms. Watts made that

19  comment for the latter half of your employment?

20      A   As I recall, yes.

21      Q   And how often did Ms. Watts tell you you

22  were too nice?

Transcript of Harry A. Bolden
November 18, 2022                    253

1      A   I'd say like maybe about 20 times.

2      Q   Okay.

3      A   In total.

4      Q   Is that the same thing as telling you to

5  thug it up?

6      A   Yes.

7      Q   Okay.  Did you --

8      A   Oh, that's what I thought you meant.  I'm

9  sorry.

10     Q   Okay.  So would she say those two things

11  together?

12     A   Synonymously or interchangeably.

13     Q   Interchangeably.

14         So sometimes she would say you were too

15  nice, sometimes she would say you need to thug it

16  up?

17     A   Yeah.

18     Q   How many times did she tell you to thug it

19  up?

20     A   I want to say like maybe 20 is too much.

21  10, 15 times.  I just thought of that afterwards.

22     Q   Did you ever tell her that you didn't like

Transcript of Harry A. Bolden
November 18, 2022                              255

1  else that you heard?

2      A  Correct.

3      Q  Did anyone else tell you to thug it up?

4      A  No.  The only reason I mentioned it is

5  because it was something that other coworkers were

6  aware of.

7      Q  So you said that you thought Ms. Watts

8  thought it was inconsistent for you to be black,

9  that if you're black, you also have to be hostile,

10 right?

11     A  Uh-huh.

12     Q  Did she ever say that?

13     A  No.  She didn't say that, but I think it was

14 a valid deduction that one could make.

15     Q  Based on what?

16     A  The fact that -- I think it had several

17 things to do with the fact that -- I'm African

18 American, that I try to get along with my coworkers,

19 I try to be productive, I'm on time.  You know, I

20 try to be respectful.  All of those things are

21 problematic, I think, as a black person.  I think

22 that if you're a Caucasian, then that's not an

Transcript of Harry A. Bolden
November 18, 2022                              279

```
1        Q   And that was true from when you worked at

2   CAEI to now?

3        A   Pretty much.

4        Q   Okay.

5        A   Even though I did have a social life, kind

6   of, there.

7        Q   Okay.  With your coworkers?

8        A   To a certain degree, yes.

9        Q   My pain restricts my travel to short

10  necessary journeys under half an hour --

11       A   Exactly.

12       Q   -- that's what you checked?

13       A   Yes.

14       Q   That's true?  Okay.

15       A   Yes.

16       Q   And that was true from when you worked at

17  CAEI to present?

18       A   Yes.

19       Q   Then under employment, slash, homemaking, it

20  says:  Pain prevents me from doing anything but

21  light duties.

22           Is that correct?
```

**JA355**

Transcript of Harry A. Bolden
November 18, 2022                                    302

1     A   Yes.  As a matter of fact, apparently there

2  were like calls that were coming in every day.

3  Also, that towards -- I can't remember the exact

4  month it was, but it was that IM that Angelique had

5  sent me, the whole team had decided that they were

6  not going to go to work, that they decided we can't

7  deal with her.  And they were so right in

8  retrospect.  We're going to -- we want a town hall

9  so we can discuss our meetings.

10        And I stupidly got up and I said, you know,

11  let's just try to resolve -- let's understand that

12  we have a problem here and then to try to fix it.

13  And then everybody was like, you're right, let's do

14  this and do that.  And I thought it would just be,

15  okay, we realize we've gotten to a point now where

16  people are not going to work, so we've got to try to

17  figure out what the problem is.  And it just got

18  worse from there, actually.  But nobody decided to

19  not go -- everyone went back to work.

20     Q   Everyone in your environment?

21     A   Yes.

22     Q   What were they complaining about at this

1    town hall thing?

2       A   Just Angelique's kind of military -- I don't

3    know what to call it.  Just her way of management.

4       Q   Okay.  When you said calls were coming in

5    about Ms. Watts, what do you mean by that?

6       A   Well, all I know is that a number of my

7    coworkers would say that they would be calling the

8    HR to talk.  So I'm assuming that they were aware of

9    it.  But I didn't listen to those calls, I wasn't

10   privy to them, or different calls.

11      Q   Okay.  So after Ms. Smoot asked you if it's

12   related to her harassment by Ms. Watts, what did

13   you -- did you explain that after you said yes?

14      A   Yes.

15      Q   How did you explain it?

16      A   I started to give details, you know, about

17   the auto-in times, I started to give details about,

18   you know, being asked to serve and then being

19   punished for it, and the training issue, and how

20   that was -- I started to explain the stuff about

21   some of the things that Ms. Watts would say, like

22   the Marvin Gutherie issue, you know, and just that I

JA357

Transcript of Harry A. Bolden
November 18, 2022                                    304

1    just wanted to be moved to a different department.

2        Q   Okay.  And what did Ms. Smoot say that she

3    was going to do with the complaint?

4        A   She said there was nothing that she could do

5    that day, but -- and I don't know if we worked the

6    next day, but she said that Monday is when -- no, it

7    wasn't the next day, because Mr. Hubbard actually

8    came there the next day.  He didn't talk about what

9    Ms. Smoot and I had talked about, but he came on the

10   5th, and I talked to her on the 4th.  So he came to

11   the 111 building on the -- or the 110 Fayette

12   building on the 5th.  I thought he was coming there

13   to talk about what I had called Ms. Smoot about, but

14   it was a different conversation we had.

15       Q   Okay.  So what did Ms. Smoot say she was

16   going to do, if it wasn't that day, then another

17   day?

18       A   She just said that she would take care of

19   it.  And what happened was she apparently contacted

20   Brian Andrews, and he spoke with me on February 7.

21   And he said he understood that there was an issue

22   going on between myself and Angelique, what was

1     A  No.

2     Q  Okay.  And then on February 7, you met with

3  Brian Andrews, you testified to that?

4     A  Correct.

5     Q  When you testified earlier that you -- I

6  think you said, let it all out, what exactly were

7  you talking about?

8     A  Well, he just asked what was going on, and I

9  just simply explained to him what had been

10  transpiring with Angelique Watts over a period of

11  time, that it wasn't just one isolated incident, and

12  I wasn't making a mountain out of a molehill, and

13  that there was something that was going on here.

14     Q  Well, I'm asking for specifically what you

15  told Mr. Andrews about what was going on, if you can

16  recall.

17     A  Sure.

18        I told Mr. Andrews about the -- serving

19  lunches, and how she would have me do it, and then

20  after I did it she would then threaten me.  And she

21  had stated many times that she had e-mailed him.  He

22  didn't say whether or not he had gotten those

Transcript of Harry A. Bolden
November 18, 2022                                    312

```
1   e-mails or not, but I let him know about that and
2   the punishments that were coming with that.
3          I let him know about the auto-in time, I let
4   him know, you know, about having me train people and
5   then being punished for doing it.
6      Q  At that time did you believe that Ms. Watts
7   had, in fact, been treating you differently than
8   others?
9      A  I'm not a stickler for -- it didn't really
10  become an issue for me until it started to affect me
11  personally, when the attacks were just not a
12  question of a personal -- a person's particular
13  likes or dislikes, but when that person's likes or
14  dislikes affect you as a person and your ability to
15  function, is, I think, when you have to speak out.
16     Q  Okay.  Were you truthful with Mr. Andrews
17  during the February 7 meeting?
18     A  Yes.
19     Q  The next day, February 8, I believe you had
20  a phone conversation with --
21     A  Correct.
22     Q  -- me.
```

**JA360**

1          Is it two separate phone calls with

2    Ms. Smoot and Mr. Hubbard or two separate calls?

3          A  It was one call.  I had actually called Kia

4    Smoot to give her an update of what had happened.

5    And then she said, hold on, Ray is going to get on

6    the other line.  So he then got on the line.

7          Q  What had happened with what?

8          A  The meeting with Mr. Andrews.

9          Q  Why did you feel it was important to call

10   Ms. Smoot and Hubbard as a result of your

11   conversation with Mr. --

12         A  Because by that time I had formally made a

13   complaint, and I wanted to let her know that there

14   was an action that was taken in terms of speaking

15   with Brian Andrews, and then to let her know the

16   outcome of the action with Brian Andrews.

17         Q  Okay.  So did Mr. Andrews tell you on

18   February 7 that he was meeting with you as a result

19   of the complaint you made to Ms. Smoot?

20         A  In so many words.  He said that you had an

21   issue with -- no.  Yeah.  You had an issue with

22   Angelique Watts.  What's going on.

# Exhibit 2

# Exhibit 2

Dear JoAnn Simmons-Holmes:

Please find below a forward message from Vice President Raymond Hubbard. This message will hopefully substantiate my claim that Mr. Hubbard originally asked to speak with me regarding my concerns of how I had been treated by Angelique Watts in a meeting which occurred previous week. His meeting with me was not, as he would claim, the result of his informing me of a Supervisory promotion.


Thank you,
Harry Bolden

----- Forwarded Message -----
**From:** "Bolden, Harry:(Contractor - BGE)" <Harry.Bolden@bge.com>
**To:** "bolden.harry@yahoo.com" <bolden.harry@yahoo.com>
**Sent:** Wednesday, February 10, 2016 7:22 PM
**Subject:** FW: Follow up conversation



-----Original Message-----
From: Raymond K. Hubbard [mailto:rhubbard@caeiinc.com]
Sent: Wednesday, February 10, 2016 7:07 PM
To: Bolden, Harry:(Contractor - BGE)
Subject: [EXTERNAL] Follow up conversation


>
> Harry,
>
> I want to catch up tomorrow to finish the conversation that we started last week. To avoid any issues we will do this at CAEI's office in Columbia. Please meet Kia and I at 11AM tomorrow at 9150 Bendix Road, Suite 102 in Columbia.
>
> Please confirm that you received this.
>
> Ray
>
> Sent from my iPad
This Email message and any attachment may contain information that is proprietary, legally privileged, confidential and/or subject to copyright belonging to Exelon Corporation or its affiliates ("Exelon"). This Email is intended solely for the use of the person(s) to which it is addressed. If you are not an intended recipient, or the employee or agent responsible for delivery of this Email to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this Email is strictly prohibited. If you have received this message in error, please immediately notify the sender and permanently delete this Email and any copies. Exelon policies expressly prohibit employees from making defamatory or offensive statements and infringing any copyright or any other legal right by Email communication. Exelon will not accept any

# Exhibit 3

# Exhibit 3

**JA364**

**Case: 849 - Hotline Phone**
**Other Subsidiaries - North America**
**Hostile work Environment, Retaliation and Discrimination or Harassment**

## Case Snapshot

**Opened:** 11/15/2021
**Days open:** 15
**Last modified:** 12/08/2021 2:38 PM
**Date closed:** 12/01/2021
**Intake method:** Hotline Phone
**Status:** Closed
**Alert:** Green

## General Case Info

**Case number:**
849
**Received/Reported date:**
11/15/2021
**Language:**
English
**Assigned tier:**
Other Subsidiaries - North America

**Issue**
**Primary issue:**
Hostile work Environment, Retaliation and Discrimination or Harassment

## Case Details

**Reported tier information**
**Case type:**
Allegation
**Intake method:**
Hotline Phone

**Location**
**Organization/Building name:**
PayPal Holdings, Inc.
**Branch number:**
Other Subsidiaries
**Location/Address:**
- Other Subsidiaries
**City:**
Not Listed
**Country/Territory:**
United States

**Reporter contact information**
**Is the reporter an employee?**
Yes

**Reporter anonymous:**
Yes

## Case Information

**Please identify the person(s) engaged in this behavior:**
Lori Ketchum - senior agent
Jeanette Sheehan - former team leader
Dax Cerebo (phonetic spelling) - senior agent

**Do you suspect or know that a supervisor or management is involved?**
Yes

**If yes, then who?**
Jeanette Sheehan, former team leader
Mike Smit, team leader

**Is management aware of this problem?**
Yes

**What is the general nature of this matter?**
The caller is targeted by different senior agents at the workplace.

**Where did this incident or violation occur?**
The caller works at home.
9690 Deereco Rd, 7th floor,
Timonium, MD 21093

**Please provide the specific or approximate time this incident occurred:**
on November 11, 2021

**How long do you think this problem has been going on?**
3 months to a year

**How did you become aware of this violation?**
It happened to me

**Details:**
In May 2021, the caller was assisting an individual A (name unknown), non-employee, who did not want to continue having a credit PayPal account. The caller provided a number for the individual A to contact the PayPal bank in order to cancel the credit account since it was not the caller's job to cancel the credit PayPal account. The caller called Dax to inform about the individual's A situation, but the caller was left on the line for 40 minutes. When Dax answered the call, Dax told the caller that it was the caller's responsibility to cancel the credit PayPal account from the PayPal bank. The caller did not cancel the individual's A credit PayPal account from PayPal bank because it did not correspond to the fraud department to do it. Dax persistently insisted the caller that he/she had to cancel the credit PayPal account and explained the caller how to do it. On the same day, after the caller's shift, the caller wrote to Matthew Anton, former team lead, an email to inform Matthew about the incident with Dax. Matthew replied to the caller's email that Matthew would do a follow up on that situation, and Matthew talked to Dax. The day after this incident, Dax failed four of the caller's QD's. Jeanette brought up to the caller his/her failed QD's. Jeanette reviewed the caller's QD's results with the caller. Jeanette told the caller that she would change the caller's QD's results from a fail to a pass. Jeanette told the caller that she was going to send an email to him/her on Monday to change the QD's results, but Jeanette did not contact the caller that Monday. Then, Jeanette scheduled a meeting on Friday of the same week, but Jeanette cancelled again Friday's meeting because Jeanette had training. The following Friday, the caller and Jeanette met on a video call. Jeanette told the caller that Jeanette was busy and would review again the caller's QD's results in a couple of days, but Janette did not do it. On a different day, the caller eliminated an individual's B PayPal account that wanted to be activated. However, the driver's license provided did not match with the individual's B name account. In addition, other information such as security number, telephone number, billing and gift address did not match with the driver's license provided and the individual's B PayPal account data. The caller proceeded to eliminate the PayPal account. The caller specified on the disposition section that due to the incoherence between the driver's license as well as other information provided in contrast with the individual's B PayPal account, the PayPal account was deleted. Next day after the caller eliminating the PayPal account, the caller was informed that he/she failed the QD's by Dax. The caller informed the situation to Lisa Pacheco, fraud agent, who is replacing Mike Smit while he is on his sabbatical until Friday, November 19. Lisa recommended the caller to report the situation to Jeanette due to the incoherence between the caller's QD's results and the caller's adequate actions. Jeanette told the caller that the failed QD's results were not going to be changed. On another day, Jeanette sent an e-mail to the caller. In the e-mail, Janette told the caller that the caller's handle time was high. The caller replied to the e-mail explaining that he/she was taking more handle time due to Lori's feedbacks that Lori required the caller to do. Jeanette replied to the same e-mail, and told the caller that the caller's explanation did not matter because the

**JA366**

handle time was still high. Days later, on a virtual meeting, Jeanette told the caller that Lori's feedbacks recommended to the caller to do were not necessary, and it was the reason behind the caller's high handle time. The caller applied Jeanette's recommendations and his/her handle time reduced drastically.

Since June, the PayPal Holdings' stablished a new process called App Pen. The caller started different trainings in order to know how to apply the PayPal Holdings' new process of App Pen. Daily assignments were sent, and other coworkers (names and job titles unknown) were assigned to do them in order to practice and apply the App Pen process. However, during this time, the caller was excluded and not assigned those App Pen assignments on multiple times.

From September to October, Mike Smit asked who has worked with the App Pen PayPal Holdings' new process and the caller manifested through the Microsoft team chat that he/she has not worked with the App Pen new process. Other employees (names and job titles unknown) also reported to Mike Smit that they had not worked with the App Pen PayPal Holdings' new process through the Microsoft team chat. At the beginning of October, Adam Basillion (phonetic spelling), senior agent, asked the caller through the Microsoft team chat if the caller had worked on App Pen, and the caller told Adam that he/she had not. A week later, Julie Schmit, senior agent, also asked the caller through the Microsoft team chat if the caller had worked with App Pen, and the caller told Julie that he/she had not.

In October, Jeanette sent another write-up to the caller on his/her workday in regards to the caller's high time handle again. The caller informed to Mike Smit about Jeanette's e-mail. The caller mentioned to Mike Smit that the caller had acknowledged the prior write-up from May through e-mail. The caller asked Mike Smit to clarify on an email about Janette's last write-up because the last Janette's write-up e-mail contained a May's date and an October's date since it seems a write-up about the same situation, which was previously resolved. Mike Smit told the caller that Mike Smit would write that email, but Mike Smit did not send any email back to the caller. In addition, once Mike Smit said to the caller that, "Perception is reality." The caller disagreed with Mike Smit, and Lisa witnessed Mike's Smit words said to the caller, since Mike Smit always tends to force an ideology through those phrases. Moreover, Mike Smit divided one team to make two teams in order to do a competition at the work place where the team with the highest QD's, would win the competition. The caller did not want to participate because he/she felt targeted since senior agents have failed previously the caller's QD's for unjustified reasons. Mike Smit persistently insisted the caller to participate, but the caller refused.

At the beginning of November, Jeannette sent an e-mail to the caller denying the changes of the QD's results done by Dax in May. After that, Janette promised the caller that she would change those QD's results.

On November 6, the caller sent an e-mail to Mike Zack, (job title unknown), who is the team leader's boss. In that email, the caller reported all the situations stated before in regards to Mike Smit, Jeanette, Lori and Dax. In the e-mail, the caller specifically indicated that he/she has been excluded to work with the App Pen by Lori and other different senior agents (names unknown) who were in charge of giving the assignments of App Pen.

On November 10, Mike Zack replied to the caller's email and apologized for the time Mike Zack took to respond the caller's email. In the email, Mike Zack wrote down excuses for the team leaders' behaviors, and made the caller seem as responsible for the caller's situation. Mike Zack asked the caller what the caller wanted to be done in regards to his/her situation.

On November 11, the caller started to work with the App Pen for the first time although he/she was supposed to work with the App Pen several months ago.

## Follow-ups

### Reporter Additional Information

**11/26/2021 - Reporter**
The caller has not receive the outcome of the investigation and is still interested in receiving a response and is willing to provide more contact information.

### Questions/Comments and Reporter Responses

**11/16/2021 - Schwiefert, Claudia**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **HARRY A. BOLDEN,** | |
| **Plaintiff,** | |
| **v.** | **Civil No. 1:21-cv-02295-JRR** |
| **CAEI, INC.** *et al.*, | |
| **Defendants.** | |

## MEMORANDUM OPINION

This matter comes before the court on Defendant Baltimore Gas and Electric Company's ("BGE") Motion for Summary Judgment.  (ECF No. 39; the "Motion.")  The parties' submissions have been reviewed and no hearing is necessary.  Local Rule 105.6 (D. Md. 2023).  For the reasons set forth herein, the Motion will be granted.

## I.    BACKGROUND

On September 7, 2021, Plaintiff Harry Bolden filed his original complaint against Defendants CAEI and Exelon Business Services Company, LLC, ("Exelon"), alleging employment-related race- and sex-based discrimination and harassment, and retaliation by termination.[1]  (ECF No. 1.)  On February 25, 2022, Exelon filed a motion to dismiss, which was denied on May 9, 2022.  (ECF Nos. 11, 17, 18.)  On November 23, 2022, Plaintiff filed an Amended Complaint against CAEI and BGE.[2]  (ECF No. 37.)  The Amended Complaint sets forth three counts: (I) Discrimination/Disparate Treatment Based on Race and Sex – 42 U.S.C. §§

---

[1] Plaintiff served CAEI on December 14, 2021.  (ECF No. 6.)  To date, CAEI has not responded to the Complaint.

[2] Plaintiff substituted BGE for Exelon Business Services Company, LLC, as a Defendant on the basis that "Exelon and BGE are both fully owned subsidiaries of Exelon Corporation, and BGE is the appropriate defendant in this matter."  (ECF No. 37.)

2000e, *et seq.*; (II) Harassment Based on Race and Sex – 42 U.S.C. §§ 2000e, *et seq.*; and (III) Retaliation and Wrongful Termination – 42 U.S.C. §§ 2000e, *et seq.*  Plaintiff seeks: (i) compensatory and punitive damages; (ii) statutory pre-judgment interest; (iii) reasonable attorneys' fees; and (iv) any other this relief this court deems proper.  (ECF No. 34-1 at 7.)

On January 30, 2023, BGE filed the instant Motion.  (ECF No. 39.)  BGE argues it is entitled to summary judgment because: (1) Plaintiff did not exhaust his administrative remedies as to BGE; (2) the substantial identity exception to exhaustion does not apply; (3) BGE and CAEI are not joint employers; and (4) neither BGE nor CAEI engaged in unlawful discrimination, harassment, or retaliation.  *Id.* at 19, 24, 27.

## II.    UNDISPUTED MATERIAL FACTS

CAEI was a business that provided information and technology consulting and professional services.[3]  (Def.'s Mot., Raymond Hubbard Decl., Exhibit 2, ECF No. 39-4 ¶ 3.)  BGE is a gas and electric utility company.  (Def.'s Mot., Brian Andrews Decl., Exhibit 3, ECF No. 39-5 ¶ 3.)  CAEI and BGE had a contractual relationship.  (Hubbard Decl., ECF No. 39-4 ¶ 14; Andrews Decl., ECF No. 39-5 ¶ 6.)  Raymond Hubbard, CAEI's former Vice President of Operations, managed CAEI's customer account with BGE.  (Hubbard Decl., ECF No. 39-4 ¶ 5.)  Hubbard was also "responsible for managing BGE's Collections Strategy Pilot [] that focused on collecting outstanding funds due on gas and electric bills from BGE's customers."  *Id.*  Plaintiff worked as a billing specialist on BGE's Collections Strategy Pilot program in the financial solutions department.[4]  (Bolden Dep. 88:5-17, 87:12-88:14, 97:9-16; Hubbard Decl., ¶ 11.)

---

[3] CAEI went out of business in 2018.  (Hubbard Decl., ECF No. 39-4 ¶ 6.)

[4] The Collections Strategy Pilot program was expected to last three to six months.  (Bolden Dep. 87:15-21.)  However, Bolden worked in the financial solutions department program from September 12, 2014, until his termination in February 2016.  *Id.* at 101:17-121 and 140:19-21.

CAEI was headquartered at 9256 Bendix Road, Suite 102, Columbia, Maryland 21045. (Hubbard Decl., ECF No. 39-4 ¶ 8.)  Plaintiff went to CAEI's headquarters in Columbia, Maryland, where he applied for employment.  (Bolden Dep. 82:9-83:17.)  Subsequently, Kia Smoot, CAEI's Human Resources Director, interviewed Plaintiff for a job.  *Id.* at 82:7-22 and 84:19-21.  After interviewing with CAEI, Plaintiff then had a second round of interviews with BGE.  *Id.* at 85:13-19.  The interview with BGE was not at CAEI's office.  *Id.* at 83:18-20.  After the interviews, Smoot extended Plaintiff an offer to work in the financial solutions department program.  (Bolden Dep. 86:19-87:11.)  Plaintiff accepted the position with CAEI and worked as a billing specialist on BGE's Collections Strategy Pilot program in the financial solutions department.  (Bolden Dep. 88:5-17, 87:12-88:14, 97:9-16; Hubbard Decl., ¶ 11.)

CAEI had a role in operating BGE's financial solutions department program.  (Andrews Decl., ECF No. 39-5 ¶ 6.)  While BGE and CAEI had a contractual relationship, CAEI and BGE were separate and distinct entities.  (Hubbard Decl., ECF No. 39-4 ¶ 10.)  CAEI never jointly operated a facility with BGE.  *Id.* ¶ 9.  CAEI remained "the entity responsible for management of its own employees."  (Hubbard Decl., ECF No. 39-4 ¶ 14.)  CAEI was "responsible for hiring and firing its employees and providing day-to-day supervision of its employees . . . ."  *Id.* ¶ 15.  CAEI had its own Human Resources department and maintained CAEI employees' records, including Plaintiff's records.  *Id.* ¶ 18.  CAEI provided employees, including Plaintiff, with employment benefits and paid into both unemployment and workers' compensation insurance.  *Id.* ¶ 22.

At the outset of employment, all CAEI employees, including Plaintiff, were made aware of CAEI's contractual relationship with BGE and Exelon through the "Temporary Worker Agreement."  (Hubbard Decl., ECF No. 39-4 ¶ 14.)  CAEI provided Plaintiff with the Temporary

**JA370**

Worker Agreement on September 12, 2014. (Def.'s Mot., Exhibit 4, ECF No. 39-6.) The

Temporary Worker Agreement provided, in part:

> This Temporary Worker Agreement (the "Agreement") is made this 12 day of September, 2014 by and among Bolden, Harry, an individual ("Temporary Worker") and CAEI, INC. a MARYLAND CORPORATION, Temporary Worker's employer ("Employer").

> WHEREAS, Employer has contracted with PONTOON SOLUTIONS, a FLORIDA corporation ("Vendor"), for Employer to provide certain services, including work performed on a temporary basis by Temporary Worker, to Vendor's Customer (defined below); and

> WHEREAS, Vendor has contracted with Exelon Business Services Company, LLC, a Delaware limited liability company, on behalf of itself and its affiliates ("Customer"), for Vendor to provide certain services related to Customer's temporary workforce under a program managed by Vendor (the "Program"); and

> WHEREAS, Temporary Worker may be assigned by Employer, at Vendor's direction, to work for Customer on a temporary basis.

> NOW, THEREFORE, for good and valuable consideration, the parties agree as follows:

> 1. Temporary Worker.
> Temporary Worker may, in Vendor's sole discretion, be engaged to provide services to Customer through the Program as an employee of Employer and not as an employee of Customer. Temporary Worker shall perform all services or work under the Program to the satisfaction of Customer.

> Temporary Worker acknowledges and agrees that no employment relationship between Temporary Worker and Customer or between Temporary Worker and Vendor is created by this Agreement, the agreement between Vendor and Customer, or by Employer's agreement with Vendor. Temporary Worker acknowledges and agrees that he or she is not a third party beneficiary of the agreement between Vendor and Customer and hereby waives any such rights which may arise under such agreement between Vendor and Customer.

4

**JA371**

(Def.'s Mot., Exhibit 4, ECF No. 39-6.)  Plaintiff read the Temporary Worker Agreement and then signed it while at CAEI.  (Bolden Dep. 112:10-20.)

After Plaintiff accepted the position, he attended CAEI orientation with the team of CAEI employees in the financial solutions department program.  (Bolden Dep. 89:12-91:18.)  The orientation was conducted by Smoot and Hubbard.  *Id.* at 82:11 and 89:15-90:1.  Brian Andrews, BGE's Manager of Customer Care, was also at the orientation.  *Id.* at 89:6-11.  At orientation, CAEI employees, including Plaintiff, were provided CAEI's Employee Handbook.  (Bolden Dep. 93:3-6; Hubbard Decl., ECF No. 39-4 ¶ 20.)

During Plaintiff's time at CAEI, he had three site supervisors—Debra Chew, Tabitha Horn, and Angelique Watts.  (Bolden Dep. at 95:7-18.)  Plaintiff also had monthly evaluations, at which he received performance feedback from CAEI supervisors, including Chew, Horn, Watts, Hubbard, and BGE's Manager of Customer Care, Brian Andrews.  (Bolden Dep. 127:19-128:18; Andrews Decl., ECF No. 39-5 ¶ 5.)  In mid-2015, Watts became Plaintiff's direct supervisor.  (Bolden Dep. 132:1-3; Hubbard Decl., ECF No. 39-4 ¶ 23.)  Plaintiff alleges that Watts forced him "to perform menial and degrading tasks that were not demanded of other employees; these tasks included preparing and serving meals for the office staff."  (Amended Complaint, ECF No. 34-1 ¶ 12; Bolden Dep., 161:12-21, 168:1-173:1-8.)  On or about February 12, 2016, Hubbard terminated Plaintiff employment.[5]  (Bolden Dep., 219:17-20; Hubbard, Decl., ECF No. 39-4 ¶ 30.)

On October 17, 2016, Plaintiff filed a Charge of Discrimination against CAEI with the Maryland Commission on Civil Rights ("MCCR").[6]  (Def.'s Mot., Exhibit 8, ECF No. 39-10.)  During the investigation, MCCR conducted a fact-finding hearing with Bolden, Smoot, Hubbard,

---

[5] Plaintiff testified at deposition that Hubbard called him on the 12th (Bolden Dep. 219:17); Hubbard's affidavit states Plaintiff was terminated on or about February 11, 2016.  (Hubbard Decl., ECF No. 39-4 ¶ 30.)

[6] Charges of Discrimination filed with the MCCR are automatically cross-filed sent to the EEOC for dual or cross-filing purposes.

"Mr. Barnett" (whom Plaintiff identified as CAEI's CEO and President), and Otis Rease (Bolden's CAEI co-worker). (Bolden Dep., 143:5-11.) MCCR did not interview BGE Senior Supervisor Khadija Duncan.[7] (Duncan Decl., ECF No. 39-14 ¶ 7.)

On February 17, 2016, Plaintiff and CAEI entered into a Pre-Determination Settlement Agreement to resolve the MCCR Charge. (Bolden Dep., 199:4-15; Def.'s Mot., Exhibit 11, ECF No. 39-13.) Thereafter, Plaintiff decided not to go forward with the Agreement and the MCCR investigation continued. (Bolden Dep., 200:11-201:1.) On September 23, 2020, MCCR issued its Written Finding. (Def.'s Mot., Exhibit 13, ECF No. 39-15.) On June 10, 2021, the EEOC issued Plaintiff a copy of the Notice of Right to Sue. (Def.'s Mot., Exhibit 14, ECF No. 39-16.)

## III.    LEGAL STANDARD

### Federal Rule of Civil Procedure 56

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249. Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial."

---

[7] Khadija Duncan's former name is Khadija Webster. (ECF No. 39-14 ¶ 1.) The court will refer to Ms. Duncan by her current name.

6

**JA373**

*Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).  A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted).  Additionally, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).

Further, in undertaking this inquiry, the court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party.  *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007).  Critically, on a Rule 56 motion, the court "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that the trial court may not make credibility determinations at the summary judgment stage).  Indeed, it is the function of the fact-finder to resolve factual disputes, including issues of witness credibility.  *Tolan v. Cotton*, 572 U.S. 650, 660 (2014).

## IV.    ANALYSIS

### A.    Exhaustion of Administrative Remedies

BGE argues that it is entitled to summary judgment because Plaintiff did not exhaust his administrative remedies.  (ECF No. 39-1 at 18.)[8]

Title VII requires a plaintiff to exhaust administrative remedies prior to bringing suit in court.  *See Walton v. Harker*, 33 F.4th 165, 172 (4th Cir. 2022) (citing 42 U.S.C. § 2000e-5(b), (f); 29 U.S.C. § 633a(d)) (explaining that "[i]t is well settled that before filing suit under Title VII or

---

[8] For consistency, the court cites to page numbers as they appear at the top of the page in ECF.

**JA374**

the ADEA, a plaintiff must exhaust [his] administrative remedies by bringing a charge with the EEOC"). Specifically, "[u]nder Title VII, a civil action may be brought after administrative proceedings have ended or conciliation attempts have failed only 'against the respondent named in the [administrative] charge.'" *Alvarado v. Bd. of Trustees of Montgomery Cmty. Coll.*, 848 F.2d 457, 458 (4th Cir. 1988) (quoting 42 U.S.C. § 2000e–5(f)(1)).

An EEOC charge serves two important purposes: (1) "it notifies the charged party of the asserted violation" and (2) "it brings the charged party before the EEOC and permits effectuation of the [Civil Rights] Act's primary goal, the securing of voluntary compliance with the law." *Dickey v. Greene*, 710 F.2d 1003, 1005 (4th Cir. 1983), *rev'd on other grounds*, 729 F.2d 957 (4th Cir. 1984); *see Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005) (noting that administrative exhaustion is to "ensure[] that the employer is put on notice of the alleged violations so that the matter can be resolved out of court if possible"). The exhaustion requirement, therefore, is not "simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005). It "serves a vital function in the process of remedying an unlawful employment practice." *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 407 (4th Cir. 2013).

"Clearly, an entity not named in the administrative charge, and not provided with notice of the charge or the proceedings, cannot participate in the administrative conciliation processes." *Marshall v. Anne Arundel Cnty., Md.*, No. SAG-18-0074, 2020 WL 1939712, at *5 (D. Md. Apr. 22, 2020). "Thus, in ordinary circumstances, subsequent suit can be brought only against the respondent named in the [administrative] charge." *Id.* (internal quotation marks omitted). "However, in light of the liberal construction afforded to EEOC charges, certain exceptions have been made to the naming requirement." *Id.*

**JA375**

In the instant case, it is undisputed that Plaintiff did not name BGE in his charge of discrimination with the MCCR and the EEOC. (Def.'s Mot., Exhibit 8, ECF No. 39-10; Def.'s Mot., Exhibit 10, ECF No. 39-12.) Accordingly, unless the substantial identity exception applies, Plaintiff may not bring suit against BGE.

### B. <u>Substantial Identity Test</u>

"Although the Fourth Circuit has not formally adopted the test, other Courts within the circuit have employed the substantial identity test to assess whether a civil action can fairly be brought against a defendant other than the one named in the EEOC charge." *Marshall,* 2020 WL 1939712, at *5. The substantial identity test requires analysis of four factors:

> 1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint;
>
> 2) whether, under the circumstances, the interests of a named [party] are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings;
>
> 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; [and]
>
> 4) whether the unnamed party had in some way represented to the complainant that its relationship with the complainant is to be through the named party.

*Vanguard Justice Soc'y Inc. v. Hughes*, 471 F. Supp. 670, 688 (D. Md. 1979) (quoting *Glus v. G.C. Murphy Co.*, 562 F.2d 880, 888 (3d Cir. 1977)). "Of these four factors, the second and third are the most important as they are most reflective of the two-fold purpose of the naming requirement." *Crosten v. Kamauf*, 932 F. Supp. 676, 682 (D. Md. 1996).

**JA376**

1.      **Factor One**

The first factor, whether the role of the unnamed party could have been ascertained at the time of the filing of the EEOC complaint, weighs in favor of BGE.  *See Marshall*, 2020 WL 1939712, at *6 (concluding that the plaintiff "readily could have named the County in her EEOC charge as her employer, or as one of her employers, if she intended to assert a claim for discrimination against it" where the plaintiff knew the county had paid her salary and provided her benefits, and, by the time she filed her administrative charge, she had contacted the county regarding her allegations of discrimination).

Plaintiff testified at deposition that he physically went into CAEI to apply and interview, and then subsequently physically went to BGE to be interviewed by BGE employees.  (Bolden Dep. 82:2-9 and 83:1-6.)  Plaintiff explained that CAEI and BGE were in separate locations.  *Id.* at 83:13-22.  Plaintiff further testified that he applied for a position at BGE while he was employed at CAEI.  *Id.* at 203:6-204:20.  Indeed, in connection with his Charge of Discrimination, when asked by the intake officer what remedy he was seeking, Plaintiff advised: "I had only acted professionally in my time at CAEI & BGE; winning several awards for service and dedication . . . I therefore ask that the company, CAEI, be made aware[9] of this harmful mistake; that compensatory and punitive damages be granted for what I have indured [sic].  I also ask to be given back my former post."  (Def's Mot., Exhibit 15, ECF No. 39-17.)

Relying on his deposition, Plaintiff maintains that he thought BGE and CAEI were one and same company, and that he did not understand the Temporary Employment Agreement.  (ECF No. 45-1 at 9; citing Bolden Dep. 115:1-4, 116:12-15, 111:2-22, and 112:1-9.)  At his deposition, Plaintiff reviewed the Temporary Employment Agreement and testified:

---

[9] This exhibit is a photocopy of a hand-written intake notes in connection with Plaintiff's administrative Charge.  The photocopy cuts off minor portions of the document, including what the court believes is the word "aware."

**JA377**

Q. So looking at this agreement, CAEI is defined as your employer, correct?

A. Yes.

Q. And then it goes on to say that the employer has contracted with Pontoon Solutions, a Florida corporation defined as, in quotation marks, vendor, for employer to provide certain services, including work performed on a temporary basis by temporary worker to the vendor's customer. Do you see that?

A. Yes.

Q. Do you understand that Pontoon was a vendor to provide certain services to their customer?

A. Yes.

Q. Okay. And moving to the next paragraph, the agreement states that the vendor has contracted with Exelon Business Services Company. Then it's defined as the customer, in quotation marks. For vendor to provide certain services relating to customer's temporary workforce under a program managed by the vendor. Do you see all of that?

A. Yes.

Q. Okay. So do you understand that Exelon Business Services Company was Pontoon's customer?

A. I don't know the legal definitions or associations. But I didn't think of it in those terms.

Q. Okay. But you signed this agreement, correct?

A. Yes.

Q. Okay. So let's go down to paragraph 1, temporary worker. Did you read this agreement before you signed it?

A. Yes.

Q. Did anyone explain this agreement to you?

A. No.

**JA378**

Q. Did you sign it when you were at CAEI –

A. Yes.

Q. -- that day? Okay. Temporary worker, paragraph 2. Temporary worker, which is you?

A. Yes.

Q. Temporary worker acknowledges and agrees that no employment relationship between temporary worker and customer or between temporary worker and vendor is created by this agreement. The agreement between vendor and customer or by employer's agreement with vendor; do you see that?

A. Yes.

Q. Okay. And we just discussed who all of these -- what all of these terms mean, but you would agree that this provision -- in this provision you acknowledged that there was no employment agreement between you and Exelon, correct?

A. No. Because I'm doing service for Exelon in some way.

Q. Well, the language says: Temporary worker acknowledges and agrees that no employment relationship between temporary worker and customer is created by this agreement.

A. Give me one second just to read it.

Q. Sure.

A. Okay. Yeah, it's kind of confusing because it says temporary worker shall perform all services or work under the program to the satisfaction of the customer. So if you're performing work to the satisfaction of the customer, that would kind of assume a relationship between you, as an individual, and the customer, as an objective entity.

Q. So, Mr. Bolden, the question is, you signed this agreement, we've established, right?

A. Uh-huh.

JA379

(Bolden Dep. 111:4-114:11.)

With regard to whether BGE and CAEI were separate entities, Plaintiff testified:

> Q. . . . So when you signed this agreement, you were aware that Exelon Business Services was a separate entity from CAEI, correct?
>
> A. Correct.
>
> Q. Okay. And that BGE was a separate entity from CAEI, correct?
>
> A. No, I did not know that until Mr. -- I don't know. I thought it was all one company.
>
> Q. Did you ever receive any policies from BGE?
>
> A. Any policies from BG&E? No.
>
> Q. Written policies?
>
> A. Only -- I don't know that this is a policy, but they would reinforce the idea that safety was paramount to everything. Safety at BG&E was above and beyond anything that you do of any importance every day at work. And so they wanted you to work in the same fashion. That's the only thing they stressed every meeting pretty much was about --sorry.
>
> Q. Okay. So you testified earlier that, you know, all these -- your site supervisors were all employed by CAEI, that you and these 23 billing specialists were employed by CAEI, and then other people like Mr. Andrews and Ms. Webster were provided by BGE, correct?
>
> A. Yes.
>
> Q. Okay. So why would they be -- why would you say that they're all one company?
>
> A. In terms of BG&E and Exelon being two separate identities, I thought it was just a rose called by another name.
>
> Q. Oh, that BGE and Exelon are the same thing?

13

**JA380**

A. Yes.

Q. Okay. But you recognize that BGE and Exelon are separate from CAEI?

A. Now I do.

Q. Now you do?

A. Oh. I'm sorry. I said -- I knew that before. I thought that BGE and Exelon are separate from each other, I didn't know that. I thought they were the same.

Q. Okay. So let's clean this up just a little bit. I think we -- at least I got a little bit confused. So you understand that BGE and CAEI are separate companies?

A. Correct.

Q. Okay. And that Exelon and CAEI are separate companies, correct?

A. Now I do, yes.

Q. Okay. And you may or may not have known that BGE and Exelon are separate companies?

A. I'm sorry. I missed it. Can you once more -- can you just repeat?

Q. Okay. So you understand that BGE and CAEI are separate companies?

A. Yes. Yes.

Q. Okay. And you understand that Exelon and CAEI are separate companies?

A. Yes.

Q. Okay. You understand now that BGE and Exelon are separate companies?

A. Yes.

Q. Okay. But maybe in the past you didn't know?

14

**JA381**

A. Yes.

Q. Is that what you were talking about before?

A. Yes.

Q. Okay. I think we're clear on that then. So when you said I thought they were all one company, you were referring to BGE and Exelon being all one company?

A. Yes.

(Bolden Dep. 114:18-118:3.)

When looking at the broader framework and context of Plaintiff's testimony, Plaintiff admits that he knew BGE and CAEI were separate companies. The confusion was not between BGE and CAEI; rather, Plaintiff was confused about whether Exelon and BGE were separate companies. Plaintiff testified further that, at least by 2016, he knew BGE and CAEI were separate companies. *Id.* 205:4-8. Plaintiff fails to provide evidence to suggest that, at the time of filing his Charge of Discrimination, he could not reasonably ascertain the role of BGE. Plaintiff fails to generate a genuine dispute of material fact as to factor one.

### 2.    Factor Two

With regard to the second factor, BGE argues that it was necessary to name BGE in the Charge of Discrimination because its interests are dissimilar to those of CAEI. (ECF No. 39-1 at 21.) Plaintiff maintains there is a similarity of interest between BGE and CAEI because the MCCR's Written Findings include a reference to Kadijah Duncan, a manager at Exelon. (ECF No. 45-1 at 9.)

For the second factor, courts consider the management, ownership, corporate officers, and interrelatedness of the parties. *See Marshall*, 2020 WL 1939712, at *7 (noting that the named party and the unnamed party were entirely different and operated separate and distinct offices);

**JA382**

*EEOC v. 1618 Concepts, Inc.*, 432 F. Supp. 3d 595, 605 (M.D.N.C. 2020) (finding that the defendants are closely interrelated where: (1) "[t]hey share employees and have common ownership, management, and corporate officers;" (2) they "share a main office location, where employee files for all three [d]efendants are maintained;" and (3) they "share an email account and company vehicles"); *Mayes v. Moore*, 419 F. Supp. 2d 775, 783 (M.D.N.C. 2006) (explaining that the unnamed parties' interests are not similar when the defendants are separate business entities); *Tietgen v. Brown's Westminster Motors, Inc.*, 921 F. Supp. 1495, 1496 (E.D. Va. 1996) (finding that the statutory naming requirement was no bar to the plaintiff's claim because he alleged "substantial identity" including that the defendants were "under common control, including specifically that the same persons exercised control over employment decisions at both dealerships"); *Lindblad v. J&L Services, Inc.*, No. 4:18-cv-1336-RBH-TER, 2019 WL 653968, at *9 (D.S.C. Jan. 20, 2019) (noting that the second factor is not satisfied where the parties are "separate corporate entities").

The affidavit of Raymond Hubbard, CAEI's Vice President of Operations during Plaintiff's employment, provides:

> CAEI was headquartered at 9256 Bendix Road, Suite 102, Columbia, Maryland 21045. This location was never jointly operated by CAEI and either BGE and/or Exelon Business Services Company, LLC ("Exelon");
>
> CAEI never jointly operated a facility with BGE;
>
> CAEI is a separate and distinct entity from BGE, and it does not share any corporate or business identity with BGE;
>
> I have personal knowledge of the contracting process between BGE and CAEI. CAEI entered this contractual relationship with the intention that it would be the entity responsible for the management of its own employees; and

16

**JA383**

> BGE was not responsible for managing or supervising CAEI employees, and BGE did not exercise control over any CAEI employees' work conditions. CAEI was solely responsible for hiring and firing its employees and providing day-to-day supervision of its employees at the Collections Strategy Pilot, including disciplining its employees and promoting its employees to senior or lead positions. I interviewed Mr. Bolden in person and made the decision to hire him.

(Hubbard Decl., ECF No. 39-4 ¶¶ 8-10, 14-15.)

Plaintiff fails to address these factors and does not provide evidence that BGE and CAEI are so similar that it would have been unnecessary to name BGE in the Charge of Discrimination. Instead, Plaintiff makes reference to the court's memorandum opinion at ECF No. 17 and the MCCR Written Finding that includes Exelon Employee, Khadija Duncan. (ECF No. 45-1 at 9.) Plaintiff then argues "[e]vidence produced in records of the cases shows that allegations in the pleadings are substantiated [sic] denying Defendant's summary judgment as a matter of law." *Id.* It is unclear how the court's memorandum opinion and the MCCR Written Finding that references Duncan, taken together or separately, suggest a similarity of interest between BGE and CAEI of the sort required here. That notwithstanding, in the court's memorandum opinion at ECF No. 17, the court concluded that for purposes of the motion to dismiss only, it was plausible that Exelon (or BGE) was aware of the underlying Charge of Discrimination against CAEI because MCCR's Written Finding referenced Ms. Duncan and an investigation. Thus, the court allowed it to proceed because it was plausible that Ms. Duncan or Exelon Management was interviewed as part of the MCCR's underlying investigation. (Def.'s Mot., Exhibit 13, ECF No. 39-15.) Discovery, however, has demonstrated otherwise.

The affidavit of Khadija Duncan provides that she "was not interviewed by the MCCR in connection with Mr. Bolden's Charge of Discrimination against CAEI;" nor was Duncan aware of "Mr. Bolden's Charge of Discrimination against CAEI, filed with the Maryland Commission on

**JA384**

Civil Rights ('MCCR') until after Mr. Bolden filed the instant lawsuit in September 2021."
(Duncan Decl., ECF No. 39-14 ¶¶ 6-7.)  Further, Hubbard's affidavit provides that, "[t]o the best
of my knowledge, the MCCR did not interview anyone from Exelon or BGE during the course of
the investigation."  (Hubbard, Decl., ECF No. 39-4 ¶ 33.)

Plaintiff cites to no authority to suggest that MCCR's reference to Ms. Duncan implies that
BGE and CAEI's interests are so similar that naming BGE in the Charge of Discrimination was
unnecessary.  Accordingly, Plaintiff fails to generate a dispute of fact on this issue.

### 3.    Factor Three

With regard to factor three, BGE argues that it was prejudiced by not participating in the
underlying administrative proceeding.  (ECF No. 39-1 at 22.)  Relying on *Gamble v. Charles
County*, Plaintiff maintains that Defendant was not prejudiced by not participating because the
case was not resolved in the administrative proceeding.  (ECF No. 45-1 at 10; citing *Gamble v.
Charles County*, 2020 WL 3491823, 20-cv-3126-PWG (D. Md. Aug. 9, 2021)).

In *Gamble v. Charles County*, the plaintiff filed a complaint against the Charles County
Sheriff's Office, and stated that he did not think he also needed to name Charles County "because
he understood the Sheriff's Office to be a county agency."  2021 WL 3491823, at *2.  The *Gamble*
court noted that, while the plaintiff "may have been able to determine whether the Sheriff and
County are distinct entities, this is far from common knowledge, and doing so requires careful
analysis of multiple sections of the Maryland Code."  *Id.* at *10.  The court further concluded that
the County funds the Sheriff's office such that the two entities have similar interests.  *Id.*
Additionally, while the County argued that the Sheriff could not properly represent its interest, the
court explained, "the County fails to articulate how those interests significantly differ from the

18

**JA385**

Sheriff's." *Id.*   Finally, with regard to the third factor, which Plaintiff relies on here, the *Gamble* court explained:

> As to prejudice, the EEOC filing did not result in an adverse finding against either the County or the Sheriff; it is wholly implausible that, had the County been named in the EEOC filing, it would have altered its course as to Mr. Gamble in the EEOC proceedings because the commission found that Mr. Gamble had not made out a statutory violation.

*Id.* at *10.   Accordingly, the *Gamble* court concluded that the plaintiff satisfied the substantial identity test, and the facts did not warrant dismissal of the unnamed party.  2021 WL 3491823, at *10.

The instant case, however, differs materially from *Gamble.*  In contrast to the *Gamble* plaintiff, Plaintiff here filed discrimination charges with the MCCR.  Through the MCCR process, BGE argues "it is unknown whether BGE's participation in the settlement discussions could have resulted in a complete resolution of the matter." (ECF No. 48 at 9.)  It is undisputed that BGE did not participate in the administrative proceedings.   It is also undisputed that, at the MCCR proceedings, MCCR conducted a fact-finding conference at which Plaintiff and CAEI employees—Hubbard, Smoot, and Barnett—participated; however, BGE (or Exelon) did not participate.  (Andrews Decl., ECF No. 39-4 ¶ 32; Bolden Dep. at 143:5-144:9.)   Additionally, Plaintiff and CAEI engaged in settlement discussions, and reached a settlement agreement that Plaintiff signed and later repudiated.  (Pre-Determination Settlement Agreement, ECF No. 39-13; Bolden Dep., 198:19-199:21.)  Further, contrary to *Gamble*, as discussed in Section I.A.1, *supra*, Plaintiff was aware that BGE and CAEI were separate entities.  Plaintiff fails to show their interests were so similar that naming BGE was unnecessary.

**JA386**

Plaintiff has failed to produce evidence that BGE would not be prejudiced by its absence in the administrative process.[10]  Rather, it is undisputed that BGE did not receive notice of the administrative action at all, including the MCCR fact-finding conference.  The court agrees with Defendant, therefore, that BGE "was deprived of notice and the opportunity to consider, through the conciliation process, whether the case could be resolved in a voluntary fashion."  *Marshall*, 2020 WL 1939712, at *8 (D. Md. Apr. 22, 2020); *see Phillips v. Goodwill Industries*, No. GLR-14-3256, 2015 WL 3844089, at *2 (D. Md. June 19, 2015) (noting that "the United States Court of Appeals for the Fourth Circuit has explained that notice to the employer of the alleged discrimination serves as a vital function in remedying an unlawful employment practice because it gives an employer the opportunity to independently investigate and resolve the alleged discriminatory actions") (citing *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 407 (4th Cir. 2013)); *Lindblad*, 2019 WL 653968, at *9 (concluding that the unnamed party "suffer[s] unfair prejudice by remaining a party to Plaintiffs' Title VII claims because it was not given the opportunity to respond to the administrative charges or participate in the EEOC's resolution and conciliation process").

### 4.    Factor Four

BGE argues that it did not represent to Plaintiff that their relationship would be through CAEI.  (ECF No. 39-1 at 23.)  Plaintiff counters that BGE's actions and inactions led him to believe that his relationship with BGE was through CAEI.  (ECF No. 45-1 at 10.)

While the relationship between BGE and CAEI may have been complicated to Plaintiff, it is undisputed that Plaintiff knew at the relevant time they were separate entities.  *See* Section I.A.1,

---

[10] To the extent Plaintiff suggests that BGE had notice of the MCCR investigation and/or fact-finding conference because MCCR referenced Ms. Duncan in its Fact-Finding Report, the court disagrees.  *See* Section I.A.2., *supra.* Further, it is undisputed that BGE did not receive notice of this matter until December 2021.  (Andrews Decl., ECF No. 39-5 ¶ 12.)

**JA387**

*supra.* Plaintiff testified at deposition that he interviewed with CAEI and BGE at separate locations, he signed a CAEI Temporary Worker Agreement, and that he understood BGE and CAEI were separate entities. *See* Section I.A.1, *supra.* Indeed, Plaintiff applied for a position with BGE before his termination and discussed employment options at BGE with Mr. Andrews. (Bolden Dep. 235:8-11 and 236:17-19.) Plaintiff fails to provide evidence to generate a dispute of fact as to whether BGE represented its relationship with Plaintiff would be through CAEI, such that filing a charge against CAEI also meant he was filing a charge against BGE. That notwithstanding, the second and third factors, which weigh in BGE's favor, and "are the most important as they are most reflective of the two-fold purpose of the naming requirement." *Crosten*, 932 F. Supp. at 682.

In sum, Plaintiff has failed to generate evidence on which a reasonable juror could conclude that the substantial identity exception applies in this case. Accordingly, by failing to name BGE in his MCCR and EEOC discrimination charge, Plaintiff failed to exhaust his administrative remedies.

### C. **Joint Employer**

To the extent Plaintiff maintains that BGE is a "joint employer" such that BGE and CAEI may both be considered his employee, "[a] charge must be filed against each employer to pursue a claim against that employer." *Phillips v. Goodwill Indus.*, No. GLR-14-3256, 2015 WL 3844089, at *2 (D. Md. June 19, 2015) (quoting EEOC Compliance Manual, § 2–III(B)(1)(a)(iii)(b)); *see Lindblad v. J&L Services, Inc.*, No. 4:18-cv-1336-RBH-TER, 2019 WL 653968, at *10 (D.S.C. Jan. 20, 2019) *report and recommendation adopted sub nom. Lindblad v. J&L Servs., Inc.*, No. 418CV01336RBHTER, 2019 WL 652248 (D.S.C. Feb. 15, 2019) (noting that district courts in the Fourth Circuit have held that even if a plaintiff advances a theory of "joint

**JA388**

employer, by which both entities may be considered" plaintiff's employer, such theory does not alter the requirement that "[an EEOC] charge must be filed against each employer to pursue a claim against that employer") (quoting *Phillips*, 2015 WL 3844089, at \*2 (D. Md. June 19, 2015)). Accordingly, because Plaintiff failed to name BGE in his MCCR/EEOC charge, Plaintiff's joint employer theory fails.

## CONCLUSION

For the reasons set forth herein, by separate order, Defendant's Motion for Summary Judgment (ECF No. 39) is GRANTED.

/S/

_____
Julie R. Rubin
United States District Judge

September 12, 2023

JA389

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**HARRY A. BOLDEN,**

       **Plaintiff,**

  **v.**

       **Civil No. 1:21-cv-02295-JRR**

**CAEI, INC.** *et al.*,

       **Defendants.**

## ORDER

This matter comes before the court on Defendant Baltimore Gas and Electric Company's Motion for Summary Judgment. (ECF No. 39.) The parties' submissions have been reviewed and no hearing is necessary. Local Rule 105.6 (D. Md. 2023). For the reasons set forth in the accompanying memorandum opinion, it is this 12th day of September 2023:

**ORDERED** that the Motion for Summary Judgment shall be, and is hereby, **GRANTED**; and further it is

**ORDERED** that **JUDGMENT** be entered in favor of Defendant Baltimore Gas and Electric Company and against Plaintiff on all counts; Madam Clerk shall close this case.

/S/

_____
Julie R. Rubin
United States District Judge

**JA390**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| HARRY A. BOLDEN | * | |
| | * | |
| Plaintiff, | * | Civil Action No.: 1:21-cv-02295-JRR |
| vs. | * | |
| | * | |
| CAEI, INC., et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### PLAINTIFF'S MOTION & MEMORANDUM IN SUPPORT OF MOTION FOR RECONSIDERATION OF SUMMARY JUDGMENT

Plaintiff, Harry A Bolden ("Plaintiff"), by undersigned counsel, and pursuant to Local Rule 105.10, hereby asks the Court to reconsider the summary judgment entered against him as authorized by Federal Rule of Civil Procedure 59(e).

### I. INTRODUCTION

Plaintiff is Harry Bolden; defendant is CAEI, Inc and BGE.

Plaintiff sued defendant for monetary, and other appropriate relief to redress intentional violations by defendant of rights secured to the Plaintiff pursuant to Federal and Maryland State laws.

On January 30, 2023, Defendants filed motion for Summary Judgment. The clerk entered judgment on September 12, 2023. Plaintiff files this motion on September 26, 2023, which is within 14 days after the entry of judgment, pursuant to Local Rule 105.10. Plaintiff files this motion for reconsideration and asks the Court to vacate the summary judgment.

1

**JA391**

## II. ARGUMENT

### A. Legal Standards.

Under Rule 59(e), a motion to alter or amend a final judgment may be granted only " (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998). *Butler v. Directsat USA, LLC*, 307 F.R.D. 445, 445 (D. Md. 2015)

In this case, the Court granted the Defendant's Motion for summary judgment on the grounds that Plaintiff failed to exhaust his administrative remedies against Defendant by not naming Defendant in the EEOC charge. The Court applied the *substantial identity* test to determine whether Plaintiff may "bring suit against" Defendant and concluded that Plaintiff cannot.

To determine whether a *substantial identity* exists between two entities, the court should consider: "(1) similarity of interests between named and unnamed parties; (2) ability of the plaintiff to ascertain the unnamed party at the time of the EEOC charge; (3) notice of the EEOC charge by the unnamed party; and (4) prejudice."*Zhang,*332 F.Supp.2d at 867 (citing *Thomas v. Bet Sound-Stage Rest./Brett Co, Inc.,*61 F.Supp.2d 448, 457-58 (D.Md. 1999)). *Lipscomb v. Technologies, Services, Information, Inc.*, Civil Action No. DKC 09-3344, at 13-15 (D. Md. Feb. 18, 2011).

In concluding that Plaintiff did not meet the *substantial identity test*, the Court reasoned that there was no dispute in the material facts as to each factor in the test**.** Summary judgment is only to be granted when no genuine and disputed issues of material fact remain, and the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A genuine issue of material fact may exist if the evidence presented to the court is sufficient to indicate the existence of a factual dispute that could be resolved in favor of the non-moving party at trial. Rachael-Smith v. FTDATA, Inc., 247 F. Supp. 2d 734, 742 (citing

2

**JA392**

Anderson v. Liberty Lobby, Inc.,477 U.S. 242 (1986)) Only "facts that might affect the outcome

of the suit under the governing law" are material. Anderson, 477 U.S. at 248. Moreover, a dispute

over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict

for the non-moving party." Id.  Here, a multitude of disputes in material facts exist that should have

precluded a ruling of summary judgment in favor of the Defendant.

    **1.  Plaintiff Has New Evidence**

    The Court should grant Plaintiff's motion for reconsideration because Plaintiff has

discovered new evidence not available at the time of summary judgment. Hale v. Townley, 45 F.3d

914, 921 (5th Cir. 1995). The newly discovered evidence shows that BGE was aware of Plaintiff's

administrative claim at the MCCR and is attached to this motion. The Court should consider the new

evidence and grant the relief requested by this motion because the evidence is important to the

movant's case.  (MCCR February 2017 Letter from Mr Hubbard to MCCR, signatures of Attendees

at MCCR proceeding and sign in log of BGE's Brain Andrews, Sr., as billing clerk manager for

Plaintiff, hereinafter **Exhibit 1**) This shows that Mr. Hubbard (and Mrs. Webster-Duncan) were

aware of the charges prior to 2021. (response letters and a statement from Mr. Hubbard, dated 2-17-

2017, suggesting that he had prior knowledge of the charges). The evidence also shows that Mr.

Hubbard signed the attendance sheet at the fact-finding hearing, along with CAEI President and CEO

Mr. Steve Burnett. Furthermore, since Mr. Hubbard and CAEI were notified before attending the

fact-finding hearing, as a vendor for Exelon-BGE, it would have been their obligation to inform BGE

(which they were already aware of) about the impending charge, considering the potential risk

involved for the other party.

    This evidence goes to further support Plaintiff's facts satisfying substantial identity Test

Factor No. 2 of similar interest between BGE and CAEI, and Fact No. 4 pm whether BGE lead

**JA393**

Plaintiff to believe that its interest was represented through CAEI. This also raised a dispute in the material facts pertaining to these substantial identity test factors.

### 2. Material Facts are Disputed Pertaining to the *Substantial Identity* Test Factors

### a. Whether BGE's role was Known when Plaintiff Filed MCCR Charge

Even if the facts shows that Plaintiff may have known that BGE and CAEI were separate companies, the inferences from the facts shows that Plaintiff known that BGE and CAEI so distinct for purposes of his employment such that he was aware that BGE should be name separately in the charge of discrimination. The Court's conclusion that Plaintiff was confused between Exelon and CAEI is erroneous because this does not go to the issue awareness of BGE's role separately from CAEI at the time Plaintiff filed his charge of discrimination.

### b. Whether There is Similarity of Interest Between BGE & CAEI's

In addition to the new evidence, the court's undisputed facts show similarity of interest between BGE and CAEI. Mr. Hubbard managed CAEI's customer account with BGE and was also response for managing BGE's Collection Strategy Pilot. Dkt. 49 at 2 "CAEI had a role in operating BEG's financial solutions department program". Id. at 3 The facts are also disputed as to the similarity of interest because the evidence shows shared management and supervision, share operation, share email account, share office and working equipment with BGE and CAEI in regard to the Collection Strategy Pilot program.

### c. Whether BGE was prejudice by not Participating in the Administrative proceeding.

The court misapplied *Gramble*. The applicable principle in *Gramble* is and that it is "wholly implausible" that the County would have altered its course had it been named in the EEOC filing (pg. 12). Additionally, the EEOC informed Mr. Gamble that it was unable to find a violation of any applicable employment discrimination statute (pg. 3). *Gamble v. Charles Cnty.*, 20-cv-3126-PWG,

at *21 (D. Md. Aug. 9, 2021) Likewise in this case, MCCR did not did a violation and BGE clearly demonstrate that naming BGE in the MCCR Charge of discrimination would not have altered its course, had it been named in the chare of discrimination.

### 3. The Judgment Will Result in Manifest Injustice

The judgment contains a clear error or will result in manifest injustice. As a matter of Law, the Court should grant Plaintiff's motion for reconsideration because the judgment contains a clear error or will result in manifest injustice. *See Russell v. Delco Remy*, 51 F.3d 746, 749 (7th Cir. 1995); *Collison v. Int'l Chem. Workers Union, Local 217*, 34 F.3d 233, 236 (4th Cir. 1994). -In this instance however, if the Court does not vacate the Summary Judgment in favor of Defendant. It will result in manifest injustice because the Court did not consider and apply the appropriate weight to all facts in the records supporting that Plaintiff met the substantial identity test as there is new evidence that came to light.

Clear error or manifest injustice occurs where a court "has patently misunderstood a party or has made a decision outside the adversarial issues presented to the Court by the parties or has made an error not of reasoning but of apprehension ...." *King v. McFadden*, 2015 WL 4937292 * 2 (D.S.C. August 18, 2015) (quoting *Campero USA Corp. v. ADS Foodservice LLC*, 916 F. Supp. 2d 1284, 1292-93 (S.D. Fla. 2012) (citations omitted). "In the context of a motion to reconsider, manifest injustice is defined as 'an error by the court that is direct, obvious, and observable.'" *Saunders v. Riverside Regional Jail*, June 14, 2012, 2012 WL 2192262 (E.D. Va. June 14, 2012) (quoting *Register v. Cameron & Barkley Co.*, 481 F.Supp.2d 479, 480 n.1 (D.S.C. 2007). *Wagner v. Warden*, Civil Action No. ELH-14-791, at *5-6 (D. Md. Mar. 24, 2016)

The court has not drawn the inference from the facts in favor of Plaintiff and furthermore, the Court's interpretation of the facts a misunderstanding of Plaintiff's facts. As a result, the Court's conclusion and decision on the Defendant's motion for summary judgment will result in manifest

**JA395**

injustice. The error in the court's judgment and its failure to consider all the relevant facts in favor

of the plaintiff will result in manifest injustice. Therefore, the plaintiff's motion for reconsideration

should be granted. The court's decision and interpretation of the facts demonstrate a

misunderstanding of the plaintiff's position, leading to an unfair outcome. The concept of manifest

injustice refers to a clear and obvious error by the court that is observable and has a direct impact on

the fairness of the judgment. In this case, allowing the summary judgment in favor of the defendant

to stand without reconsidering would be manifest injustice.

### III. CONCLUSION

**WHEREFORE**, based upon the foregoing, the Plaintiff respectfully request that this Court

grant his Motion for Reconsideration, and vacate its Order granting Motion for Summary Judgment

in favor of the Defendant, enter an Order denying Summary Judgment, and any other relief the Court

deems just and proper.


Respectfully,

*/s/ George A. Rose*
George A. Rose, Esq.,
Federal Bar No.: 26086
Rose Law Firm, LLC
9134 Liberty Road, Randallstown, MD.  21202
Ph: #: 410-727-7555 / Facsimile #: 443-320-0962
Email: grose@roselawfirm.net
Attorney for *Plaintiff Harry A. Bolden*


### CERTIFICATE OF SERVICE

I hereby certify that on this 26 day of September 2023, a copy of the foregoing Plaintiff's

Motion For Reconsideration Of Summary Judgment, was served on counsel of record by the Court's

CM/ECF system.

*/s/ George A. Rose*

6

**JA396**

CAEI, INC
9256 Bendix Road, Suite 202
Columbia, MD 21045

RECEIVED

FEB – 9 2017

Maryland Commission on Civil Rights

February 5, 2017

Ms. JoAnn Simmons-Holmes
Civil Rights Officer
State of Maryland Commission on Civil Rights
6 Saint Paul Street, Suite 9000
Baltimore, MD 21202-1631

Re:    Harry Bolden vs. CAEI, INC MCCR Charge Number 1611-0734 Addendum Statement

Dear, Ms Simmons-Holmes,

I am writing in response to your letter dated January 24, 2017. At your request CAEI has prepared a response to Mr. Bolden's addendum statement.

I have attached CAEI's Response.

Because of the change of content of Mr. Bolden's statements I would ask that we be allowed to modify our list of potential attendees at the scheduled hearing. Below is a modified list of representatives/witnesses who may attend any subsequent fact finding meetings that your office might schedule;

| Ray Hubbard | Steven Burnett | Kia Smoot |
| Angie Watts | Nicole Russ, | Robin Roden |
| Otis Rease | Paul Forrester | |

PLNT SUPP 97
JA397

**RESPONDENT:**

_____     **DATE:** _____
Signature/Title

**RESPONDENT REPRESENTATIVE:**

Kia R Smoot, Human Resources     **DATE:** 2|17|17
Signature/Title

**RESPONDENT REPRESENTATIVE:**

_____ VP operations     **DATE:** 2/17/17
Signature/Title

**RESPONDENT REPRESENTATIVE:** President/C.E.O
_____     **DATE:** 2-17-2017
Signature/Title

**RESPONDENT REPRESENTATIVE:**

_____     **DATE:** _____
Signature/Title

**RESPONDENT REPRESENTATIVE:**

_____     **DATE:** _____
Signature/Title

| E | F | G | H | | I | J | K | L | M |
|---|---|---|---|---|---|---|---|---|---|
| Timesheet / Expense Number | Job Title | Manager | Work Location | | Week Ending Date | Date Invoiced to Exelon | LOOKUP.BUSINESS UNIT | LOOKUP.FACILITY | LOOKUP.DEPAR |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 9/13/2014 | 9/23/2014 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 9/20/2014 | 9/23/2014 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 9/27/2014 | 9/30/2014 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 10/4/2014 | 10/8/2014 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 10/11/2014 | 10/14/2014 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 10/18/2014 | 10/21/2014 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 10/18/2014 | 10/21/2014 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 10/25/2014 | 10/28/2014 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 11/1/2014 | 11/4/2014 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 11/8/2014 | 11/11/2014 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 11/15/2014 | 11/18/2014 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 11/22/2014 | 11/25/2014 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 11/29/2014 | 12/2/2014 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 12/6/2014 | 12/9/2014 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 12/13/2014 | 12/16/2014 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 12/20/2014 | 12/23/2014 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 12/20/2014 | 12/23/2014 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 12/27/2014 | 12/30/2014 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 1/3/2015 | 1/6/2015 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 1/10/2015 | 1/13/2015 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 1/17/2015 | 1/20/2015 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 1/24/2015 | 1/27/2015 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 1/31/2015 | 2/10/2015 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 2/7/2015 | 2/10/2015 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 2/14/2015 | 2/17/2015 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 2/21/2015 | 2/24/2015 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 2/28/2015 | 3/3/2015 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 3/7/2015 | 3/17/2015 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 3/14/2015 | 3/17/2015 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 3/21/2015 | 3/24/2015 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 3/21/2015 | 3/24/2015 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 3/28/2015 | 3/31/2015 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 4/4/2015 | 4/7/2015 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 4/11/2015 | 4/14/2015 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 4/18/2015 | 4/21/2015 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 4/25/2015 | 4/28/2015 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 5/2/2015 | 5/12/2015 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 5/9/2015 | 5/12/2015 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 5/16/2015 | 5/19/2015 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 5/23/2015 | 5/26/2015 | 001 | | 81161 |
| 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 5/30/2015 | 6/2/2015 | 001 | | 81161 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| HARRY A. BOLDEN, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Case No.: 1:21-cv-02295-JRR |
| | * | |
| CAEI INC. and | * | |
| BALTIMORE GAS AND ELECTRIC, CO. | * | |
| | * | |
| Defendants. | * | |

_____/

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION & MEMORANDUM IN**
**SUPPORT OF MOTION FOR RECONSIDERATION OF SUMMARY JUDGMENT**

Defendant, Baltimore Gas and Electric Company ("Defendant" or "BGE"), by and through

its undersigned counsel, hereby submits this Opposition to Plaintiff's Motion & Memorandum in

Support of Motion for Reconsideration of Summary Judgment.

**I.      INTRODUCTION**

Relying upon documents Defendant produced in discovery and re-asserting arguments

made in his opposition to Defendant's Motion for Summary Judgment, Plaintiff requests the Court

reconsider its September 12, 2023 Order granting Defendant's Motion for Summary Judgment,

entering judgment in favor of Defendant, and closing this case. Specifically, Plaintiff disputes the

Court's ruling that Plaintiff failed to exhaust his administrative remedies and that he failed to meet

his burden in establishing that the substantial identity exception applies on these facts. ECF No.

52, p. 2. Rather, Plaintiff argues that the Court committed clear legal error, based on newly

discovered evidence, because it "did not consider and apply the appropriate weight to all facts in

the record" in analyzing the substantial identity test. _Id._ p. 5. Thus, in his Motion and

Memorandum in Support of Motion for Reconsideration of Summary Judgment ("Plaintiff's

**JA400**

Motion"), he argues that there are material facts in dispute, which preclude the Court from granting summary judgment in Defendant's favor, and that the September 12 Order must be vacated to prevent manifest injustice to Plaintiff. *Id.* p. 3, 5-6.

Plaintiff's Motion fails on both points. As discussed more fully herein, Plaintiff's representation that he discovered new evidence is completely disingenuous. In fact, although Defendant's Bates stamps (curiously) do not appear on Plaintiff's Exhibit 1 to his Motion, Defendant produced this evidence to Plaintiff during the discovery phase of this litigation. Moreover, such evidence does not create a material dispute of fact to warrant altering or amending the judgment. Plaintiff's Motion entirely fails to demonstrate that the Court made a clear legal error. Rather, Plaintiff merely seeks to re-litigate old matters because he disagrees with the Court's analysis set forth in the September 12 Order, presents evidence that was in his possession prior to the filing of his opposition, and make arguments that he failed to raise prior to entry of judgment. Such conduct is an improper use of Rule 59(e). *See, e.g.*, *Pittman v. Deutsch Bank Nat'l Trust Co.*, No. 18-02425, 2020 WL 5759767, at *2-3 (D. Md. Sept. 28, 2020) ("A Rule 59(e) motion 'may not be used to relitigate old matters, or to raise arguments to present evidence that could have been raised prior to the entry of judgment' . . . '[M]ere disagreement does not support a Rule 59(e) motion.' . . . 'Such limitations on Rule 59(e) motions are necessary because '[w]ere it otherwise, then there would be no conclusion to motions practice, each motion becoming nothing more than the latest installment in a potentially endless serial that would exhaust the resources of the parties and the [C]ourt—not to mention its patience.'").

For these reasons, Plaintiff's Motion should be denied, and the September 12, 2023, Order should not be disturbed.

**JA401**

## II.   **LEGAL STANDARD**

"Under Rule 59(e), the Court may grant a motion to alter or amend the judgment to: (1) accommodate an intervening change in controlling law; (2) account for new evidence previously unavailable; or (3) correct a clear error of law or prevent manifest injustice." *Tawney v. AC & R Insulation Co.*, No. CIV. WDQ-13-1194, 2014 WL 3725926, at *1–2 (D. Md. July 24, 2014) (citing *Gagliano v. Reliance Standard Life Ins. Co.*, 547 F.3d 230, 241 n.8 (4th Cir. 2008)). "Thus, the rule permits a district court to correct its own errors, 'sparing the parties and the appellate courts the burden of unnecessary appellate proceedings.'" *Pac. Ins. Co. v. Am. Nat's Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998) (quoting *Russell v. Delco Remy Div. of Gen. Motors Corp.*, 51 F.3d 746, 749 (7th Cir. 1995)). "Rule 59(e) motions may not be used, however, to raise arguments which could have been raised prior to the issuance of the judgment, nor may they be used to argue a case under a novel legal theory that the party had the ability to address in the first instance." *Id.* (citing a collection of cases). Further, "'[m]ere disagreement does not support a Rule 59(e) motion.'" *Pittman*, 2020 WL 5759767, at *2 (internal citation omitted).

In general, "reconsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly." *Robinson v. Martin*, No. DKC-18-295, 2020 WL 13644336, *1 (D. Md. Jan. 23, 2020) (quoting *Pac. Ins. Co.*, 148 F.3d at 403); *see also Wagner v. Warden*, No. CV ELH-14-791, 2016 WL 1169937, at *1 (D. Md. Mar. 24, 2016) (citing 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2810.1 at 171 (3d ed. 2012) ("In practice, because of the narrow purposes for which they are intended, Rule 59(e) motions typically are denied.")).

"[I]f a party relies on newly discovered evidence in its Rule 59(e) motion, the party 'must produce a 'legitimate justification for not presenting' the evidence during the earlier

**JA402**

proceeding.'" *Pac. Ins. Co.*, 148 F.3d at 403. In fact, "[t]he moving party must show: (1) the evidence is newly discovered since the judgment was entered; (2) due diligence on the part of the movant to discover the new evidence has been exercised; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence is such that is likely to produce a new outcome if the case were retried, or is such that would require the judgment to be amended." *Tawney*, 2014 WL 3725926, at *2 (quoting *Boryan v. U.S.*, 884 F.2d 767, 771 (4th Cir. 1989)). "Evidence that is available to a party prior to entry of judgment, therefore, is not a basis for granting a motion for reconsideration as a matter of law." *Id.* (quoting *Boryan*, 884 F.2d at 771-72). The moving party bears the burden of demonstrating that the evidence meets this requirement. *See JTH Tax, Inc. v. Aime*, 984 F.3d 284, 292 (4th Cir. 2021).

To demonstrate that the court made a clear error or manifest injustice will occur, Plaintiff must demonstrate that the Court "patently misunderstood a party" and made "'direct, obvious, and observable'" error. *See, e.g.*, *Pittman*, 2020 WL 5759767, at *3; *Wagner*, 2016 WL 1169937, at *1 (holding that the motion presented no facts to suggest clear error or manifest injustice, but rather, attempted to rehash claims already fully considered and adjudicated). "[T]his Court will only grant a Rule 59(e) motion to alter or amend a judgment based on a clear error of law when the prior judgment 'strike[s] the court as wrong with the force of a five-week-old, unrefrigerated dead fish.'" *Pittman*, 2020 WL 5759767, at *3 (internal citation omitted). "The Court's previous decision must be 'dead wrong.'" *Id.*

### III.   **ARGUMENT**

The Parties agree that a motion to alter or amend a final judgment, pursuant to Rule 59(e), may only be granted for any of the three discrete reasons set forth above. Plaintiff argues that he has discovered new evidence that was not available to him at the summary judgment stage and that

the Court committed a clear error in rendering its September 12 Order, which will result in a manifest error to Plaintiff if such judgment is not vacated.  Both foregoing arguments must fail because the evidence Plaintiff alleges is "new evidence" <u>has been available to him for almost a year since November 4, 2022</u> (in some instances even earlier), Plaintiff has not provided a legitimate justification for failing to present such evidence to the Court at the summary judgment stage, and the Court did not commit a clear error of law in rendering its September 12 Order.  And, in any event, the evidence does not impact the Court's ruling.

**A. <u>Plaintiff Has Failed To Produce A Legitimate Justification For Not Presenting The Alleged New Evidence At The Summary Judgment Stage.</u>**

In efforts to revive this case against BGE, Plaintiff disingenuously argues that he has discovered new evidence that was not available to him as of March 21, 2023, when he filed his opposition to Defendant's Motion for Summary Judgment.  *See* ECF No. 52, p. 3.  As discussed herein, this representation is false.  Plaintiff's newly discovered evidence consists of three pages, which are Bates stamped as "PLNT SUPP 001-003" and attached to Plaintiff's Motion collectively as Exhibit 1.  *See* ECF No. 52-1.  PLNT SUPP 001 is a February 5, 2017 Letter from CAEI, Inc. ("CAEI") to Ms. JoAnn Simmons-Holmes, Civil Rights Officer; PLNT SUPP 002 is a signature page signed by Kia R. Smoot, CAEI Human Resources; Raymond Hubbard, CAEI VP Operations; and Steven Burnett, CAEI President/C.E.O.; and PLNT SUPP 003 is an excerpt from a spreadsheet.  *See id.*  These documents were previously produced by Defendant to Plaintiff in discovery on November 4, 2022.  *See* **Exhibit A**, November 4, 2022, E-mail Regarding Defendant's Discovery Responses; *see also* **Exhibit B**, MCCR.0265-.0266; **Exhibit C**,

**JA404**

MCCR.0145-.0146[1]; and **Exhibit D**, BGE.000177-.000178.  Notably, PLNT SUPP 001-003 are incomplete documents and appear to be magnified so that Defendant's Bates stamps are no longer visible.  *Compare* ECF No. 52-1 *with* Exs. B-D.  This is a highly misleading presentation of the evidence to the Court.

In addition to BGE producing these documents in discovery, both MCCR.0265-.0266 and MCCR.0145-.0146 were previously relied upon by Defendant in this case.  On February 25, 2022, Defendant filed its Motion to Dismiss with this Court and, in support thereof, appended MCCR.0145-.0146.  *See* ECF No. 11-5.  Thereafter, on January 30, 2023, Mr. Hubbard expressly referenced MCCR.0265-.0266 in his Declaration.  *See* ECF No. 39-4, ¶ 35.  Based on the foregoing, Plaintiff's argument that this evidence was unavailable to him at summary judgment is plainly false, and clearly, with a review of the document production, Plaintiff could have relied on such evidence in opposing Defendant's Motion for Summary Judgment.  In fact, other than representing that this evidence was recently discovered, Plaintiff provides no further explanation as to when he discovered the evidence or why the evidence was unavailable to him at the summary judgment stage.  For these reasons alone, Plaintiff's Motion must be denied.

Even if the Court exercised its discretion to consider the substance of this evidence, the only relevant facts that can be drawn from these documents are that CAEI submitted a response to the MCCR; Ms. Smoot, Mr. Hubbard, and Mr. Burnett signed an unknown signature page; and Brian Andrews was a Manager for BGE—facts which neither party disputes.  *See* ECF No. 52-1.  This evidence is merely cumulative of the evidence already considered by the Court at the summary judgment stage.  In fact, the September 12 Order expressly relies on Mr. Bolden's sworn

---

[1]     Defendant Bates stamped the documents it received from the Maryland Commission on Civil Rights ("MCCR") with the MCCR prefix when it produced these documents to Plaintiff.  *See* **Exhibit E**, Defendant's Production Log.

**JA405**

deposition testimony to establish the undisputed fact that Brian Andrews was BGE's Manager of Customer Care[2] and that the MCCR conducted a fact-finding hearing with Mr. Bolden, Ms. Smoot, Mr. Hubbard, and Mr. Burnett (all CAEI employees). *See* ECF No. 49, pp. 5-6. BGE has also never disputed that CAEI had notice of Mr. Bolden's Charge of Discrimination (the "Charge"). As mentioned above, in support of Defendant's Motion for Summary Judgment, Mr. Hubbard stated in his sworn Declaration that he prepared the February 5, 2017, Letter to the MCCR. *See* ECF No. 39-4, ¶ 35. Therefore, the information that can be gleaned from the mere three pages of evidence was already considered by this Court in rendering its summary judgment ruling, and therefore, reconsideration is not warranted.

Plaintiff also incorrectly argues that it can be inferred from this evidence that Khadija Duncan, a BGE employee, was aware of the Charge prior to 2021 and that CAEI was obligated to notify BGE of the Charge as the result of their contractual relationship. *See* ECF No. 52, p. 3. There is simply no basis to support these inferences as none of the evidence relied on by Plaintiff implicates Ms. Duncan in any way. Plaintiff's representations are mere speculation, and Plaintiff has failed to provide any new evidence to impeach or refute the undisputed facts in the record, including the sworn declarations of Ms. Duncan, Mr. Andrews, and Mr. Hubbard. *See* ECF No. 39-14, ¶ 6; ECF No. 39-5, ¶ 12; ECF No. 39-4, ¶ 32. Notably, Plaintiff did not depose Ms. Duncan. The fact that Plaintiff now argues that he has newly discovered evidence, which Defendant provided almost a year ago.

---

[2]    In support of Defendant's Motion for Summary Judgment, Mr. Andrews also stated in his sworn declaration that he was employed by BGE as the Manager of Customer Care between 2014 and 2016. ECF No. 39-5, ¶ 6. Defendant also identified Mr. Andrews in its November 4, 2022 Answers to Interrogatories as "Former Manager of Customer Care." *See* **Exhibit F**, BGE's Ans. to Interrogatory No. 1.

Lastly, other than Plaintiff baldly stating that "[t]his evidence" goes to further support factors 2 and 4 of the substantial identity test in Plaintiff's favor and that such evidence is material, Plaintiff offers no argument to support this contention or any argument whatsoever to satisfy its burden in demonstrating that the Court should vacate its September 12 Order.

In short, Plaintiff's "newly discovered evidence" is not new and Plaintiff has not set forth any legitimate justification for failing to timely present available and existing evidence to this Court prior to its September 12 Order. Accordingly, Plaintiff's Motion must be denied.

**B. Plaintiff's Motion Improperly Attempts To Re-Litigate Issues And Does Not Establish That The Court Committed Clear Legal Error To Warrant Vacating The September 12 Order To Prevent A Manifest Injustice.**

In efforts to establish that the Court did not properly consider all facts in the record, Plaintiff essentially attempts to re-litigate whether the substantial identity test applies. Such attempt to rehash already decided issues is an inappropriate use of Rule 59(e). *See, e.g.*, *Pittman*, 2020 WL 5759767 at *2-3.

In re-arguing the first factor of the substantial identity test, whether Mr. Bolden could have ascertained BGE's role at the time he filed the Charge, Plaintiff alleges that the "Court's conclusion that Plaintiff was confused between Exelon and CAEI is erroneous because this does not go to the issue [of] awareness of BGE's role separately from CAEI at the time Plaintiff filed his charge of discrimination." ECF No. 52, p. 4. Plaintiff's summary of the September 12 Order is completely wrong. Contrary to Plaintiff's assertion, the Court squarely addressed the fact that Plaintiff was aware that BGE was a separate entity from CAEI at the time he filed his Charge. ECF No. 49, p. 15. In fact, the Court expressly stated: "Plaintiff admits that he knew BGE and CAEI were separate companies. The confusion was not between BGE and CAEI; rather, Plaintiff was confused about whether Exelon and BGE were separate companies. Plaintiff testified further, at least by 2016, he

**JA407**

knew BGE and CAEI were separate companies." *Id*. In conclusion, the Court held that "Plaintiff fails to provide evidence to suggest that, at the time of filing his Charge of Discrimination, he could not reasonably ascertain the role of BGE." *Id*. Accordingly, Plaintiff has not set forth any basis to support that the Court made a clear error in applying the facts to the first factor of the substantial identity test.

As to the second factor, whether BGE and CAEI shared such similar interests that it would be unnecessary to name BGE in the administrative proceedings, Plaintiff merely disagrees with the Court's analysis of this factor. Without citing any authority or evidence in the record, Plaintiff argues that the undisputed facts demonstrate that BGE and CAEI share management, supervision, operation, email accounts, and equipment. ECF No. 52, p. 4. Not only does Plaintiff mischaracterize the record evidence, he also offers no evidence to refute the evidence relied upon by the Court in granting judgment in favor of Defendant, including the sworn declarations of Mr. Hubbard and Ms. Duncan. Moreover, Plaintiff failed to make this argument at the summary judgment stage; and therefore, he is precluded from raising this argument now. *Pittman*, 2020 WL 5759767, *2. The Court even highlighted in its Order that Plaintiff failed to address this factor and did not provide any evidence that BGE and CAEI are "so similar that it would have been unnecessary to name BGE in the Charge[.]" ECF No. 49, p. 17. Regardless, the Court analyzed the evidence in the record and noted that Plaintiff failed to cite any "authority to suggest that MCCR's reference to Ms. Duncan implies that BGE and CAEI's interests are so similar that naming BGE in the Charge of Discrimination was unnecessary." *Id*. at p. 18. Accordingly, the Court held that Plaintiff failed to generate a dispute of fact as to factor two. *Id*.

In an attempt to argue that the Court committed clear error as to factor three, whether BGE's absence from the administrative proceedings resulted in actual prejudice to it, Plaintiff

**JA408**

argues that the Court's Order "misapplied" *Gamble v. Charles Cnty.*, No. 20-cv-3126-PWG, 2020 WL 3491823 (D. Md. Aug. 9, 2021), and Plaintiff merely re-argues that *Gamble* is instructive on the underlying facts. *See* ECF No. 52, p. 4-5. Plaintiff completely ignores, and does not address whatsoever, the Court's detailed analysis distinguishing the facts in *Gamble* from the facts in the instant case, including the fact that the two cases involve different administrative agencies and therefore, different administrative processes. *See* ECF No. 49, p. 18-19 and ECF No. 52, p. 4-5. Plaintiff's Motion further fails to appreciate that the Court further distinguished these facts from the facts in *Gamble* because Mr. Bolden was aware that BGE and CAEI were separate entities. *See* ECF No. 49, p. 19. Plaintiff's argument on this point is the precise type of recycled argument and mere disagreement that is improper in a Rule 59(e) motion.

Finally, Plaintiff argues that manifest injustice will occur if the Court does not consider its September 12 Order because the Court did not consider and apply the appropriate weight to all facts in the record as it relates to the substantial identity test and in light of the "new evidence that came to light." *See* ECF No. 52, p. 5. As discussed above, the new evidence did not recently come to light, and further, the purported new evidence does not provide any additional facts to create a material dispute of fact that requires the Court to amend or alter its judgment. Moreover, Plaintiff could have presented this evidence at summary judgment but failed to do so. *Arvon v. Liberty Mut. Fire Ins. Co.*, No 20-1249, 2021 WL 3401258, at *3 (4th Cir. Aug. 4, 2021) ("the court committed no error by failing to consider Arvon's testimony about the phone call because Arvon never cited to it during the summary judgment proceedings."). Regardless, the evidence Plaintiff now seeks to rely on does not create a genuine dispute of material fact. *See id.* Other than baldly asserting that the Court has misunderstood "Plaintiff's facts[,]" Plaintiff fails to demonstrate how the Court's September 12 Order is a direct, obvious, and observable error in determining that

**JA409**

the substantial identity exception did not apply on these facts. As Plaintiff knows, the substantial identity test requires a highly fact specific analysis of the four factors. Plaintiff has not made any argument whatsoever to establish that the belated evidence alters the Court's analysis of the undisputed facts in the record, but rather, merely attempts to improperly take a second bite of the apple. *See, e.g.*, *Squire v. Identity Inc.*, No. CV-20-2062-PJM, 2021 WL 5961465, at *1 (D. Md. Dec. 16, 2021) (quoting *Yi v. Colvin*, No. 18-02425, 2020 WL 5759767, at *3 (D. Md. Sept. 28, 2020) ("This extraordinary remedy 'is not license for a losing party to get a 'second bite of the apple.'"); *Wagner*, 2016 WL 1169937, at *1 (holding that the motion presented no facts to suggest clear error or manifest injustice, but rather, attempted to rehash claims already fully considered and adjudicated).

Based on the foregoing, Plaintiff has failed to demonstrate that the Court committed clear legal error and that manifest injustice will result if the requested relief is not granted.[3]

## IV.    **CONCLUSION**

Based on the foregoing, Plaintiff's Motion falls woefully short of the showing required to invoke the extraordinary remedy to alter or amend a judgment. Accordingly, Plaintiff's Motion should be denied.

---

[3]    If this Court were to grant the relief requested by Plaintiff, the only party who would suffer manifest injustice is BGE. In fact, the filing of Plaintiff's Motion based on "newly discovered evidence" that was previously provided to Plaintiff in this litigation is not only unfair to BGE, but unjust.

**JA410**

Respectfully submitted,


_____/s/_____
Lindsey A. White (Bar No. 29183)
Veronica Yu Welsh (Bar No. 10024)
SHAWE ROSENTHAL LLP
One South Street, Suite 1800
Baltimore, Maryland 21202
Telephone: (410) 752-1040
Facsimile: (410) 752-8861
white@shawe.com
vyw@shawe.com

*Attorneys for Defendant, Baltimore Gas and
Electric Company*

12

**JA411**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on October 10, 2023, true and correct copies of

Defendant's Opposition to Plaintiffs' Motion & Memorandum in Support of Motion for

Reconsideration of Summary Judgment was electronically filed and thereby served upon:

> George A. Rose, Esq.
> Rose Law Firm, LLC
> 9134 Liberty Road
> Baltimore, MD 21133
> grose@roselawfirm.net
>
> *Attorney for Plaintiff*


_____
     /s/
Veronica Yu Welsh

**JA412**

# Exhibit A

# Exhibit A

**JA413**

**From:** Veronica Yu Welsh
**Sent:** Friday, November 4, 2022 5:35 PM
**To:** Joseph D. Allen; Debra M. Hnat; J. Stephen Simms
**Cc:** Sarah Czapski; Lindsey A. White
**Subject:** RE: Bolden v. BGE, Defendant's Discovery Responses

Hi Joseph,

You should have received a Sharefile link with Defendant's document production (BGE.000001-000221 and MCCR.0001-0340), as well as a Production Log.  Please let us know if you have any difficulty accessing the documents.

Thank you,

Veronica

Veronica Yu Welsh
**Shawe Rosenthal LLP**
Cell: 914-329-7604
Direct: 410-843-3494

The information contained in this communication may be confidential, is intended only for the use of the recipient named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender and delete the original message and any copy of it from your computer system.

**From:** Lindsey A. White <law@shawe.com>
**Sent:** Friday, November 4, 2022 5:04 PM
**To:** Joseph D. Allen <jdallen@simmsshowers.com>; Debra M. Hnat <dhnat@simmsshowers.com>; J. Stephen Simms <jssimms@simmsshowers.com>
**Cc:** Veronica Yu Welsh <vyw@shawe.com>; Sarah Czapski <sdc@shawe.com>
**Subject:** Bolden v. BGE, Defendant's Discovery Responses

Joseph,

Attached please find Defendant's First Answers to Interrogatories and Answers to Requests for Production of Documents. We will send the document production separately.

Regards,
Lindsey

Lindsey A. White
**Shawe Rosenthal LLP**
One South Street, Suite 1800
Baltimore, MD 21202

**JA414**

Cell Phone: 410-262-9519
Main Office: 410-752-1040
Direct Office: 410-843-3472
Law@shawe.com
Shawe.com
Laboremploymentreport.com

Up to date COVID-19 resources available at www.shawe.com

  

  

The information contained in this communication may be confidential, is intended only for the use of the recipient named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender and delete the original message and any copy of it from your computer system.

**JA415**

# Exhibit B

# Exhibit B

**JA416**

Contact Center | Application Development | Enterprise Management | Infrastructure Management

9256 Bendix Road
Suite 102
Columbia, MD 21045

( ) 443.319.5381  ( ) 443.319.5392
( ) contact@caeiinc.com

a Systems Integration Company
www.caeiinc.com

Raymond K. Hubbard
CAEI, INC
9256 Bendix Road, Suite 102
Columbia, MD 21045





February 5, 2017

Ms. JoAnn Simmons-Holmes
Civil Rights Officer
State of Maryland Commission on Civil Rights
6 Saint Paul Street, Suite 9000
Baltimore, MD 21202-1631

Re:    Harry Bolden vs. CAEI, INC MCCR Charge Number 1611-0734 Addendum Statement

Dear, Ms Simmons-Holmes,

I am writing in response to your letter dated January 24, 2017. At your request CAEI has prepared a response to Mr. Bolden's addendum statement.

I have attached CAEI's Response.

Because of the change of content of Mr. Bolden's statements I would ask that we be allowed to modify our list of potential attendees at the scheduled hearing. Below is a modified list of representatives/witnesses who may attend any subsequent fact finding meetings that your office might schedule;

| | | |
|---|---|---|
| Ray Hubbard | Steven Burnett | Kia Smoot |
| Angie Watts | Nicole Russ, | Robin Roden |
| Otis Rease | Paul Forrester | |

JA417

If you require any additional information about this case you can telephone me at 443-319-5381 or reach me via email – rhubbard@caeiinc.com, or via US Mail.

Sincerely,

Raymond Hubbard
Vice President, Operations

# Exhibit C

# Exhibit C

**JA419**

## FACT FINDING CONFERENCE

A complaint has been filed with the Commission charging the Respondent with a violation of Title 20 of the State Government Article, Annotated Code of Maryland (hereinafter "Title 20"); this complaint is identified as follows:

### Complainant, Harry Bolden

#### vs.

### Respondent, CAEI, Inc.

### Case No.: 1611-0734

Pursuant to the Maryland Commission on Civil Rights' Rules of Procedure, COMAR 14.03.01.05C(1), this fact-finding conference has been convened to:

   (a) Define the basis and issues of the Complaint,
   (b) Identify the areas of agreement and disagreement
   (c) Resolve disputes when possible
   (d) Determine if there is a basis for a negotiated settlement of the complaint

Once the parties have had the opportunity to present relevant information and documentation; the Commission staff may take the opportunity to speak with both parties independently to determine if conditions exist for resolving the case immediately. If no settlement can be reached during this process, the case may require further investigation, based on the facts, which may involve additional documentation, site visits and witness interviews. All information gathered prior to, during, and after the fact finding conference by the investigator will be confidential and used for the purposes of resolving the instant case only. Information provided to the investigator *will not* be shared with the other party unless the party submitting the information gives consent to share the information with the other party.

If we find that based on the gathered evidence it appears that there is *Probable Cause* to believe that the Complainant was discriminated against, the Investigator will take the necessary steps to conciliate the matter. However, if our conciliatory efforts fail, the case will be forwarded to the Commission's Office of the General Counsel.

If we find that based on the submitted evidence that there is *No Probable Cause* to believe that the Complainant was discriminated against, a written finding of *No Probable Cause* will be issued and the case will be subsequently dismissed. The Complainant will have 15 days to file a written Request for Reconsideration to the Commission's Deputy Director. Once the Deputy Director has reviewed the Complainant's request, a decision will be made to either uphold the finding of the Investigator or remand the case back to the Investigator for further investigation.

*1*

I solemnly swear or affirm under the penalties of perjury and upon personal knowledge that the statements I provide to the State of Maryland Commission on Civil Rights (the Commission) in connection with its investigation into the above-referenced complaint of discrimination filed before the Commission pursuant to Title 20 of the State Government Article, Annotated Code of Maryland are true and correct.

**RESPONDENT:**

_____          DATE: _____
Signature/Title

**RESPONDENT REPRESENTATIVE:**

_Kia R Smoot, Human Resources_          DATE: 2/17/17
Signature/Title

**RESPONDENT REPRESENTATIVE:**

_____ VP operations          DATE: 2/17/17
Signature/Title

**RESPONDENT REPRESENTATIVE:**

_____ President/C.E.O.          DATE: 2-17-2017
Signature/Title

**RESPONDENT REPRESENTATIVE:**

_____          DATE: _____
Signature/Title

**RESPONDENT REPRESENTATIVE:**

_____          DATE: _____
Signature/Title

2

JA421

# Exhibit D

# Exhibit D

**JA422**

| Invoice Number | Assignment Number | Exelon User ID | Contractor | Timesheet / Expense Number | Job Title | Manager | Work Location | Week Ending Date | Date Invoiced to Exelon | LOOKUP.BUSINESS UNIT | LOOKUP.FACILITY | LOOKUP.DEPARTMENT | LOOKUP.SUB ACCOUNT | LOOKUP.PROJECT | LOOKUP.OPERATING UNIT | TEXT.PRODUCT | TEXT.CUSTOMER SEGMENT | ASSIGNMENT.Contractor Classification | Pay Code | Bill Rate | Units | Net Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3706 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 9/13/2014 | 9/23/2014 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $25.00 | 8.00 | $200.50 |
| 3706 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 9/20/2014 | 9/23/2014 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $25.00 | 40.00 | $1,002.50 |
| 3709 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 9/27/2014 | 9/30/2014 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $25.00 | 39.50 | $989.97 |
| 3713 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 10/4/2014 | 10/8/2014 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $25.00 | 40.00 | $1,002.50 |
| 3715 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 10/11/2014 | 10/14/2014 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $25.00 | 40.00 | $1,002.50 |
| 3717 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 10/18/2014 | 10/21/2014 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | OT | $33.75 | 2.00 | $67.67 |
| 3717 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 10/18/2014 | 10/21/2014 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $25.00 | 40.00 | $1,002.50 |
| 3719 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 10/25/2014 | 10/28/2014 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $25.00 | 40.00 | $1,002.50 |
| 3723 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 11/1/2014 | 11/4/2014 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $25.00 | 40.00 | $1,002.50 |
| 3725 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 11/8/2014 | 11/11/2014 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $25.00 | 40.00 | $1,002.50 |
| 3727 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 11/15/2014 | 11/18/2014 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $25.00 | 40.00 | $1,002.50 |
| 3730 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 11/22/2014 | 11/25/2014 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $25.00 | 40.00 | $1,002.50 |
| 3734 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 11/29/2014 | 12/2/2014 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $25.00 | 30.50 | $764.41 |
| 3736 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 12/6/2014 | 12/9/2014 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $25.00 | 40.00 | $1,002.50 |
| 3738 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 12/13/2014 | 12/16/2014 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $25.00 | 40.00 | $1,002.50 |
| 3740 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 12/20/2014 | 12/23/2014 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $25.00 | 40.00 | $1,002.50 |
| 3743 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 12/27/2014 | 12/30/2014 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | OT | $33.75 | 8.50 | $287.60 |
| 3746 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 1/3/2015 | 1/6/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $25.00 | 23.00 | $576.44 |
| 3748 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 1/10/2015 | 1/13/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $25.00 | 31.50 | $789.47 |
| 3750 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 1/17/2015 | 1/20/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $25.00 | 40.00 | $1,002.50 |
| 3752 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 1/24/2015 | 1/27/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $25.00 | 40.00 | $1,002.50 |
| 3758 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 1/31/2015 | 2/3/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $25.00 | 40.00 | $1,002.50 |
| 3758 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 2/7/2015 | 2/10/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $25.00 | 23.00 | $576.44 |
| 3760 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 2/14/2015 | 2/17/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $25.00 | 40.00 | $1,002.50 |
| 3760 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 2/21/2015 | 2/24/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $25.00 | 38.75 | $971.16 |
| 3762 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 2/28/2015 | 3/3/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $25.00 | 31.50 | $789.47 |
| 3766 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 3/7/2015 | 3/10/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $25.00 | 29.75 | $745.61 |
| 3771 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 3/14/2015 | 3/17/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $25.00 | 38.00 | $952.37 |
| 3771 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 3/14/2015 | 3/17/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | OT | $25.00 | 2.50 | $64.28 |
| 3773 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 3/21/2015 | 3/24/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $23.75 | 40.00 | $952.38 |
| 3773 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 3/21/2015 | 3/24/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | OT | $23.75 | 2.50 | $64.28 |
| 3776 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 3/28/2015 | 3/31/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $23.75 | 40.00 | $952.38 |
| 3779 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 4/4/2015 | 4/7/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $23.75 | 40.00 | $952.38 |
| 3781 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 4/11/2015 | 4/14/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $23.75 | 40.00 | $952.38 |
| 3784 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 4/18/2015 | 4/21/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $23.75 | 31.50 | $750.00 |
| 3786 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 4/25/2015 | 4/28/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $23.75 | 40.00 | $952.38 |
| 3792 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 5/2/2015 | 5/12/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $23.75 | 4.00 | $95.24 |
| 3792 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 5/9/2015 | 5/12/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $23.75 | 33.50 | $797.62 |
| 3794 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 5/16/2015 | 5/19/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $23.75 | 37.50 | $892.86 |
| 3796 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 5/23/2015 | 5/26/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $23.75 | 40.00 | $952.38 |
| 3802 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 5/30/2015 | 6/2/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | OT | $32.06 | 2.00 | $64.28 |
| 3802 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 5/30/2015 | 6/2/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $23.75 | 40.00 | $952.38 |
| 3807 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 6/6/2015 | 6/9/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $23.75 | 40.00 | $952.38 |
| 3807 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 6/13/2015 | 6/16/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $23.75 | 40.00 | $952.38 |
| 3809 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 6/20/2015 | 6/23/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | OT | $32.06 | 2.50 | $80.35 |
| 3812 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 6/20/2015 | 6/23/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $23.75 | 40.00 | $952.38 |
| 3816 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 6/27/2015 | 6/30/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $23.75 | 40.00 | $952.38 |
| 3818 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 7/4/2015 | 7/8/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | OT | $32.06 | 2.50 | $80.35 |
| 3820 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 7/11/2015 | 7/14/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $23.75 | 40.00 | $952.38 |
| 3820 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 7/18/2015 | 7/21/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | OT | $32.06 | 2.50 | $80.35 |
| 3822 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 7/18/2015 | 7/21/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $23.75 | 40.00 | $952.38 |
| 3826 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 7/25/2015 | 7/28/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $23.75 | 40.00 | $952.38 |
| 3828 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 8/1/2015 | 8/4/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $23.75 | 34.00 | $809.52 |
| 3832 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 8/8/2015 | 8/11/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $23.75 | 40.00 | $952.38 |
| 3832 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 8/15/2015 | 8/19/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | OT | $32.06 | 2.50 | $80.35 |
| 3834 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 8/15/2015 | 8/19/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $23.75 | 40.00 | $952.38 |
| 3834 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 8/22/2015 | 8/25/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | OT | $32.06 | 2.50 | $80.35 |
| 3840 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 8/22/2015 | 8/25/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $23.75 | 40.00 | $952.38 |
| 3840 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 8/29/2015 | 9/3/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $23.75 | 40.00 | $952.38 |
| 3842 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 9/5/2015 | 9/8/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $23.75 | 40.00 | $952.38 |
| 3845 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 9/12/2015 | 9/16/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $23.75 | 40.00 | $952.38 |
| 3847 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 9/19/2015 | 9/22/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $23.75 | 40.00 | $952.38 |
| 3849 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 9/26/2015 | 9/29/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | RT | $23.75 | 40.00 | $952.38 |
| 3853 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 10/3/2015 | 10/6/2015 | 001 | 81161 | 515080 | BGEOPLRBI | | | | | | OT | $32.06 | 7.50 | $241.05 |
| 3856 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 10/3/2015 | 10/13/2015 | 001 | 80852 | 515080 | BGEOPUPAC1 | | | | | | RT | $23.75 | 40.00 | $952.38 |
| 3859 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 10/10/2015 | 10/17/2015 | 001 | 80852 | 515080 | BGEOPUPAC1 | | | | | | OT | $32.06 | 2.50 | $80.35 |
| 3863 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 10/17/2015 | 10/20/2015 | 001 | 80852 | 515080 | BGEOPUPAC1 | | | | | | RT | $23.75 | 40.00 | $952.38 |
| 3869 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 10/24/2015 | 10/27/2015 | 001 | 80852 | 515080 | BGEOPUPAC1 | | | | | | RT | $23.75 | 40.00 | $952.38 |
| 3869 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 10/31/2015 | 11/3/2015 | 001 | 80852 | 515080 | BGEOPUPAC1 | | | | | | OT | $32.06 | 2.50 | $80.35 |
| 3873 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 11/7/2015 | 11/10/2015 | 001 | 80852 | 515080 | BGEOPUPAC1 | | | | | | RT | $23.75 | 34.00 | $809.52 |
| 3877 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 11/14/2015 | 11/17/2015 | 001 | 80852 | 515080 | BGEOPUPAC1 | | | | | | RT | $23.75 | 33.75 | $803.57 |
| 3882 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 11/14/2015 | 11/21/2015 | 001 | 80852 | 515080 | BGEOPUPAC1 | | | | | | OT | $32.06 | 2.50 | $80.35 |
| 3882 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 11/21/2015 | 11/24/2015 | 001 | 80852 | 515080 | BGEOPUPAC1 | | | | | | RT | $23.75 | 40.00 | $952.38 |
| 3890 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 11/28/2015 | 12/1/2015 | 001 | 80852 | 515080 | BGEOPUPAC1 | | | | | | RT | $23.75 | 25.50 | $607.14 |
| 3897 | 11990 | 050044 | Bolden, Harry | 0 | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility SGC-OSF | 12/5/2015 | 12/8/2015 | 001 | 80852 | 515080 | BGEOPUPAC1 | | | | | | RT | $23.75 | 34.00 | $809.52 |

USCA4 Appeal: 23-2195   Doc: 25   Filed: 04/01/2024   Pg: 429 of 444



USCA4 Appeal: 23-2195   Doc: 25   Filed: 04/01/2024   Pg: 430 of 444

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S | T | U | V | W |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 80 | 3901 | 11990 | 050044 | Bolden, Harry | 0 | | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 12/12/2015 | 12/15/2015 | 001 | | 80852 | 515080 | BGECUPAC1 | | | | | OT | $32.06 | 2.50 | $80.35 |
| 81 | 3901 | 11990 | 050044 | Bolden, Harry | 0 | | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 12/12/2015 | 12/15/2015 | 001 | | 80852 | 515080 | BGECUPAC1 | | | | | RT | $23.75 | 40.00 | $952.38 |
| 82 | 3907 | 11990 | 050044 | Bolden, Harry | 0 | | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 12/19/2015 | 12/22/2015 | 001 | | 80852 | 515080 | BGECUPAC1 | | | | | OT | $32.06 | 2.50 | $80.35 |
| 83 | 3907 | 11990 | 050044 | Bolden, Harry | 0 | | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 12/19/2015 | 12/22/2015 | 001 | | 80852 | 515080 | BGECUPAC1 | | | | | RT | $23.75 | 40.00 | $952.38 |
| 84 | 3911 | 11990 | 050044 | Bolden, Harry | 0 | | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 12/26/2015 | 12/29/2015 | 001 | | 80852 | 515080 | BGECUPAC1 | | | | | RT | $23.75 | 25.50 | $607.14 |
| 85 | 3919 | 11990 | 050044 | Bolden, Harry | 0 | | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 1/2/2016 | 1/5/2016 | 001 | | 80852 | 515080 | BGECUPAC1 | | | | | RT | $23.75 | 34.00 | $809.52 |
| 86 | 3923 | 11990 | 050044 | Bolden, Harry | 0 | | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 1/9/2016 | 1/12/2016 | 001 | | 80852 | 515080 | BGECUPAC1 | | | | | OT | $32.06 | 0.50 | $16.07 |
| 87 | 3923 | 11990 | 050044 | Bolden, Harry | 0 | | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 1/9/2016 | 1/12/2016 | 001 | | 80852 | 515080 | BGECUPAC1 | | | | | RT | $23.75 | 40.00 | $952.38 |
| 88 | 3927 | 11990 | 050044 | Bolden, Harry | 0 | | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 1/16/2016 | 1/19/2016 | 001 | | 80852 | 515080 | BGECUPAC1 | | | | | OT | $32.06 | 2.50 | $80.35 |
| 89 | 3927 | 11990 | 050044 | Bolden, Harry | 0 | | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 1/16/2016 | 1/19/2016 | 001 | | 80852 | 515080 | BGECUPAC1 | | | | | RT | $23.75 | 40.00 | $952.38 |
| 90 | 3931 | 11990 | 050044 | Bolden, Harry | 0 | | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 1/23/2016 | 1/26/2016 | 001 | | 80852 | 515080 | BGECUPAC1 | | | | | OT | $32.06 | 1.00 | $32.14 |
| 91 | 3931 | 11990 | 050044 | Bolden, Harry | 0 | | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 1/23/2016 | 1/26/2016 | 001 | | 80852 | 515080 | BGECUPAC1 | | | | | RT | $23.75 | 40.00 | $952.37 |
| 92 | 3938 | 11990 | 050044 | Bolden, Harry | 0 | | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 1/30/2016 | 2/2/2016 | 001 | | 80852 | 515080 | BGECUPAC1 | | | | | RT | $23.75 | 32.25 | $767.85 |
| 93 | 3942 | 11990 | 050044 | Bolden, Harry | 0 | | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 2/6/2016 | 2/9/2016 | 001 | | 80852 | 515080 | BGECUPAC1 | | | | | RT | $23.75 | 39.00 | $928.56 |
| 94 | 3946 | 11990 | 050044 | Bolden, Harry | 0 | | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 2/13/2016 | 2/16/2016 | 001 | | 80852 | 515080 | BGECUPAC1 | | | | | RT | $23.92 | 25.50 | $611.46 |
| 95 | 3994 | 11990 | 050044 | Bolden, Harry | 0 | | BILLING CLERK IV | Andrews Sr, Brian J | SGC-Office Storage Facility | SGC-OSF | 4/23/2016 | 4/26/2016 | 001 | | 80852 | 515080 | BGECUPAC1 | | | | | RT | $23.92 | 0.00 | $0.00 |

BGE A00174
JA424

# Exhibit E

# Exhibit E

**JA425**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| HARRY A. BOLDEN, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *   Civil Case No.:  1:21-cv-02295-JRR |
| | * |
| CAEI INC., et al., | * |
| | * |
| | * |
| Defendants. | * |

---/

**PRODUCTION LOG**

| Bates | Document | Responsive to: |
|---|---|---|



**JA426**



| MCCR.0001-.0340 | Bolden's Maryland Commission on Civil Rights File | #3, #6 |

**JA427**

# Exhibit F

# Exhibit F

**JA428**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

HARRY A. BOLDEN,                          *
                                          *
        Plaintiff,                        *
                                          *
v.                                        *   Civil Case No.: 1:21-cv-02295-JRR
                                          *
CAEI INC., et al.,                        *
                                          *
                                          *
        Defendants.                       *
_____/

## DEFENDANT BALTIMORE GAS AND ELECTRIC COMPANY'S ANSWERS TO
## PLAINTIFF'S FIRST SET OF INTERROGATORIES

Defendant, Baltimore Gas and Electric Company ("Defendant" or "BGE"), by its undersigned counsel, hereby answers Plaintiff's First Set of Interrogatories (hereinafter "Plaintiff's Interrogatories").

## PRELIMINARY STATEMENT



**JA429**



## <u>INTERROGATORIES</u>

**Interrogatory No. 1:**    Identify all persons who are likely to have personal knowledge of any fact alleged in the complaint or in your answer to the complaint, and state the subject matter of the personal knowledge possessed by each such person. (Discovery Guidelines STANDARD INTERROGATORY NO. 6)

3

**OBJECTION:** 

**ANSWER:** Subject to and without waiving the foregoing objection, Defendant identifies the following individuals as having knowledge pertaining to the factual allegations in Plaintiff's Complaint or Defendant's Answer:

6. **Brian Andrews**, current Director of Strategic Initiatives; Former Manager of Customer Care. Mr. Andrews has knowledge of BGE's relationship with CAEI; and the call center collections project on which Plaintiff worked. Mr. Andrews should only be contacted through undersigned counsel.

**JA431**

5

**JA432**



Date:   November 4, 2022                     Respectfully submitted,


                                                     /s/
                         Lindsey A. White (Bar No. 29183)
                         Veronica Yu Welsh (Bar No. 10024)
                         SHAWE ROSENTHAL LLP
                         One South Street, Suite 1800
                         Baltimore, Maryland 21202
                         Telephone: (410) 752-1040
                         Facsimile: (410) 752-8861
                         white@shawe.com
                         vyw@shawe.com

                         *Attorneys for Defendant*

**JA433**

## **VERIFICATION**

I, Unae Hutchinson, Principal HR Business Partner, on behalf of Defendant, Baltimore Gas and Electric Company, hereby certify under penalty of perjury that Defendant's Answers to Plaintiff's First Set of Interrogatories are true and correct to the best of my information, knowledge and belief.

_Unae Hutch_

Unae Hutchinson

With respect to objections only:

Respectfully submitted,

_/s/_

Lindsey A. White (Bar No. 29183)
Veronica Yu Welsh (Bar No. 10024)
SHAWE ROSENTHAL LLP
One South Street, Suite 1800
Baltimore, Maryland 21202
Telephone: (410) 752-1040
Facsimile: (410) 752-8861
white@shawe.com
vyw@shawe.com

*Attorneys for Defendant*

12

**JA434**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 4th day of November 2022, a true and correct copy of Defendant Baltimore Gas and Electric Company's Answers to the Plaintiff's Interrogatories to Defendant was served via electronic mail upon:

> Joseph D. Allen
> Simms Showers, LLP
> 201 International Circle, Suite 230
> Baltimore, MD 21030
> jdallen@simmsshowers.com
>
> *Attorney for Plaintiff*

_____/s/_____
Veronica Yu Welsh

#1044865

**JA435**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

Harry Bolden                                    *

                                                *

     **v.**                                    *        **Case No.**   21-cv-02295-JRR

CAEI, Inc., et al.                              *

                                                *

### NOTICE OF APPEAL

Notice is hereby given that     Harry Bolden           ,
<span style="font-size:smaller">(fill in names of **all** parties who are appealing)</span>

      Plaintiff         in the above captioned case, hereby appeals to the
<span style="font-size:smaller">(indicate plaintiff's or defendant/s)</span>

United States Court of Appeals for the Fourth Circuit    ORDER
<span style="font-size:smaller">(indicate order or judgment)</span>

the entered in this case on    September 12, 2023     .

  October 6, 2023

Date

                               Harry Bolden

Signature

                               Harry Bolden

Printed Name and Bar Number

                               213 Westshire Road #2
                               Baltimore, MD 21229

Address

                               bolden.harry@yahoo.com

Email Address

                               410-967-6723

Telephone Number

Fax Number

<span style="font-size:smaller">Notice of Appeal (06/2016)</span>

**JA436**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**HARRY A. BOLDEN**

    *Plaintiff,*

    **v.**

**CAEI, INC.,** *et al.,*

    *Defendants.*

        **Civil No. JRR-21-02295**

## <u>ORDER</u>

The court has before it Plaintiff's Motion for Reconsideration of Summary Judgment at ECF No. 52 (the "Motion"). The court has examined all submissions and no hearing is necessary. Local Rule 106.5 (D. Md. 2023).

The court is not persuaded to reconsider its entry of summary judgment in Defendants' favor. Notwithstanding Plaintiff's assertion that "Plaintiff has discovered new evidence not available at the time of summary judgment" (Motion at 3), the documents on which Plaintiff relies were exchanged in discovery and/or part of the underlying administrative record. Further, while the court appreciates that Plaintiff disagrees with the court's analysis and conclusions of law, Plaintiff's Motion seeks to relitigate previously litigated issues, which the court declines to do based on previously available evidence. Even were the documents on which Plaintiff rests his Motion in fact "newly discovered" or genuinely unavailable to Plaintiff at the time summary judgment papers were filed, the court is unpersuaded that they generate a dispute of material fact, even when viewed in a light most favorable to Plaintiff as the non-movant. In addition, the court discerns no clear error of law on its part; nor does the court agree with Plaintiff that summary judgment in Defendants' favor (and denial of the Motion) operates a manifest injustice.

**JA437**

It is, therefore, this 12th day of November 2023:

**ORDERED** that Plaintiff's Motion for Reconsideration of Summary Judgment at ECF No. 52 shall be, and is hereby, **DENIED.**

_____ /s/
Julie R. Rubin
United States District Judge

**JA438**